# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | |
|---|---|
| IN RE: FIRE APPARATUS ANTITRUST LITIGATION | MDL No. 3179 |
| | Case No. 2:26-md-03179-WCG |
| | Hon. William C. Griesbach |
| | **INDIRECT PURCHASER PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **<u>JURY TRIAL DEMANDED</u>** |

011328-11/5017095 V1

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | PARTIES | 10 |
| | A. Plaintiffs | 10 |
| |     1. City of Arcadia | 10 |
| |     2. City of Ann Arbor | 11 |
| |     3. Claverack Fire District | 12 |
| |     4. Commack Fire District | 12 |
| |     5. Durango Fire Protection District | 13 |
| |     6. City of Fountain Valley | 14 |
| |     7. City of Fullerton | 15 |
| |     8. City of La Crosse | 16 |
| |     9. City of Las Vegas | 17 |
| |     10. City of Middletown | 18 |
| |     11. City of Milwaukee | 18 |
| |     12. City of New Brighton | 20 |
| |     13. City of Onalaska | 21 |
| |     14. City of Raleigh | 21 |
| |     15. City of Ridgeland | 22 |
| |     16. City of Rochester | 22 |
| |     17. Unified Government of Wyandotte County / Kansas City | 24 |
| |     18. The Water Witch Company | 25 |
| | B. Defendants | 26 |
| |     1. REV Group | 26 |
| |     2. Oshkosh Corporation and Pierce Manufacturing, Inc. | 30 |

011328-11/5017095 V1

3. Rosenbauer America LLC......................................................................... 31

4. The Fire Apparatus Manufacturers' Association...................................... 34

5. Unnamed Defendants and Co-Conspirators............................................. 35

6. Agents and Affiliates .............................................................................. 35

III. JURISDICTION AND VENUE ........................................................................ 36

IV. FACTUAL ALLEGATIONS .............................................................................. 38

A. The Fire Apparatus Industry Was Diverse and Comprised of Many Independent Sellers Until Approximately 2008, When the Great Recession Devastated the Industry.................................................. 38

B. REV Group, Oshkosh, and Rosenbauer Start Rolling Up Fire Apparatus Manufacturers.................................................................... 39

1. REV Group ............................................................................... 39

2. Oshkosh..................................................................................... 51

3. Rosenbauer................................................................................ 53

C. Manufacturer Defendants Seek to Cooperate Rather Than Compete. ................................................................................................ 54

D. Manufacturer Defendants Exchange Confidential, Competitively Sensitive Information Through FAMA.................................................. 56

1. FAMA statistical reports and industry updates. ....................... 57

a. The Data & Research Committee. ................................. 57

b. Defendants share competitively sensitive and thorough information through FAMA. ........................ 58

c. FAMA's data is confidential and kept to its members, which include Defendants. ........................... 65

2. FAMA meetings. ....................................................................... 67

E. Manufacturer Defendants Further Colluded by Communicating through Pricing Consortiums ............................................................... 72

F. The Conspiracy Enabled Defendants to Suppress Supply and Raise Prices of Fire Apparatus in Parallel During the Class Period. ................................................................................................ 75

011328-11/5017095 V1

1. Manufacturer Defendants' backlogs soared in parallel during the Class Period. ................................................................. 75

2. Despite increasing demand, Manufacturing Defendants decided against increasing their manufacturing capacity.......................... 81

3. The price of Fire Apparatus doubled during the Class Period. ................................................................................................... 84

4. Manufacturer Defendants used "floating prices" during the class period to charge even more for Fire Apparatus........................... 85

G. Defendants' Conspiracy Had the Intended Effect of Increasing Each Manufacturers' Prices, Leading to Historic Profit Margins and Revenues. .................................................................................... 88

H. Market Power and Barriers to Entry. .................................................... 93

1. Relevant markets.......................................................................... 93

2. The product market encompasses all Fire Apparatus. .............................. 93

3. The geographic market is the United States. ............................................ 96

4. Manufacturer Defendants have market power in the relevant markets....................................................................................... 96

5. High barriers to entry in the Fire Apparatus manufacturing market protect Manufacturer Defendants' market shares. ........................ 97

I. Plaintiffs and Other Class Members Have Been Harmed as a Result of the Conspiracy ......................................................................... 98

1. Plaintiffs and other Class members have overpaid for Fire Apparatus as a result of Defendants' anticompetitive behavior........................................................................................... 98

2. Inflated prices and long backlogs have prevented Plaintiffs and the other Class members from timely replacing old vehicles in their Fire Apparatus fleets, and their fleets have suffered as a result........................................................... 99

3. Reduced Fire Apparatus fleets are less able to respond to disasters........................................................................................ 105

4. Plaintiffs and Class members have also suffered harm because they have had to redirect funds toward

011328-11/5017095 V1

purchasing Fire Apparatus that they would have otherwise put toward other essential needs. ............................................................ 110

V.      CLASS ACTION ALLEGATIONS ..................................................................111

     A.     All Requirements of Federal Rule of Civil Procedure 23(a) Are Met. ................................................................................................... 112

     B.     All Requirements of Federal Rule of Civil Procedure 23(b)(3) Are Met. ................................................................................................... 113

VI.     ANTITRUST INJURY ............................................................................. 115

VII.    FRAUDULENT CONCEALMENT & EQUITABLE TOLLING ................................. 115

VIII.   CONTINUING VIOLATION .................................................................. 117

IX.     HOLD-AND-USE ................................................................................... 118

X.      CLAIMS FOR RELIEF ......................................................................... 119

FIRST CLAIM FOR RELIEF: RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE  SHERMAN ACT, 15 U.S.C. § 1  (On Behalf of the Nationwide Class for Injunctive and Equitable  Relief Against All Defendants) ............................................................................................... 119

SECOND CLAIM FOR RELIEF: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION  (on behalf of the Nationwide Class for injunctive and equitable relief) ............................................... 120

THIRD CLAIM FOR RELIEF: VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18 (AGAINST REV GROUP) ....................................... 123

FOURTH CLAIM FOR RELIEF: CONNECTICUT ANTITRUST ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Connecticut) ................................................................................................ 124

FIFTH CLAIM FOR RELIEF: MICHIGAN ANTITRUST REFORM ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Michigan) ................................................................................................... 124

SIXTH CLAIM FOR RELIEF: MISSISSIPPI ANTITRUST LAW (On Behalf of State Law Class Members that Purchased Fire Apparatus in Mississippi) ..................... 125

SEVENTH CLAIM FOR RELIEF: NEW YORK DONNELLY ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in New York) ................................................................................................... 125

011328-11/5017095 V1

EIGHTH CLAIM FOR RELIEF: VIOLATION OF WISCONSIN STATE ANTITRUST LAW, WIS. STAT. ANN. § 133.01, *et seq.* (On Behalf of the State Law Class Members that Purchased Fire Apparatus in Wisconsin) ............................................................................................... 126

NINTH CLAIM FOR RELIEF: ALABAMA ANTITRUST LAW (On Behalf of State Law Class Members that Purchased Fire Apparatus in Alabama) ......................... 127

TENTH CLAIM FOR RELIEF: ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Alaska) ........................................................ 127

ELEVENTH CLAIM FOR RELIEF: ARKANSAS DECEPTIVE TRADE PRACTICES ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Arkansas) ............................................................. 128

TWELFTH CLAIM FOR RELIEF: ARIZONA ANTITRUST ACT (On Behalf of State Law Class Members That Purchased Fire Apparatus in Arizona) ...................... 130

THIRTEENTH CLAIM FOR RELIEF: ARIZONA CONSUMER FRAUD ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Arizona) ................................................................................................... 130

FOURTEENTH CLAIM FOR RELIEF: CALIFORNIA CARTWRIGHT ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in California) ................................................................................................. 131

FIFTEENTH CLAIM FOR RELIEF: CALIFORNIA UNFAIR COMPETITION LAW (On Behalf of State Law Class Members that Purchased Fire Apparatus in California) ............................................................................. 132

SIXTEENTH CLAIM FOR RELIEF: COLORADO STATE ANTITRUST ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Colorado) ............................................................................................. 133

SEVENTEENTH CLAIM FOR RELIEF: COLORADO CONSUMER PROTECTION ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Colorado) ............................................................. 134

EIGHTEENTH CLAIM FOR RELIEF: DISTRICT OF COLUMBIA ANTITRUST ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in the District of Columbia) ................................................. 135

NINETEENTH CLAIM FOR RELIEF: DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in the District of Columbia) ................................................................................................. 136

011328-11/5017095 V1

TWENTIETH CLAIM FOR RELIEF: FLORIDA DECEPTIVE AND UNFAIR
TRADE PRACTICES ACT (On Behalf of State Law Class Members
that Purchased Fire Apparatus in Florida) ........................................................ 137

TWENTY-FIRST CLAIM FOR RELIEF: HAWAII ANTITRUST LAW (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Hawaii).............................................................................................................. 138

TWENTY-SECOND CLAIM FOR RELIEF: ILLINOIS ANTITRUST ACT (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Illinois).............................................................................................................. 138

TWENTY-THIRD CLAIM FOR RELIEF: ILLINOIS CONSUMER FRAUD &
DECEPTIVE BUSINESS PRACTICES ACT (On Behalf of State Law
Class Members that Purchased Fire Apparatus in Illinois)............................... 139

TWENTY-FOURTH CLAIM FOR RELIEF: IOWA COMPETITION LAW (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Iowa) ................................................................................................................. 140

TWENTY-FIFTH CLAIM FOR RELIEF: KANSAS RESTRAINT OF TRADE
ACT (On Behalf of State Law Class Members that Purchased Fire
Apparatus in Kansas) ........................................................................................ 141

TWENTY-SIXTH CLAIM FOR RELIEF: MAINE ANTITRUST LAW (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Maine)................................................................................................................ 141

TWENTY-SEVENTH CLAIM FOR RELIEF: MARYLAND ANTITRUST
ACT (On Behalf of State Law Class Members that Purchased Fire
Apparatus in Maryland) .................................................................................... 142

TWENTY-EIGHTH CLAIM FOR RELIEF: MARYLAND CONSUMER
PROTECTION ACT (On Behalf of State Law Class Members that
Purchased Fire Apparatus in Maryland) ........................................................... 142

TWENTY-NINTH CLAIM FOR RELIEF: MASSACHUSETTS CONSUMER
PROTECTION ACT (On Behalf of State Law Class Members that
Purchased Fire Apparatus in Massachusetts).................................................... 143

THIRTIETH CLAIM FOR RELIEF: MINNESOTA ANTITRUST LAW (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Minnesota) ........................................................................................................ 145

THIRTY-FIRST CLAIM FOR RELIEF: MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT (On Behalf of State Law Class
Members that Purchased Fire Apparatus in Minnesota).................................... 145

011328-11/5017095 V1

THIRTY-SECOND CLAIM FOR RELIEF: MONTANA UNFAIR TRADE
PRACTICES & CONSUMER PROTECTION ACT (On Behalf of State
Law Class Members that Purchased Fire Apparatus in Montana) .................................. 146

THIRTY-THIRD CLAIM FOR RELIEF: NEBRASKA JUNKIN ACT (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Nebraska) .............................................................................................................................. 147

THIRTY-FOURTH CLAIM FOR RELIEF: NEBRASKA CONSUMER
PROTECTION ACT (On Behalf of State Law Class Members that
Purchased Fire Apparatus in Nebraska) ............................................................................ 148

THIRTY-FIFTH CLAIM FOR RELIEF: NEVADA ANTITRUST ACT (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
Nevada) ................................................................................................................................. 148

THIRTY-SIXTH CLAIM FOR RELIEF: NEVADA DECEPTIVE TRADE
PRACTICES ACT (On Behalf of State Law Class Members that
Purchased Fire Apparatus in Nevada) ............................................................................... 149

THIRTY-SEVENTH CLAIM FOR RELIEF: NEW HAMPSHIRE ANTITRUST
LAW (On Behalf of State Law Class Members that Purchased Fire
Apparatus in New Hampshire) ........................................................................................... 150

THIRTY-EIGHTH CLAIM FOR RELIEF: NEW HAMPSHIRE CONSUMER
PROTECTION ACT (On Behalf of State Law Class Members that
Purchased Fire Apparatus in New Hampshire) ................................................................. 151

THIRTY-NINTH CLAIM FOR RELIEF: NEW JERSEY ANTITRUST ACT
(On Behalf of State Law Class Members that Purchased Fire Apparatus
in New Jersey) ...................................................................................................................... 152

FORTIETH CLAIM FOR RELIEF: NEW MEXICO ANTITRUST ACT (On
Behalf of State Law Class Members that Purchased Fire Apparatus in
New Mexico) ........................................................................................................................ 152

FORTY-FIRST CLAIM FOR RELIEF: NEW MEXICO UNFAIR PRACTICES
ACT (On Behalf of State Law Class Members that Purchased Fire
Apparatus in New Mexico) ................................................................................................. 153

FORTY-SECOND CLAIM FOR RELIEF: NORTH CAROLINA ANTITRUST
LAW (On Behalf of State Law Class Members that Purchased Fire
Apparatus in North Carolina) ............................................................................................. 154

FORTY-THIRD CLAIM FOR RELIEF: NORTH DAKOTA UNIFORM STATE
ANTITRUST ACT (On Behalf of State Law Class Members that
Purchased Fire Apparatus in North Dakota) ..................................................................... 155

011328-11/5017095 V1

FORTY-FOURTH CLAIM FOR RELIEF: OREGON ANTITRUST LAW (On Behalf of State Law Class Members that Purchased Fire Apparatus in Oregon) ............................................................................................ 155

FORTY-FIFTH CLAIM FOR RELIEF: OREGON UNFAIR TRADE PRACTICES ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Oregon) ................................................ 156

FORTY-SIXTH CLAIM FOR RELIEF: RHODE ISLAND ANTITRUST ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Rhode Island) ............................................................ 157

FORTY-SEVENTH CLAIM FOR RELIEF: RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Rhode Island) ............................................................................................ 158

FORTY-EIGHTH CLAIM FOR RELIEF: SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in South Carolina) ............................ 159

FORTY-NINTH CLAIM FOR RELIEF: SOUTH DAKOTA ANTITRUST LAW (On Behalf of State Law Class Members that Purchased Fire Apparatus in South Dakota) ............................................................ 160

FIFTIETH CLAIM FOR RELIEF: SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION STATUTE (On Behalf of State Law Class Members that Purchased Fire Apparatus in South Dakota) ............................................................................................ 160

FIFTY-FIRST CLAIM FOR RELIEF: TENNESSEE FAIR TRADE PRACTICE ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Tennessee) ............................................ 161

FIFTY-SECOND CLAIM FOR RELIEF: UTAH ANTITRUST ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in Utah) ............................ 162

FIFTY-THIRD CLAIM FOR RELIEF: VERMONT ANTITRUST LAW (On Behalf of State Law Class Members that Purchased Fire Apparatus in Vermont) ............................................................................................ 162

FIFTY-FOURTH CLAIM FOR RELIEF: WEST VIRGINIA ANTITRUST ACT (On Behalf of State Law Class Members that Purchased Fire Apparatus in West Virginia) ............................................................ 163

FIFTY-FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT (on behalf of the State Law Class) ............................................................................................ 164

Case 2:26-md-03179-WCG    Filed 06/16/26    Page 9 of 179    Document 108
011328-11/5017095 V1

REQUEST FOR RELIEF ................................................................................................ 164

DEMAND FOR JURY TRIAL ...................................................................................... 165

Case 2:26-md-03179-WCG    Filed 06/16/26    Page 10 of 179    Document 108

011328-11/5017095 V1

1. Plaintiffs bring this action on behalf of themselves and a proposed class of all others similarly situated who purchased Fire Apparatus[1] made by any of the Manufacturer Defendants[2] from a retailer, dealer or other method that does not include direct purchases from the manufacturers (the "Indirect Purchaser Class") from January 1, 2016 to the present ("the Class Period").

2. Defendants are the Oshkosh Corporation ("Oshkosh"); Pierce Manufacturing, Inc. ("Pierce"); the REV Group, LLC (formerly, REV Group, Inc.), ("REV Group"); Rosenbauer America LLC ("Rosenbauer"); Rosenbauer South Dakota, LLC; Rosenbauer Minnesota, LLC; and the Fire Apparatus Manufacturers' Association ("FAMA"). All named Defendants are collectively referred to as "Defendants" and any successors, agents, assigns of these named entities. Any unnamed, not yet identified co-conspirators with the Defendants are referred to as "Unnamed Co-Conspirator Defendants."

3. Plaintiffs bring this action against Defendants under Section 1 of the Sherman Act, Section 7 of the Clayton Act, and under state antitrust law and common law. Plaintiffs seek treble damages and all other monetary remedies available under the applicable antitrust laws to compensate them and the class for losses associated with the anti-competitive conduct alleged herein. Plaintiffs also seek injunctive relief that will restore free and fair competition to the nation's Fire Apparatus market , as well as restitution, disgorgement, and

---

[1] Fire Apparatus is defined consistently with NFPA 1900 industry standard as "a vehicle designed to be used under emergency conditions to transport personnel and equipment or to support the suppression of fires or mitigation of other hazardous conditions."

[2] "Manufacturer Defendants" refers to Oshkosh Corporation; Pierce Manufacturing, Inc.; REV Group, Inc.; and Rosenbauer America LLC; including as they acted through, or by directing or controlling, any of their subsidiaries.

011328-11/5017095 V1

civil penalties to the full extent authorized by law. Plaintiffs demand a trial by jury on their damage claims.

## I.    INTRODUCTION

4. Fire Apparatus prices have doubled in the last ten years. A Fire Apparatus that cost $500,000 in the mid-2010s now costs $1 million, and a more specialized Fire Apparatus that used to cost $900,000 now costs more than $2 million. Cost increases and inflation alone do not explain these price increases, which have squeezed municipal budgets and prevented communities from replacing their old Fire Apparatus. At the same time, wait times for a new Fire Apparatus have ballooned from 18 months in the mid-2010s to more than four years today.

5. As a result of high prices and long order backlogs, Fire Apparatus that should have been retired after 15 or 20 years are now celebrating their 30th "birthdays" on the front lines. These older trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. When fires break out and no Fire Apparatus are available to respond, these gaps can have deadly consequences. And even communities that have been able to purchase new Fire Apparatus have had to redirect funds from other priorities to cover the price increases.

6. These dangerous and financially devastating conditions for communities across the United States were created by three main players—the Manufacturer Defendants—who collectively control approximately 70 percent of the United States Fire Apparatus market. The Manufacturer Defendants relied on the industry's relatively inelastic demand to artificially create long backlogs of orders from fire departments. In a competitive market, this behavior would be an open invitation for a competitor to increase production and offer competitive pricing to steal their customers. That did not happen. Instead, Manufacturer

011328-11/5017095 V1

Defendants exploited their dominant position and conspired to raise prices almost twofold and restrict output rather than compete.

7. The Manufacturer Defendants shared competitively sensitive information to facilitate their scheme through another entity, FAMA, an exclusive trade organization to which they belonged. This information—sensitive and nonpublic output and pricing data that would not be shared in a competitive market—helped provide the certainty and stability crucial to carrying out the scheme. As it told its members, FAMA is "here to maximize profits of FAMA member companies."[3] Consistent with that candid declaration, FAMA's data is not available to consumers, fire departments, or any other group that does not qualify for its membership. FAMA also held regular meetings attended by the Manufacturer Defendants, which provided ample opportunity to collude.

8. Defendants additionally facilitated their ability to effectively collude through an ongoing quest to acquire and consolidate independent makers of Fire Apparatus. Defendant REV Group led the charge. While owned and operated by a New York private equity firm, it rolled up several independent manufacturers and, in the process, obtained a monopoly in the market for custom Fire Apparatus cab chassis, the single largest cost component in the production of Fire Apparatus. REV Group's owners deployed a business strategy to restrict supply to promote long wait times, known as "backlogs," for the delivery of Fire Apparatus. These delays, which stretched from a year when the conduct began to more than four years as of last year, allowed REV Group to artificially increase prices and prop up REV Group's

---

[3] Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, FIRE APPARATUS MFRS. ASS'N, 2, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

011328-11/5017095 V1

stock price at the expense of municipalities like Plaintiffs and other class members that need safe and reliable Fire Apparatus.

9. Thanks to their anticompetitive conduct, Manufacturer Defendants have been able to increase their margins and boost total profits, all without concern that their competitors will try to steal market share. Nor are Manufacturer Defendants concerned that potential new entrants would compete on price and availability, because high barriers to entry prevent new competitors from coming into the market. And while the increased prices are hurting local governments, Manufacturer Defendants' CEOs and shareholders have profited greatly from the orchestrated backlogs and inflated prices.

10. REV Group executives celebrated the success of their price fixing activities and exorbitant price hikes as "price realization" to investors and bragged about doubling profits through supply restriction and price hikes. In 2018, instead of lamenting hefty backlogs, REV Group's then-CEO Tim Sullivan told investors: "We like backlog, we love backlog," and his successor boasted in 2022 that under his tenure "our backlog for fire apparatus has tripled, growing by over $1 billion."[4] By 2024, REV Group backlogs soared to $4.2 billion in undelivered orders. Similarly, in 2022, Oshkosh CEO John Pfeifer celebrated the backlogs the Oshkosh Defendants were able to engineer, describing a $660 million quarterly backlog as "another record backlog,"[5] later advertising to investors that "[w]e have the strongest

---

[4] REV Group, Inc. (REVG) Q2 2023 Earnings Call Transcript, https://seekingalpha.com/article/4610397-rev-group-inc-revg-q2-2023-earnings-call-transcript (last visited March 23, 2026).

[5] Oshkosh (0KDI.L) Q1 2023 Earnings Call, https://mlq.ai/stocks/0KDI.L/earnings-call-transcript/Q1-2023/ (last visited March 23, 2026).

backlog we've ever had in Fire & Emergency" [6] and bragging that "Pierce's backlog is at an all-time high up more than 80 percent compared to the prior year."[7] In a competitive market companies would be racing to eliminate backlog to improve market share and increase profit. That did not happen here.

11. Defendants' conduct has not gone unnoticed. By early 2025, both congressional and FTC investigations had commenced to examine the Fire Apparatus manufacturing industry. For example, on April 15, 2025, in a bipartisan effort, Senators Elizabeth Warren (D-Massachusetts) and James Banks (R-Indiana) sent a letter to Edward A. Kelly, General President, International Association of Fire Fighters, seeking information regarding "the impacts of private equity roll-ups of Fire Apparatus manufacturers, and the adverse impact of this consolidation on fire fighter and public safety."[8] And on September 10, 2025, representatives from Pierce and REV Group were called before the United States Senate Subcommittee for Disaster Relief at a hearing on Capitol Hill and questioned regarding industry price fixing and the devastating effect that the inflated prices were having on the local governments and their fire departments.

12. As these investigations have started to reveal, this dangerous situation was not created by inflation or other natural market forces. Instead, these market conditions were

---

[6] OSK Q2 2022 Earnings Call Transcript, https://tickertrends.io/transcripts/OSK/Q2-earnings-transcript-2022 (last visited March 23, 2026).

[7] Oshkosh (OSK) Q3 2022 Earnings Call, https://mlq.ai/stocks/OSK/earnings-call-transcript/Q3-2022/ (last visited March 23, 2026).

[8] Letter from Senator Elizabeth Warren and Senator Jim Banks to Edward Kelly, General President, International Association of Fire Fighters (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf (last visited March 23, 2026).; *see also* Mike Baker, Senators Investigate Private Equity Role in Soaring Fire-Truck Costs, New York Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equityfire-trucks-congress-investigation.html (last visited March 23, 2026).

011328-11/5017095 V1

created by Defendants' anticompetitive, illegal and coordinated schemes to monopolize the Fire Apparatus market in order to first control, and then restrict, supply and unlawfully drive-up prices to generate profits.

13. The move to dominate the market began around 2008 when private equity firm American Industrial Partners ("AIP") saw an opportunity in a diverse and diffuse market that could be exploited because of its captive customers who must purchase Fire Apparatus to provide lifesaving services to their constituents. Put otherwise, AIP saw that if the market could restrain competition, supply could be restricted and prices hiked with customers having no choice but to pay those exorbitant prices.

14. Starting in 2008, AIP began its scheme by purchasing a larger player in the market, E-One, Inc. and combining it with four other companies to create a vehicle for monopolization called Allied Specialty Vehicles ("ASV"). ASV was later rebranded to become Defendant REV Group. AIP hired Tim Sullivan as CEO and tasked him with implementing an "Operating Agenda" to monopolize the market through the REV Group,[9] make as much profit as the companies could and then sell out in a "successful public exit" for AIP and its shareholders.[10] AIP maintained control over the REV Group and its Board of Directors and directed and participated in its unlawful anti-competitive schemes until it sold its stake in 2024.[11]

---

[9] REV Group, Inc., Amendment No. 4 to Form S-1 Registration Statement (Jan. 17, 2017), https://www.sec.gov/Archives/edgar/data/1687221/000119312517010592/d251368ds1a.htm (last visited June 16, 2026).

[10] *Id.*

[11] *See* RV Business, *REV Group Reports Q2 Results, Updates Fiscal 2024 Outlook* (June 6, 2024), https://rvbusiness.com/rev-group-reports-q2-results-updates-fiscal-2024-outlook/

011328-11/5017095 V1

15. Between 2016 and 2024, AIP and the REV Group found numerous competitors in the marketplace willing to participate in the scheme to restrain competition, including Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara") and Spartan Emergency Response ("Spartan") who had already acquired Smeal Fire Apparatus, Ladder Tower Company, and US Tanker Fire Apparatus ("UST"). AIP and REV Group consolidated these market competitors under a single umbrella of REV Group. In the process, REV Group obtained a monopoly in the market for custom Fire Apparatus cab chassis, the single largest cost component in the production of Fire Apparatus.[12]

16. AIP and the REV Group sold their scheme to investors by marketing itself as an experienced "Experienced Consolidator."

17. Enormous profits followed as AIP and the REV Group picked off competitors, restricted supply, hiked prices and extracted as much revenue as possible from the REV Group, cutting operations and cutting investment in the business of producing the life-saving products they manufactured. Indeed, while paying hundreds of millions of dollars to AIP and REV Group investors, AIP and the REV Group shuttered manufacturing facilities and production hubs.[13]

18. The massive profits AIP and the REV Group shareholders were able to reap were not a byproduct of a superior business model but were generated by unlawful backlogs and price hikes. In fact, by 2024, REV Group backlogs soared to $4.2 billion in undelivered

---

[12] *See, e.g.,* REV Group, Inc., Vehicles for Life, Jefferies Industrial Conference, SEEKING ALPHA (Aug. 9, 2017), https://seekingalpha.com/article/4097458-rev-group-revg-presents-at-jefferies-13th-annual-industrials-conferenceslideshow (last visited Jan. 26, 2026) (pie chart showing chassis as at least 25% of the cost of a Fire Apparatus)

[13] *See, e.g.*, Rev Group Closing Plants in Virginia, Pennsylvania, Milwaukee Business Journal (Sep. 14, 2021), https://www.bizjournals.com/milwaukee/news/2021/09/14/rev-group-closing-plants-in-virginia-pennsylvania.html (last visited June 15, 2026)

011328-11/5017095 V1

orders and AIP and REV Group had hiked prices by 50-100%. REV Group executives celebrated these exorbitant price hikes as "price realization" to investors and bragged that about doubling profits through supply restriction and price hikes that "you bring them [acquired companies] into the fold, you got to give them religion, and they've got it now."[14]

19. Defendants also have imposed "floating" price clauses that allow them to increase prices from the date of order to account for increased costs incurred during the extended wait time for new Fire Apparatus.[15] For Defendants, this is a financial win-win. They not only manipulate the supply/demand equilibrium, they reap additional profit from their own delays. As REV Group's then CEO, Tim Sullivan, stated in 2017, "my entire career has always been about making money" and "[y]ou should know that at REV, it's all about making money."[16]

20. The Oshkosh Defendants were similarly successful. Indeed, by 2022, Oshkosh CEO John Pfeifer celebrated the backlogs the Oshkosh Defendants engineered, describing a $660 million quarterly backlog as "another record backlog," later advertising to investors that "[w]e have the strongest backlog we've ever had in Fire & Emergency" and bragging that "Pierce's backlog is at an all-time high up more than 80% compared to the prior year." At the same time, Oshkosh was touting that it "maintains leading market share in nearly all of its

---

[14] https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html (last visited June 16, 2026); https://investors.terex.com/news/news-details/2026/Terex-Reports-First-Quarter-2026-Results/default.aspx (last visited June 16, 2026).

[15] Letter from Kansas State Rep. Lynn Melton to U.S. Sen. Josh Hawley, dated September 4, 2025; Letter from Chad A. Russell, President, Kansas State Ass'n of Fire Chiefs to the Honorable Members of the Kansas Congressional Delegation, dated July 29, 2025, https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf.

[16] REV Group, Inc. Q4 2017 Earnings Call Transcript, SEEKING ALPHA (Dec. 20, 2017), https://seekingalpha.com/article/4133124-revs-revg-ceo-tim-sullivan-on-q4-2017-results-earnings-call-transcript (last visited Jan. 26, 2026).

businesses" and that "Pierce maintains the largest North American fire apparatus distribution network."[17]

21. Once Defendants were successful in shrinking the Fire Apparatus market to only a few large players, they were then able to unlawfully conspire to ensure supply was restricted and unlawfully fix prices.

22. Defendants had created a market where only three companies control approximately 70 percent of the U.S. Fire Apparatus market. But the participants in this oligopoly needed each other to ensure supply remained restricted and prices remained artificially high. So Defendants began to work together, using Defendant industry organization Fire Apparatus Manufacturers' Association ("FAMA") as a vehicle to improperly share information about supply and price among competitors and further their conspiracy to restrict supply and artificially elevate prices. Manufacturer Defendants used FAMA to share sensitive, non-public economic data, a practice that normally does not exist in a competitive market, to collude on supply restriction and price. FAMA collects and sends competitive information to an outside consulting company, which compiles the data into reports that FAMA then distributes to its members, including primarily Defendants. FAMA additionally provides a forum for Manufacturer Defendants to communicate with each other directly during yearly members-only meetings.

23. Indirect Purchaser Plaintiffs ("IPPs") and putative indirect Class members are public entities who bought Fire Apparatus indirectly—for example, through a dealer or cooperative—from a Manufacturer Defendant who passed on the artificially high price that was a result of the anticompetitive conduct.

---

[17] 2022 10K, at 2, 88.

011328-11/5017095 V1

24. IPPs and Class members are among the local governments and political subdivisions that have been damaged by Defendants' illegal conduct and had their residents put at risk. Plaintiffs and Class members have paid artificially inflated prices for Fire Apparatus during the Class Period that exceeded the amount they would have paid if the price for Fire Apparatus had been determined by a competitive market. Plaintiffs seek equitable and monetary relief, and to restore competition in the marketplace.

## II. PARTIES

### A. Plaintiffs

#### 1. City of Arcadia

25. Plaintiff City of Arcadia ("Arcadia") is a city of approximately 54,472 residents located in Los Angeles County, California.

26. Arcadia provides fire protection, emergency medical services, hazardous-materials response, rescue operations, and other emergency services through the Arcadia Fire Department. In 2025, the Department responded to over 6,100 calls for service. The Department maintains and operates a fleet of fire apparatus and emergency-response vehicles that are essential to protecting Arcadia's residents, businesses, and public infrastructure.

27. Arcadia has purchased multiple Fire Apparatus from Manufacturer Defendants during the Class Period, both indirectly and directly. The Fire Apparatus that Arcadia purchased were sold at artificially inflated prices due to the conduct by Defendants alleged herein. Arcadia has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

28. In December 2016, Arcadia purchased a new Pierce triple-combination pumper, mounted on an Arrow XT Chassis (Engine 105), directly from Pierce Manufacturing for $718,854.53. Arcadia received this Fire Apparatus in September 2017.

011328-11/5017095 V1

29. In August 2019, Arcadia purchased a new Pierce Arrow XT triple-combination pumper (Engine 106) from Pierce-authorized dealer, South Coast Fire Equipment, Inc., for $788,649.41. Arcadia received this Fire Apparatus in March 2020.

30. In July 2021, Arcadia purchased a new Pierce Arrow XT triple-combination pumper (Engine 107) from Pierce-authorized dealer, South Coast Fire Equipment, Inc., for $844,451.87. Arcadia received this Fire Apparatus in February 2023.

31. In July 2024, Arcadia purchased a new Pierce Enforcer 107-foot Tractor Drawn Aerial ladder truck (New Truck 105) from Pierce-authorized dealer, South Coast Fire Equipment, Inc., for $1,933,871.57. Arcadia is still awaiting delivery of this Fire Apparatus; South Coast Fire Equipment, Inc. informed Arcadia that the expected delivery is early 2027.

32. Because of Defendants' conduct, Arcadia has paid artificially inflated prices for Fire Apparatus and experienced substantial delays in the delivery of critical emergency response vehicles.

**2. City of Ann Arbor**

33. Plaintiff City of Ann Arbor ("Ann Arbor") is located in southeast Michigan with a population of approximately 121,000 people.

34. Throughout the Class Period, Ann Arbor purchased Fire Apparatus from separate authorized dealers of the Manufacturer Defendants. As a direct result of Defendants' conduct alleged herein, Ann Arbor purchased these Fire Apparatus at artificially inflated prices and suffered antitrust injury.

35. On June 14, 2022, Ann Arbor executed a purchase order with Halt Fire, Inc. for a 2022 Pierce Custom Enforcer A Pumper Fire Apparatus for a price of $662,453.00.

36. On February 4, 2025, Ann Arbor executed a purchase order with Halt Fire, Inc. for a Fire Tiller Pierce 107 Tractor Aerial Mounted for a price of $2,384,695.00.

011328-11/5017095 V1

37. Ann Arbor has received delivery of the 2022 Pierce Custom Enforcer A Pump Fire Apparatus. It awaits delivery of the Fire Tiller Pierce 107 Tractor Aerial Mounted.

38. Ann Arbor also executed a purchase order with the REV Group's authorized dealer West Shore Fire Inc. On July 7, 2023, Ann Arbor executed a purchase order with West Shore Fire Inc. for a 2025 E-One Typhoon Engine for a price of $830,000.00. Nearly two and a half years after execution of the purchase order, Ann Arbor still awaits delivery of the E-One truck.

### 3. Claverack Fire District

39. Plaintiff Claverack Fire District ("Claverack") is a fire department located in Claverack, New York. They are a municipal entity. Since January 1, 2016, Claverack has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Claverack purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Claverack has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

40. In 2025, Claverack purchased a Pierce Rescue Engine for $1,683,030 from Firematic Supply Co. Inc.

### 4. Commack Fire District

41. Plaintiff Commack Fire District ("Commack") is a fire district located in Commack, New York. Since January 1, 2016, the Commack Fire District has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Commack purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Commack has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

42. In 2018, Commack purchased two Pierce Enforcer Pumpers for $1,250,000.

43. Between 2022-2023, Commack purchased through a lease-purchase agreement 2 Pierce Enforcer Pumpers for $1,390,656.66 and 1 Pierce Enforcer Aerial for $1,843,252.

**5.     Durango Fire Protection District**

44. Plaintiff Durango Fire Protection District ("Durango") provides all hazard responses to 325 square miles of La Plata County, Colorado, as well as the City of Durango.

45. Since January 1, 2016, Durango has indirectly purchased Manufacturer Defendants' Fire Trucks through Front Range Fire Apparatus Ltd., a dealer in Frederick, Colorado.

46. In June 2019, Durango purchased a Spartan ER S-180 Pumper for $790,546.00.

47. In April 2020, Durango purchased a demonstrator BME Type 3 Fire Engine built on a 2018 Freightliner chassis for $317,000.00. 21.

48. In August 2022, Durango purchased a Pierce Enforcer Pumper for $691,885.00 that included a 100% Prepay discount of $16,295.00. The delivery time was 18.5 to 20.5 months. Leading up to the purchase, in a July 21, 2022 email to Durango's Fire Chief, the Pierce dealer, Front Range Fire Apparatus, Ltd.'s President/Owner, Duane Doucette, stated: "Over the last 20 plus years we have been use to 8 to 10 month deliveries and annual increase of 2.5 to 3% but it seems just overnight it has changed to 30 month deliveries and several 3% to 5% increases a year."  Durango's Chief had earlier explained in a July 21, 2022, email: "We understand supply chain issues, etc., and that it isn't the end users or sales fault. However, it also isn't the taxpayers' fault in our district who have to foot the bill. . . We would love any insight, guidance, or thoughts from you on what the future looks like for apparatus, as we cannot continue to afford these types of increases."  This was in response to a July 14, 2022, email from Front Range Fire Apparatus, Ltd., "Just a warning, before you open the attachment the costs are ugly."

011328-11/5017095 V1

49. In September 2022, Durango purchased a BME International Type 3 truck for $404,684.00.

50. In October 2022, Durango purchased a Pierce Freightliner 4x4 Tactical Tender for $414,114.00, that included a $2,500.00 prepayment discount.

51. In September 2023, Durango purchased a Pierce Enforcer Pumper for $801,287.97

52. In February 2024, Durango purchased a Pierce Freightliner 4x4 Pumper for $528,619.00.

53. In October 2024, Durango purchased a Pierce Enforcer 107' Ascendant Ladder Truck for $1,703,674.73, which included a $435,000 100% prepayment discount.

54. In December 2024, Durango purchased a Pierce Enforcer Pumper for $878,284.79.  This truck was identical to the September 2023 purchase 15 months earlier, but at a nearly 10% price increase -- despite Durango's $20,000.00 prepayment discount.

55. In March 2025, Durango purchased a Pierce Freightliner 4x4 Pumper for $614,241.06.

56. In January 2026, Durango purchased a Pierce Enforcer PUC for $1,061,045.00 that included a $40,000 prepayment discount.

57. The Fire Apparatus Durango purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Durango has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

**6.     City of Fountain Valley**

58.     Plaintiff City of Fountain Valley ("Fountain Valley") is a city in California. Since January 1, 2016, Fountain Valley has indirectly purchased Fire Apparatus from Manufacturer Defendants, through South Coast Fire Equipment.

59. The Fire Apparatus that Fountain Valley purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Fountain Valley has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

60. In 2016, Fountain Valley purchased a Pierce Engine for $561,248. This Fire Apparatus was received approximately 16 months later. In 2020, Fountain Valley purchased a Pierce Ladder Truck for $1,514,132. This Fire Apparatus was received approximately 16 months later.

61. In 2021, Fountain Valley purchased a Pierce Engine for $820,419. This Fire Apparatus was received approximately 27 months later.

62. In 2025, Fountain Valley purchased a Pierce Engine for $1,089,146. The build time is estimated to be 44 months, meaning that Fountain Valley will not receive this Fire Apparatus until at least 2028. If the cost for materials has increased in the interim, then Fountain Valley may have to pay more for this Fire Apparatus that is currently on order.

### 7. City of Fullerton

63. Plaintiff City of Fullerton ("Fullerton") is a city in California. Since January 1, 2016, Fullerton has indirectly purchased Fire Apparatus from Manufacturer Defendants through South Coast Fire Equipment. The Fire Apparatus that Fullerton purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Fullerton has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint. By way of example, in just the last four years, Fullerton has purchased several Fire Apparatus.

64. In 2023, Fullerton purchased a Pierce Quint for $2,206,022. The build time for this Fire Apparatus is estimated to be 44 months, meaning that Fullerton will not receive this

011328-11/5017095 V1

Fire Apparatus until at least 2027. If the cost for materials has increased in the interim, then Fullerton may have to pay more for this Fire Apparatus that is currently on order.

65. In 2023, Fullerton purchased a Pierce Engine for $1,169,061. The build time for this Fire Apparatus is estimated to be 43 months, meaning that Fullerton will not receive this Fire Apparatus until at least 2027. If the cost for materials has increased in the interim, then Fullerton may have to pay more for this Fire Apparatus that is currently on order.

66. In 2023, Fullerton purchased a Pierce Engine for $1,206,003. The build time for this Fire Apparatus is estimated to be 48 months, meaning that Fullerton will not receive this Fire Apparatus until at least 2027. If the cost for materials has increased in the interim, then Fullerton may have to pay more for this Fire Apparatus that is currently on order.

**8. City of La Crosse**

67. Plaintiff City of La Crosse ("La Crosse") is a city of 52,680 people located on Wisconsin's western border.[18] The Fire Apparatus that La Crosse purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. La Crosse has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

68. La Crosse has purchased multiple Fire Apparatus from Manufacturer Defendants for its fire department since 2016. Among these are two Pierce Arrow XT aerial trucks, a Pierce Saber pumper tanker,[19] two Pierce Ultimate Configuration ("PUC") pumper trucks,

---

[18] *Welcome to La Crosse!*, LA CROSSE WISCONSIN, https://www.cityoflacrosse.org/city-services/about-la-crosse-wisconsin (last visited Aug. 19, 2025).

[19] *Fire Wiki*, FANDOM.COM, https://fire.fandom.com/wiki/La_Crosse_Fire_Department_(Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).

011328-11/5017095 V1

and a Spartan truck[20] purchased from Reliant Fire Apparatus, Inc. La Crosse has also purchased a Rosenbauer Panther 4x4 for its airport.

### 9. City of Las Vegas

69. Plaintiff the City of Las Vegas ("Las Vegas") is the most populous city in the state of Nevada, with approximately 678,924 residents. It is the seat of Clark County, which also contains Henderson and North Las Vegas, as well as the Las Vegas Strip, Nellis Air Force Base, and Hoover Dam. Las Vegas features world-famous Downtown Las Vegas, known for its main street with a vast array of dining and entertainment options. While the Las Vegas Strip is just outside its city limits, Las Vegas is itself a major travel destination with an estimated 41.7 million visitors annually.

70. The Las Vegas Fire & Rescue Department ("LVFRD") provides all fire suppression, prevention, and education programs in Las Vegas as well as paramedic emergency medical services to the residents and visitors of Las Vegas community. It is an I.S.O. Class One fire department, with 21 stations covering 150 square miles in Clark County and neighboring areas. The LVFRD also has a Bomb Squad, Hazardous Materials Team, and Technical Rescue Team that provides services for Las Vegas and the rest of Clark County. In total, the LVFRD serves upwards of 2 million residents throughout the City of Las Vegas metropolitan area. From 2020-2024, the LVFRD responded to approximately 76,000 fire incidents per year, or just over 200 incidents every day.

71. Las Vegas has purchased multiple Fire Apparatus from Defendants during the relevant period. In September 2021, Las Vegas ordered four Pierce Engines for a purchase price of $721,429 each and a Pierce Truck for a purchase price of $1,203,119. Those vehicles

---

[20] *Id.*

011328-11/5017095 V1

were delivered to the LVFRD in July 2023 after a twenty-two-month wait. Then in October 2022, Las Vegas ordered five trucks, including four Pierce Engines for a purchase price of $905,130.75 each, and a Pierce Truck for a purchase price of $1,541,891. Those vehicles have yet to be delivered. And in July 2023, Las Vegas ordered three Pierce Engines for a purchase price of $1,016,653.33 each. Those vehicles were finally delivered to the LVFRD in April 2025 after a twenty-one-month wait.

72. Because of Defendants' conduct, Plaintiff has experienced lengthy wait times and paid artificially-inflated prices for Fire Apparatus. Plaintiff has suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### 10. City of Middletown

73. Plaintiff City of Middletown ("Middletown") is a city in Connecticut. Since January 1, 2016, Middletown has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Middletown purchased was sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Middletown has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

74. In April 2023, Middletown purchased a Spartan/Smeal 75' Quint Fire Apparatus for $1,140,941 from New England Fire Equipment & Apparatus Corporation.

### 11. City of Milwaukee

75. Plaintiff City of Milwaukee ("Milwaukee") is the largest city in Wisconsin and home to nearly 600,000 residents. Since January 1, 2016, Milwaukee has purchased Fire Apparatus from dealers of Manufacturer Defendants for the Milwaukee Fire Department. The Fire Apparatus that Milwaukee purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Milwaukee has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

011328-11/5017095 V1

76. Between 2016 and 2025, Milwaukee purchased 19 Fire Apparatus for a total cost of approximately $20 million dollars.

77. In 2016, Milwaukee purchased two Pierce Fire Engines from Reliant for $551,034.50 each.

78. In 2019, Milwaukee purchased two Pierce Fire Engines from Reliant for $499,994.00 each.

79. In 2019, Milwaukee purchased a Pierce Heavy Rescue from Reliant for $909,970.00.

80. In 2020, Milwaukee purchased two Pierce Aerial Platforms from Reliant for $1,285,025.00 each.

81. In 2021, Milwaukee purchased a Pierce Aerial Platform from Reliant for $1,285,025.00.

82. In 2022, Milwaukee purchased a Pierce Fire Engine from Reliant for $643,782.00.

83. In 2023, Milwaukee purchased two Pierce Fire Engines from Reliant for $755,958.75 each.

84. In 2024, Milwaukee purchased three REV E-One Fire Engines from Fire Services, Inc. for $987,771.00 each.

85. In January 2025, Milwaukee purchased three REV E-One Fire Engines from Fire Services, Inc. for $1,104,400.00 each. To date, these Fire Engines have not been delivered. If the cost of materials increases over the next few years, then Milwaukee will have to pay more for these Fire Apparatus that are currently on order.

011328-11/5017095 V1

86. In June 2025, Milwaukee purchased two REV E-One Ladder Trucks from Fire Services, Inc. for $1,857,972.88 each. To date, the Ladder Trucks have not been delivered. If the cost of materials increases over the next few years, then Milwaukee will have to pay more for these Fire Apparatus that are currently on order.

**12. City of New Brighton**

87. Plaintiff City of New Brighton ("New Brighton") has a fire department as part of its Public Safety Department located in New Brighton, Minnesota. New Brighton is a municipal entity. Since January 1, 2016, New Brighton has indirectly purchased Fire Apparatuses from Manufacturer Defendants. The Fire Apparatus that New Brighton purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. New Brighton has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

88. In 2016, New Brighton purchased a 2016 Rosenbauer Commander Pumper for $549,752.00 from Rosenbauer Minnesota, LLC.

89. In 2019, New Brighton purchased a Rosenbauer 78' Viper Aerial for $845,191.00 from Rosenbauer Minnesota, LLC.

90. In 2019, New Brighton purchased a Rosenbauer Ford F-350 Mini-Rescue for $123,455.00 from Midway Ford (Ford F-350 chassis) and Rosenbauer Minnesota, LLC (body).

91. In 2026, New Brighton purchased a Rosenbauer Commander Pumper for $1,134,627.00 from Rosenbauer Minnesota, LLC.

92. New Brighton made all of the above purchases through a purchasing cooperative, Sourcewell.

011328-11/5017095 V1

### 13. City of Onalaska

93. Plaintiff City of Onalaska ("Onalaska") is a city in Wisconsin. Since January 1, 2016, Onalaska has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Onalaska purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Onalaska has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

94. In 2018, Onalaska purchased a Pierce Impel Engine for $550,593. The build time for this Fire Apparatus was 11 to 12 months.

95. In 2021, Onalaska purchased a Pierce Impel Ladder Truck for $989,170. The build time for this Fire Apparatus was 12.5 to 14.5 months.

96. In 2025, Onalaska purchased a Pierce Velocity Pumper Tanker for $1,119,921. The build time is estimated to be 52 to 55 months, meaning that Onalaska will not receive this Fire Apparatus until at least 2029. If the cost for materials increases over the next 4 to 5 years, then Onalaska will have to pay more for this Fire Apparatus that is currently on order.

### 14. City of Raleigh

97. Plaintiff City of Raleigh, North Carolina ("Raleigh") is a municipal entity. Since January 1, 2016, Raleigh has indirectly purchased Fire Apparatus from Manufacturer Defendants for the Raleigh Fire Department. The Fire Apparatus that Raleigh purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Raleigh has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

98. Since 2016, Raleigh has purchased four Spartan Fire Apparatus for more than $3.7 million through Atlantic Coast Fire Trucks LLC. Specifically, Raleigh ordered four engines on June 8, 2023, through the HGAC cooperative purchasing program.

011328-11/5017095 V1

99. Since 2016, Raleigh has purchased thirty-six Pierce Fire Apparatus for more than $31 million through Atlantic Emergency Solutions, Inc.

### 15. City of Ridgeland

100. Plaintiff City of Ridgeland ("Ridgeland") is a city in Mississippi. Since January 1, 2016, Ridgeland has indirectly purchased Fire Apparatus from Manufacturer Defendants. The Fire Apparatus that Ridgeland purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Ridgeland has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

101. On July 10, 2017, Ridgeland purchased a Pierce 2017 Enforcer Pumper with equipment for $409,354 from Emergency Equipment Professionals.

102. On October 1, 2019, Ridgeland purchased a 2020 Pierce Enforcer Customer Pumper for $592,800 from Emergency Equipment Professionals.

103. On October 10, 2024, Ridgeland purchased a Pierce New Ladder Truck for $1,336,786.60 from Emergency Equipment Professionals.

104. On October 10, 2024, Ridgeland also purchased a 2026 Pierce Saber Custom Pumper for $866,698 from Emergency Equipment Professionals.

### 16. City of Rochester

105. Plaintiff City of Rochester ("Rochester") is a municipal corporation organized under the laws of the State of New York. Rochester is located in Monroe County, New York, and has approximately 211,000 residents. The City's principal offices are located at City Hall, 30 Church Street, Rochester, New York, 14614.

106. Since 2019, Rochester has contracted for the purchase of several fire trucks, both directly with REV Group subsidiary E-ONE and through an authorized dealer,

011328-11/5017095 V1

Premier Fire Apparatus, Inc.; as well as at least one fire truck from Rosenbauer through an authorized dealer, Empire Emergency Apparatus.

107. These orders include several different types of apparatus including pumpers, aerials, and rescue units, and total millions of dollars in expenditures. But on information and belief, deliveries of these essential apparatus were and are delayed by Defendants' unlawful scheme, and the prices paid by Plaintiff were increased.

108. Rochester has purchased multiple Fire Apparatus manufactured by Defendants during the relevant period. In December 2019, Rochester purchased two E-ONE Fire Apparatus for the purchase price of $517,696 each.

109. In July 2020, Rochester purchased an E-ONE Fire Apparatus for the purchase price of $677,832.

110. In January 2021, Rochester purchased three E-ONE Fire Apparatus for the purchase price of $536,958 each.

111. In September 2021, Rochester purchased two E-ONE Fire Apparatus for the purchase price of $526,958 each.

112. In February 2023, Rochester purchased an E-ONE Fire Apparatus for the purchase price of $689,000.

113. In April of 2023, Rochester purchased a Spartan Fire Apparatus for the purchase price of $444,645.

114. In April of 2024, Rochester purchased a Rosenbauer Fire Apparatus for the purchase price of $888,417.

115. In November of 2024, Rochester purchased two E-ONE Typhoon pumpers for the purchase price of $1,478,462 each.

011328-11/5017095 V1

116. In November 2025, Rochester purchased two E-ONE pumper trucks for the purchase price of $978,815 each.

117. Because of Defendants' conduct, Plaintiff has experienced lengthy wait times and paid artificially-inflated prices for Fire Apparatus. Plaintiff has suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

**17.     Unified Government of Wyandotte County / Kansas City**

118. Plaintiff the Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government" or "Plaintiff") is a consolidated city and county government located on the eastern border of the State of Kansas. Wyandotte County is home to the cities of Kansas City, Bonner Springs, and Edwardsville. Kansas City is the third largest city in Kansas with approximately 153,345 residents.

119. The Kansas City Kansas Fire Department ("KCKFD") is the fire protection arm of the Unified Government. It has 80 vehicles in its fleet and operates 18 fire stations. The KCKFD serves as the primary protector of approximately 128 square miles of response area, providing emergency services to the citizens of Kansas City, Kansas, as well as multifuel tank farms, manufacturing plants, and other high-risk facilities. The KCKFD is designed to be an all-hazards fire department capable of handling nearly every type of emergency — medical, fire, rescue, or hazardous materials incident. The KCKFD responded to approximately 37,000 incidents in 2025, or just over 100 incidents every day, and has an ever-increasing workload of about 4% each year.

120. The Unified Government has purchased multiple Fire Apparatus from Defendants during the relevant period. For example, in January 2022, the Unified Government purchased a Pierce Pumper from Pierce authorized dealer Conrad Fire Equipment for a base price of $530,667 and a final purchase price of $702,694. That vehicle

011328-11/5017095 V1

was finally delivered to the KCKFD in February 2024 after a 25-month wait. And in February 2023, the Unified Government purchased a Pierce Pumper from Pierce authorized dealer Conrad Fire Equipment for a base price of $671,796 and a final purchase price of $857,500. That vehicle was delivered in July 2025 after a 29-month wait.

### 18. The Water Witch Company

121. Plaintiff Water Witch Fire Company ("Water Witch") is a 100% volunteer department responsible for providing Fire, Rescue, and EMS coverage for the Port Deposit, Woodlawn, and Conowingo areas in the state of Maryland. Water Witch's coverage area spans roughly forty square miles and includes approximately 10,000 residents. Water Witch currently has three fire stations and operates two engines, one trunk, one tanker, one rescue engine, two brush trucks, three boats, three ambulances, and three utility vehicles.

122. Water Witch has purchased multiple Fire Apparatus from Defendants during the relevant time period. Water Witch's most recent purchase occurred on April 14, 2026, when it entered into an agreement with Pierce authorized dealer Atlantic Emergency Solutions, Inc. to purchase a Pierce Heavy-Duty Pumper on a Pierce Enforcer Custom Chassis for $1,380,510. The purchase agreement anticipates delivery within 1,470 days—a potential forty-eight-month wait. Because of Defendants' conduct, Plaintiff has experienced lengthy wait times and paid artificially inflated prices for Fire Apparatus. Plaintiff has suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

011328-11/5017095 V1

### B. Defendants

#### 1. REV Group

123. REV Group, LLC (previously known as REV Group Inc.) ("REV Group") is incorporated in Delaware and is headquartered in Brookfield, Wisconsin, in the Milwaukee, Wisconsin area.[21]

124. REV Group manufactures Fire Apparatus under multiple brand names, including: E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower").[22] 113 dealers nationwide sell Fire Apparatus from these brands across all 50 states. Additionally, REV Group sells Spartan cabs and chassis to approximately 40 smaller builders.[23]

125. REV Group currently operates manufacturing plants in Ocala, Florida; Hamburg, New York; Nesquehoning, Pennsylvania; Ephrata, Pennsylvania; Brandon, South Dakota; Charlotte, Michigan; Snyder, Nebraska; and Holden, Louisiana.[24]

---

[21] Rev Group, Inc. SEC Form 10K (Oct. 31, 2023), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (last visited Aug. 15, 2025).

[22] *REV Group Invests in Its Ephrata Facility to Increase Aerial and TDA Apparatus Production*, FIREAPPARATUSMAGAZINE.COM (Feb. 28, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-its-ephrata-facility-to-increase-aerial-and-tda-apparatus-production (last visited Aug. 15, 2025).

[23] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited Aug. 15, 2025).

[24] *Who We Are*, REVGROUP.COM, https://revgroup.com/who-we-are (last visited Aug. 15, 2025).

Case 2:26-md-03179-WCG    Filed 06/20/26    Page 36 of 179    Document 108
011328-11/5017095 V1

126. Of the roughly $3 billion in annual Fire Apparatus sales in the United States, REV Group captures approximately $1 billion, or at least 33 percent of the total.[25] In 2024, REV Group's full year net income was $257.6 million.[26]

127. In October, 2025, months after this lawsuit was filed, REV Group announced it was merging into, and becoming a wholly owned subsidiary of, Terex Corporation.[27] That merger was announced as complete on February 2, 2026.[28] While REV Group is no longer trading on the New York Stock Exchange and is a wholly owned subsidiary of Terex, upon information and belief it will continue to do business as REV Group.

128. E-ONE is a fire apparatus and custom chassis manufacturer formed in 1974. In the mid-1980s E-ONE had become the largest fire apparatus builder in the United States. In 2008, AIP acquired E-ONE for $20 million, which AIP later combined with KME, Ferrara, and Spartan to form REV Group. E-ONE is a wholly- owned subsidiary of REV Group incorporated under the laws of the state of Delaware and headquartered in Ocala, Florida.

---

[25] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (last visited Aug. 15, 2025) (hereinafter "Musharbash").

[26] Julie Nuernberg, *REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results*, REVGROUP.COM (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results (last visited Aug. 15, 2025).

[27] https://rvbusiness.com/rev-group-announces-strategic-merger-with-terex-corp/ (last visited March 23, 2026).

[28] https://investors.terex.com/news/news-details/2026/TEREX-AND-REV-GROUP-COMPLETE-MERGER-CREATING-A-PREMIER-SPECIALTY-EQUIPMENT-MANUFACTURER/default.aspx (last visited March 23, 2026).

129. KME along with KME Global, LLC, KME Holdings LLC, KME RE Holdings, LLC, are wholly owned subsidiaries of REV Group. KME is a fire apparatus and custom chassis manufacturer founded in 1946. From 1946 to 2016, KME was a family-owned company that built a strong brand and reputation as a producer of high-quality fire apparatuses and custom chassis. As of 2016, KME had expanded from its humble beginnings in Pennsylvania to a company with over 800 employees, national sales, and facilities in California, New York, and Virginia. In 2016, REV Group acquired KME for $40.1 million. KME is incorporated under the laws of the state of Pennsylvania and is headquartered in Nesquehoning, Pennsylvania. KME Global, LLC is incorporated under the laws of the state of Pennsylvania and based in Pennsylvania. Both KME Holdings, LLC and KME RE Holdings LLC are incorporated under the laws of the state of Delaware and based in Pennsylvania.

130. Ferrara along with FFA Holdco., Inc., FFA Acquisition Co., Inc., Ferrara Fire Apparatus Holding Company, Inc., are wholly owned subsidiaries of REV Group. Ferrara is a fire apparatus and custom chassis manufacturer founded in 1979. Ferrara operated for years as an independent supplier; in April 2017, REV Group acquired the company for roughly $100 million. Ferrara is incorporated under the laws of the state of Louisiana and has its principal place of business in Holden, Louisiana. The Ferrara Holding Companies are each incorporated under the laws of the state of Delaware and based in Louisiana.

131. Spartan is a wholly owned subsidiary of REV Group incorporated under the laws of Nevada with its principal place of business in Brandon, South Dakota. Similarly, Smeal SFA, LLC ("Smeal SFA"), Smeal LTC, LLC ("Smeal LTC"), Smeal Holding, LLC

011328-11/5017095 V1

("Smeal Holding"), and Detroit Truck Manufacturing, LLC ("DTM") are wholly owned subsidiaries of REV Group incorporated under the laws of, and headquartered in, Michigan.is These entities do business under the Spartan, Smeal, and Ladder Tower brands. Spartan Fire, through various corporate iterations, has been manufacturing fire apparatuses and custom chassis since 1979. Smeal SFA, through various corporate iterations, has been manufacturing fire apparatuses and custom chassis since 1955. Smeal LTC, through various corporate iterations, has been manufacturing fire apparatuses since the 1970s. Spartan's predecessor, Spartan Motors, operated independently for years, until REV Group acquired the Spartan emergency response unit from Spartan Motors in February 2020 for $55 million.

132. From at least 2010 through March 2024, REV Group was steered by a private equity firm, AIP, LLC and its affiliated funds, whose equity holdings afforded them substantial influence over REV Group's operations, strategy, and board composition. As described more fully below, since at least 2010, REV Group has pursued an aggressive acquisition strategy, consolidating numerous formerly independent Fire Apparatus manufacturers into a single corporate group. As of March 2025, REV Group and its subsidiaries account for approximately 33 percent of U.S. Fire Apparatus sales, making it the dominant supplier in the market.

133. Throughout the Class Period, REV Group sold Fire Apparatus in interstate commerce in the United States and participated and continue to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

011328-11/5017095 V1

## 2. Oshkosh Corporation and Pierce Manufacturing, Inc.

134. Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin and is headquartered in Oshkosh, Wisconsin.[29]

135. Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other Fire Apparatus in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[30] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[31] Together, this dealer network sells Fire Apparatus to customers in all 50 states.

136. In late 2025, Oshkosh reported periodic net sales of $7.73 billion across all of its business lines, including Fire Apparatus manufacturing, and estimated total net sales for 2025 between $10.3 and $10.4 billion, including sales through its subsidiary Pierce. Oshkosh, including through Pierce, captures around $750 million in annual Fire Apparatus sales in the United States, or at least 25 percent of the total.[32] Oshkosh's reported 2024 fourth

---

[29] OSHKOSH CORP., FORM 10-K at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf (last visited Aug. 19, 2025).

[30] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, FIREAPPARATUSMAGAZINE.com (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology-at-ces-2025/ (last visited Aug. 15, 2025); *Tour of Pierce Manufacturing,* Inc., R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited Aug. 15, 2025).

[31] *Find a Dealer*, PIERCE.COM, https://www.piercemfg.com/find-a-dealer (last visited Aug. 15, 2025).

[32] Musharbash, *supra* note 14.

011328-11/5017095 V1

quarter net income was $153.1 million.[33] Pierce has an annual revenue of approximately $1 billion.

137.     Defendant Pierce Manufacturing Inc. ("Pierce") is Oshkosh's leading North American subsidiary and operates in Oshkosh's Vocational segment. Pierce's products include custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, elliptical tankers, and homeland security apparatuses. Pierce also manufactures its own custom chassis on which it builds its custom apparatuses. Pierce, which operates factories in Wisconsin and Florida, is incorporated under the laws of the state of Wisconsin, and its principal place of business is in Appleton, Wisconsin.

138.     The "Oshkosh Defendants" refer to Oshkosh and Pierce Defendants.

139.     Throughout the Class Period, the Oshkosh Defendants sold Fire Apparatus in interstate commerce in the United States. At all relevant times, the Oshkosh Defendants participated and continue to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

### 3.     Rosenbauer America LLC

140.     Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company

---

[33] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, OSHKOSHCORP.COM (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3 (last visited Aug. 15, 2025).

011328-11/5017095 V1

based in Austria and listed on the Vienna Stock Exchange.[34] Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.[35]

141.     Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire trucks.[36]

142.     Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[37] Together, these dealers sell Fire Apparatus to customers in all 50 states.

143.     Rosenbauer captures approximately $307 million in United States Fire Apparatus sales annually,[38] or at least 10 percent of the market.[39]

---

[34] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).

[35] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www.rosenbauer.com/en/de/rosenbauer-group/company/locations/sales-and-service-locations/rosenbauer-america-llc (last visited Aug. 15, 2025).

[36] FAMA.ORG, https://www.fama.org/members/company_profile/?id=99 (last visited Aug. 15, 2025).

[37] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer (last visited Aug. 15, 2025).

[38] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (converted to U.S. dollars from 262.9 million euros) (last visited Aug. 15, 2025).

[39] Musharbash, *supra* note 14.

011328-11/5017095 V1

144.     Significantly, Rosenbauer has a history of engaging in anticompetitive conduct in its home market. In 2011, it participated in two separate conspiracies targeting local fire departments in Europe. First, the German Federal Cartel Office (Bundeskartellamt) found Rosenbauer guilty of participating in a price fixing cartel for Fire Apparatus and fined Rosenbauer 10.5 million Euros.[40] Additionally, a Rosenbauer subsidiary admitted to participating in a ladder fire truck cartel in Europe as follows:

> The German competition authority, the Bundeskartellamt, has imposed a fine of €17.5 million on Iveco Magirus Brandschutztechnik for its involvement in anti-competitive agreements on the manufacture of turntable ladder fire fighting machines.
>
> The authority said in a statement that Metz Aerials, the German aerial ladder subsidiary of Austria's Rosenbauer, was also part of the cartel, but has not been fined because Rosenbauer informed the Bundeskartellamt of the cartel agreement in 2010 "by way of a leniency application".
>
> The Bundeskartellamt said it had referred the sales managers and CEOs involved "to the competent public prosecutor's office for examination under criminal law."
>
> In July, Iveco Magirus Brandschutztechnik said its managing director, Mr. Roel Nizet, had resigned from the company in May at his own request.
>
> The cartel agreement concerned the manufacture of fire engines with turntable ladders between 1998 and November 2007, of which Iveco and Rosenbauer have a combined market share of close to 100%, said the Bundeskartellamt.
>
> The authority said that during this period the companies' sales managers met at regular intervals and divided tenders among each other on the basis of project lists.

---

[40] *EANS-Adhoc: Rosenbauer International AG 2010 result higher than expected, due to reversal of provision / Anti-trust proceedings in Germany end with official notice of 10.5 EUR Mio. Fine*, PRESSEPORTAL (Oct. 2, 2011), https://www.presseportal.ch/de/pm/100009184/100618850 (last visited Mar. 23, 2026).

011328-11/5017095 V1

> ***The authority said that to conceal the cartel agreements, the sales managers initially communicated via prepaid mobiles and since the football world championship 2006 in a 'football code' referring to cartel meetings as 'training' and to rebates in the form of match results.***[41]

145. Throughout the Class Period, Rosenbauer sold Fire Apparatus in interstate commerce in the United States. At all relevant times, Rosenbauer participated and continues to participate in a conspiracy to fix, raise, maintain, or stabilize the prices of Fire Apparatus in the United States.

### 4. The Fire Apparatus Manufacturers' Association

146. The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[42] As of May 2025, FAMA had 55 manufacturer members,[43] including REV Group subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh subsidiary Pierce; and Rosenbauer.[44] John Schultz, the Vice President and General Manager of Pumper Products at Pierce,[45] is FAMA's vice-chair.[46]

---

[41] Murray Pollok, KHL.COM, *Iveco Magirus and Metz Aerials in German cartel ruling* https://www.khl.com/news/iveco-magirus-and-metz-aerials-in-german-cartel-ruling/1066089.article (last visited Oct. 1, 2025) (emphasis added).

[42] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/ (last visited Aug. 15, 2025).

[43] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Aug. 15, 2025).

[44] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

[45] *John Schultz*, PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Aug. 15, 2025).

[46] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

011328-11/5017095 V1

147. As of October 2025, FAMA had 135 member companies across North America. About 60 percent of FAMA's members are companies that manufacture components of a Fire Apparatus, such as a ladder or a hose. The other 40 percent of FAMA's members are companies who manufacture the Fire Apparatus itself, including the subsidiaries of Manufacturer Defendants: E-ONE, Ferrara, KME, Spartan, Pierce, and Rosenbauer—all of which are members of FAMA.

148. FAMA acted as a co-conspirator of the Manufacturer Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the other them.

### 5. Unnamed Defendants and Co-Conspirators

149. Various other persons, firms, and entities not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. Plaintiffs reserve the right to name some or all of those entities as Defendants. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators, whether or not they are named as defendants in this Consolidated Amended Complaint.

### 6. Agents and Affiliates

150. Whenever this Complaint refers to any act, deed, or transaction of any corporation or other business entity, the allegation means that the corporation or business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

151. Each Defendant acted as the agent or joint venturer of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged in this

011328-11/5017095 V1

Complaint. The acts alleged were done through Defendants and their use of Defendants' subsidiaries, affiliates, divisions, or other related entities and through their respective officers, directors, employees, agents, or representatives, who were acting within the scope of their authority and for the benefit of their respective principals.

152. To the extent that any parent companies, subsidiaries, or affiliates of Defendants participated in, facilitated, or benefitted from the conduct alleged herein, Plaintiffs reserves the right to name them as additional Defendants as their identities and roles become known through discovery.

### III. JURISDICTION AND VENUE

153. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 18 and 26. Plaintiffs brings this action under Section 4 and 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 7 of the Clayton Act (15 U.S.C. § 18).

154. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Plaintiffs' state law claims derive from the same common nucleus of operative fact as their federal claims, i.e., their federal and state claims all arise from Defendants' anticompetitive behavior in the Fire Apparatus market. Plaintiffs bring state law class claims on behalf of the State Law Class to recover actual and/or compensatory damages, treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply and increasing the price of Fire Apparatus. Plaintiffs seek damages in excess of $5,000,000.

155. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant, either directly or through the ownership and/or substantial control of

011328-11/5017095 V1

that Defendant's subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered Fire Apparatus to purchasing entities throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

156. Defendant REV Group is headquartered in this District and through its wholly owned subsidiaries, sold its products through Fire Apparatus dealers in this District.

157. Defendant Oshkosh, and Defendant Pierce, are headquartered in this District. Defendant Oshkosh, through its wholly owned subsidiaries, sold its products through Fire Apparatus dealers in this District. Defendant Oshkosh operates manufacturing facilities in this District.

158. Defendant Rosenbauer regularly sold its products through Fire Apparatus dealers in this District.

159. Defendant FAMA regularly transacts business with entities headquartered in this District related to this action, including the Manufacturer Defendants. Defendant FAMA regularly receives information from, and shares information to, these entities.

160. Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

161. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because multiple Defendants resided or transacted business in this District, are licensed to do

011328-11/5017095 V1

business or are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## IV. FACTUAL ALLEGATIONS

**A. The Fire Apparatus Industry Was Diverse and Comprised of Many Independent Sellers Until Approximately 2008, When the Great Recession Devastated the Industry.**

162. The modern Fire Apparatus manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[47] Small and midsized Fire Apparatus manufacturers—typically family-owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies.[48] Competition among these smaller firms kept Fire Apparatus prices near costs, and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand.[49] By 2008, these companies sold over 5,000 new Fire Apparatus in the United States every year.

163. For decades, the Fire Apparatus industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new Fire Apparatus prior to 2008 was around 3 percent.[50]

164. Starting in 2008, the Great Recession decimated municipal budgets, which in turn caused a drop-off in demand for new Fire Apparatus. By 2011, the market for new

---

[47] Musharbash, *supra* note 14.

[48] *Letter to FTC and DOJ re Firetrucks*, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[49] Musharbash, *supra* note 14.

[50] *Id.*

011328-11/5017095 V1

Fire Apparatus sales had fallen more than 40 percent from its peak,[51] from 5,000 a year to around 3,000 a year.[52] Many independent Fire Apparatus manufacturers folded during this period. Demand for Fire Apparatus did not fully rebound until the mid-2010s.

**B.      REV Group, Oshkosh, and Rosenbauer Start Rolling Up Fire Apparatus Manufacturers.**

### 1.      REV Group

165.      Capitalizing on the economic turbulence of the Great Recession, a midsize private-equity firm, American Industrial Partners ("AIP"), began a twelve-year long strategy to consolidate large portions of the Fire Apparatus industry ultimately under REV Group.

166.      On August 5, 2008, AIP announced that it had entered the Fire Apparatus market through AIP Fund IV's direct acquisition of E-ONE in a carveout transaction from Federal Signal Corporation. E-ONE, a leading Fire Apparatus manufacturer, became the foundation for AIP's planned roll-up of the Fire Apparatus Market. As described by an AIP managing partner at the time, E-ONE was "a premier brand name in the fire rescue market [which] has a tremendous franchise that we can build on."[53] E-ONE then manufactured and continues to manufacture a complete range of Fire Apparatus, including brush units, pumpers, and aircraft rescue and firefighting vehicles.

---

[51] Paul C. Darley, *The Fire Apparatus Market is Coming Back... Just Look at the Data*, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Aug. 15, 2025).

[52] *See id.*; Musharbash, *supra* note 14.

[53] American Industrial Partners, Acquisition of E-ONE, Inc., https://americanindustrial.com/american-industrial-partners-announces-acquisition-of-e-one-inca-subsidiary-of-federal-signal-corporation/ (last visited June 16, 2026).

011328-11/5017095 V1

167. On August 24, 2010, AIP formed REV Group's predecessor, ASV, through the combination of E-ONE with three other AIP portfolio companies.[54] With approximately $1 billion in combined revenue, ASV became an immediate market leader in specialty vehicles, including Fire Apparatus.

168. On July 9, 2014, AIP offered Timothy M. Sullivan the role of CEO of ASV, describing a partnership that could create $800 million to $1 billion in shareholder value over a three-year period. In its offer, AIP highlighted ASV's 14 manufacturing sites, $1.7 billion revenue—a 70 percent increase from just four years earlier—and market leading positions across multiple specialty vehicle categories, including fire and emergency. AIP stated that Sullivan was "ideal to lead ASV as its end markets accelerate with the recovery of municipal and discretionary consumer spending and as we prepare for a public exit of a rapidly improving business." Among Sullivan's top priorities was to assist AIP "with the purchase and integration of targeted acquisitions and preparing [REV Group] for a highly successful public exit."

169. On November 1, 2015, under AIP's ownership, direction and control, ASV changed its name to REV Group, Inc. to signal the company's planned growth strategy.[55] As Sullivan explained, "Like a revving engine letting bystanders know a car is

---

[54] AIP Announces the Formation of Allied Specialty Vehicles, Inc., American Industrial Partners (Aug. 24, 2010), https://americanindustrial.com/american-industrial-partners-announces-theformation-of-allied-specialty-vehicles-inc-a-leading-manufacturer-of-specialty-vehicles-in-northamerica/ (last visited June 16, 2026).

[55] Allied Specialty Selects REV as New Company Name, Fire Apparatus & Emergency Equipment (Nov. 2, 2015), https://www.fireapparatusmagazine.com/fireapparatus/ambulances/allied-specialty-vehicles-selects-rev-as-new-company-name/ (last visited June 16, 2026).

011328-11/5017095 V1

preparing for a quick acceleration, REV communicates to the world that we are set for growth."

170. In early 2016, under AIP's direction and active management, REV Group's corporate headquarters were relocated from Orlando, Florida to Milwaukee, Wisconsin.

171. After the rebranding, AIP accelerated its pace of rolling up Fire Apparatus manufacturers and consolidating the market through REV Group. In 2016, through AIP's expertise and long-term plan to roll-up the market, and under AIP's ownership, direction, and control, REV Group purchased KME, based in Nesquehoning, Pennsylvania for $40 million. Founded in 1946 as a family business, at the time, KME had more than 800 associates and operated in Pennsylvania, Virginia, New York, and California. KME had an "extensive independent dealer network" and produced a broad array of Fire Apparatus, including pumpers, aerials, and tankers.[56] KME still produces a broad array of Fire Apparatus, including pumpers, aerials, and tankers.

172. On February 1, 2017, AIP took REV Group public, selling 12.5 million shares at $22.00 per share for gross proceeds of $275 million. While continuing to portray its brands to fire departments as steeped in tradition and local community-building, in its prospectus, REV Group marketed itself to Wall Street rather brazenly as an "Experienced

---

[56] REV Group Acquires Kovatch Mobile Equipment, REV Group (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited June 16, 2026); Chris Mc Loone, REV Group Invests in the Strength of Fire Apparatus Brands, Fire Apparatus & Emergency Equipment (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-groupinvests-in-the-strength-of-fire-apparatus-brands/ (last visited June 16, 2026); KME Fire Apparatus Sold REV Group, Firehouse (Apr. 11, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fireapparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kmefire-apparatus-sold-to-revgroup/ (last visited June 16, 2026).

011328-11/5017095 V1

Consolidator," telling potential investors that the status quo of small and fragmented manufacturers presented "an opportunity for market leadership" and "acquisitive growth."[57]

173. REV Group's IPO was a smashing success, funneling $275 million in proceeds to REV Group and its controlling shareholders at AIP.[58] This financing enabled the roll-up strategy to proceed quickly.

174. Following the IPO, AIP retained—through the AIP Funds—approximately 70% of REV Group's outstanding shares as of December 15, 2017.[59] As one Wells Fargo analyst observed, AIP held "substantial control over corporate actions irrespective of how other shareholders vote."[60]

175. In connection with the offering, AIP entered into an amended and restated shareholders agreement ("REV Shareholders Agreement") granting AIP expansive governance rights and control over REV Group. Under the REV Shareholders Agreement, so long as AIP maintained 15% of all outstanding shares of REV Group's common stock, AIP would hold the right to exercise control over all major REV Group corporate actions, and AIP exercised all such rights.

176. Specifically, under the REV Shareholders Agreement, so long as AIP held at least 15% of REV Group's outstanding shares it would retain the ability to nominate the greater of five board members or a majority of directors, designate the Board Chairman,

---

[57] REV Group, Inc. 2017 10k, at 1, 13; https://www.sec.gov/Archives/edgar/data/1687221/000156459017025241/revg-10k_20171031.htm (last visited March 23, 2026).

[58] *See Id.* at 56.

[59] Investors.com, The New America, (Mar. 17, 2017) "This Fire Truck Maker Hopes to Catch Hot Market at Right Time," https://www.investors.com/research/the-new-america/this-ipo-looksto-transport-an-older-urbanized-population/ (last visited June 16, 2026).

[60] *Id.*

011328-11/5017095 V1

approve special dividends exceeding $10 million, approve mergers or asset sales involving more than 15% of REV Group's consolidated assets or revenues, and approve any bankruptcy proceedings or voluntary dissolution of the company or material subsidiaries.

177. Shortly after the IPO, in March 2017, under AIP's direction and control, for $100 million, REV Group completed the acquisition of another family-owned business, Ferrara Fire Apparatus, Inc., based in Holden, Louisiana. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million. Before the purchase, Ferrara was a key competitor of E-ONE in the southern United States.[61] In REV Group's own words, Ferrara was a "leading custom fire apparatus" manufacturer.

178. Dan Peters, President of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[62] Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[63] The

---

[61] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited June 16, 2026); *REV Group Acquires Ferrara Fire Apparatus, Inc.*, REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last visited June 16, 2026).

[62] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Aug. 15, 2025).

[63] *Id.*

011328-11/5017095 V1

Ferrara purchase cemented REV Group's position as a dominant Fire Apparatus manufacturer.

179.  By acquiring Ferrara, AIP ensured that REV Group enhanced its "geographic markets and its product offering, particularly with custom Fire Apparatus including pumpers, aerials, and industrial vehicles."

180.  Not satisfied with control over E-ONE, KME, and Ferrara—each a prominent Fire Apparatus brand in its own right—REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") in 2020.[64] These brands had a significant presence in the Midwest market. The acquisitions solidified REV Group's position as the top Fire Apparatus manufacturer in the United States.[65] Specifically, Spartan Emergency Response was a key acquisition, as it was and remains (as Spartan Fire today) one of only three manufacturers of custom chassis that not only use their chassis in their own apparatuses, but also supply their chassis to competing apparatus builders. By gaining control of this critical input on which many smaller competitors depended, REV Group gained effective control over the supply chain of many builders.[66]

---

[64] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Aug. 15, 2025).

[65] *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, FIREAPPARATUSMAGAZINE.COM (Feb. 3, 2020), https://www.fireapparatusmagazine.com/the-fire-station/the-station-news/rev-group-inc-completes-acquisition-of-spartan-emergency-response/ (last visited Aug. 15, 2025).

[66] After closing its acquisition of Spartan in 2020, REV Group announced that one the benefits of the transaction was that it enabled REV Group to "[e]xpan[d] into the core vertical of fire apparatus chassis and cabs." REV Group, Inc. Acquires Spartan Motors Emergency

011328-11/5017095 V1

181.     A Fire Apparatus unit consists of three major components: (a) the chassis; (b) the cab; and (c) the body. The chassis is the structure on which the rest of the Fire Apparatus components are mounted. It consists of the frame, the engine, the transmission system, the steering system, the braking system, and other structural and mechanical parts essential to operating the vehicle. The cab is the front cabin where firefights sit and from which the driver controls the Fire Apparatus. Finally, the body is the rear firefighting structure of the Fire Apparatus. The composition of the body varies with the type of Fire Apparatus, but generally includes formed or extruded compartments fitted with a variety of fire suppression equipment (fire pumps, auxiliary pumps, foaming systems, and associated equipment, etc.), rescue equipment (ladders, winches, and associated equipment), water tanks and other tools designed to serve the unit's firefighting mission.

182.     The cab and chassis components of Fire Apparatus are typically built by a single manufacturer as a combined unit called a cab chassis. Two types of cab chassis may be used in building Fire Apparatus: (a) specialty cab chassis; and (b) commercial cab chassis. Specialty cab chassis (often referred to as "custom cab chassis" in the industry) are designed specifically for fire service; they are built to comply with National Fire Protection Association ("NFPA") standards from the ground up and can be customized to meet the purchasing fire department's needs. Commercial cab chassis are standardized units designed and built for use in freight trucks and other vocational vehicles, and they cannot be

---

Response, REV GROUP, INC. (Feb. 3, 2020), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/spartan-er-acquisition-final.pdf (last visited June 16, 2026).

011328-11/5017095 V1

customized for specific fire-department needs.[67] Because specialty cab chassis can be tailored to meet a fire department's specifications and needs, they account for an estimated 60 percent of annual purchases by fire departments.[68]

183.    Before Defendants consolidated the industry, some manufacturers produced all three Fire Apparatus components in-house, but most Fire Apparatus manufacturers produced only the body in-house and subcontracted the rest to third-party suppliers. These suppliers included a number of fire-specialized cab chassis manufacturers, including Spartan from the 1970s until it expanded into body manufacturing through an acquisition in 1997. They also included the vertically integrated Fire Apparatus manufacturers, most of which were willing to supply specialty cab chassis to smaller Fire Apparatus manufacturers because they had excess capacity. As Defendants consolidated the Fire Apparatus market, however, the competitive dynamics changed. By 2020, Spartan was the last manufacturer selling specialty cab chassis to independent Fire Apparatus manufacturers on a regular basis, giving it an estimated 90% share of this market.

184.    By acquiring Spartan, REV Group also acquired this monopoly over the market for specialty cab chassis, forcing the vast majority of independent Fire Apparatus manufacturers to rely on REV Group for this critical input they need to produce their own Fire Apparatus. Very few non-Defendant manufacturers produce their own specialty cab chassis because doing so is cost-prohibitive for small manufacturers. As of 2024, only three

---

[67] Bill Adams, Custom Chassis Models and Styles, FIREAPPARATUSMAGAZINE.COM (Mar. 2, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/custom-chassis-models-and-styles/ (last visited Jan. 26, 2026).

[68] The Apparatus Architect: The Decision—Commercial vs. Custom, FIREHOUSE.COM (Mar. 1, 2020), https://www.firehouse.com/apparatus/article/21121832/the-apparatus-architect-the-decisioncommercial-vs-custom (last visited Jan. 26, 2026).

011328-11/5017095 V1

of the estimated 41 non-Defendant Fire Apparatus manufacturers in operation made their own specialty cab chassis. And, as a result of the exceptional backlogs and output restrictions alleged in this Complaint, no Fire Apparatus manufacturer who makes their own specialty cab chassis has an incentive to divert any of its cab chassis production to its rivals who would undercut their own Fire Apparatus sales.[69]

185. At the time of REV Group's acquisition, Spartan effectively conditioned its willingness to sell specialty cab chassis on the buyer's agreement not to make, or plan to make, its own specialty cab chassis. For example, in 2013, Spartan cut off Rosenbauer immediately after Rosenbauer announced plans to begin manufacturing its own cab chassis for limited types of procurements, even though Rosenbauer accounted for around 50 percent of Spartan chassis sales and was one of Spartan's oldest customers. REV Group has embraced and continued to implement this condition. Notably, the Spartan executive who first implemented this policy in 2012 and participated in the Rosenbauer cut-off in 2013 was none other than Mike Virnig, who ultimately joined REV Group in 2018, advocated for and helped execute its acquisition of Spartan in 2020, and shortly thereafter was appointed the President of REV Group's fire division.

186. The acquisition of Spartan's specialty chassis monopoly has given REV Group the power to impose cost increases on rival Fire Apparatus suppliers and otherwise limit the ability of those suppliers to compete on price. It has also given REV Group the

---

[69] *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, FULD &COMPANY, https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatusindustry/#:~:text=Stay%20ahead%20of%20your%20competition%20through (last visited Jan. 26, 2026).

011328-11/5017095 V1

power to restrain independent, non-integrated Fire Apparatus manufacturers from expanding their output in response to rising prices and growing industry backlogs.

187.    The anticompetitive effects of REV Group's specialty cab chassis monopoly are amplified by the proliferation of so-called "single manufacturer" clauses in requests for bids or proposals on Fire Apparatus procurements. Generally, these clauses state that the cab, body, and chassis of the requested Fire Apparatus must be manufactured by one firm, or by separate divisions of one firm, and prohibit the use of subcontractors for the manufacturing of the cab, chassis, or body.[70] Such clauses prevent the vast majority of non-Defendant manufacturers (who cannot produce their own cab chassis) from competing for a large number of Fire Apparatus procurements. As this limits the economic incentives of non-Defendant manufacturers to scale up production, it results in higher prices and reduced supply for all Fire Apparatus purchasers.

188.    When REV Group acquired Spartan in 2020, each of its other Fire Apparatus subsidiaries—E-ONE, KME, and Ferrara—manufactured all the specialty cab chassis used in its Fire Apparatus production. Within months of acquiring Spartan, however, REV Group directed its pre-existing subsidiaries to curtail their production of their own specialty cab chassis and start obtaining their specialty cab chassis needs from Spartan. By April 2021, REV Group was bragging to investors that it had successfully turned Spartan's specialty cab chassis into the "platform" for all of its subsidiary's Fire Apparatus offerings.[71]

---

[70] *See* Making Apparatus Specs Clear, Concise, and Consistent, FIREENGINEERING.COM (June 1, 2009), https://www.fireengineering.com/fire-apparatus/making-apparatus-specs-clear-concise-and-consistent/ (last visited Jan. 26, 2026) (providing a model RFP).

[71] Investor & Analyst Day, REV GROUP at 27-32 (April 15, 2021), https://www.sec.gov/Archives/edgar/data/1687221/000119312521117088/d152365dex991.htm (last visited June 16, 2026).

011328-11/5017095 V1

By cutting its pre-existing cab chassis capacity and absorbing Spartan's in this way, REV Group throttled the availability of chassis to the vast majority of non-Defendant Fire Apparatus manufacturers who had until then depended on Spartan for this critical input.

189. Ultimately, the challenged acquisitions unlawfully conferred upon REV Group the power to increase rival Fire Apparatus manufacturers' cost of production through its specialty cab chassis monopoly and even preclude those rivals from building and selling Fire Apparatus in the first place, to the detriment of competition and consumers. But for its acquisition by REV Group, Spartan would have remained a strong, committed source of supply, with the ability and incentive to meet the demands of non-Defendant Fire Apparatus manufacturers that have had strong economic incentives over the past five years to take advantage of massive backlogs to increase their own market share. However, when REV Group acquired Spartan, it ceased production of cab chassis at its three other subsidiaries (KME, E-ONE, and Ferrara) and absorbed Spartan's capacity internally. This alone had the effect of substantially lessening competition in the downstream market for Fire Apparatus.

190. REV Group used its market power to tamp down competition in the industry. Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[72]

191. By 2021, REV Group stopped even pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry

---

[72] Musharbash, *supra* note 14.

011328-11/5017095 V1

consolidator."[73] That same presentation highlighted a strategy that called for REV Group's subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings. REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives.[74] The investor presentation further called for the elimination of geographic overlaps between the marketing of its different Fire Apparatus brands and dealers. REV Group's Fire Apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[75]

192. REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[76]

---

[73] Investor & Analyst Day, REV GROUP at 6 (April 15, 2021), https://www.sec.gov/Archives/edgar/data/1687221/000119312521117088/d152365dex991.htm (last visited June 16, 2026).

[74] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025).

[75] Musharbash, *supra* note 14.

[76] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

011328-11/5017095 V1



*Image 1: REV Group's history of consolidation.*[77]

## 2. Oshkosh

193. Oshkosh responded to REV Group's roll-up by making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[78] BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included Fire Apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[79] Subsequent to these expansions, Oshkosh controlled a full quarter of the U.S. Fire Apparatus market.

[77] *REV Group, Inc. Presentation July 2021*, REVGROUP.COM, https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[78] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Aug. 15, 2025).

[79] *Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-

011328-11/5017095 V1

194. In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties. [80]

195. In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[81] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

196. In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[82]

---

in-bme (last visited Aug. 15, 2025); *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Aug. 15, 2025).

[80] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Aug. 15, 2025).

[81] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Aug. 15, 2025).

[82] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Aug. 15, 2025).

011328-11/5017095 V1

197. In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[83]

198. Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[84] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[85]

199. These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

### 3. Rosenbauer

200. Rosenbauer International A.G., seeing REV Group's and Oshkosh's consolidation efforts, finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer America from General Safety Equipment Corporation in June 2022.[86]

---

[83] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, PIERCEMFG.COM (Sept. 1, 20123), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment (last visited Aug. 15, 2025).

[84] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan (last visited Aug. 15, 2025).

[85] *Id.*

[86] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/pl/fr/group/presse/wirtschaftspresse/wirtschaftspresse-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).

011328-11/5017095 V1

201. In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for apparatus sales in Colorado and Wyoming.[87]

202. Rosenbauer's dealers are assigned non-overlapping territories, reducing inter-dealer competition.



*Image 2: Geographic territories of Rosenbauer dealers.[88]*

## C. Manufacturer Defendants Seek to Cooperate Rather Than Compete.

203. While rolling up independent Fire Apparatus manufacturers and tamping down competition between their own brands, Manufacturer Defendants have also sought to cooperate, rather than compete, with one another.

204. For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it ***with our***

---

[87] Rosenbauer America, *Rosenbauer Announces New Partnership with IKON Fire, LLC*, ROSENBAUERAMERICA.COM (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-llc/ (last visited Aug. 15, 2025).

[88] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer/ (last visited Aug. 15, 2025).

011328-11/5017095 V1

*competitors*, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[89]

205.     REV Group company executives have also told analysts that the company would substantially raise its profit margins and that ***other companies were doing the same***.[90]

206.     Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to ***bolster opportunities through partnerships and other alliances***." [91] He also predicted "***cooperation between like businesses*** to gain an edge in the marketplace."[92]

207.     As part of their price fixing agreement Defendants shared information on their intent to increase prices, and by how much, for time periods as narrow as six months.[93] This information allowed the Manufacturer Defendants to impose concurrent price increases

---

[89] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025) (emphasis added).

[90] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025) (emphasis added).

[91] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUSMAGAZINE.COM (Dec. 120, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025) (emphasis added).

[92] *Id*. (emphasis added).

[93] *The Fire Apparatus Industry: An Update (Report V4) April 2021*, Fire Apparatus Mfrs. Ass'n, 22, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026).

011328-11/5017095 V1

with confidence that others would follow. Indeed, the Manufacturer Defendants attributed their increased sales revenue to such price increases within the same years.[94]

**D.  Manufacturer Defendants Exchange Confidential, Competitively Sensitive Information Through FAMA.**

208.  On its site, FAMA purports that its mission is to "advance and protect the interests of the fire and emergency services community through the use of our member companies' resources."[95] FAMA's remarks in a 2022 members-only meeting, however, reveal a different goal: "The FAMA's mission states, we are here to maximize profits of FAMA member companies."[96]

209.  E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA.[97] FAMA colludes with the Manufacturer Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

---

[94] *See* REV Group 2021 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf (attributing increased revenue to price in 2021) (last visited March 23, 2026); Oshkosh 2021 Annual Report, https://www.investors.oshkoshcorp.com/media/document/22f86d57-d1cc-4871-94fb-e43f63cfe3dd/assets/Oshkosh_AR21_update_35243.pdf?disposition=inline (same) (last visited March 23, 2026); REV Group, Inc. Reports Strong Fiscal 2023 Fourth Quarter and Full Year Results, Provides Fiscal 2024 Full Year Guidance, REV Group (Dec. 13, 2023), https://investors.revgroup.com/investor-releases/2023/12-13-2023-120038628 (same but for 2023) (last visited March 23, 2026); Oshkosh 2024 Annual Report, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf?disposition=inline (same) (last visited March 23, 2026).

[95] *Mission*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/mission/ (last visited March 23, 2026).

[96] Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, FIRE APPARATUS MFRS. ASS'N, 2, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[97] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

56

011328-11/5017095 V1

### 1. FAMA statistical reports and industry updates.

210. FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. At one of its members-only meetings, a FAMA board member delivering a report on behalf of the board stated: "[W]e need to understand why companies join FAMA today."[98] The board member then proceeded to list four "primary reasons and key deliverables of FAMA"—the first on that list was "statistics."[99]

#### a. The Data & Research Committee.

211. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning."[100] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[101]

212. Since 2021, the Data & Research Committee has been led by employees of the Manufacturer Defendants. John Schultz, the current Vice Chair of the Committee, works as a Vice President for Pierce—the primary subsidiary for Defendant Oshkosh. For the last four years, Shultz has served as chairperson of the Data & Research Committee. Prior to

---

[98] Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, Fire Apparatus Mfrs. Ass'n, 2, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[99] *Id.*

[100] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

[101] *Id.*

011328-11/5017095 V1

this, the Committee was chaired by Mike Schoenberger, Director of Dealer Development for Defendant Rosenbauer. The same trend can be observed with FAMA's Board of Directors; since 2009, the following Manufacturer Defendants' employees have sat on the FAMA Board of Directors: Harold Boer, Rosenbauer; John E. Sztykiel, Spartan; Mike Power, Pierce; Phil Gerace, KME; Mike Schoenberger, Rosenbauer; Michael Moore, Pierce; John Slawson, Spartan; Jeromie Johnston, Pierce; Bert McCutcheon, Ferrara; and Gary Pacilio, E-ONE.

> **b.** **Defendants share competitively sensitive and thorough information through FAMA.**

213. The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website for the members to access.

214. Some of the types of competitively sensitive data that FAMA collects from its members and then shares are sales and shipments data.

215. The data shared through FAMA is granular. Members submit the units sold by type of apparatus and price to FAMA on a quarterly basis. Members can then view the submitted data, which includes the state where the sale occurred, and deduce the amount of apparatus other manufacturers are making and selling. FAMA even guides members on how to derive their own market share from FAMA data on the website (*see Image 3*).[102]

---

[102] 2022 Spring Meeting, FIRE APPARATUS MFRS. ASS'N, 120, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf (last visited March 23, 2026).

011328-11/5017095 V1




*Image 3: FAMA Presentation showing members how to calculate market share from the information available in FAMA's online portal*

The FAMA portal also shows pricing information for Fire Apparatus sold by members (*see*

*Image 4*).

011328-11/5017095 V1



***Image 4: FAMA online data portal displaying data for Fire Apparatus booked, including price, country, chassis type, pump type, and more (close-up versions below).[103]***

| Vehicle Classification | Country | | | Chassis | | | | Pump | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Canada | United States | Other | Commercial Hi Torque Trans (1251+ Ft/Lbs) | Commercial Lo Torque Trans (0-1250 Ft/Lbs) | Custom Hi Torque Trans (1251+ Ft/Lbs) | Custom Lo Torque Trans (0-1250 Ft/Lbs) | Mid | Rear | Fr |
| Aerial Ladder waterway 0-94 Mid. | 0 | 21 | 0 | 0 | 0 | 21 | 0 | 14 | 0 | |

| | Pump Type | | | | Axle | | Foam | | | | | Foam Type | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jone | Up To 1000 Gpm | 1250 To 1750 Gpm | 2000 + Gpm | None | Single | Tandem | Class A | Class B | Class A And B | Compressed Air | None | Automatic | Manual | None | Numbe Reporte |
| 7 | 0 | 10 | 4 | 7 | 13 | 8 | 4 | 0 | 1 | 0 | 16 | 3 | 2 | 16 | |

[103] 2022 Spring Meeting, FIRE APPARATUS MFRS. ASS'N, 118, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf (last visited March 23, 2026).

| | Foam Type | | | Totals | | |
|---|---|---|---|---|---|---|
| e | Automatic | Manual | None | Number Of Trucks Reported With Sales Price | Average | Total |
| | 3 | 2 | 16 | 14 | 911034.97 | 12754489.53 |
| | 19 | 5 | 41 | 11 | 895196.74 | 9847164.14 |

216.    As soon as 2010, FAMA's statistics committee reported to members that "they will be collecting selling price information for future reports" to member companies.[104]

217.    The data shared through FAMA is also contemporaneous and can be indexed based on time. Indeed, in a 2013 FAMA Newsletter, the then-president of FAMA instructed members that "[i]t is very important that apparatus manufacturers report as quickly as possible so that we can get these timely reports. This allows all of us to react and adjust to market conditions."[105] That newsletter was titled "A Rising Tide Lifts All Boats."

218.    Not just anyone can access FAMA's data, however. "FAMA does not release this information to the public."[106] Instead, the data is uploaded onto a secure portion

---

[104] FAMA Flyer Stoking the Fire Together, FIRE APPARATUS MFRS. ASS'N, 5, https://www.fama.org/wp-content/uploads/2015/09/1442838951_55fff9a76a7cb.pdf (last visited March 23, 2026).

[105] *FAMAflyer A rising tide lifts all boats*, FIRE APPARATUS MFRS. ASS'N, 2, https://www.fama.org/wp-content/uploads/2015/09/1442788119_55ff33177212f.pdf (last visited March 23, 2026).

[106] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

011328-11/5017095 V1

of the FAMA website that FAMA describes as a "members-only section."[107] "Only those companies that participate in the statistical studies and members are privy to these reports."[108]

219.     In addition to the data portal, FAMA provides valuable information to members in the form of confidential industry updates.[109] These updates are created from FAMA data provided by FAMA members.[110] Similar to the portal, FAMA updates include member data on the number of Fire Apparatus units booked, sorted by year, state, type of apparatus.[111]

220.     These updates also include results from long-term questions signaling FAMA members' intent on pricing and output decisions. For example, an update reported

---

[107] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

[108] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join; https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).

[109] *The Fire Apparatus Industry: An Update (Report V3)*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026); *The Fire Apparatus Industry: An Update (Report V4) April 2021*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026); *The Fire Apparatus Industry: An Update (Report V4 Abridged) April 2021*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/wp-content/uploads/2021/04/1619117536_6081c5e08de0d.pdf (last visited March 23, 2026).

[110] *The Fire Apparatus Industry: An Update (Report V4) April 2021*, FIRE APPARATUS MFRS. ASS'N, 5, 20-22, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026); *The Fire Apparatus Industry: An Update (Report V3)*, Fire Apparatus Mfrs. Ass'n, 4, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026).

[111] *The Fire Apparatus Industry: An Update (Report V3)*, FIRE APPARATUS MFRS. ASS'N, 12, 15, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026).

011328-11/5017095 V1

that, "by a ratio exceeding 12 to 1," FAMA member respondents "expect to be able to sustain some upward pressure on prices charged" over the next six months.[112] The results of that survey also distinguished between expectations that orders, sales, and sales volume would increase "[s]ignificantly" or "[s]lightly" (*see Image 5*, below).[113]

Exhibit 13. FAMA Member Confidence Index

| | Orders | Sales | Sales Prices |
|---|---|---|---|
| **Index Reading** | | | |
| | 54.9 | 55.2 | 66.2 |
| **Expectations** | | | |
| Increase Significantly | 7.8% | 6.5% | 7.8% |
| Increase Slightly | 36.4% | 37.7% | 55.8% |
| No Change | 27.3% | 28.6% | 31.2% |
| Decrease Slightly | 24.7% | 24.7% | 3.9% |
| Decrease Significantly | 3.9% | 2.6% | 1.3% |

Source: Sage; FAMA

***Image 5: Table from FAMA Industry Update showing pricing and output trend expectations among FAMA members.[114] "Sage" (Sage Policy Group, Inc.) is the firm contracted by FAMA to produce the update.[115]***

221.     FAMA's updates also reported on members' current factory utilization (almost three-quarters of respondents indicated that their factories were not at full utilization),[116] "how many employees at their company were involved in fire apparatus or

---

[112] *The Fire Apparatus Industry: An Update (Report V4) April 2021*, Fire Apparatus Mfrs. Ass'n, 22, https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf (last visited March 23, 2026).

[113] *Id.*

[114] *Id.*

[115] *Id.* at 5.

[116] *See id.* at 18.

011328-11/5017095 V1

equipment manufacturing,"[117] whether they expected industry consolidation to increase or decrease,[118] and more.

222. These updates also included considerable consumer-side data, such as data on the age of fire departments' fleets.[119]

223. Accordingly, not only could FAMA members discern their competitors' pricing and output from the data available within their FAMA portals, but they could be reassured not to deviate from price increases or output restraints using these updates.

224. Indeed, FAMA's own members attest to the competitive usefulness of this data. When asked to rate on a scale of 1-10 how "valuable" FAMA's data was, over eighty percent of members gave ratings of 7-10.[120] Thirty percent gave a perfect rating.[121] FAMA also asked its members to rate 1-10 "how actionable is the statistics data available today."[122] Over sixty-five percent gave ratings of 7-10.[123] Only under eight percent of all respondents rated the actionability of the data under 5.[124]

225. And, in a newsletter jointly issued with FAMA, a Fire and Emergency Manufacturers and Services Association ("FEMSA") board member lauded FAMA's

---

[117] *Id.* at 20.

[118] *Id.* at 21.

[119] *The Fire Apparatus Industry: An Update (Report V3)*, FIRE APPARATUS MFRS. ASS'N, 20, https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf (last visited March 23, 2026).

[120] *See* Meeting Minutes Fire Apparatus Manufacturers' Association Spring Membership Business Meeting, Fire Apparatus Mfrs. Ass'n, 3, https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited March 23, 2026).

[121] *See id.*

[122] *Id.*

[123] *See id.*

[124] *See id.*

011328-11/5017095 V1
64

detailed information and usefulness: "FAMA has been compiling detailed statistics for apparatus and pumps for nearly 50 years. Not only do they track quarterly shipments (sales), but they also keep a pulse on the new order activity which is equally important. The quarterly FAMA results are talked about in our industry more than ever these days. Many members use this information as the definitive benchmark . . . . Based on these reports, if your company's numbers are good, you will mention that you are doing better than the market. And if not, you have a crutch to fall back on by noting that 'everyone' was off."[125] FEMSA added that it would follow FAMA's example in providing information to its members.[126]

### c. FAMA's data is confidential and kept to its members, which include Defendants.

226. FAMA imposes strict limits on who can become a member, and consequently, who has access to its reports and data. To join FAMA, an entity must (a) be "engaged in the manufacture of fire fighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[127] Notably, fire departments, municipalities, and other buyers of Fire Apparatus are *not* eligible to join FAMA under this definition. Such entities—apparatus

---

[125] *FAMA FEMSA news Elevating Effectiveness*, FIRE APPARATUS MFRS. ASS'N, 3, https://www.fama.org/wp-content/uploads/2015/09/1442788434_55ff3452210ac.pdf (last visited March 23, 2026).

[126] *Id.*

[127] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

011328-11/5017095 V1

manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.

227. Even among its members, FAMA further restricts data access to those companies that provide their own data, in a give-data-to-get-data scheme. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but refused."[128] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[129] Participating in the information exchange scheme, then is crucial, because without participation, FAMA members could not determine their competitor's supply, pricing, and their own market share.

228. FAMA itself acknowledges how necessary membership is to compete, noting that it is the only source for non-public competitive information in the Fire Apparatus market.

---

[128] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

[129] *Id.*

011328-11/5017095 V1
66



FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Image 6: Section of a flyer titled "Why Join FAMA?"[130]*

### 2. FAMA meetings.

229. In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."[131]

230. At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the Fire Apparatus manufacturing market.

---

[130] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

[131] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

011328-11/5017095 V1



***Image 7: Anirban Basu, Chairman & CEO of the Sage Policy Group,
presenting an economic forecast at a FAMA gathering.[132]***

231. Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

---

[132] Fire Apparatus Mfrs. Ass'n, *FAMA Membership Meetings*, YOUTUBE.COM (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Aug. 15, 2025).

011328-11/5017095 V1



*Image 8: FAMA Purchasing Roundtable*[133]



*Image 9: Rosenbauer employees attending a FAMA meeting*[134]

---

[133] *Id.*

[134] *Id.*

011328-11/5017095 V1



*Image 10: FAMA members-only meeting[135]*



*Image 11: FAMA discussion group[136]*

---

[135] *Id.*

[136] *Id.*



*Image 12: FAMA discussion group[137]*

232.    Manufacturer Defendants had ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.



**NETWORKING**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulations of organizational goals and provide a forum to share information.

*Image 13: Section of a flyer titled "Why Join FAMA?"[138]*

---

[137] *Id.*

[138] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

011328-11/5017095 V1

71

233. The granular market statistics are openly acknowledged as a benefit to being a member. One manufacturer reported after attending a FAMA meeting, "I'll tell you, all of the talk down there was about industry statistics. And, while I can't share those details with you, unless you're a FAMA member, what I can tell you is last year in 2022, there were over 6000 new fire apparatus sold here in the United States."[139]

234. In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[140] These missives offered another avenue for communication and coordination among Manufacturer Defendants.

**E. Manufacturer Defendants Further Colluded by Communicating through Pricing Consortiums**

235. Cooperative purchasing organizations allow participating entities, such as governmental and non-profit entities, to purchase goods and services through existing contracts, thereby streamlining the purchasing process. These cooperatives, or purchasing consortiums, are intermediaries in the purchasing process. For example, Sourcewell and Houston-Galveston Area Council ("HGAC") are prominent cooperative purchasing organizations that municipalities use to negotiate pricing contracts with dealers to indirectly purchase Fire Apparatus across the country. Both organizations are public entities created by state statute.[141]

---

[139] Inside Darley April 2023, DARLEY (Mar. 31, 2023), https://www.darley.com/media/inside-darley-april-2023/ (last visited June 16, 2026).

[140] *Id.*

[141] https://www.hgacbuy.org/program-statutes (last visited June 16, 2026); https://www.sourcewell-mn.gov/compliance-legal (last visited June 16, 2026).

011328-11/5017095 V1

236. Cooperative purchasing organizations are widely used by entities purchasing Fire Apparatus, with approximately sixty percent of Fire Apparatus being purchased via cooperative agreement.[142] For example, at least 50,000 agencies throughout North America use Sourcewell.[143]

237. These cooperative purchasing organizations send out requests for proposals to Manufacturer Defendants and in return use these proposals to coordinate pricing among participating entities.

238. For example, in response to Sourcewell's October 12, 2021 Request for Proposals, Defendant Pierce, as well as Defendant REV Group subsidiaries Ferrara, and KME each submitted coordinated pricing for custom pumpers, tankers, rescues, and aerials at 5% off their respective, undisclosed list prices.

239. Pierce was so bold to disclose in its Response to Sourcewell's solicitation that it "will not favor one GPO [Group Purchasing Organization] over another" and its "pricing model is consistent across all."[144]

240. Not only did the Manufacturer Defendants coordinate their pricing to Sourcewell, but they offered the same pricing structure to HGAC to further avoid competing on price. For example, Defendant Pierce, as well as Defendant REV Group subsidiaries

---

[142] https://www.firehouse.com/apparatus/press-release/21278851/sourcewell-fire-service-leaders-apparatus-suppliers-embrace-cooperative-purchasing?utm_ (last visited June 16, 2026).

[143] *Id.*

[144] Master Cooperative Purchasing Agreement, No. 113021-OKC, between Sourcewell and Oshkosh Corp. (April 5, 2022), https://files.sourcewell.org/public/Shared%20Documents/Solicitations/10462/00004210/Contract%20Documents/Oshkosh%20Contract%20113021.pdf (last visited June 16, 2026).

011328-11/5017095 V1

Ferrara, KME, and E-ONE each submitted the same 5% discount on custom pumpers, tankers, rescues, and aerials in response to HGAC's July 26, 2023 Request for Proposals.

241.     Instead of competing independently for each cooperative solicitation, Manufacturer Defendants submitted identical pricing structures—both to each other and across solicitations—regardless of the competitive environment or purchasing group.

242.     Manufacturer Defendants repeated the same collusive conduct again in 2025, when they had their next opportunity to do so. In response to Sourcewell's August 20, 2025 Requests for Proposals, Defendant Pierce and REV Group subsidiaries E-One, Ferrara, KME, Spartan, submitted substantially similar pricing proposals. Defendant Pierce offered a 5.50% discount off its undisclosed list price.[145] REV Group—through E-One, Ferrara, KME, and Spartan—offered a 5% discount off their undisclosed list prices for certain types of Fire Apparatus.[146]

---

[145] https://files.sourcewell.org/public/Shared%20Documents/Solicitations/11177/00008471/Additional%20Documents/Sourcewell%2008082025%20website%20document%20info.1.12.2026.pdf (last visited June 16, 2026).

[146] https://files.sourcewell.org/public/Shared%20Documents/Solicitations/11177/00008651/Additional%20Documents/REV%20Ferrara%2008082025-RVG-2%20Price%20Document.pdf (last visited June 16, 2026);
https://files.sourcewell.org/public/Shared%20Documents/Solicitations/11177/00008652/Additional%20Documents/REV%20KME%2008082025-RVG-3%20Price%20Document.pdf (last visited June 16, 2026);
https://files.sourcewell.org/public/Shared%20Documents/Solicitations/11177/00008653/Additional%20Documents/REV%20Spartan%2008082025-RVG-4%20Price%20Document.pdf (last visited June 16, 2026).

011328-11/5017095 V1

**F. The Conspiracy Enabled Defendants to Suppress Supply and Raise Prices of Fire Apparatus in Parallel During the Class Period.**

**1. Manufacturer Defendants' backlogs soared in parallel during the Class Period.**

243. Demand for Fire Apparatus picked up in the mid-2010s as the economy rebounded after the Great Recession, increasing steadily until approximately 2020. Between 2020 and 2022, the number of Fire Apparatus orders spiked as municipal coffers became flush with COVID relief funds. Since about 2022, order activity has hovered between 5,500 and 6,500 trucks per year.

244. Manufacturer Defendants' production has not kept pace with this increased demand. Particularly within the last few years, Manufacturer Defendants' order backlogs have ballooned in parallel.

245. For example, before 2020, REV Group had a backlog of roughly $1 billion worth of fire department orders.[147] In 2021, that backlog had increased to $1.499 billion, a 55.2 percent increase from 2020.[148] In 2022, the backlog increased again to $2.589 billion, a 72.8 percent increase from 2021.[149] By 2023, REV Group reported a record $3.65 billion backlog, a 41 percent increase over 2022.[150] REV Group's backlog increased again in 2024.

[147] REV Group 2019 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2019.pdf (last visited March 23, 2026).

[148] REV Group 2021 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf (last visited March 23, 2026).

[149] REV Group 2022 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-2022-annual-report.pdf (last visited March 23, 2026).

[150] Reuters, *Fire Truck Boom Highlights Divide in US Manufacturing*, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Aug. 15, 2025).

011328-11/5017095 V1

As of October 2024, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[151]

246. Before 2020, Oshkosh similarly had a backlog of approximately $1 billion for its fire and emergency segment.[152] In 2021, that backlog increased to $1.39 billion, a 27.6 percent increase from 2020.[153] In 2022, the backlog increased again to $2.9 billion, a 85.4 percent increase from 2021.[154] By 2023, that backlog was up to $4.0 billion, a 42.1 percent increase from 2022.[155]

247. In a 2020 earnings call, when it was reported that Pierce had a "record backlog of more than $1.3 billion," Oshkosh replied that "it puts us in a strong position and provides visibility well into 2021." As the backlog continued increasing, reaching as high as $5.67 billion in 2024, Oshkosh viewed this favorably remarking it provides "strong visibility over horizon."

---

[151] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Aug. 15, 2025).

[152] Oshkosh 2019 Annual Report, https://www.investors.oshkoshcorp.com/media/document/96a3d771-f1f2-480b-8f7a-b8a220a1231e/assets/Oshkosh_2019AR_10K_34031.pdf?disposition=inline (last visited March 23, 2026).

[153] Oshkosh 2021 Annual Report, https://www.investors.oshkoshcorp.com/media/document/22f86d57-d1cc-4871-94fb-e43f63cfe3dd/assets/Oshkosh_AR21_update_35243.pdf?disposition=inline (last visited March 23, 2026).

[154] REV Group 2022 Annual Report, https://www.investors.oshkoshcorp.com/media/document/6dfcbf22-9d70-4ba8-8571-21fb66f7df75/assets/oshkosh_ar22_35748.2.pdf?disposition=inline (last visited March 23, 2026).

[155] Oshkosh 2023 Annual Report, https://www.investors.oshkoshcorp.com/media/document/6ca5f796-6438-464e-b753-e69cf8085767/assets/2023%20Oshkosh%20Corporation%20Annual%20Report.pdf?disposition=inline (last visited March 23, 2026).

011328-11/5017095 V1

248. Rosenbauer's backlogs have also substantially increased. Before 2020, Rosenbauer reported a €355.4 million backlog for its Americas region.[156] In 2022, the backlog had increased to €560.1 million, a 56.6 percent increase from 2021.[157] By 2023, its backlog was €725.0, a 25.8 percent increase from 2022.[158] And by 2024, Rosenbauer's backlog soared again to €989.8 million, a 31.6 percent increase from 2023.[159] That same year, in 2024, Rosenbauer stated that "prices have improved due to price increases in manufacturers' order backlogs."[160] And by the beginning of 2025, the backlog had already increased to approximately $2.73 billion.[161]

249. Increased backlogs have translated to substantial delays prior to delivery of new Fire Apparatus. Wait times in some areas have more than quadrupled, from 1 year to 4.5 years.[162] An individual going by the username "Capttomo" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final

---

[156] Rosenbauer 2021 Annual Report, https://bericht.rosenbauer.com/2021/wp-content/uploads/Rosenbauer_Annual_Report_2021.pdf (last visited March 23, 2026).

[157] Rosenbauer 2024 Annual Report, https://bericht.rosenbauer.com/2024/wp-content/uploads/RB_Annual_Report_2024.pdf (last visited March 23, 2026).

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/Record High Order Backlog*, NuWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: €265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.") (last visited Aug. 15, 2025).

[162] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

011328-11/5017095 V1

inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years."[163] Another user noted that a REV Group dealer "added 15 months to the delivery time" for a Fire Apparatus.[164] A third reported an estimated delivery time of 48 months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization."[165] And yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.[166]



*Image 14: Forum comment by Capttomo regarding state of the Fire Apparatus industry.[167]*



*Image 15: Forum comment by Sfdc111 regarding state of the Fire Apparatus industry.[168]*

---

[163] *Skyrocketing Apparatus Costs and Outrageous Delivery Times*, NYCFIRE.NET, https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Aug. 15, 2025).

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

011328-11/5017095 V1



***Image 16: Forum comment by CFDMarshal regarding state of the Fire Apparatus industry.[169]***

250.     As another example, Sue Finkam, the mayor of Carmel, Indiana, said her city was growing and needed to add more fire stations. But as matters stand now, the city expects to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's Fire Apparatus to be delivered.[170]

251.     The data bears out these anecdotes. While orders spiked to 45 percent above average levels, order fulfillment dropped nearly 10 percent below average levels in 2022, as illustrated in the graph below.

---

[169] *Id.*

[170] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).

011328-11/5017095 V1
78



*Image 17: North America Fire Apparatus Trend.[171]*

252.	While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to dent the serious backlog.

253.	In addition to delays for new Fire Apparatus, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day. But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[172]

---

[171] *FAMA Releases Fire Apparatus Industry Update*, Fire Engineering (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Aug. 15, 2025).

[172] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**; *see also* Fire Apparatus & Emergency Equipment Staff, *REV Group Fire Division Launches New E-*

254. These backlogs cannot be explained by supply chain disruptions in the wake of the COVID-19 pandemic or other geopolitical events of the early 2020s. Although supply chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[173]



*Image 18: Global Supply Chain Pressure Index from June 30, 2017 to June 30, 2025.[174]*

### 2. Despite increasing demand, Manufacturing Defendants decided against increasing their manufacturing capacity.

255. In the face of increasing demand, Manufacturer Defendants have failed to increase capacity and, in some cases, have shuttered manufacturing facilities, worsening the Fire Apparatus shortage. This is inconsistent with a market operating free from collusion.

256. Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such

---

*Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Aug. 15, 2025).

[173] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263 (last visited Aug. 15, 2025).

[174] *Global Supply Chain Pressure Index (GSCPI)*, FED. RESERVE BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi#/interactive (last visited Aug. 15, 2025).

manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an uncompetitive market."[175] And neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

257.     Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact *shuttered* existing plants. In September of 2021, REV Group shut down two KME custom Fire Apparatus manufacturing facilities in Pennsylvania and Virginia.[176] The closure cut the company's manufacturing footprint by roughly one third.[177]

258.     During the September 2025 Senate Subcommittee Hearing, President of REV Specialty Group Mike Virnig admitted that following the acquisition of KME manufacturing operations were consolidated, and with consolidation came "[r]educed production of KME trucks and resulting delayed deliveries." These delays were felt by real departments at the receiving end.

259.     In a press release, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants.[178]

---

[175] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[176] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (last visited Aug. 15, 2025).

[177] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[178] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021),

011328-11/5017095 V1

The process, unsurprisingly, resulted in additional, substantial delays. Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be completed at the KME Pennsylvania plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays.[179] Eventually, Mr. Timerman received his truck more than *four years* after his department first placed the order.[180]

260. Despite these record-setting backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[181] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[182] Skonieczny further commented, "I don't think it's impacting our market share."[183] According to REV Group's SEC reports, the company considers its backlog to *enhance* its value to shareholders by giving the company "strong visibility into future net sales."[184]

---

https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilitie (last visited Aug. 15, 2025).

[179] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[180] *Id.*

[181] Musharbash, *supra* note 14.

[182] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[183] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Aug. 15, 2025).

[184] Musharbash, *supra* note 14.

011328-11/5017095 V1

### 3. The price of Fire Apparatus doubled during the Class Period.

261. Unsurprisingly, given growing demand and flat or declining supply, the cost of Fire Apparatus has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[185] Within the last few years, prices have increased to an average of $1 million per pumper truck.[186] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[187] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[188]

262. Mini pumper trucks have also experienced an unprecedented price hike. On an online forum regarding the price of Fire Apparatus, one user commented the following in April 2025:

---

[185] *Id.*; CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("'In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'") (last visited Aug. 15, 2025).

[186] Musharbash, *supra* note 14.

[187] CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**; Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025); Musharbash, *supra* note 14.

[188] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Aug. 15, 2025).

011328-11/5017095 V1

> My department was looking into replacing our 30 year old second
> due engine with a quick attack mini pumper which would work
> great for our service area. It's basically a Ford F350 crew cab with
> a pump, tank, and box on it. When we first priced it 2 years ago,
> the price tag was $350k. We didn't get the grant so we priced it
> again the following year to try for the grant again and the price
> shot up to $500k in just a years time. A small rural department
> simply doesn't have the money to purchase trucks at these prices.

263.     Another user commented:

> The department I volunteer is a smaller department in Iowa. We
> run about 225 calls. We recently signed a contract for a new engine
> that won't get delivered until 2029. The cost of that truck was 1.2
> million. We ordered a new engine in 2016, which is basically a
> twin to our newly ordered truck. Cost on it was $450,000 and took
> 16 months to get.

264.     Seeking out competition is not a viable option for customers looking to get

a better deal on Fire Apparatus. As one industry executive has observed, "[t]here are now

times when all vendors at a bid table, each with a 'different' product, are all owned and

managed by the same parent company. How is that competitive for the purchaser?"[189] Fire

departments across the country have little alternative than to pay the exorbitant prices

Manufacturer Defendants are charging for their Fire Apparatus.

**4.     Manufacturer Defendants used "floating prices" during the class period to
charge even more for Fire Apparatus.**

265.     On top of already high base prices for new Fire Apparatus, REV Group,

Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing

"floating prices" on their customers. Using the purported difficulty of projecting material

costs over a years-long lead time as an excuse, Manufacturer Defendants have added price

clauses to their contracts that allow Manufacturer Defendants to increase the final price of a

---

[189] Musharbash, *supra* note 14.

011328-11/5017095 V1

Fire Apparatus *after* it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck.[190] Mark Fusco, the president of Rosenbauer, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[191]

266.    Jason Shivers, chair of the International Association of Fire Chief's ("IAFC") Emergency Vehicle Management Section, submitted testimony for the September 2025 Senate Subcommittee Hearing, stating that "[i]n some cases, fire departments are being asked to pay deposits for vehicles and then have to pay unbudgeted additional costs over the time period for construction and delivery of the apparatus."

267.    Edward Kelly, General President of the International Association of Firefighters (IAFF), refers to floating prices as "the real crime" because the backlogs are created artificially by these companies. Kelly explained during the September 2025 Senate Subcommittee Hearing that "'floating prices' ha[ve] added even more instability to apparatus procurement by allowing manufacturers to arbitrarily raise prices of a vehicle before delivery…Floating prices are even more troubling when considering that the very backlogs created by consolidation are being then used to justify these mid-contract hikes." Further, for some municipalities, Fire Apparatus "spending must compete with other important and necessary municipal expenditures."

---

[190] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

[191] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025).

011328-11/5017095 V1

268. At the Senate Subcommittee Hearing, Jason Shivers, the chair of the Emergency Vehicle Management Section of the International Association of Fire Chiefs, testified that "in some cases, fire departments are being asked to pay deposits for vehicles and then have to pay unbudgeted additional costs over the time period for construction and delivery of the apparatus."

269. One fire department in Massachusetts ordered a Fire Apparatus in 2022 and then added two more to their original order in 2023. After the second order, the Fire Apparatus manufacturer increased the price of the apparatus ordered in 2022 by $150,000 to match the price of the apparatuses ordered in 2023. The manufacturer threatened not to deliver the apparatus ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[192]

270. As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper apparatus after a 7-month delay.[193] And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[194]

---

[192] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

[193] *Id.*

[194] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective*, at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf (last visited Aug. 15, 2025).

011328-11/5017095 V1

## G. Defendants' Conspiracy Had the Intended Effect of Increasing Each Manufacturers' Prices, Leading to Historic Profit Margins and Revenues.

271. Manufacturer Defendants have reaped the profits of these price increases. In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[195] In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes Fire Apparatus.[196]

272. In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8 percent to 10.5 percent from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[197]

---

[195] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[196] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[197] OSHKOSH, INVESTOR DAY at 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3 (last visited Aug. 15, 2025).

011328-11/5017095 V1



*Image 19: Oshkosh's financial performance, 2022 to 2024.[198]*

273. Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.[199] According to the company, that revenue growth will be "supported by strong backlog" and price increases.[200]

274. With a few exceptions during the pandemic years, overall revenues for Fire Apparatus manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

---

[198] *Id.*

[199] *Id.* at 86.

[200] *Id.* at 87.

011328-11/5017095 V1



*Image 20: Fire Apparatus Manufacturing Revenue in the United States.[201]*

275.     The REV Group substantially increased prices as evidenced by their massive increase in sales revenues. In 2021, the net sales from REV Group's fire and emergency segment were $1.125 billion.[202] When commenting on its net sales for that year, REV Group noted that it had "strong price realization" in that segment.[203] REV Group's net sales in its fire and emergency segment continued to increase to $1.174 billion in 2023.[204] In the fourth quarter of 2023, alone, the net sales were $339.1 million, an increase of $86.1

---

[201] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Aug. 15, 2025).

[202] REV Group 2021 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf (last visited March 23, 2026).

[203] *Id.*

[204] REV Group 2023 Annual Report, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (last visited March 23, 2026).

011328-11/5017095 V1

million, from $253.0 million in the fourth quarter of 2022.[205] REV Group attributed this increase compared to the prior quarter, in part, to "price realizations."[206]

276.     Similarly, and in parallel, Oshkosh raised prices as demonstrated by their increase in sales revenues. In 2021, the net sales from Oshkosh's fire and emergency segment were $1.227 billion, a 10.8 percent increase from 2020.[207] That same year, Oshkosh primarily attributed the increase in its gross margin from that segment to "improved pricing."[208] In 2023, Oshkosh combined its fire and emergency segment with its commercial segment to create a new vocational segment. That year, the vocational segment had net sales of $2.578 billion.[209] Oshkosh pointed to "higher pricing" as a reason for its increased net sales and again primarily attributed the increase in its gross margin to "improved pricing."[210] In 2024, when Oshkosh reported $3.31 billion in net sales for its vocational segment, it again attributed the increase in its net sales and gross margins to "improved pricing."[211]

---

[205] REV Group, Inc. Reports Strong Fiscal 2023 Fourth Quarter and Full Year Results, Provides Fiscal 2024 Full Year Guidance, REV Group (Dec. 13, 2023), https://investors.revgroup.com/investor-releases/2023/12-13-2023-120038628 (last visited March 23, 2026).

[206] *Id.*

[207] Oshkosh 2021 Annual Report, https://www.investors.oshkoshcorp.com/media/document/22f86d57-d1cc-4871-94fb-e43f63cfe3dd/assets/Oshkosh_AR21_update_35243.pdf?disposition=inline (last visited March 23, 2026).

[208] *Id.*

[209] Oshkosh 2023 Annual Report, https://www.investors.oshkoshcorp.com/media/document/6ca5f796-6438-464e-b753-e69cf8085767/assets/2023%20Oshkosh%20Corporation%20Annual%20Report.pdf?disposition=inline (last visited March 23, 2026).

[210] *Id.*

[211] Oshkosh 2024 Annual Report, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-

011328-11/5017095 V1

277.     Rosenbauer similarly and in parallel to Oshkosh and REV Group raised prices as demonstrated by their historic increase in revenues. For its Americas region, Rosenbauer reported revenues of €271.5 million in 2022, €275.7 million in 2023, and €346.8 million in 2024.[212]

278.     In the September 2025 Senate Subcommittee Hearing, Senator Josh Hawley said to an executive of REV Group, "Your profits have grown five times over the last five years to 250 million dollars, but nobody can get their equipment."[213] In the same hearing, Senator Hawley sharply criticized REV Group for paying dividends to investors and doing stock buybacks rather than investing in addressing the multi-billion-dollar backlog, describing their conduct as "a heist."[214] Indeed, in a 2025 earnings call, REV Group announced that given their strong financial performance, "we made the decision to repurchase approximately 2,900,000.0 shares of our common stock for $88,000,000 within the quarter."[215]

---

b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf?disposition=inline (last visited March 23, 2026).

[212] Rosenbauer 2024 Annual Report, https://bericht.rosenbauer.com/2024/wp-content/uploads/RB_Annual_Report_2024.pdf (last visited March 23, 2026).

[213] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, 119 Cong., https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited March 23, 2026).

[214] *See id.*

[215] REV Group Inc. R (1RG.F) Q2 FY2025 earnings call transcript, https://finance.yahoo.com/quote/1RG.F/earnings/1RG.F-Q2-2025-earnings_call-324839.html (last visited March 23, 2026).

011328-11/5017095 V1

279. Significantly, the Federal Trade Commission opened an inquiry into the Fire Apparatus industry. Two of the Defendants—Pierce Manufacturing, Inc., and REV Group, LLC—are cooperating with the FTC's investigation.

## H. Market Power and Barriers to Entry.

### 1. Relevant markets.

280. One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all Fire Apparatus, and the geographic market is the United States.

### 2. The product market encompasses all Fire Apparatus.

281. This case concerns Fire Apparatus as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive Fire Apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These Standards classify Fire Apparatus within the United States into seven types, all of which are at issue in this case:[216]

- **Type 1** fire trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural

---

[216] *Types of Fire Trucks: An Overview and Comparison*, PIERCE (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Aug. 15, 2025).

firefighting and initial emergency medical services. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. They are designed to carry four firefighters.

- **Type 2** fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

- **Type 3** fire trucks are often referred to as a wildland fire truck or a brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- **Type 4** fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose

011328-11/5017095 V1

capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

- **Types 5, 6, and 7** fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.

| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2 ½" (MIN. FT) | 1200 | 1000 | ✗ | ✗ | ✗ | ✗ | ✗ |
| HOSE 1 ½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✗ |
| HOSE 1" (MIN. FT) | ✗ | ✗ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ |
| PUMP AND ROLL | ✗ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✗ | ✗ | ✗ | ✗ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED   ✗ NOT REQUIRED/OPTIONAL

011328-11/5017095 V1

*Image 21: NFPA types and specifications.[217]*

282. Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[218] These trucks are also included in the relevant product market.

### 3. The geographic market is the United States.

283. As described above, all three Manufacturer Defendants sell Fire Apparatus to fire departments across the 50 states. The relevant market is the United States.

### 4. Manufacturer Defendants have market power in the relevant markets.

284. As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the Fire Apparatus industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual Fire Apparatus sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market.[219]

---

[217] BOISE MOBILE EQUIPMENT, *Types of Fire Trucks and Their Purpose* (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks (last visited Aug. 15, 2025).

[218] PIERCE, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Aug. 15, 2025).

[219] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

011328-11/5017095 V1

285.     The significant degree of concentration in the Fire Apparatus market can be measured with the Herfindahl-Hirschman Index, or "HHI." As the DOJ has explained, the HHI is "a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.[220] The HHI "approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.[221] According to the 2023 DOJ/FTC Merger Guidelines, a market is considered highly concentrated if it has an HHI greater than 1,800. The Fire Apparatus market has an estimated HHI that exceeds 1,800. In other words, the market easily qualifies as highly concentrated.

**5.     High barriers to entry in the Fire Apparatus manufacturing market protect Manufacturer Defendants' market shares.**

286.     There are high barriers to becoming a manufacturer of Fire Apparatus. Fire Apparatus is expensive equipment that must meet strict NFPA design, safety, and performance standards. Accordingly, to enter into the market, a new manufacturer would need a significant amount of capital to afford the cost of materials, equipment, regulatory compliance, and skilled labor necessary to construct Fire Apparatus.

287.     The low-volume nature of Fire Apparatus production presents an additional hurdle as it makes it difficult for new manufacturers to achieve cost competitiveness without an established order backlog. The cost of producing Fire Apparatus, combined with the long lead times, means that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period.

---

[220] https://www.justice.gov/atr/herfindahl-hirschman-index (last visited June 16, 2026).

[221] *Id.*

011328-11/5017095 V1

288.     New entrants also face the challenges associated with a highly concentrated market. The Manufacturer Defendants have consolidated control over the Fire Apparatus market in the past decade by serially acquiring their competitors. New entrants, then, must compete against incumbents with deep institutional knowledge, longstanding relationships with municipalities, and extensive and exclusive dealer networks.

289.     Taken together, these structural features make breaking into the Fire Apparatus industry challenging.

## I.     Plaintiffs and Other Class Members Have Been Harmed as a Result of the Conspiracy

### 1.     Plaintiffs and other Class members have overpaid for Fire Apparatus as a result of Defendants' anticompetitive behavior.

290.     If the price of Fire Apparatus had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[222] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

291.     There are approximately 5,000 new Fire Apparatus sold in the United States every year.[223] Of these, about 75 percent are pumpers.[224] That means that since 2016,

---

[222] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[223] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, SUTPHEN (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-making-fire-engines-in-the-united-states-since-1890 (last visited Aug. 15, 2025).

[224] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Aug. 15, 2025).

011328-11/5017095 V1

Plaintiffs and other Class members have paid a combined total of approximately $56.25 billion for new Fire Apparatus[225]—$19.8 billion more than expected based on increased inflation alone.[226]

292. Even accounting for issues facing the Fire Apparatus market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

**2. Inflated prices and long backlogs have prevented Plaintiffs and the other Class members from timely replacing old vehicles in their Fire Apparatus fleets, and their fleets have suffered as a result.**

293. As Fire Apparatus age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.[227]

294. Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging apparatus in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using apparatus that have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the

---

[225] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[226] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

[227] Joseph Murray, *Fire Chief Considerations: Making the Case for Apparatus Replacement*, Fire Apparatus & Emergency Equipment (Jan. 22, 2025) (citing NFPA 1900), https://www.fireapparatusmagazine.com/fire-apparatus/fire-chief-considerations-making-the-case-for-apparatus-replacement/ (last visited Mar. 23, 2026).

011328-11/5017095 V1

country are facing a crisis where demand for new Fire Apparatus has outstripped availability and funding.[228]

295.    For example, Plaintiff La Crosse is currently operating a 2006 Pierce Enforcer (a quint fire apparatus),[229] a vehicle that is nearly 20 years old. Although La Crosse has ordered a replacement for the vehicle, long expected delivery times mean La Crosse will need to rely on this outdated Fire Apparatus for several more years.

296.    Price and availability concerns also spurred the La Crosse Fire Department to change its operating plan, which previously relied on three apparatus, to a plan based on the cheaper configuration of two apparatus. In some cases, La Crosse has been shut out of the market altogether: although it recently looked at purchasing a new Fire Apparatus for its airport, the $1 million price tag and the long wait time were too much for the city, which decided to make do with its current fleet. To try to adapt to ever-increasing prices and lengthening backlogs, the La Crosse Fire Department has already begun requesting funds for a replacement apparatus that it will not need until 2030.

297.    Other examples of aging fleets abound. In January 2025, the Chicago fire department threw a mock thirtieth birthday celebration for one of its trucks, which was older than many firefighters on the force.

---

[228] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

[229] FIREFIGHTING WIKI, *La Crosse Fire Department (Wisconsin)*, https://fire.fandom.com/wiki/La_Crosse_Fire_Department_(Wisconsin)#Apparatus_Roster (last visited Aug. 15, 2025).

011328-11/5017095 V1



***Image 22: Celebration of Chicago Fire Department Truck D545's 30th birthday[230]***

298.    In Los Angeles, the city's fire department has long aimed to have 90 percent of its fleet ready for deployment at any given time, but it has averaged only 78 percent in recent years as older apparatus are pulled for maintenance.[231] Union officials have said that rising prices for replacement vehicles have forced the department to order fewer new rigs than it had planned.[232]

---

[230] Katherine Laidlaw, *Why Does a Fire Truck Cost $2 Million?*, HUSTLE (July 18, 2025), https://thehustle.co/originals/why-does-a-fire-truck-cost-2-million (last visited Aug. 15, 2025).

[231] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[232] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).

011328-11/5017095 V1

299. Auditors in Atlanta found that more than a third of the city's aging firefighting fleet was out of commission.[233] Atlanta, Georgia was using pick-up trucks to fight fires when one-third of their fleet was out of service. Houston and Seattle have reported similar struggles with their fleets.[234]

300. Smaller municipalities, including towns in Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia, have faced comparable difficulties.[235] For example, in 2024, the city of Evanston, Illinois had to persuade a dealer to sell a demonstration vehicle to accelerate delivery of a $2.3 million new apparatus to only "12 to 14 months" to replace an 18 year old reserve apparatus with "major defects… that would cost around $300,000 to fix."[236] The Chief of the Ann Arbor, Michigan fire department recently observed that "[t]he price of fire trucks has become bonkers," revealing "almost a monopoly market," such that their next truck will cost $2.4 million and

---

[233] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**; Riley Bunch, *City Leaders Reveal Plans to Address Aging Fire Trucks*, ATLANTA JOURNAL-CONSTITUTION, (Aug. 19, 2024), https://www.ajc.com/news/atlanta-news/city-leaders-reveal-plans-to-address-aging-fire-trucks/YGFTTY7ZPRBPJP54Z2RYDMXLOA (last visited Aug. 15, 2025).

[234] Christy Grimes, *Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements*, GOV'T FLEET (Sept. 11, 2023), https://www.government-fleet.com/10206016/houston-fire-department-to-replace-aging-vehicles (last visited Aug. 15, 2025); David Kroman, *Seattle Firetruck Fleet Deteriorating Faster than Repairs Can Keep Up*, SEATTLE TIMES (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-fire-truck-fleet-deteriorating-faster-than-repairs-can-keep-up (last visited Aug. 15, 2025).

[235] CBS NEWS, *North Texas Fire Department in Crisis Needs Financial Windfall To Overcome Equipment Challenges* (Jan. 23, 2025), https://www.cbsnews.com/texas/video/north-texas-fire-department-in-crisis-needs-financial-windfall-to-overcome-equipment-challenges (last visited Aug. 15, 2025); Allen Clayton, *City of Clarksburg Approves $3.1 Million to Purchase New Fire Trucks*, 12WBOY (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks (last visited Aug. 15, 2025); Musharbash, *supra* note 14; Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[236] Bill Smith, *Council OK's Fire Truck Buy*, EVANSTON NOW (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy (last visited Aug. 15, 2025).

011328-11/5017095 V1

take 4 years to deliver.[237] The number of service calls received by the Ann Arbor Fire Department ("AAFD") across its six fire stations has been steadily increasing for more than a decade, increasing from 6,953 in 2016 to 13,432 in 2025.[238] Furthermore, a recent boom in downtown development as well as increasingly variable weather patterns have the AAFD facing a need for more specialized training in responding to additional challenges, such as how to navigate high-rise buildings and respond to damage caused by intense storms. To respond to such service calls, AAFD access to fully functioning Fire Apparatus is paramount. And the fire chief of Watertown, New York, has said, his department was so desperate for a new apparatus to keep operations running that it bought one used from another city, even though that apparatus was already more than two decades old.[239]

301.    The Fire Department of Quincy, Massachusetts ordered new Fire Apparatus in 2022, but because of manufacturing delays, it has been forced to buy used apparatus from other cities.[240] Some of the Fire Apparatus still in rotation in the Quincy fleet are more than twenty years old, and as a result are constantly undergoing repairs.[241] Much like the fire departments in Columbus, Ann Arbor, and Storm Lake, Quincy Fire Department

---

[237] Ryan Stanton, *Ann Arbor Is Getting a New Fire Truck, But It Will Take 4 Years and Cost $2.4 M*, MLIVE (Feb. 7, 2025), https://www.mlive.com/news/ann-arbor/2025/02/ann-arbor-is-getting-a-new-fire-truck-but-it-will-take-4-years-and-cost-24m.html (last visited Aug. 15, 2025).

[238] Ann Arbor Fire Department, 2025 Annual Report, https://www.a2gov.org/media/4glhvywf/2025-aafd-annual-report.pdf (last visited March 23, 2026).

[239] Baker, Farrell & Kovaleski, at n.**Error! Bookmark not defined.**.

[240] Mike Sullivan, *Nationwide fire truck shortage impacting Mass. departments. IAFF asks for investigation*, CBS News (May 17, 2025), https://www.cbsnews.com/boston/news/fire-truck-shortage-massachusetts/ (last accessed Mar. 23, 2026).

[241] *Id.*

011328-11/5017095 V1

was given a quote of over \$2 million and a four year wait time to receive their replacement Fire Apparatus.[242]

302. According to testimony given by IAFF General President Edward Kelly, at the September 2025 Senate Subcommittee Hearing, 17 of San Francisco's 34 ladder trucks are more than 20 years old.[243] Two of them are over 30 years old.[244] Due to the city's characteristically hilly streets, these older rigs are more prone to stalling, thus forcing firefighters to take alternate, lengthier routes to avoid those hills.[245] This increases response time and the likelihood of a more precarious situation once the firefighters do arrive at the scene.[246]

303. The city of Pittsburgh is currently grappling with how to replace their aging fleet. Pittsburgh's fire bureau shared, "in an ideal situation, fire trucks would be used for 7 years at the maximum, then spend 3 years in the reserve backup fleet before being retired. A more realistic, 'achievable' approach would be to have trucks operating for 10 years and then no more than 5 on the reserve fleet."[247] However, this timeline is unachievable due to delays and prices.[248] The next best option would be repairing the current fleets but

---

[242] *See id.*

[243] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, 119 Cong., https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited March 23, 2026).

[244] *Id.*

[245] *See id.*

[246] *See id.*

[247] Julia Maruca, *Why Pittsburgh's fire and EMS vehicle fleets are facing a crisis,* 90.5 WESA (May 16, 2025), https://www.wesa.fm/politics-government/2025-05-16/pittsburgh-fire-ems-vehicle-fleet-crisis (last visited March 23, 2026).

[248] *Id.*

011328-11/5017095 V1

even that is a challenge because an older vehicle means replacement parts are harder to come by.[249] Leaders are facing pressure to solve the "aging fleet" problem. Robert Brooks, president of the Pennsylvania Professional Firefighters Association, shared his experience with pricing: "Twenty years ago, I started fighting fires, and a ladder truck was about $800,000. Now it's in the $2 million range. An engine, a pumper that was somewhere around $400,000 to $500,000 is now $1 million to $1.2 million."[250] Altogether, the city of Pittsburgh would have to put aside $20 million a year to replace the whole fleet. Pete McDevitt, City Council Budget Director, guesses it would take more than 10 years to replace everything.[251] Even upon approval of these high prices, there is still the issue of delays.[252] Some of the orders wouldn't be delivered for 2-4 years, which would prolong the cycle to half a decade.[253]

### 3. Reduced Fire Apparatus fleets are less able to respond to disasters.

304. High prices and long waits for Fire Apparatus are endangering public safety in communities across the country, particularly those facing natural disasters.

305. Los Angeles's experience in January 2025, when two large fires raged for days and killed 29 people, is a particularly poignant example of the harm communities can suffer when their Fire Apparatus fleets are reduced.[254] More than 100 of the Los Angeles Fire

---

[249] *Id.*

[250] Julia Maruca, *Why Pittsburgh's fire and EMS vehicle fleets are facing a crisis*, 90.5 WESA (May 16, 2025), https://www.wesa.fm/politics-government/2025-05-16/pittsburgh-fire-ems-vehicle-fleet-crisis (last visited March 23, 2026).

[251] *Id.*

[252] *Id.*

[253] *Id.*

[254] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-

011328-11/5017095 V1

Department's ("LAFD") 183 Fire Apparatus were out of service at the time the fires broke out.[255] Chuong Ho, a firefighter and union leader who was among those who reported for work during the fires, said the lack of Fire Apparatus meant many of the firefighters who were available to help that day could not be sent to the front lines.[256] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed Fire Apparatus fleet impeded the department's ability to respond to the fires.[257] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities[258] and the loss of homes and lives.[259]

---

regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

[255] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[256] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[257] *Id.*

[258] David Zahniser, *Fires and Windstorms Caused at Least $350 Million in Damage to L.A. Public Facilities, Report Says*, L.A. TIMES (Jan. 22, 2025), https://www.latimes.com/california/story/2025-01-22/la-me-wildfire-costs-los-angeles-public-infrastructure (last visited Aug. 15, 2025).

[259] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

011328-11/5017095 V1



***Image 23: Out-of-service Fire Apparatus sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.[260]***



***Image 24: Out-of-service Fire Apparatus sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.[261]***

---

[260] Perkin Amalaraj, *Dozens of Fire Trucks Waiting for Repair while Fires Ravage LA*, DAILY MAIL (Jan. 14, 2025), https://www.msn.com/en-ae/news/other/dozens-of-fire-trucks-waiting-for-repair-while-fires-ravage-la/ar-BB1rr7vy (last visited Aug. 15, 2025).

[261] *Id.*

011328-11/5017095 V1

306.     Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that Fire Apparatus manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[262] During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in that blaze.[263] And in Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of new apparatus.[264]

307.     In the September 2025 Senate hearing, Edward Kelly, General President of IAFF, described how long backlogs threaten firefighters' ability to protect the communities that they serve. Kelly responded:

> Chief Rubin [Fire Chief of the Kansas City Fire Department] testified earlier, in his city, they had to put, because they did not have enough apparatus on hand to staff the firehouses, they were putting firefighters out basically on pickup trucks like painting crews with ground ladders. Now, if you're trapped in the third or fourth floor, you're jumping.[265]

308.     Kelly provided another harrowing tale of the Defendants' impact on firefighters' ability to protect their communities, explaining that in Chicago, fire fighters who were responding to a deadly house fire—which killed four people, including a five-year-

---

[262] Baker, Farrell & Kovaleski, *supra* note **Error! Bookmark not defined.**.

[263] *Id*.

[264] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Aug. 15, 2025).

[265] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, 119 Cong., https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited March 23, 2026).

011328-11/5017095 V1

old—were delayed when their Fire Apparatus stalled.[266] Kelly told Senators, "Fire Fighters had to restart the truck to raise the ladder and rescue victims . . . [a]nd the scariest part is, today on September 10, two-and-a-half months after that incident, that very same rig is still in service."[267]

309.     Jason Shivers, chair of the International Association of Fire Chief's ("IAFC") Emergency Vehicle Management Section, submitted testimony to the U.S. Senate as well, on behalf of the IAFC.[268] He stated Fire Apparatus costs have risen by 20 to 25 percent since 2020 and fire chiefs can order Fire Apparatus and expect their delivery in four years.[269] Because of the supracompetitve prices and delays, fire departments have been forced to use apparatus past the 15- year recommended age limit and reserve fleets that do not have up-to-date safety improvements.[270] According to his testimony, these Fire Apparatus problems affected community safety: "Some fire departments did not have fire apparatus to use for consistent and reliable response to mutual aid response requests from their local neighbors or from across the nation."[271]

310.     Some cities have finally had enough. In April 2025, the San Diego County Board of Supervisors voted to pursue legal challenges to what they described as a corporate

---

[266] *See id.*

[267] *Id.*

[268] Jason Shivers, Sounding the Alarm: America's Fire Apparatus Crisis, Hearing Before the Subcomm. on Disaster Mgmt., District of Columbia, and Census, https://www.iafc.org/docs/default-source/1gr/gr_testimonyhsgachearingfireapparatus10sep25.pdf (last visited March 23, 2026).

[269] *Id.* at 2.

[270] *Id.*

[271] *Id.* at 3.

011328-11/5017095 V1

monopoly of Fire Apparatus and firefighting equipment.[272] The Board voted unanimously to explore legal action, citing soaring prices and the substantial increase in wait time to deliver the Fire Apparatus, noting the increased consolidation of the market into the hands of just a few companies.[273] In particular, the Board emphasized that the crisis facing California was not being caused by wildfires, but by a supply chain "taken over by corporate consolidation and greed."[274]

**4.     Plaintiffs and Class members have also suffered harm because they have had to redirect funds toward purchasing Fire Apparatus that they would have otherwise put toward other essential needs.**

311.     In addition to problems adequately responding to disasters with diminished fleets, the rising cost of Fire Apparatus maintenance and replacement has squeezed fire departments' and municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters.[275] For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[276]

---

[272] SD County Board of Supervisors votes to challenge 'corporate monopoly' of firetruck supply chain, abc10 News San Diego, https://www.10news.com/news/local-news/sd-county-board-of-supervisors-votes-to-challenge-corporate-monopoly-of-firetruck-supply-chain (last visited March 23, 2026).

[273] *Id.*

[274] *Id.*

[275] Musharbash, *supra* note 14.

[276] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

011328-11/5017095 V1
110

312. These shortages in equipment are so critical that some municipalities are being forced to cancel or postpone the training of new firefighters. On March 26, 2025, the Chief of the Columbus Division of Fire, Jeff Happ, told his division that active Fire Apparatus could no longer be used for training, and that any training cadets missed as a result would have to be made up at a later date.[277] The president of the firefighter union, Steven Stein, said in a statement that having to choose between adequately training cadets or removing a valuable Fire Apparatus from a neighborhood is "unacceptable."[278] In addition, two-thirds of the City of Columbus's fleet are operating outside their recommended life expectancy.[279] The city submitted an order for a new tiller ladder truck from Pierce Manufacturing in November 2023 for $2.3 million (as compared with a similar truck for which they paid roughly $968,000 in 2012).[280] The city was told it could expect delivery in late 2027 or early 2028.[281]

## V. CLASS ACTION ALLEGATIONS

313. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following Classes:

---

[277] Columbus fire truck shortage reaching critical state, local firefighter union says, The Columbus Dispatch, https://www.dispatch.com/story/news/local/2025/04/02/columbus-firefighter-union-fire-truck-shortage-ohio/82755623007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z1133xxp000850c000850e1133xxv003648d--65--b--65--&gca-ft=157&gca-ds=sophi (last visited March 23, 2026).

[278] *Id.*

[279] *Id.*

[280] *Id.*

[281] *Id.*

011328-11/5017095 V1

- **Nationwide Class**: All local or municipal government entities with fire departments that indirectly purchased Fire Apparatus from Manufacturer Defendants in the United States at any time from January 1, 2016, until the present.

- **State Law Class**: All persons, fire departments, municipalities, and entities that indirectly purchased Fire Apparatus from Manufacturer Defendants in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin at any time from January 1, 2016, until the present.

314. Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from these Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**A.      All Requirements of Federal Rule of Civil Procedure 23(a) Are Met.**

315. A class action is warranted in this case because the Class members are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Classes; the claims of the representative parties are typical of the claims of the Classes; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Classes.

011328-11/5017095 V1

316. **Numerosity**: Class members are so numerous (including thousands of municipalities) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

317. **Commonality**: Plaintiffs' antitrust claims are common to all Class members, and individual complaints otherwise may result in inconsistent or varying adjudications.

318. **Typicality**: Antitrust violations and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

319. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class members in that Plaintiffs have no interests adverse to, or that conflict with, the Classes which Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.      All Requirements of Federal Rule of Civil Procedure 23(b)(3) Are Met.**

320. In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

321. **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

011328-11/5017095 V1

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Fire Apparatus sold in interstate commerce in the United States;

- The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

- The effect of Defendants' alleged conspiracy on the prices of Fire Apparatus;

- Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiffs and other Class members;

- The effect of Defendants' alleged conspiracy on the prices of Fire Apparatus sold in the United States during the class period;

- Whether Plaintiffs and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

- The appropriate Class-wide measure of damages.

322. **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct, both for Class members themselves and for the court system. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

011328-11/5017095 V1

## VI. ANTITRUST INJURY

323. Defendants' anticompetitive conduct had the following effects, among others:

- Price competition has been restrained or eliminated with respect to Fire Apparatus;

- The prices of Fire Apparatus have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiffs and other Class members have been deprived of free and open competition; and

- Plaintiffs and other Class members have paid artificially inflated prices for Fire Apparatus, causing substantial harm to Plaintiffs and other Class members.

324. The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of Fire Apparatus. As a direct and foreseeable result, Plaintiffs and other Class members paid supra-competitive prices for Fire Apparatus during the class period.

325. By reason of the alleged violations of the antitrust laws, Plaintiffs and other Class members have been injured because they paid higher prices for Fire Apparatus than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VII. FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

326. Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint.

011328-11/5017095 V1

Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or Class members on inquiry notice that there was a conspiracy to fix prices for Fire Apparatus. The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, limitation of any explicit reference to competitor pricing, communications on documents, communication of competitively sensitive data to one another through the members-only FAMA-created channels detailed herein, which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor price discussions from non-conspirators (including customers).

327. Additionally, Defendants fraudulently concealed their wrongful conduct by providing pretextual reasons for their supracompetitive prices and prolonged wait times. For example, in the September 2025 Senate Subcommittee Hearing, Mike Virnig, President of REV Group, explained the price increases and delivery times were due to inflation of input and manufacturing costs over recent years, including increased costs of labor, raw materials and other inputs, as well as operational challenges and spikes in demand.

328. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and Class members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

011328-11/5017095 V1

## VIII. CONTINUING VIOLATION

329. During the Class Period, Manufacturer Defendants continued to make sales to Plaintiffs and Class members of Fire Apparatus whose prices were artificially inflated as a result of the antitrust violations alleged above. Defendants continually renewed and adjusted their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

330. Defendants' meetings and misrepresentations were overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy to fix prices.

331. Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of a Fire Apparatus by a Manufacturer Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violations that injured Plaintiffs and Class members and started the statutory period running again.

332. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs and Class members.

333. Further, each purchase by Plaintiffs and Class members through the Class Period of Defendants' Fire Apparatus, the price which resulted from Defendants' continually renewed and adjusted price-fixing agreement and unlawful conduct, necessarily caused new and accumulating injury to Plaintiffs and Class members.

011328-11/5017095 V1

334. As shown above, Defendants secretly exchanged data through FAMA, met in and around FAMA meetings that are not open to the public, and offered facially plausible pretextual explanations for price increases and increasing backlogs. While Plaintiffs have known of the dysfunction in the Fire Apparatus market, the causes only truly came into focus after the Los Angeles wildfires and scrutiny on the Fire Apparatus industry that followed. When REV Group acquired competitors, it insisted that it would preserve competition among and between them and asserted that the combination would lead to improved efficiency. Even when REV Group extolled backlogs as a profit driver, it asserted that it would increase capacity to shrink those backlogs. When REV Group shuttered 30% of its capacity in 2022, it claimed that it would make up for that loss through improvements in existing facilities. It was all untrue. REV Group never had any intention of reducing the backlogs. Nor did Oshkosh or Rosenbauer. Defendants could restrict capacity secure in the knowledge that none of them would seek to capitalize on that restriction through its own capacity increases.

335. Claims for these antitrust violations accrue each time a victim pays a supracompetitive price and/or suffers some form of financial damage proximately caused by Defendants' antitrust violations. Such claims have accrued with each sale and with each payment of a surcharge imposed by the Defendant. And such claims will continue to accrue until the effects of Defendants' conduct cease to be felt.

## IX. HOLD-AND-USE

336. In addition to obtaining assets in acquisitions, Defendants retained those assets and used them in new ways to inflict anticompetitive injuries. These new uses created new causes of action, each time restarting the applicable statute of limitations for any Plaintiffs' Clayton Act claims.

011328-11/5017095 V1

337. Indeed, because Defendants' acquisitions were part of a gradual effort to build market dominance, Defendants' early acquisitions brought forth anticompetitive restraints on commerce later in time. Those early acquisitions—and the dominant position they built—made later acts possible that caused antitrust injuries, including restricting supply and supracompetitive price increases and other conduct alleged herein.

## X. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

**RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
(On Behalf of the Nationwide Class for Injunctive and Equitable Relief Against All Defendants)**

338. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

339. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of Fire Apparatus in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

340. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

- Fixing, raising, and stabilizing the price of Fire Apparatus; and

- Allocating among themselves and collusively reducing the production of Fire Apparatus.

341. The combination and conspiracy alleged herein has had the following effects, among others:

011328-11/5017095 V1

- Price competition has been restrained or eliminated with respect to Fire Apparatus;

- The production of Fire Apparatus has been restrained at artificially low levels;

- The price of Fire Apparatus has been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiffs and other Class members have been deprived of free and open competition; and

- Plaintiffs and other Class members have paid artificially inflated prices for Fire Apparatus, causing substantial harm to Plaintiffs and other Class members.

342. Plaintiffs and other Class members have been injured and will continue to be injured by paying more for Fire Apparatus from Manufacturer Defendants than they would have paid and will pay in the absence of the combination and conspiracy.

343. Plaintiffs and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF:

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION
### (on behalf of the Nationwide Class for injunctive and equitable relief)

344. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing

011328-11/5017095 V1

agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

346. The relevant product market is Fire Apparatus as recognized by NFPA Standard 1900 regarding automotive Fire Apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing. The relevant geographic market is the United States.

347. Manufacturer Defendants possess market power in the relevant market. Manufacturer Defendants control between 70 and 80 percent of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially deflate the number of Fire Apparatus produced in the United States below competitive levels and to artificially inflate the price Plaintiffs and other members of the Nationwide Class pay for Fire Apparatus above competitive levels.

348. An increase in the price of Fire Apparatus could be imposed collectively by Manufacturer Defendants without losing customers. The Fire Apparatus market is a unique product market.

349. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included the exchange through FAMA Statistical Reports and FAMA meetings.

350. Manufacturer Defendants' regular information exchanges through FAMA reflected concerted action between competitors in the market for Fire Apparatus.

011328-11/5017095 V1

351. Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

352. The agreement to regularly exchange detailed and non-public economic information about their companies suppressed competition between Manufacturer Defendants.

353. When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Manufacturer Defendants used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the Fire Apparatus market. This strategic information was a material factor in Manufacturer Defendants' decisions to inflate the prices that Plaintiffs and other members of the Nationwide Class paid for Fire Apparatus during the class period.

354. Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

355. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for Fire Apparatus in the United States, and (2) inflating the prices of Fire Apparatus during the class period.

011328-11/5017095 V1

356.     As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and the other Class members have been injured in their business or property by paying artificially inflated prices for Fire Apparatus during the class period.

**THIRD CLAIM FOR RELIEF:**

**VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18**
**(AGAINST REV GROUP)**

**(On behalf of Nationwide Class for Injunctive Relief)**

357.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

358.     REV Group's serial acquisitions have in the aggregate substantially lessened competition in the markets for Fire Apparatus and specialty cab chassis in the United States. The anticompetitive effects of the serial acquisitions are continuing.

359.     In the alternative, REV Group's acquisition of Spartan substantially lessened competition in the markets for Fire Apparatus and specialty cab chassis in the United States. The anticompetitive effects of the Spartan acquisition are continuing.

360.     Defendants' anticompetitive conduct set forth in this Complaint has thus violated Section 7 of the Clayton Act. See 15 U.S.C. § 18.

361.     As a result of Defendants' violation of Section 7 of the Clayton Act, Plaintiffs and other Class members have suffered, and will continue to suffer antitrust injury in the form of paying supracompetitive prices for new Fire Apparatus, extended wait times to receive Fire Apparatus and parts, purchases of used and inferior Fire Apparatus due to excessive prices and long wait times for new Fire Apparatus, and diversion of resources to meet the demands of public safety with outdated and/or inoperable Fire Apparatus.

011328-11/5017095 V1

362.      Plaintiffs and other Class members are threatened with further loss or damage by reason of the actual or likely lessening of competition described above and is entitled to  injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 sufficient to unwind the anticompetitive effects of the Section 7 violation.

## FOURTH CLAIM FOR RELIEF:

### CONNECTICUT ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Connecticut)**

363.      Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-24, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Connecticut, and (2) Fire Apparatus prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Connecticut commerce and caused Class members in Connecticut to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Connecticut seek all forms of relief available under Conn. Gen. Stat. § 35-24, *et seq*.

## FIFTH CLAIM FOR RELIEF:

### MICHIGAN ANTITRUST REFORM ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Michigan)**

364.      Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' flagrantly unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) Fire Apparatus prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high

011328-11/5017095 V1

levels. During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce and caused Class members in Michigan to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Michigan seek all forms of relief available under Mich. Comp. Laws § 445.771, *et seq*.

**SIXTH CLAIM FOR RELIEF:**

**MISSISSIPPI ANTITRUST LAW**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Mississippi)**

365.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. § 75-21-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Mississippi; and (2) Fire Apparatus prices in the State of Mississippi were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Mississippi commerce and caused Class members in Mississippi to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Mississippi seek all forms of relief available under Miss. Code Ann. § 75-21-1, *et seq*.

**SEVENTH CLAIM FOR RELIEF:**

**NEW YORK DONNELLY ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New York)**

366.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New York; (2) Fire Apparatus prices in the State of New York were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period,

011328-11/5017095 V1

Defendants' unlawful conduct substantially affected New York commerce and caused Class members in New York to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New York seek all forms of relief available under N.Y. Gen. Bus. Law § 340, *et seq*.

**EIGHTH CLAIM FOR RELIEF:**

**VIOLATION OF WISCONSIN STATE ANTITRUST LAW,**
**WIS. STAT. ANN. § 133.01, *et seq.***
**(On Behalf of the State Law Class Members that Purchased Fire Apparatus in Wisconsin)**

367. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

368. Wisconsin state antitrust law aims "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. Ann. § 133.01.

369. Plaintiffs purchased Fire Apparatus within Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of those Fire Apparatus would have been lower, in an amount to be determined at trial.

370. Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for Fire Apparatus, in violation of Wis. Stat. Ann. § 133.01, *et seq*.

371. Plaintiffs and members of the Wisconsin Class were injured with respect to purchases of Fire Apparatus in Wisconsin and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

011328-11/5017095 V1

## NINTH CLAIM FOR RELIEF:

### ALABAMA ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Alabama)**

372.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Ala. Code § 6-5-60, *et seq.* Defendants' unlawful conduct had the following effects: (1) competition for Fire Apparatus was restrained, suppressed, and eliminated within Alabama; (2) Fire Apparatus prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Alabama have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Alabama commerce and caused Class members in Alabama to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and the Class members in Alabama seek all forms of relief available under Ala. Code § 6-5-60, *et seq.*

### TENTH CLAIM FOR RELIEF:

### ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Alaska)**

373.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Alaska, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Alaska. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed,

011328-11/5017095 V1

and eliminated throughout the State of Alaska; (2) Fire Apparatus prices in the State of Alaska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and Class members in Alaska seek all relief available under that statute.

### ELEVENTH CLAIM FOR RELIEF:

### ARKANSAS DECEPTIVE TRADE PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Arkansas)**

374. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arkansas, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Arkansas. Defendants deliberately failed to disclose material facts to Plaintiffs and Class

011328-11/5017095 V1

members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Arkansas; (2) Fire Apparatus prices in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq.*, and, accordingly, Plaintiffs and Class members in Arkansas seek all relief available under that statute.

011328-11/5017095 V1

## TWELFTH CLAIM FOR RELIEF:

### ARIZONA ANTITRUST ACT
**(On Behalf of State Law Class Members That Purchased Fire Apparatus in Arizona)**

375.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' unlawful conduct had the following effects: (1) competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Arizona; (2) Fire Apparatus prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Arizona have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Arizona commerce and caused Class members in Arizona to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Arizona seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

### THIRTEENTH CLAIM FOR RELIEF:

### ARIZONA CONSUMER FRAUD ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Arizona)**

376.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arizona, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Arizona. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive. Defendants' unlawful conduct had the following effects: (1) price

011328-11/5017095 V1

competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Arizona; (2) Fire Apparatus prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arizona commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1521, *et seq*., and, accordingly, Plaintiffs and Class members in Arizona seek all relief available under that statute.

**FOURTEENTH CLAIM FOR RELIEF:**

**CALIFORNIA CARTWRIGHT ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in California)**

377.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout California; (2) Fire Apparatus prices in the State of California were

raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected California commerce and caused Class members in California to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in California seek all forms of relief available under Cal. Bus. & Prof. Code § 16700, *et seq*.

**FIFTEENTH CLAIM FOR RELIEF:**

**CALIFORNIA UNFAIR COMPETITION LAW**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in California)**

378. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in California, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in California. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of California; (2) Fire Apparatus prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels in violation of both the Sherman Act and California's Cartwright Act; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected California commerce and consumers. As a direct and proximate result of

011328-11/5017095 V1

Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, and, accordingly, Plaintiffs and Class members in California seek all relief available under that statute.

### SIXTEENTH CLAIM FOR RELIEF:

### COLORADO STATE ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Colorado)**

379. Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. § 6-4-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Colorado; (2) Fire Apparatus prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Colorado commerce and caused Class members in Colorado to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Colorado seek all forms of relief available under Colo. Rev. Stat. § 6-4- 101, *et seq.*

011328-11/5017095 V1

## SEVENTEENTH CLAIM FOR RELIEF:

## COLORADO CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Colorado)**

380.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Colorado, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Colorado. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Colorado; (2) Fire Apparatus prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative

misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

## EIGHTEENTH CLAIM FOR RELIEF:

### DISTRICT OF COLUMBIA ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in the District of Columbia)**

381. Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and Purchased Fire Apparatus in the District of Columbia, paid supra-competitive, artificially inflated prices for Fire Apparatus. During the Class Period, Defendants' unlawful conduct substantially affected the District of Columbia's commerce and caused Class members in the District of Columbia to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in the District of Columbia seek all forms of relief available under D.C. Code § 28-4501, *et seq.*

011328-11/5017095 V1

# NINETEENTH CLAIM FOR RELIEF:

## DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in the District of Columbia)**

382. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the District of Columbia Consumer Protection Procedures Act, D.C. Code, § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in the District of Columbia, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in the District of Columbia. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Apparatus prices in the District of Columbia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected the District of Columbia's commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free

011328-11/5017095 V1

and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and Class members in the District of Columbia seek all relief available under that statute.

**TWENTIETH CLAIM FOR RELIEF:**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Florida)**

383. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Florida, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Florida. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Florida; (2) Fire Apparatus prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*,

011328-11/5017095 V1

and, accordingly, Plaintiffs and Class members in Florida seek all relief available under that statute.

## TWENTY-FIRST CLAIM FOR RELIEF:

### HAWAII ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Hawaii)**

384. Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Hawaii; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) Plaintiffs and members of the Class, including those who resided in the Hawaii and Purchased Fire Apparatus in Hawaii, paid supracompetitive, artificially inflated prices for Fire Apparatus. During the Class Period, Defendants' unlawful conduct substantially affected Hawaii commerce and caused Class members in Hawaii to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Hawaii seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

## TWENTY-SECOND CLAIM FOR RELIEF:

### ILLINOIS ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Illinois)**

385. Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout Illinois; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; and (3) Plaintiffs and members of the Class, including those who resided in the Illinois and Purchased Fire Apparatus in Illinois,

011328-11/5017095 V1

paid supra- competitive, artificially inflated prices for Fire Apparatus. During the Class Period, Defendants' unlawful conduct substantially affected Illinois commerce and caused Class members in Illinois to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Illinois seek all forms of relief available under 740 Ill. Comp. Stat. 10/1, *et seq.*

## TWENTY-THIRD CLAIM FOR RELIEF:

### ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Illinois)

386. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Illinois, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Illinois. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair.

387. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Illinois; (2) Fire Apparatus prices in the State of Illinois were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Illinois commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of

Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq*., and, accordingly, Plaintiffs and Class members in Illinois seek all relief available under that statute.

**TWENTY-FOURTH CLAIM FOR RELIEF:**

**IOWA COMPETITION LAW**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Iowa)**

388.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Fire Apparatus prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' unlawful conduct substantially affected Iowa commerce and caused Class members in Iowa to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Iowa seek all forms of relief available under Iowa Code § 553.1, *et seq*.

011328-11/5017095 V1

## TWENTY-FIFTH CLAIM FOR RELIEF:

## KANSAS RESTRAINT OF TRADE ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Kansas)**

389. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Fire Apparatus prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Kansas commerce and caused Class members in Kansas to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Kansas seek all forms of relief available under Kan. Stat. Ann. § 50-101, *et seq.*

## TWENTY-SIXTH CLAIM FOR RELIEF:

## MAINE ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Maine)**

390. Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. Tit. 10, §1101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Fire Apparatus prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maine commerce and caused Class members in Maine to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Maine seek all forms of relief available under Me. Stat. Tit. 10, § 1101, *et seq.*

011328-11/5017095 V1

## TWENTY-SEVENTH CLAIM FOR RELIEF:

### MARYLAND ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Maryland)**

391. Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Maryland; and (2) Fire Apparatus prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maryland commerce and caused Class members in Maryland to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Maryland seek all forms of relief available under Md. Code Ann., Com. Law § 11- 201, *et seq*.

### TWENTY-EIGHTH CLAIM FOR RELIEF:

### MARYLAND CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Maryland)**

392. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Maryland Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Maryland, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Maryland. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed,

011328-11/5017095 V1

and eliminated throughout the State of Maryland; (2) Fire Apparatus prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Maryland commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law § 13- 101, *et seq.*, and, accordingly, Plaintiffs and Class members in Maryland seek all relief available under that statute.

**TWENTY-NINTH CLAIM FOR RELIEF:**

**MASSACHUSETTS CONSUMER PROTECTION ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Massachusetts)**

393. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Massachusetts, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or

011328-11/5017095 V1

obtained in Massachusetts. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus.

394. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the Commonwealth of Massachusetts; (2) Fire Apparatus prices in the Commonwealth of Massachusetts were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq.*, and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

011328-11/5017095 V1

**MINNESOTA ANTITRUST LAW**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Minnesota)**

395. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Minnesota; and (2) Fire Apparatus prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Minnesota commerce and caused Class members in Minnesota to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Minnesota seek all forms of relief available under Minn. Stat. § 325D.49, *et eq.*

**THIRTY-FIRST CLAIM FOR RELIEF:**

**MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Minnesota)**

396. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Minnesota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Minnesota. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed,

011328-11/5017095 V1

and eliminated throughout the State of Minnesota; (2) Fire Apparatus prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43-48, *et seq.*, and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

**THIRTY-SECOND CLAIM FOR RELIEF:**

**MONTANA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Montana)**

397.     Defendants' unfair, unconscionable, or deceptive acts or practices violated the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.*, and 30-14-201, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Montana, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or

011328-11/5017095 V1

obtained in Montana. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Montana; (2) Fire Apparatus prices in the State of Montana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and Class members seek all relief available under that statute.

**THIRTY-THIRD CLAIM FOR RELIEF:**

**NEBRASKA JUNKIN ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nebraska)**

398. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nebraska; and (2) Fire Apparatus prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nebraska commerce and caused Class members in Nebraska to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Nebraska seek all forms of relief available under Neb. Rev. Stat. § 59-801, *et seq*.

011328-11/5017095 V1

## THIRTY-FOURTH CLAIM FOR RELIEF:

### NEBRASKA CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nebraska)**

399. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nebraska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Nebraska. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nebraska; (2) Fire Apparatus prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59- 1601, *et seq*., and, accordingly, Plaintiffs and Class members in Nebraska seek all relief available under that statute.

## THIRTY-FIFTH CLAIM FOR RELIEF:

### NEVADA ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nevada)**

400. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.210, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and

011328-11/5017095 V1

eliminated throughout the State of Nevada; and (2) Fire Apparatus prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nevada commerce and caused Class members in Nevada to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Nevada seek all forms of relief available under Nev. Rev. Stat. Ann. § 598A.210, *et seq.*

## THIRTY-SIXTH CLAIM FOR RELIEF:

### NEVADA DECEPTIVE TRADE PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Nevada)**

401. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Fire Apparatus prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of

011328-11/5017095 V1

money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and Class members in Nevada seek all relief available under that statute.

## THIRTY-SEVENTH CLAIM FOR RELIEF:

### NEW HAMPSHIRE ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Hampshire)**

402.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Hampshire; and (2) Fire Apparatus prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected New Hampshire commerce and caused Class members in New Hampshire to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New Hampshire seek all forms of relief available under N.H. Rev. Stat. Ann. § 356:1, *et seq*.

011328-11/5017095 V1

## THIRTY-EIGHTH CLAIM FOR RELIEF:

## NEW HAMPSHIRE CONSUMER PROTECTION ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Hampshire)**

403. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Hampshire, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in New Hampshire. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Hampshire; (2) Fire Apparatus prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and Class members in New Hampshire seek all relief available under that statute.

011328-11/5017095 V1

**THIRTY-NINTH CLAIM FOR RELIEF:**

**NEW JERSEY ANTITRUST ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Jersey)**

404. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.J. Stat. Ann. § 56:9-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Jersey; (2) Fire Apparatus prices in the State of New Jersey were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Jersey commerce and caused Class members in New Jersey to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in New Jersey seek all forms of relief available under N.J. Stat. Ann. § 56:9-1, *et seq*.

**FORTIETH CLAIM FOR RELIEF:**

**NEW MEXICO ANTITRUST ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Mexico)**

405. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. § 57-1-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Apparatus prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce and caused Class members in New Mexico to pay supracompetitive prices for Fire Apparatus.

Accordingly, Plaintiffs and Class members in New Mexico seek all forms of relief available under N.M. Stat. Ann. § 57-1-1, *et*

## FORTY-FIRST CLAIM FOR RELIEF:

### NEW MEXICO UNFAIR PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in New Mexico)**

406. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the N.M. Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Fire Apparatus were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and Class members. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and Class members and the prices paid by them for Fire Apparatus as set forth in N.M. Stat. § 57-12-2E. Plaintiffs and Class members were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and Class members had no power to negotiate a lower price. Moreover, Plaintiffs and Class members lacked any meaningful choice in purchasing Fire Apparatus because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and Class members could avoid the overcharges. Defendants' conduct with regard to sales of Fire Apparatus, including their illegal conspiracy to secretly fix the price of Fire Apparatus at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of

011328-11/5017095 V1

Plaintiffs and Class members. Defendants took grossly unfair advantage of Plaintiffs and Class members. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Fire Apparatus. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Apparatus prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and Class members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and Class members in New Mexico seek all relief available under that statute.

## FORTY-SECOND CLAIM FOR RELIEF:

### NORTH CAROLINA ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in North Carolina)**

407. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. § 75-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of North Carolina; (2) Fire Apparatus prices in the State of North Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Carolina commerce and caused

011328-11/5017095 V1

Class members in North Carolina to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in North Carolina seek all forms of relief available under N.C. Gen. Stat. § 75-1, *et seq.*

## FORTY-THIRD CLAIM FOR RELIEF:

### NORTH DAKOTA UNIFORM STATE ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in North Dakota)**

408. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of North Dakota; (2) Fire Apparatus prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Dakota commerce and caused Class members in North Dakota to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in North Dakota seek all forms of relief available under N.D. Cent. Code § 51-08.1- 01, *et seq.*

## FORTY-FOURTH CLAIM FOR RELIEF:

### OREGON ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Oregon)**

409. Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Apparatus prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants'

011328-11/5017095 V1

unlawful conduct substantially affected Oregon commerce and caused Class members in Oregon to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Oregon seek all forms of relief available under Or. Rev. Stat. § 646.725, *et seq*.

### FORTY-FIFTH CLAIM FOR RELIEF:

### OREGON UNFAIR TRADE PRACTICES ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Oregon)**

410. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Oregon, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Oregon. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Apparatus prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Oregon commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions

011328-11/5017095 V1

concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq*., and, accordingly, Plaintiffs and Class members in Oregon seek all relief available under that statute.

## FORTY-SIXTH CLAIM FOR RELIEF:

### RHODE ISLAND ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Rhode Island)**

411. Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws § 6-36-7, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Apparatus prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Rhode Island commerce and caused Class members in Rhode Island to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Rhode Island seek all forms of relief available under R.I. Gen. Laws § 6-36-7, *et seq*.

011328-11/5017095 V1

# FORTY-SEVENTH CLAIM FOR RELIEF:

## RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Rhode Island)

412. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Apparatus prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market.

011328-11/5017095 V1

Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and Class members in Rhode Island seek all relief available under that statute.

**FORTY-EIGHTH CLAIM FOR RELIEF:**

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in South Carolina)**

413. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of South Carolina; (2) Fire Apparatus prices in the State of South Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and South Carolina Class members have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and Class members in South Carolina seek all relief available under that statute.

011328-11/5017095 V1

## FORTY-NINTH CLAIM FOR RELIEF:

### SOUTH DAKOTA ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in South Dakota)**

414. Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws § 37-1-3.1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Apparatus prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce and caused Class members in South Dakota to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in South Dakota seek all forms of relief available under S.D. Codified Laws § 37-1-3.1, *et seq*.

## FIFTIETH CLAIM FOR RELIEF:

### SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION STATUTE
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in South Dakota)**

415. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Apparatus were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Apparatus. Defendants misrepresented to all purchasers

011328-11/5017095 V1

during the Class Period that Defendants' Fire Apparatus prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Apparatus prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Apparatus, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Apparatus at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiffs and Class members as they related to the cost of Fire Apparatus they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and Class members in South Dakota seek all relief available under that statute.

### FIFTY-FIRST CLAIM FOR RELIEF:

### TENNESSEE FAIR TRADE PRACTICE ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Tennessee)**

416. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Apparatus was restrained,

011328-11/5017095 V1

suppressed, and eliminated throughout the State of Tennessee; (2) prices for Fire Apparatus, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Tennessee commerce and caused Class members in Tennessee to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Tennessee seek all forms of relief available under Tenn. Code Ann. § 47-25-101, *et seq.*

### FIFTY-SECOND CLAIM FOR RELIEF:

### UTAH ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Utah)**

417. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. § 76-10-3101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Utah; (2) prices for Fire Apparatus in the State of Utah were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Utah commerce and caused Class members in Utah to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Utah seek all forms of relief available under Utah Code Ann. § 76-10-3101, *et seq.*

### FIFTY-THIRD CLAIM FOR RELIEF:

### VERMONT ANTITRUST LAW
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Vermont)**

418. Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vt. Stat. Ann. § 2453, *et seq.* Defendants' unlawful conduct had the

011328-11/5017095 V1

following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Fire Apparatus prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Vermont commerce and caused Class members in Vermont to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in Vermont seek all forms of relief available under 9 Vt. Stat. Ann. § 2465, *et seq.*

## FIFTY-FOURTH CLAIM FOR RELIEF:

### WEST VIRGINIA ANTITRUST ACT
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in West Virginia)**

419. Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code § 47-18-1, *et seq.* Defendants' Conspiracy had the following effects: (1) price competition for Fire Apparatus was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) Fire Apparatus prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia and caused Class members in West Virginia to pay supracompetitive prices for Fire Apparatus. Accordingly, Plaintiffs and Class members in West Virginia seek all forms of relief available under W. Va. Code § 47-18-1, *et seq.*

011328-11/5017095 V1

## FIFTY-FIFTH CLAIM FOR RELIEF:

### UNJUST ENRICHMENT
### (on behalf of the State Law Class)

420.	Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

421.	As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Fire Apparatus.

422.	Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the State Law Class.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.	The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B.	The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust and common law;

C.	Plaintiffs and the Classes recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiffs and the other

011328-11/5017095 V1

Class members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that is withheld from the public;

F.      Plaintiffs and Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and Class members have such other and further relief as the case may require and the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

011328-11/5017095 V1

Dated: June 16, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: _/s/ Steve W. Berman_
Steve W. Berman (Bar #12536)
Moses Jehng  (Bar #64333)
Stephanie Verdoia (Bar #58636)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: moses.jehng@hbsslaw.com
Email: stephaniev@hbsslaw.com

By: _/s/ Erin K. Dickinson_
Erin Dickinson (Bar #1036707)
Charles Crueger (Bar #1029825)
**CRUEGER DICKINSON LLC**
4532 North Oakland Avenue
Milwaukee, WI 53211
Telephone: (414) 210-3868
Email:  ekd@cruegerdickinson.com
Email:  cjc@cruegerdickinson.com

By: _/s/ Daniel C. Hedlund_
Daniel C. Hedlund (Bar #025833)
Joshua J. Rissman (Bar #0391500)
Frances Mahoney-Mosedale (Bar #402741)
Gabrielle M. Kolb (Bar #504386)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 S Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
Email: dhedlund@gustafsongluek.com
Email: jrissman@gustafsongluek.com
Email: fmahoneymosedale@gustafsongluek.com
Email: gkolb@gustafsongluek.com

_Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs_

Jennifer Duncan Hackett
James R. Martin
Sabrina A. Nelson
Noah Wolfenstein
Desmond Sims
**ZELLE LLP**
1775 Pennsylvania Avenue, NW Suite 375
Washington, DC 20006

011328-11/5017095 V1

Telephone: (202) 899-4100
Fax: (612) 336-9100
Email: jhackett@zellelaw.com
Email: jmartin@zellelaw.com
Email: snelson@zellelaw.com
Email: nwolfenstein@zellelaw.com
Email: dsims@zellelaw.com

*Executive Committee Chair for Indirect Purchaser Plaintiffs*

Adam J. Zapala
Elizabeth T. Castillo
Christopher F. Jeu
Christian S. Ruano
Lauren A. Devens
**COTCHETT, PITRE & McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

*Executive Committee Counsel for Indirect Purchaser Plaintiffs*

James C. Shah
Natalie Finkelman Bennett
**MILLER SHAH LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Ph. 866-540-5505
Email: jcs@millershah.com
Email: nfinkelman@millershah.com

*Executive Committee Counsel for Indirect Purchaser Plaintiffs*

Kevin Landau
Brett Cebulash
Miles Greaves
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, New York 10038
Telephone: 646-873-7654
Facsimile: 212-931-0703
Email: klandau@tcllaw.com
Email: bcebulash@tcllaw.com
Email: mgreaves@tcllaw.com

011328-11/5017095 V1

*Executive Committee Counsel for Indirect Purchaser Plaintiffs*

Paul F. Novak
Casey Verville
Milena Lai
**WEITZ & LUXENBERG, P.C.**
Fisher Building
3011 West Grand Blvd., 24th Floor
Detroit, MI 48202
Phone: (313) 800-4170
Fax: (646) 293-7992
Email: pnovak@weitzlux.com
Email: cverville@weitzlux.com
Email: mlai@weitzlux.com

*Executive Committee Counsel for Indirect Purchaser Plaintiffs*


Douglas P. Dehler (Bar #1000732)
Joseph D. Newbold (Bar #1085294)
**O'NEIL, CANNON, HOLLMAN, DEJONG & LAING S.C.**
111 E. Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
Phone: (414) 276-5000
Email: doug.dehler@wilaw.com
Email: joe.newbold@wilaw.com

*Liaison Counsel for Indirect Purchaser Plaintiffs*


Chris Cowan
R. Christopher Cowan, Esq., Ltd.
P.O. Box 512
813 Main Avenue, Suite 209
Durango, CO 81302-0512
970-880-8900
214-853-5800 fax
chris@cowan.ltd

*Additional Indirect Purchaser Plaintiffs' Counsel*

Gretchen Freeman Cappio
Ryan McDevitt
Garrett Heilman
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
Email: gcappio@kellerrohrback.com

Email: rmcdevitt@kellerrohrback.com
Email: gheilman@kellerrohrback.com

*Additional Indirect Purchaser Plaintiffs' Counsel*

Michael E. Klenov
mklenov@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
Saint Louis, MO 63101
Tel.: (314) 241-4844

George A. Zelcs
gzelcs@koreintillery.com
Daniel A. Epstein
depstein@koreintillery.com
Labeat Rrahmani
lrrahmani@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750

*Additional Indirect Purchaser Plaintiffs' Counsel*


WOLF POPPER LLP
Chet B. Waldman
Matthew Insley-Pruitt
Adam T. Savett
570 Lexington Avenue, 19th Floor
New York, NY 10022
Telephone: 212/759-4600
CWaldman@wolfpopper.com
MInsley-Pruitt@wolfpopper.com
ASavett@wolfpopper.com

*Additional Indirect Purchaser Plaintiffs' Counsel*

011328-11/5017095 V1