**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| IN RE: FIRE APPARATUS ANTITRUST LITIGATION | Case No. 2:26-md-03179-WCG<br><br>MDL No. 3179<br><br>Hon. William C. Griesbach |
| This document relates to:<br><br>*Direct Purchaser Plaintiff and Indirect Purchaser Plaintiff Class Action Tracks* | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS CLASS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINTS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. The Firetruck Industry .......... 3

B. The Parties .......... 5

1. Defendants .......... 5

2. Class Plaintiffs .......... 7

C. Class Plaintiffs' Claims .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 10

I. Class Plaintiffs Fail to State a Section 1 Claim (DPP Count 1 and IPP Counts 1–2) .......... 10

A. Class Plaintiffs Fail to Plead an Agreement to Restrain Fire Truck Production or Raise Fire Truck Prices (DPP Count 1 and IPP Count 1) .......... 10

1. Class Plaintiffs Do Not Allege Direct Evidence of an Agreement to Restrict Output or Raise Prices .......... 11

2. Class Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement to Restrict Production or Raise Prices .......... 11

a. Class Plaintiffs Fail to Allege Parallel Conduct .......... 12

b. Class Plaintiffs Fail to Allege "Plus Factors" Placing Any Parallel Conduct in the Context of a Preceding Agreement .......... 18

i. There are no acts against self-interest .......... 18

ii. Membership in FAMA is insufficient .......... 20

iii. Alleged market conditions do not facilitate an agreement .......... 21

iv. Class Plaintiffs fail to allege cooperation among Defendants ..... 22

B. Class Plaintiffs Fail to Plead a Conspiracy to Exchange Competitively Sensitive Information (DPP Count 1 and IPP Count 2) ..... 23

1. Class Plaintiffs Fail to Plead an Agreement Among Defendant Manufacturers to Exchange Information ..... 23

2. Class Plaintiffs Fail to Plead That Any Information Exchange Unreasonably Restrained Trade in a Relevant Market ..... 25

a. Class Plaintiffs' Putative Product Market Is Legally Deficient ..... 25

b. The Alleged Information Exchange Is Not Anticompetitive ..... 28

i. FAMA statistical reports are not alleged to contain competitively sensitive information ..... 29

ii. The alleged industry structure is not conducive to collusion ..... 30

II. Class Plaintiffs Fail to Plead a Section 7 Claim (DPP Count 2 and IPP Count 3) ..... 32

III. DPPs Fail to Plead a Section 2 Attempted Monopolization Claim (DPP Counts 4–5) ..... 34

CONCLUSION ..... 35

GLOSSARY ..... 40



Case 2:26-md-03179-WCG Filed 08/17/26 Page 3 of 52 Document 153

**TABLE OF AUTHORITIES**

**CASES**


*Agnew v. National Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ........ 23, 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 9, 13, 20

*Automotive Alignment & Body Service, Inc. v. State Farm Mutual Automobile Insurance Co.*,
953 F.3d 707 (11th Cir. 2020) ........ 20

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) ........ 17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ *passim*

*Birkley v. Amazon.com Services LLC*,
813 F. Supp. 3d 906 (E.D. Wis. 2025) ........ 9

*In re Broiler Chicken Antitrust Litigation*,
2025 WL 461407 (N.D. Ill. Feb. 11, 2025) ........ 16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........ 26

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) ........ 24

*Chamberlain Group, Inc. v. Techtronic Industries North America, Inc.*,
2017 WL 4269005 (N.D. Ill. Sept. 26, 2017) ........ 17

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ........ 12, 14, 15

*Continental Cablevision of Ohio, Inc. v. American Electric Power Co.*,
715 F.2d 1115 (6th Cir. 1983) ........ 24

*CVS Pharmacy, Inc. v. Forest Laboratories Inc. (Watson Laboratories, Inc.)*,
101 F.4th 223 (2d Cir. 2024) ........ 20

*D'Augusta v. American Petroleum Institute*,
117 F.4th 1094 (9th Cir. 2024) ........ 20

*Daneshrad v. Trean Group, LLC*,
2020 WL 11422811 (N.D. Ill. Dec. 21, 2020) ........ 17

*In re Dealer Management System Antitrust Litigation*,
313 F. Supp. 3d 931 (N.D. Ill. 2018)........................................................................ 11

*In re Flash Memory Antitrust Litigation*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009)...................................................................... 32

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021)...................................................................... 21, 25

*In re High Fructose Corn Syrup Antitrust Litigation*,
295 F.3d 651 (7th Cir. 2002)...................................................................................... 11

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)...................................................................................................... 9

*In re Insurance Brokerage Antitrust Litigation*,
618 F.3d 300 (3d Cir. 2010)................................................................................ 12, 20

*In re Interest Rate Swaps Antitrust Litigation*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................................................................... 20

*In re Baby Food Antitrust Litigation*,
166 F.3d 112 (3d Cir. 1999)....................................................................................... 19

*Lektro-Vend Corp. v. Vendo Co.*,
660 F.2d 255 (7th Cir. 1981)...................................................................................... 35

*Llacua v. Western Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019).................................................................................. 20

*In re Local TV Advertising Antitrust Litigation*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022)............................................................. 28

*In re Manufactured Home Lot Rents Antitrust Litigation*,
2025 WL 3485693 (N.D. Ill. Dec. 4, 2025)............................................................... 20

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022)....................................................................................... 10

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020)................................................................................ 24, 25

*Moehrl v. Nat'l Ass'n of Realtors*,
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023)............................................................. 15

*Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984).................................................................................................... 25

*Moore v. Boating Industry Ass'ns*,
819 F.2d 693 (7th Cir. 1987) .......... 20

*In re MultiPlan Health Ins. Provider Litigation*,
789 F. Supp. 3d 614 (N.D. Ill. 2025) .......... 21, 22, 27

*Nucap Industries, Inc. v. Robert Bosch LLC*,
273 F. Supp. 3d 986 (N.D. Ill. 2017) .......... 25, 26

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 23, 25

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
629 F.3d 697 (7th Cir. 2011) .......... 23

*In re Passenger Vehicle Replacement Tires Antitrust Litigation*,
767 F. Supp. 3d 681 (N.D. Ohio 2025) .......... 20

*In re Plasma-Derivative Protein Therapies Antitrust Litigation*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) .......... 17

*In re Pool Products Distribution Market Antitrust Litigation*,
988 F. Supp. 2d 696 (E.D. La. 2013) .......... 18

*In re Pork Antitrust Litigation*,
2019 WL 3752497 (D. Minn. Aug. 8, 2019) .......... 16

*In re Potash Antitrust Litigation*,
667 F. Supp. 2d 907 (N.D. Ill. 2009) .......... 22

*ProMedica Health System, Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) .......... 28

*In re Musical Instruments & Equipment Antitrust Litigation*,
798 F.3d 1186 (9th Cir. 2015) .......... 13

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 35

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) .......... 26

*Rosefielde v. Falcon Jet Corp.*,
701 F. Supp. 1053 (D.N.J. 1988) .......... 31

*Rozema v. Marshfield Clinic*,
977 F. Supp. 1362 (W.D. Wis. 1997) .......... 27

*Santiago v. Tesla, Inc.*,
757 F. Supp. 3d 831 (N.D. Ill. 2024)........................................................................ 29

*Shuffle Tech International, LLC v. Scientific Games Corp.*,
2015 WL 5934834 (N.D. Ill. Oct. 12, 2015)................................................................ 33

*Siva v. Am. Bd. of Radiology*,
38 F.4th 569 (7th Cir. 2022)....................................................................................9, 10

*In re Travel Agent Commission Antitrust Litigation*,
583 F.3d 896 (6th Cir. 2009)........................................................................................ 20

*In re Text Messaging Antitrust Litigation*,
630 F.3d 622 (7th Cir. 2010)........................................................................ 11, 12, 18, 24

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015)........................................................................................ 21

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989)...................................................................................... 26

*Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*,
2024 WL 2785142 (N.D. Ill. May 30, 2024)................................................................ 12

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)......................................................................................... 28

*In re Turkey Antitrust Litigation*,
642 F. Supp. 3d 711 (N.D. Ill. 2022)...................................................................... 11, 24

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019).................................................................................... 34

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990)...................................................................................... 33

*United States v. Container Corp. of America*,
393 U.S. 333 (1969)................................................................................................ 29, 31

*United States v. United States Gypsum Co.*,
438 U.S. 422 (1978)................................................................................................ 23, 30

*United States v. National Ass'n of Broadcasters*,
536 F. Supp. 149 (D.D.C. 1982)................................................................................... 19

*United States v. Philadelphia National Bank*,
374 U.S 363 (1963)........................................................................................................ 33

*Washington County Health Care Authority, Inc. v. Baxter International Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018)........................................................................20, 21

*Wertymer v. Walmart, Inc.*,
142 F.4th 491 (7th Cir. 2025)..............................................................................................12

*Williams Electronics Games, Inc. v. Barry*,
2001 WL 1104619 (N.D. Ill. Sept. 18, 2001).....................................................................20

**STATUTES**

15 U.S.C. § 18...................................................................................................................33

## INTRODUCTION

Speculation does not state an antitrust claim. But that is all Class Plaintiffs offer: they simply theorize that post-pandemic price increases and delays for fire trucks are the product of a sprawling conspiracy rather than simple economics. Their Complaints say otherwise. The pandemic prompted skyrocketing demand and disrupted supply chains causing price increases and longer wait times. None of that has anything to do with an antitrust violation. Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Class Plaintiffs must plead facts showing Defendants reached an unlawful agreement—facts merely consistent with conspiracy are not enough, especially when an "obvious alternative explanation" accounts for the facts alleged. Class Plaintiffs' Complaints fail that basic test. Their remaining theories—that a trade association's anonymized and aggregated industry statistics were somehow anticompetitive, and that separate acquisitions from as long ago as 2008 can be challenged now as anticompetitive conduct—are equally flawed.

Class Plaintiffs primarily allege two Section 1 conspiracies: an agreement to restrain fire truck production to inflate prices and an agreement to exchange competitively sensitive information through FAMA—a trade association for fire truck and component manufacturers. They also challenge a series of Defendant acquisitions dating back to 2008 under Section 7 of the Clayton Act and Section 2 of the Sherman Act. Each claim fails for multiple independent reasons.

*First*, Class Plaintiffs fail to plausibly allege the agreement at the heart of their case: a conspiracy to restrain fire truck production to inflate fire truck prices. There is no direct evidence—i.e., no "smoking gun." That leaves circumstantial evidence, which requires both parallel conduct and "plus factors" showing the conduct traces to an agreement rather than independent business decisions. Class Plaintiffs allege neither. Their only factual allegation—that REV Group, consolidated two manufacturing facilities in or around 2021—is one firm's *unilateral* action, not

parallel conduct. Their own statistics defeat any inference of conspiracy: industry production exceeded historical averages shortly after the pandemic. And their parallel pricing allegations show increases that vary widely in timing and amount—the opposite of parallel conduct. Even if Class Plaintiffs could plead parallel conduct, they plead no plus factors to infer an agreement. Their own allegations show Defendant Manufacturers acted in their independent self-interest—responding to market forces. And their remaining factors—trade association membership and market conditions—fare no better, resting on conclusory assertions and isolated statements with nothing to with an agreement among competitors.

*Second*, Class Plaintiffs' fallback theory, that Defendants conspired by exchanging competitively sensitive information through FAMA, fails too. Unlike the production-conspiracy claim, their information claim is governed by the rule of reason because the Supreme Court has recognized that such exchanges are typically procompetitive. Class Plaintiffs plead no element of their rule of reason claim. They do not allege a hub-and-spoke conspiracy, which requires an agreement among *all* Defendants to share information with *each other* (and not just FAMA). They allege only a series of vertical agreements with FAMA, not any horizontal agreement among competing manufacturers. Nor do they allege harm to competition in a properly defined antitrust market. Their putative market is legally deficient because it lumps together fire trucks that are not reasonably interchangeable. And the alleged information exchange lacks any anticompetitive potential because Class Plaintiffs never allege the exchange of competitively sensitive information. Class Plaintiffs' Section 1 claims thus fail across the board.

*Finally*, Class Plaintiffs' tertiary Clayton Act Section 7 claims—challenging alleged "roll-up" acquisitions—fail. Most of these claims are untimely, challenging acquisitions that occurred many years ago. And all rest on conclusory market share assertions rather than facts showing

anticompetitive harm. Where Class Plaintiffs do plead facts, those facts show no anticompetitive harm. Their attempt to recast this conduct as Section 2 attempted monopolization suffers the same timeliness problems, lacks the required allegations of market power and intent, and rests on the nonsensical theory that several independent firms jointly attempted to monopolize the same market. None of this states a plausible antitrust claim.

The Class Complaints answer their own question. Higher prices and longer wait times for fire trucks are not the product of conspiracies or decades old acquisitions. They are the result of surging demand colliding with pandemic-driven supply shortages. Because Class Plaintiffs' antitrust theories are implausible and their alleged injuries are fully explained by ordinary market forces, the Class Complaints should be dismissed.

## BACKGROUND[1]

### A. The Firetruck Industry

Fire trucks—also called fire apparatuses—are complex, specialized vehicles designed for use under emergency conditions to support the suppression of fires or the mitigation of other hazardous conditions. DPPC ¶¶ 82, 226, 231; *see also* IPPC ¶ 1 n1. There are many different types of fire trucks sold in the United States, including pumpers, aerials, quints, tankers, tenders, special service trucks, mobile foam trucks, aircraft rescue and firefighting trucks, and various types of wildland trucks, among others. *See* DPPC ¶¶ 216–19; IPPC ¶¶ 281–82. The type of truck needed depends on many factors, including the purpose of the truck, the geography of the area (e.g., urban versus rural), and various specifications. *See id.* Fire truck production "requires significant capital investment in engineering, manufacturing facilities, specialized equipment, and a highly trained labor force." DPPC ¶ 226; *see also* IPPC ¶ 286.

[1] Defendants assume (but do not concede) the truth of the well-pleaded allegations.

Fire trucks are typically purchased by municipal and county governments for their fire departments. *See* DPPC ¶¶ 22, 82, 233; IPPC ¶¶ 68, 226. Fire trucks are also purchased by volunteer fire departments. *See* DPPC ¶¶ 10, 233; IPPC ¶¶ 39, 41, 121. There are about 30,000 fire departments in the U.S. DPPC ¶ 231. Fire departments need new fire trucks infrequently—every 10 to 15 years on average. *Id.*; *see also* IPPC ¶ 293. Customers may either purchase fire trucks through dealer networks that operate in all 50 states or directly from a manufacturer, often through contracts negotiated by governmental cooperative purchasing organizations, including Sourcewell and HGAC. *See, e.g.*, DPPC ¶¶ 24, 42, 68, 173; IPPC ¶¶ 124, 235, 283.

Fire trucks are expensive vehicles produced in relatively small quantities with significant wait times. "Within the last few years," a combination of "growing demand" for fire trucks and "flat" supply has coincided with increased prices and wait times. *See* DPPC ¶ 199; IPPC ¶ 261. Standard pumper trucks that cost $300,000 to $500,000 in the mid-2010s now cost $1 million on average, while "ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today." IPPC ¶ 261; *see also* DPPC ¶ 199. Wait times for new trucks are up from 18 months in the mid-2010s to several years today. IPPC ¶ 4; *see also* DPPC ¶ 88.

Meanwhile, fire truck orders spiked between 2020 and 2022 "as municipal coffers became flush with COVID relief funds." IPPC ¶¶ 243, 251; *see also* DPPC ¶ 186. After "decades" of relative stability, the fire truck industry had "ground to a halt during the 2008 financial crisis," as municipalities "saw their budgets slashed." DPPC ¶¶ 84–85; *see also* IPPC ¶¶ 163–64. Demand dropped by more than 40% to 3,000 orders per year by the early 2010s, and many independent fire truck manufacturers folded during this period. IPPC ¶ 164; *see also* DPPC ¶¶ 84–85. Demand rebounded by the mid-2010s and increased steadily through the end of the decade. IPPC ¶¶ 164, 243; *see also* DPPC ¶ 178. By 2022, demand peaked at 45% above the average number of orders

booked during the 2010s. DPPC ¶ 186; IPPC ¶ 251. Demand has since begun to recede, but remains above average at about 5,500 to 6,500 orders per year. *See* DPPC ¶¶ 178, 186; IPPC ¶¶ 243, 251.

In addition to a historic spike in demand, a host of other economic factors "in the wake of the COVID-19 [pandemic]"—including inflation, supply chain disruptions, labor shortages, and material cost increases—also have contributed to higher prices and longer wait times for fire trucks. *See, e.g.*, DPPC ¶¶ 188, 205, 236; IPPC ¶¶ 254, 292, 327. The order fulfillment rate (i.e., the number of orders being shipped) dipped slightly during the pandemic, but began to exceed the average from the 2010s in approximately 2023. *See* DPPC ¶¶ 186–87; IPPC ¶¶ 251–52.

## B. The Parties

### 1. Defendants

Defendants fall into four categories: fire truck manufacturers, corporate parents of fire truck manufacturers, former investors in one of the parent corporations, and a trade association for manufacturers of fire trucks and related components.

Defendants that manufacture fire trucks, along with their corporate parents, are identified in the table below. *See* DPPC ¶¶ 21–22, 28, 30–38, 64–67; IPPC ¶¶ 124, 128–31, 137. In their Complaints, Class Plaintiffs confusingly (and improperly) use the term "Manufacturer Defendants" to include corporate parents that do not (and are not properly alleged to) manufacturer fire trucks. DPPC ¶ 2; IPPC ¶ 1 n.2. To avoid confusion, Defendants use the term "Defendant Manufacturers" to refer only to those Defendants that manufacture fire trucks.

| Defendant Family | Corporate Parent | Manufacturer Subsidiaries |
|---|---|---|
| REV Group Defendants[2] | REV Group | • E-ONE<br>• Ferrara<br>• KME<br>• Ladder Tower |

[2] The REV Group Defendants also include another subsidiary called DTM, but Class Plaintiffs do not allege what this subsidiary does. *See* DPPC ¶ 37.

| | | |
|---|---|---|
| | | • Smeal<br>• Spartan |
| Oshkosh Defendants | Oshkosh | • Pierce |
| Rosenbauer | Rosenbauer America | • Rosenbauer SD<br>• Rosenbauer MN |

Defendant Manufacturers also include Boise Mobile and its subsidiary, BME, which produce wildland fire trucks. DPPC ¶ 29.

The third category consists of the AIP Defendants, including AIP, LLC and the five AIP Investor Defendants. AIP, LLC is a New York-based private equity company. DPPC ¶¶ 45, 55. The five AIP Investor Defendants consist of three AIP funds that had held an ownership interest in REV Group and its predecessor entity, and two affiliates of those funds. *Id.* ¶¶ 46–49. The AIP Investor Defendants sold most of their holdings of REV Group in March 2024 and no longer hold any interest in REV Group following its merger with Terex Corporation in February 2026. *See id.* ¶¶ 30, 53, 56, 58, 119.

Finally, FAMA is a nonprofit trade association for manufacturers of fire trucks and fire truck components. DPPC ¶¶ 150, 159; IPPC ¶¶ 147–48, 226. FAMA had over 50 fire truck manufacturer members as of 2025, including Pierce, E-ONE, KME, Ferrara, Spartan, Rosenbauer, and dozens of other manufacturers that were not named as defendants here. *See* DPPC ¶ 150; IPPC ¶ 147. FAMA organizes biannual meetings and facilitates certain information exchanges among members. *See* DPPC ¶ 151; IPPC ¶ 209. A committee called the Data & Research Committee that oversees this exchange describes its mission as helping to “strengthen FAMA member companies by providing actionable data . . . for strategic business planning.” DPPC ¶ 154 (quoting *Data &*

*Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee ("Ex. A, *Data & Research Committee*")); IPPC ¶ 211 (same).[3]

FAMA members do not exchange information directly with each other. Rather, on a quarterly basis, information is entered through a digital portal, sent to an accounting firm for processing, and returned to the Data & Research Committee, which then uploads the processed data as a statistical report to a restricted section of the FAMA website. *See* DPPC ¶¶ 156–57, 171; IPPC ¶¶ 213, 215, 234. The published data consists of fire truck sales and orders statistics "compiled in composite form so as to conceal the identity of any company or of any specific transaction." Ex. A, *Data & Research Committee*; *see also* DPPC ¶ 154; IPPC ¶ 214. FAMA members are not required to participate in the exchange, and only members that provide their own data receive access to the statistical report. DPPC ¶ 161; IPPC ¶¶ 218, 227; *see also* Ex. A, *Data & Research Committee* ("Participation in programs will be completely voluntary.").

FAMA also organizes biannual meetings for members in the spring and fall. DPPC ¶ 166; IPPC ¶ 229. Meeting attendees listen to presentations about market trends and other topics, and participate in discussion groups. DPPC ¶¶ 167–68; IPPC ¶¶ 230–31.

**2. Class Plaintiffs**

Class Plaintiffs are fire truck customers located in various states that allege they purchased one or more of Defendant Manufacturers' fire trucks since 2016 at artificially inflated prices due to Defendants' anticompetitive conduct. Most Class Plaintiffs are municipalities that purchased fire trucks for their municipal fire departments. Two Class Plaintiffs are consolidated city-county governments. Four Class Plaintiffs are volunteer fire departments. *See generally* DPPC ¶¶ 9–20; IPPC ¶¶ 25–122.

---

[3] DPPs and IPPs both name Oshkosh, Pierce, REV Group, and the Rosenbauer Defendants. All other Defendants are named only by DPPs, except that FAMA is named only by IPPs.

Class Plaintiffs break down into two groups: DPPs, which purchased fire trucks directly from the relevant Defendant Manufacturers, DPPC ¶¶ 10, 12, 14, 16, 18, 20; and IPPs, which purchased fire trucks indirectly from dealers (some also allege direct purchases), IPPC ¶¶ 27, 34, 39, 41, 45, 58, 63, 68, 71, 73, 75, 87, 93, 97, 100, 106, 120, 122.[4] Each group purports to represent a nationwide class of similarly situated purchasers. DPPC ¶ 265; IPPC ¶ 313.

**C. Class Plaintiffs' Claims**

Class Plaintiffs primarily allege two conspiracies in violation of Section 1 of the Sherman Act.[5] First, they allege that Defendants conspired to restrict the production of fire trucks to suppress price competition and artificially inflate prices for fire trucks since at least January 1, 2016. DPPC ¶¶ 276–81 (Count 1); IPPC ¶¶ 339–42 (Count 1). Second, Class Plaintiffs allege that Defendants conspired to exchange competitively sensitive information through FAMA in furtherance of their conspiracy to raise prices by restricting output since at least January 1, 2016. DPPC ¶¶ 276–81 (Count 1); IPPC ¶¶ 345–55 (Count 2).

DPPs also challenge certain acquisitions by AIP Fund IV, REV Group, Oshkosh, and Pierce under Clayton Act Section 7 and Sherman Act Section 2. DPPs allege that these Defendants violated Section 7 through "roll up" acquisitions of other fire truck manufacturers—specifically, AIP Fund IV's acquisition of E-ONE in 2008; REV Group's acquisitions of KME in 2016, Ferrara in 2017, and Spartan in 2020; Pierce's acquisition of a 25% interest in BME in 2021; and Oshkosh's acquisition of Maxi-Métal in 2022. DPPC ¶¶ 282–86 (Count 2); *see also id.* ¶¶ 29, 98,

---

[4] DPPs consist of Augusta, Newstead, Philadelphia, Nashville, Revere, and Roseland. IPPs consist of Arcadia, Ann Arbor, Claverack, Commack, Durango, Fountain Valley, Fullerton, La Crosse, Las Vegas, Middletown, Milwaukee, New Brighton, Onalaska, Raleigh, Ridgeland, Rochester, Wyandotte County, and Water Witch.

[5] DPPs at times frame the conspiracies as three conspiracies, *e.g.*, DPPC ¶ 277, but like IPPs, they allege two unique conspiracies—the alleged conspiracies to restrict production and fix prices are the same in that Defendants allegedly fixed prices by restricting production, *see id.* ¶ 3.

102, 105, 109, 113–14, 122, 124. DPPs also assert attempted monopolization claims under Sherman Act Section 2 based on those same acquisitions. *Id.* ¶¶ 298–310 (Counts 4–5).

IPPs assert a Section 7 claim against REV Group based on its acquisitions of E-ONE, KME, Ferrara, and Spartan. IPPC ¶¶ 357–62 (Count 3); *see also id.* ¶¶ 171, 177, 180. Because the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars indirect purchasers from recovering damages on federal antitrust claims, IPPs seek only injunctive relief under federal law and assert damages claims under various state laws, which Defendants address in a separate motion. *See generally* IPP Br.

## LEGAL STANDARD[6]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting. *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court accepts as true the well-pleaded factual allegations on a motion to dismiss, but that tenet "is inapplicable to legal conclusions." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ensuring compliance with the plausibility standard "is particularly important in the antitrust context so as to avoid the potentially enormous

---

[6] Unless stated otherwise, all quotes herein are "cleaned up." *See Birkley v. Amazon.com Servs. LLC*, 813 F. Supp. 3d 906, 910 (E.D. Wis. 2025) (Griesbach, J.) (adopting this convention).

expense of antitrust discovery in cases with no reasonably founded hope of success." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022).

## ARGUMENT

### I. Class Plaintiffs Fail to State a Section 1 Claim (DPP Count 1 and IPP Counts 1–2)

Class Plaintiffs assert two violations of Section 1 of the Sherman Act: a conspiracy to restrict production of fire trucks to inflate prices; and a conspiracy to exchange competitively sensitive information through FAMA to achieve the same result. "To state a Section 1 claim, a plaintiff must allege that the defendant (1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022). The alleged conspiracies each fail because Class Plaintiffs do not plausibly allege any agreement among Defendant Manufacturers, as opposed to independent conduct. The purported information exchange conspiracy—subject to the rule of reason standard—also fails because Class Plaintiffs do not plead any unreasonable restraint of trade. They plead a legally deficient "all fire truck" market, and do not allege the information exchange involved competitively sensitive information. Class Plaintiffs' Section 1 claims should be dismissed for each reason.

#### A. Class Plaintiffs Fail to Plead an Agreement to Restrain Fire Truck Production or Raise Fire Truck Prices (DPP Count 1 and IPP Count 1)

Class Plaintiffs fail to plausibly allege a conspiracy to restrain the production or raise the price of fire trucks. They plead no direct evidence of an agreement to restrain production or raise prices among Defendants, and their Complaints lack factual allegations showing the parallel conduct or "plus factors" necessary to infer such an agreement from circumstantial evidence. At most, Class Plaintiffs allege "conscious parallelism" that is fully consistent with Defendants' economic self-interest under industry circumstances driven by the pandemic and its aftermath.

### 1. Class Plaintiffs Do Not Allege Direct Evidence of an Agreement to Restrict Output or Raise Prices

To plead an agreement, Class Plaintiffs must allege "enough factual matter (taken as true) to suggest an agreement was made." *Twombly*, 550 U.S. at 556. A plaintiff may plead an agreement through direct or circumstantial evidence. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018). "[D]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002). Direct evidence is "tantamount to an acknowledgement of guilt," *id.* at 662, or put otherwise, "equivalent to a smoking gun," *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 722 (N.D. Ill. 2022). It "usually take[s] the form of an admission by an employee of one of the conspirators[] that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

Class Plaintiffs plead no direct evidence of an agreement. They do not allege any admission of an agreement or any evidence of when, how, or where the purported agreement was made. Their conclusory allegations of agreement, *e.g.*, DPPC ¶ 276; IPPC ¶ 339, are insufficient, *see Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Given the absence of any allegations of direct evidence, the plausibility of the alleged agreement turns on circumstantial evidence. Class Plaintiffs fare no better there.

### 2. Class Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement to Restrict Production or Raise Prices

The Supreme Court in *Twombly* settled the standard for pleading an antitrust conspiracy through circumstantial evidence. A plaintiff must first allege "parallel conduct," meaning the same or substantially similar action taken by competitors around the same time, and must place that

conduct "in a context that raises a suggestion of a preceding agreement," facts commonly called "plus factors." *Twombly*, 550 U.S. at 557. This latter step is critical. Parallel conduct standing alone "could just as well be independent action" and thus "does not suggest conspiracy." *Id.* at 556–57. "Even conscious parallelism," the tendency of firms in a concentrated market to recognize and follow one another's pricing and output decisions "is not in itself unlawful." *Id.* at 553–54. Such behavior is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. A complaint therefore "is too speculative where there is an 'obvious alternative explanation' for the complaint's factual allegations." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 497 (7th Cir. 2025) (quoting *Twombly*, 550 U.S. at 567)); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("[A] claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." (quoting *Twombly*, 550 U.S. at 565, 567)).

Here, Class Plaintiffs do not plausibly allege *either* parallel conduct *or* plus factors. To the extent they allege any common, non-conclusory conduct, that conduct has an obvious explanation having nothing to do with conspiracy—just as in *Twombly.*

#### a. Class Plaintiffs Fail to Allege Parallel Conduct

"'Parallel conduct' refers to the same or substantially similar actions taken by actors on the same level." *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *12 (S.D.N.Y. June 25, 2025). It must reflect "behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *16 (N.D. Ill. May 30, 2024) (quoting *In re Text Messaging*, 630 F.3d at 628).

Although parallel conduct need not be simultaneous, it must occur relatively close in time. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (conduct that occurred "over a period of several years" was not parallel). Class Plaintiffs' parallel conduct allegations are thin, conclusory, and otherwise rely on impermissible group pleading.

***Production.*** While Class Plaintiffs repeatedly declare that Defendants have suppressed production of fire trucks, they do not allege that Defendant Manufacturers have decreased production. Rather, they allege only that Defendant Manufacturers "failed to add manufacturing capacity" in response to a surge in demand during the COVID-19 pandemic. DPPC ¶¶ 190–92; IPPC ¶¶ 255–57. In fact, with the sole exception of KME, which allegedly shuttered two manufacturing facilities in or around 2021, DPPC ¶ 192; IPPC ¶ 257, Class Plaintiffs allege no actual facts about Defendant Manufacturers' production during the alleged conspiracy.[7] The only production information Class Plaintiffs provide is a graph that *undermines* their allegations by showing that industry-wide production largely *increased* during the conspiracy period, surpassing the average production level during the 2010s by approximately 2023, once the industry began to recover from the pandemic. *See* DPPC ¶ 186; IPPC ¶ 251. Class Plaintiffs' sweeping generalization that Defendants have not increased manufacturing capacity—without any factual or Defendant-specific allegations to back it up—thus fails to plausibly allege parallel action (or inaction). *See Iqbal*, 556 U.S. at 681 ("conclusory" allegations are "not entitled to be assumed true").[8]

***Pricing.*** Class Plaintiffs' parallel pricing allegations are similarly defective. The *only* factual allegations relating to Defendant Manufacturers' pricing during the alleged conspiracy

---

[7] Even as to KME, Plaintiffs do not clearly allege whether it reduced its production capacity or simply transferred production to other facilities. *See* DPPC ¶ 192; IPPC ¶ 257.

[8] IPPs' allegation that "Manufacturer Defendants' backlogs soared in parallel during the Class Period," IPPC § IV.F.1 (header), adds nothing to the allegations concerning failure to add manufacturing capacity in response to surging demand and, thus, fails for the same reasons.

period derive from two line graphs in DPPs' Complaint, which purportedly show that prices of certain "base model" fire trucks increased at higher rates compared to "heavy duty truck manufacturing" in the period between 2015 and 2023. *See* DPPC ¶ 236. Those graphs fall well short of carrying Class Plaintiffs' burden to plausibly allege parallel conduct.

For starters, the graphs are incomplete. They reflect data for just two types of fire trucks (pumpers and aerials) out of nearly a dozen categories of trucks in the alleged market. *See infra* § I.B.1. They include a limited number of models even within those categories, omitting many of Defendant Manufacturers' pumpers and aerials. And neither chart includes a single KME fire truck. Their pricing information is fragmentary as well. The charts draw exclusively on pricing from HGAC, a single purchasing consortium. DPPC ¶ 236 nn.109–10. But consortium contracts are just one of the ways customers buy fire trucks. The Complaints allege that customers also purchase through dealer networks operating in all 50 states, directly from manufacturers, and through other consortiums such as Sourcewell. *See id.* ¶¶ 24, 42, 68, 173; IPPC ¶¶ 124, 135, 142, 235–36. HGAC's contract prices do not show the prices Defendant Manufacturers charged through any of those other channels. In fact, given that consortiums serve to negotiate pricing contracts, DPPC ¶ 173, it is not clear the graphs reflect prices any customers ultimately paid for the included trucks. The graphs also present each truck's price as a percentage of its own 2015 price rather than in dollars, masking the wide differences in what these trucks actually cost. What is more, DPPs fail to disclose the data underlying the charts. They ask the Court to accept their conclusions on faith, without revealing the inputs, methodology, or assumptions that supposedly produced them. That is not enough. *See In re Concrete & Cement Additives*, 2025 WL 1755193, at *17 ("A plaintiff may not disguise a conclusory statement by merely alleging that the conclusion derives from mathematical calculations done behind the scenes.").

More importantly, the graphs are self-defeating. They show the significant disparities in the amounts and timing of the alleged fire truck price increases since 2015. For example, by 2023, some pumper models' prices had risen at roughly three times the rate of others, with a similar spread among aerials. *See* DPPC ¶ 236. The rate of increase also varies at different times for different trucks. *See id.* Such "wide variations in the timing, scope, and amount of pricing changes" alone undermine any inference of parallel conduct. *See In re Concrete & Cement Additives*, 2025 WL 1755193, at *14 (holding that alleged price increases "in different amounts, covering different geographic regions and product lines, and at different times" failed to show parallel conduct).

Moreover, DPPs use price increases in "the heavy duty truck manufacturing industry" as a baseline for comparison, but allege no facts suggesting that industry is actually comparable to the fire truck industry. A meaningful "yardstick" comparison between two distinct industries requires control variables to account for relevant differences between them—the accepted method under antitrust law. DPPs use no such controls here so their comparison is unreliable. *See Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023) ("[F]or a particular yardstick analysis to be considered reliable, the plaintiff bears the burden of demonstrating the comparability of the proposed yardsticks.").

IPPs' allegations of purported parallel pricing are equally deficient. Lacking any actual allegations about Defendant Manufacturers' pricing, IPPs rely merely on the net revenue of the corporate parent Defendants during select post-pandemic years to allege parallel price increases. IPPC ¶¶ 275–77. Such allegations do not show Defendant Manufacturers raised prices in parallel—especially given that the alleged revenues reflect increased fire truck *sales* during the pandemic, not merely prices, as well as sales of products *other than* fire trucks. *See id.* ¶¶ 251, 275–77.

To the extent Class Plaintiffs rely on allegations relating to industry-wide average prices for pumpers and aerials today relative to the mid-2010s, *see, e.g.*, DPPC ¶ 199, IPPC ¶ 290, those too are insufficient to show parallel pricing behavior among Defendant Manufacturers. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (granting motion to dismiss where plaintiffs relied "almost exclusively on industry-wide data and ask[ed] the Court to infer that the individual Defendants all contributed to the [outcome] . . . simply because they ma[d]e up the majority of the industry"). Parallel pricing means parallel changes by the alleged conspirators—not average changes across an industry. In fact, alleged industry-wide price increases undermine any inference of conspiracy. *See In re Musical Instruments*, 798 F.3d at 1197 (granting motion to dismiss where plaintiffs alleged increase in the average price of *all* relevant products, not just those manufactured by defendants). And Class Plaintiffs' industry-wide allegations ignore pricing during the vast majority of the alleged conspiracy period.

***Acquisitions.*** Defendants' alleged "roll up" acquisitions also are not parallel conduct. The six challenged acquisitions took place over fourteen years, from 2008 to 2022, and the two groups of acquirers did not even overlap in time: AIP Fund IV made its acquisition in 2008, the REV Group acquisitions occurred between 2016 and 2020, and the Oshkosh and Pierce transactions came in 2021 and 2022. Conduct spread across so many years is not parallel. *See In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *11 (N.D. Ill. Feb. 11, 2025) (conduct spanning from 2008 to 2012 was not parallel with conduct spanning from 2011 to 2019 or from 2014 to 2017). And Rosenbauer is not alleged to have made any acquisitions at all. Nor would simultaneous acquisitions necessarily suggest an agreement to restrict outcome: acquiring a competitor says nothing about restricting production, which is presumably why courts examining them have looked

to supply cuts following acquisitions—conduct that is absent here as discussed above. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 996 (N.D. Ill. 2011).

***Group Pleading.*** Class Plaintiffs compound their deficient parallel conduct allegations by relying on pervasive group pleading. "Each defendant is entitled to know what he or she did that is asserted to be wrongful," and "[a] complaint based on a theory of collective responsibility must be dismissed"—"even for allegations of conspiracy." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (noting that "[a] contention that 'the defendants looted the corporation'—without any details about who did what—is inadequate"). Here, Class Plaintiffs repeatedly direct their allegations of parallel conduct at "Manufacturer Defendants" collectively, a term they use to amalgamate all Defendant Manufacturers and their corporate parents. *See, e.g.*, DPPC ¶¶ 173, 179, 188, 191, 195, 198, 201; IPPC ¶¶ 240–42, 244, 255, 264, 271. While a plaintiff may make allegations against an "undifferentiated group of defendants" it must be plausible that each and every defendant "performed the alleged actions attributed to the group." *Daneshrad v. Trean Grp., LLC*, 2020 WL 11422811, at *5 (N.D. Ill. Dec. 21, 2020). That is not the case here. Class Plaintiffs offer no allegations showing that the corporate parent Defendants—which do not manufacture or sell fire trucks—participated in any alleged conduct. And their allegations specific to individual Defendant Manufacturers' conduct are few and far between. Conclusory allegations directed at "Manufacturer Defendants"—however numerous—do not fill the void. *See Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*, 2017 WL 4269005, at *3 (N.D. Ill. Sept. 26, 2017) (dismissing claims based on implausible allegations directed at seven defendants).

In sum, Class Plaintiffs do not plausibly allege that Defendants undertook parallel action or inaction. The alleged conspiracy to restrain production and raise prices should be dismissed based solely on this deficiency.

**b. Class Plaintiffs Fail to Allege "Plus Factors" Placing Any Parallel Conduct in the Context of a Preceding Agreement**

Class Plaintiffs likewise fail to plead any plus factors necessary to infer an agreement from any supposed parallel conduct. On the contrary, they allege multiple obvious alternative explanations for any common conduct that defeats any inference of agreement.

i. <u>There are no acts against self-interest</u>

Generally, "the most important 'plus factor'" is "that the parallel conduct was not in the alleged conspirators' independent self-interest absent an agreement." *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (collecting cases). Conduct that serves defendants' self-interest regardless of an agreement "does not suggest conspiracy." *Twombly*, 550 U.S. at 556–57. Class Plaintiffs do not plausibly allege that Defendants undertook any acts against their independent self-interest.

Class Plaintiffs suggest that Defendant Manufacturers acted against their self-interest to the extent they failed to increase manufacturing capacity because "[u]nder typical competitive market conditions," the surge in demand during the pandemic "would be met with a corresponding increase in manufacturing capacity." DPPC ¶ 190; *see also* IPPC ¶ 256. That allegation fails on its own terms. The antitrust laws do not require any firm to invest, expand, or compete in any particular way beyond what its own interests dictate. *See In re Text Messaging*, 630 F.3d at 627 ("[S]ection 1 . . . does not require sellers to compete; it just forbids their agreeing or conspiring not to compete."). When the same decision is rational for each firm acting alone, the mere fact that each made the rational decision is not evidence of agreement. In *Twombly*'s words, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Twombly*, 550 U.S. at 566; *see also In re Text Messaging*, 630 F.3d at 627 (noting that market conditions can enable firms "to avoid competing without having to agree not to compete").

Class Plaintiffs' own allegations explain why Defendant Manufacturers did not immediately expand their production capacity: fire truck production "requires significant capital investment in engineering, manufacturing facilities, specialized equipment, and a highly trained labor force." DPPC ¶ 226; *see also* IPPC ¶ 286. They further allege that demand for fire trucks was relatively stable in the 2010s, briefly spiked during the pandemic, and quickly returned to pre-pandemic levels. *See* DPPC ¶ 186; IPPC ¶ 251. Thus, according to their Complaints, it would have made little economic sense for Defendant Manufacturers to invest significant capital in additional capacity to respond to a temporary and atypical spike in demand caused by a once-in-a-lifetime pandemic resulting in one-time federal stimulus funding. Even if Defendant Manufacturers had wanted to immediately increase capacity, alleged "supply chain and labor shortage challenges" during the pandemic would naturally have prevented them from doing so until after demand had already subsided. *See* IPPC ¶ 292; *see also* DPPC ¶ 237.

Defendant Manufacturers' alleged pricing behavior is also consistent with their independent self-interest. Class Plaintiffs allege that higher prices have yielded "considerable profit increases" for *all* Defendants. DPPC ¶ 208; *see also* IPPC ¶ 271. But profit "is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act." *In re Baby Food*, 166 F.3d 112, 134–35 (3d Cir. 1999). Class Plaintiffs also allege pandemic-induced factors that would have caused Defendant Manufacturers to independently raise prices, including inflation, supply chain disruptions, and labor and material cost increases. *See* DPPC ¶¶ 188, 205, 236; IPPC ¶¶ 254, 292, 327. Surging demand met with constant supply would naturally have prompted prices to go up as well. *United States v. Nat'l Ass'n of Broads.*, 536 F. Supp. 149, 162 (D.D.C. 1982).

Just as in *Twombly*, then, Class Plaintiffs allege ample reasons why any alleged parallel conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680. Much like Class Plaintiffs, the plaintiffs in *Twombly* alleged that the defendant regional telephone companies had agreed not to compete with each other. 550 U.S. at 551. The Supreme Court held that the alleged conspiracy was implausible because common economic experience and the plaintiffs' own allegations established that the defendants were independently motivated not to compete under prevailing market conditions. *Id.* at 567–68. Following *Twombly*'s lead, courts regularly dismiss Section 1 claims based on obvious alternative explanations for the alleged conduct, including pandemic-related explanations for production cuts or price increases.[9] The same outcome is warranted here.

ii. Membership in FAMA is insufficient

Class Plaintiffs also rely on certain Defendant Manufacturers' membership in FAMA, which they allege furnishes an "opportunity to collude." IPPC ¶ 7; *see also* DPPC ¶ 223. "Mere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust law." *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987). Nor does the "mere opportunity to conspire" through a trade association "support an inference of conspiracy." *Williams Elec. Games, Inc. v. Barry*, 2001 WL 1104619, at *7 (N.D. Ill. Sept. 18, 2001). The key

[9] *See, e.g.*, *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (holding that pandemic-related circumstances supplied an alternative explanation); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 710 (N.D. Ohio 2025) (same); *see also, e.g.*, *CVS Pharmacy, Inc. v. Forest Lab'ys Inc. (Watson Lab'ys, Inc.)*, 101 F.4th 223, 240, 242 (2d Cir. 2024); *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 729 (11th Cir. 2020); *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180–81 (10th Cir. 2019); *In re Ins. Brokerage*, 618 F.3d at 327–36; *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 908 (6th Cir. 2009); *In re Manufactured Home Lot Rents Antitrust Litig.*, 2025 WL 3485693, at *13 (N.D. Ill. Dec. 4, 2025); *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 464, 476, 485 (S.D.N.Y. 2017).

question is whether defendants *exploited* such opportunities. *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018). Class Plaintiffs fail to show that here. They provide "no evidence of what information was exchanged" at FAMA meetings, so "there is no basis for an inference" that member Defendants used FAMA meetings to plot a conspiracy. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015). As for FAMA statistical reports, Class Plaintiffs rely on the conclusion that they contain competitively sensitive data, but fail to show that any data contained in such reports is plausibly anticompetitive. *See infra* § I.B.2.b.i. In short, Class Plaintiffs' allegations concerning Defendants' participation in FAMA are "unspectacular and fail to move the needle." *Washington Cnty.*, 328 F. Supp. 3d at 843.

iii. Alleged market conditions do not facilitate an agreement

Class Plaintiffs likewise fail to plausibly allege "market-related circumstances that facilitate an agreement," such as high barriers to entry and high market concentration. *See In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 642 (N.D. Ill. 2025) (addressing this plus factor). They attempt to plead that the fire truck market is highly concentrated because REV Group, Oshkosh, and Rosenbauer together control 70% of the market. DPPC ¶ 89; IPPC ¶ 284. But Class Plaintiffs' "bare assertions" of market share are "too conclusory" to be credited. *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021); *cf.* DPPC ¶¶ 43, 57; IPPC ¶ 284. Nor is the market concentrated among few suppliers because Class Plaintiffs allege that the remaining 30% is spread across *50* non-defendant manufacturers. *See* DPPC ¶ 150; IPPC ¶ 147. Class Plaintiffs' high barriers to entry allegations fall flat for the same reason. And this industry is especially *inconducive* to conspiracy because Class Plaintiffs recognize that fire trucks come in many different varieties and are often purchased in custom configurations tailored to fire department-specific needs. *See, e.g.*, IPP ¶ 182; *see also infra* § II.B.2.b.ii.

In any event, "allegations concerning the structure of a market are insufficient alone to plausibly allege a price-fixing agreement." *MultiPlan*, 789 F. Supp. 3d at 642. After all, market circumstances that facilitate an agreement, like mere membership in a trade association, at best show the prospect of collusion—not actual collusion. *See id.*

iv. Class Plaintiffs fail to allege cooperation among Defendants

Class Plaintiffs allege that Defendants "sought to cooperate, rather than compete, with one another." DPPC ¶ 144; IPPC ¶ 203. While courts have recognized "high level of cooperation" as a plus factor, *In re Potash Antitrust Litigation*, 667 F. Supp. 2d 907, 933 (N.D. Ill. 2009), Class Plaintiffs do not plausibly allege any cooperation amongst Defendants. They merely allege three isolated statements having nothing to do with cooperation between competitors and are fully consistent with independent conduct. One statement reflects that REV Group did not tolerate "negative selling" among its own subsidiaries and dealers, not competitors. *See* DPPC ¶ 146 & n.45 (citing Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands* (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (clarifying that the statement relates to REV Group brands and dealers)); IPPC ¶ 204 & n.89 (same). The second alleged statement notes that REV Group was raising profit margins "and that other companies were doing the same," which at most describes conscious parallelism. DPPC ¶ 147; IPPC ¶ 205. The third statement, made by an executive of a third party, C.E.T. Fire Pumps, simply refers to potential "partnerships and other alliances" among unidentified "people in the fire service industry." DPPC ¶ 148; IPPC ¶ 206. Class Plaintiffs also fail to plead anything anticompetitive about Defendant Manufacturers' alleged cooperation through FAMA. *See supra* § I.A.2.b.ii; *infra* § I.B.1.

*    *    *

Class Plaintiffs plead no direct or circumstantial evidence of an agreement to restrict production or raise prices. They do not allege parallel conduct or plus factors sufficient to support a reasonable inference that any supposed parallel conduct was the product of an agreement rather than independent conduct motivated by economic self-interest. Class Plaintiffs' Section 1 conspiracy claims to reduce production should be dismissed.

### B. Class Plaintiffs Fail to Plead a Conspiracy to Exchange Competitively Sensitive Information (DPP Count 1 and IPP Count 2)

Class Plaintiffs separately allege a conspiracy to exchange competitively sensitive information through FAMA. DPPC ¶ 277; IPPC ¶ 345. An information exchange "is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011). On the contrary, information exchanges often "increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum*, 438 U.S. 422, 441 n.16 (1978). Because the exchange of information amongst competitors "does not invariably have anticompetitive effects," courts evaluate such claims under the rule of reason, not as *per se* illegal agreements. *Id.*

Under the rule of reason, Class Plaintiffs must plausibly allege that (1) Defendants entered into an agreement to exchange information and (2) the exchange "has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *see also Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335–36 (7th Cir. 2012). Class Plaintiffs do not adequately allege either element.

#### 1. Class Plaintiffs Fail to Plead an Agreement Among Defendant Manufacturers to Exchange Information

Class Plaintiffs' information-exchange claims fail at the outset because they do not allege direct or circumstantial evidence of an agreement among Defendant Manufacturers to exchange information. Pleading an agreement is essential whenever a plaintiff alleges that competitors

violated Section 1, including when the violation involves exchanging information. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223 (3d Cir. 2011) ("[T]he exchange of price information still requires showing that the defendants had an agreement."); *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1118–19 (6th Cir. 1983) ("the exchange of price data" does "not offend § 1" in "the absence of . . . an actual agreement to restrain competition").

Class Plaintiffs do not allege that Defendants directly exchanged information or agreed to do so. They instead rely on an alleged "give-data-to-get-data scheme" in which Defendant Manufacturers provided information to FAMA, which in turn provided it to others. *See* DPPC ¶¶ 151–61; IPPC ¶¶ 210–27. In other words, while Class Plaintiffs attempt to allege a "hub-and spoke" conspiracy, they solely plead a series of vertical agreements between Defendant Manufacturer "spokes" and the FAMA "hub." *See In re Musical Instruments*, 798 F.3d at 1192. They fail to allege the necessary "rim"—i.e., a horizontal agreement among Defendant Manufacturers themselves. *See id.*; *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020) ("[T]he plaintiffs must show that similarly situated members of the conspiracy coordinated not only with the [hub], but also with each other."). Without this rim, Class Plaintiffs only allege a series of individual vertical agreements between each member Defendant and FAMA, not an agreement amongst competitors. *See Marion*, 952 F.3d at 842–43 (directing district court to dismiss rimless hub-and-spoke conspiracy); *In re Musical Instruments*, 798 F.3d at 1192–98 (affirming dismissal of an alleged rimless hub-and-spoke conspiracy).

Class Plaintiffs plead no direct evidence of a horizontal agreement among Defendant Manufacturers—no "smoking gun," *Turkey*, 642 F. Supp. 3d at 722, or "admission by an employee," *Text Messaging*, 630 F.3d at 628. Nor do Class Plaintiffs allege circumstantial evidence of a horizontal agreement. Circumstantial evidence of a horizontal agreement requires

more than allegations that Defendant Manufacturers independently agreed with FAMA to voluntarily provide and receive information from FAMA. *See Marion*, 952 F.3d at 842. An agreement requires a conscious commitment to a common scheme—not parallel decisions to deal with a common intermediary. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 768 (1984). Here, Class Plaintiffs do not allege that Defendants even knew who else was participating in any FAMA information exchange when they voluntarily agreed to participate.

As for FAMA meetings, Class Plaintiffs allege only that they provide member Defendants an "opportunity to exchange sensitive economic information," DPPC ¶ 169; IPPC ¶ 232, not that member Defendants ever did so. And mere attendance at trade association meetings is not enough to infer any agreement among attendees, as discussed above. *See supra* § I.A.2.b.ii. Accordingly, Class Plaintiffs fail to plausibly allege the necessary horizontal agreement among Defendant Manufacturers for their information exchange claims.

**2. Class Plaintiffs Fail to Plead That Any Information Exchange Unreasonably Restrained Trade in a Relevant Market**

Class Plaintiffs' information-exchange claims independently fail because Class Plaintiffs do not plead that the exchange imposes an "unreasonable restraint of trade in [a] relevant market." *Agnew*, 683 F.3d at 335. This follows for two reasons: (1) Class Plaintiffs' alleged product market is legally infirm and (2) Class Plaintiffs do not allege that the type of information exchanged is plausibly anticompetitive.

**a. Class Plaintiffs' Putative Product Market Is Legally Deficient**

Under the rule of reason, Class Plaintiffs first bear the burden to show "a precise market definition in order to demonstrate that a defendant wields market power." *Agnew*, 683 F.3d at 337. "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Ohio*, 585 U.S. at 543. "To establish a relevant market, a plaintiff must

define both a geographic . . . and a product market." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). In other words, "a product market is typically defined to include the pool of goods or services that qualify as economic substitutes." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). Establishing a plausible market therefore requires a plaintiff to "allege[] facts explaining why the products included in the market are substitutes for one another." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022).

Class Plaintiffs' alleged product market does not comply with the rule of reasonable interchangeability. The putative market for purposes of their Section 1 claims encompasses *all* fire trucks governed by various national standards. DPPC ¶¶ 215–20; IPPC ¶¶ 280–83. That market is legally deficient because it lumps together a wide array of fire trucks that are not substitutes for one another. Indeed, Class Plaintiffs do not even attempt to allege that all fire trucks are substitutes for one another. And for good reason. They identify nearly a dozen categories of fire trucks included in their alleged product market, including pumpers, aerials, quints, initial attack trucks, mobile water supply trucks, special service trucks, mobile foam trucks, wildland fire suppression trucks, wildland mobile water supply trucks, wildland crew carrier trucks, and aircraft rescue vehicles. *See* DPPC ¶¶ 98, 217; IPPC ¶¶ 166, 281–82. Different types of trucks serve very different purposes, including "structural fire response," "initial attack," "fighting wildland fires," "discharging water at [elevated] positions," "transporting water," "provid[ing] support services at emergency scenes," "initial emergency medical services," and "aircraft rescue." DPPC ¶¶ 82, 217–18; *see also* IPPC ¶ 281. Different types of trucks are also meant for very different settings, with

some being suited for "urban and suburban settings," and others for "rural and wildland settings." DPPC ¶ 218; *see also* IPPC ¶ 281. Wildland trucks in particular, which are used to respond to wildfires and form an alleged submarket for purposes of Class Plaintiffs, acquisition-related claims, "have peculiar characteristics and uses." DPPC ¶ 96; *see also id.* ¶ 216; IPPC ¶ 281. There are also wide differences in specifications across trucks, including tank capacities ranging from 50 to 750 gallons, pump flows ranging from 10 to 1,000 gallons per minute, and hose lengths ranging from 300 to 1200 feet. DPPC ¶ 218; IPPC ¶ 281. Class Plaintiffs' own allegations thus establish that the relevant product market encompasses trucks that are not substitutes for each other.

Products that are not substitutes for each other may be grouped into the same market under two circumstances, but neither is present here. First, non-substitutable products "can be 'clustered' together in a 'cluster market'" where "the 'cluster' is itself an object of consumer demand." *MultiPlan*, 789 F. Supp. 3d at 632. "To qualify as a cluster market, the 'clustered' goods must be generally purchased as a group." *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1379 (W.D. Wis. 1997). For example, "[d]ifferent types of healthcare services may be grouped in a cluster market because healthcare services are often sold to commercial health plans and their members in a package." *MultiPlan*, 789 F. Supp. 3d at 632-33. Fire trucks, by contrast, clearly do not form an appropriate cluster market because they "are generally purchased individually." *Rozema*, 977 F. Supp. at 1379. Class Plaintiffs' own alleged purchases demonstrate that customers purchase trucks on an individual basis according to their specific needs, and typically no more than a few at a time. *See* DPPC ¶¶ 9–20; IPPC ¶¶ 25–122. And no one customer has a need for every type of truck. For example, Class Plaintiffs—which are overwhelmingly concentrated in urban areas—do not allege any purchases of wildland trucks. *See id.*

Second, non-substitutable products may be grouped where "there is no need to perform separate antitrust analyses for separate product markets [because] competitive conditions are similar in each." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014). Class Plaintiffs do not allege that is the case here. On the contrary, they allege that competitive conditions vary significantly across different types of fire trucks—for example, that Defendant Manufacturers produce different types of trucks, compete with different sets of competitors, and hold different shares of the alleged submarkets. *See* DPPC ¶¶ 22, 29, 32–38, 65–66, 140–41, 143; IPPC ¶¶ 128–31, 135, 141; *cf. ProMedica*, 749 F.3d at 565 (assessing whether defendant hospitals' market shares were consistent across different medical service markets).

Because Class Plaintiffs' putative market is legally infirm, they fail to plead that Defendants have sufficient market power for the alleged information exchange to produce anticompetitive effects.

**b. The Alleged Information Exchange Is Not Anticompetitive**

Class Plaintiffs independently fail to plead that the alleged information exchanged through FAMA was of a type that could plausibly cause anticompetitive effects. "Gathering information about pricing and competition in the industry is standard fare for trade associations." *In re Musical Instruments*, 798 F.3d at 1196. Absent allegations showing anticompetitive potential based on (1) "the nature of the information exchanged" and (2) "the structure of the industry involved," an agreement to exchange information does not violate the rule of reason. *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001); *accord In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *3 (N.D. Ill. Aug. 29, 2022). Neither factor demonstrates anticompetitive potential here.

i. <u>FAMA statistical reports are not alleged to contain competitively sensitive information</u>

Class Plaintiffs conclude that the data contained in FAMA statistical reports is "competitively sensitive." *E.g.*, DPPC ¶ 255; IPPC ¶ 148. But they offer few details about the specific content of the data. And the details they do allege or incorporate by reference from FAMA's website show that it is *not* competitively sensitive information because it is aggregate, backward-looking data that courts have repeatedly found lack anticompetitive potential.

The "specificity of the information" exchanged is a key factor in assessing anticompetitive potential. *Todd*, 275 F.3d at 212. Class Plaintiffs largely gloss over this factor, describing the data solely as "data regarding apparatus sales and orders" based on FAMA's website. DPPC ¶ 154 (quoting Ex. A, *Data & Research Committee*); IPPC ¶ 211 (same). They ignore that the website goes on to describe the data as *aggregated* and *anonymized* sales and order statistics that "conceal the identity of any company or of any specific transaction." Ex. A, *Data & Research Committee*.[10] Far from being anticompetitive, "[d]issemination of *aggregated* information which avoids transactional specificity (for example, data exchanged in the form of industry averages) is generally favored in the antitrust context." *Loc. TV*, 2022 WL 3716202, at *3. Indeed, the Supreme Court has explained that, in contrast to "information concerning specific sales to identified customers," exchanging "statistical report[s] on . . . average[s] . . . without identifying the parties to specific transactions," does not violate Section 1. *United States v. Container Corp. of Am.*, 393 U.S. 333, 334–35 (1969); *see also Todd*, 275 F.3d at 212 (contrasting information "aggregated in the form of industry averages" with information that "identif[ies] particular parties, transactions, and prices"). The snapshots of FAMA data that Class Plaintiffs provide are consistent with this

[10] Because Class Plaintiffs reference the Data & Research Committee's webpage in their Complaints, its contents are incorporated by reference into the Complaints and may be considered on a motion to dismiss. *See Santiago v. Tesla, Inc.*, 757 F. Supp. 3d 831, 842 n.1 (N.D. Ill. 2024).

description—they reflect anonymized aggregate order statistics and average sale prices, without identifying specific parties, transactions, or prices. *See* DPPC ¶ 158; IPPC ¶ 215.

Class Plaintiffs also do not allege the exchange of current or future data—another key factor in the analysis of whether the information exchanged was competitively sensitive. *See Todd*, 275 F.3d at 211. "Exchanges of current price information . . . have the greatest potential for generating anticompetitive effects." *Gypsum*, 438 U.S. at 441 n.16. "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "The exchange of past . . . data," by contrast, "is greatly preferred." *Id.* That is the case here—the data provided by FAMA is strictly backward-looking, being limited to "past transactions or activities." Ex. A, *Data & Research Committee*. Class Plaintiffs' allegations are again consistent with this description—the data they allege reflect pricing and other statistics solely for completed orders (conveyed as averages or aggregates as discussed above). *See* DPPC ¶ 158; IPPC ¶ 215. The only forward-looking information Class Plaintiffs allege consists of members' predictions about market trends generally—a ubiquitous practice across nearly every industry—not specifics about future pricing, sales, or production. IPPC ¶ 220.

Accordingly, the nature of the information exchanged through FAMA—anonymized, aggregate statistics on past sales and orders—demonstrates no plausible anticompetitive potential.

ii. <u>The alleged industry structure is not conducive to collusion</u>

Class Plaintiffs also fail to plausibly allege that the structure of the industry is conducive to anticompetitive effects. Courts assess whether an industry "is susceptible to the exercise of market power through tacit coordination" by considering (1) whether the industry is "highly concentrated" and (2) whether it has "fungible products" that are (3) "subject to inelastic demand." *Todd*, 275 F.3d at 207–09. Class Plaintiffs fail to allege that the fire truck industry is characterized by fungibility or inelasticity, and their allegations of market concentration are insufficient.

***Fire trucks are not fungible.*** "[F]ungibility plays a significant role in evaluating the anticompetitive potential of an information exchange." *Id.* at 209. Whereas "fungible products facilitate coordination of pricing . . . because it is easier to determine and monitor a consensus on some competitive variable," "it is less realistic for a cartel to establish and police a price conspiracy where it is difficult to compare the products being sold." *Id.* Products are fungible where they "are virtually identical," such that price is "the primary, if not the only, source of competition." *Rosefielde v. Falcon Jet Corp.*, 701 F. Supp. 1053, 1066 (D.N.J. 1988). An example of fungible products is cardboard boxes. *See Container Corp.*, 393 U.S. at 337. Fire trucks, by contrast, are customizable, bespoke products and thus highly non-fungible. There are many types of fire trucks in the alleged product market with significant differences between them. *See supra* § I.B.2.a. Furthermore, fire departments typically purchase fire trucks in custom configurations in accordance with their unique preferences and needs. *See, e.g.*, DPPC ¶¶ 18, 21, 36, 38, 68; IPPC ¶¶ 35, 102, 104, 137, 141, 177, 179, 182.

***Demand is elastic.*** This part of the inquiry asks "whether it is economically feasible for buyers to abstain from purchasing the product for some period of time." *Todd*, 275 F.3d at 211. Class Plaintiffs assert that demand is inelastic because fire trucks are necessary to provide critical firefighting services, DPPC ¶ 231, but they plead the opposite. They specifically allege that fire departments have flexibility on when to order a new truck depending on prices given that their service life is supposedly long and variable. *See id.* ¶ 238; IPPC ¶ 293. They further allege that fire departments have "scale[d] back on planned purchases" due to rising costs for new vehicles, choosing to use their existing fleet for longer periods of time. DPPC ¶ 242; *see also* IPPC ¶ 296. Thus, their factual allegations do not describe inelastic demand since they allege that fire departments buying habits change depending on price fluctuations.

***The market is not highly concentrated.*** Finally, Class Plaintiffs fail to allege a highly concentrated market conducive to anticompetitive effects for all the same reasons discussed above. *See supra* § I.A.2.b.iii. In any event, "market concentration and market shares are insufficient, standing alone," to show that an industry "is prone to collusion." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1144 (N.D. Cal. 2009).

In sum, neither the nature of the information FAMA exchanges nor the structure of the fire truck industry demonstrates anticompetitive potential. Class Plaintiffs thus fail to plead that any supposed agreement to exchange information through FAMA unreasonably restrains trade.

*    *    *

Class Plaintiffs' information exchange claims are deeply flawed. They plead a rimless hub-and-spoke conspiracy within a legally deficient alleged market. And Class Plaintiffs fail to plausibly allege that any information exchanged through FAMA has anticompetitive potential. For these reasons, Class Plaintiffs' Section 1 information exchange claims should be dismissed.

## II. Class Plaintiffs Fail to Plead a Section 7 Claim (DPP Count 2 and IPP Count 3)[11]

DPPs assert Clayton Act Section 7 claims against the AIP Defendants, the REV Group Defendants, Oshkosh, and Pierce based on their alleged acquisitions, while IPPs limit their Section 7 claim to REV Group's alleged acquisitions. DPPC ¶¶ 282–86; IPPC ¶¶ 357–62. These claims fail for multiple independent reasons discussed further in Defendants' Non-Class Brief, which Defendants incorporate by reference herein and summarize below.

*First*, Class Plaintiffs' Section 7 claims are barred by the statute of limitation to the extent they seek damages and by the doctrine of laches to the extent they seek injunctive relief with respect to the REV Group and AIP Fund IV acquisitions and the BME acquisitions. *See* Non-Class

[11] DPPs' Count 3 seeks declaratory relief for the same violations alleged in Counts 1 and 2, DPPC ¶¶ 287–97, and, thus, fails for the same reasons.

Br. § I. Like Non-Class Plaintiffs, DPPs allege no tolling doctrine to save their claims. IPPs attempt to allege tolling under the hold-and-use doctrine, which delays the limitations period where an acquisition's anticompetitive potential "is created or realized more recently as market conditions change." *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2015 WL 5934834, at *13 (N.D. Ill. Oct. 12, 2015). But their hold-and-use allegations are entirely conclusory. They allege no changes to market conditions that only recently enabled these acquisitions to produce anticompetitive effects. *See* IPPC ¶¶ 336–37.

*Second*, Class Plaintiffs fail to plausibly allege that the effect of any challenged acquisition "may be substantially to lessen competition" in any alleged market. 15 U.S.C. § 18; *see* Non-Class Br. 23. DPPs focus on horizontal acquisitions of other fire truck manufacturers, but fail to make a prima facie case of anticompetitive effect. A prima facie case requires facts showing that an acquisition would result in (1) "a firm controlling an undue percentage share of the relevant market" and (2) "a significant increase in the concentration of firms in that market." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 990 (D.C. Cir. 1990) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)). DPPs plead both elements by reciting thresholds rather than facts: market shares of "more than 30%," and an HHI "of over 1,800" with increases of "more than 100"—the minimum figures under the government's Merger Guidelines. DPPC ¶¶ 138–143; *see also* Non-Class Br. 28 n.20. Such threshold-matching allegations are insufficient. *See* Non-Class Br. § II.B. DPPs also plead the effect on concentration of the REV Group and AIP Fund IV acquisitions only in the aggregate—a single allegation that four acquisitions over twelve years together increased HHI by "more than 100," DPPC ¶ 139. But Section 7 requires an acquisition-specific showing, and that aggregate figure is consistent with each acquisition falling well below the threshold DPPs invoke. *See* Non-Class Br. § III.A. As to Maxi-Métal, DPPs allege only a

combined post-acquisition share of "over 30%," with no allegation of any resulting change in concentration. DPPC ¶ 143; *see also* Non-Class Br. 33.

IPPs focus on REV Group's acquisition of Spartan, which, like Non-Class Plaintiffs, they allege harmed competition in the Fire Apparatus market by decreasing the availability of chassis. IPPC ¶¶ 181, 188–99. This theory must be analyzed under the framework for vertical mergers. *See* Non-Class Br. 26–27. Far from making the requisite "fact-specific showing" of anticompetitive effects, *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019), IPPs plead the absence of any such effect. They allege that Spartan was one of the few companies selling chassis to competing fire truck manufacturers before the acquisition, and continues to sell chassis to competing manufacturers widely after the acquisition. *See* IPPC ¶¶ 124, 183–84. They allege that E-ONE, KME, and Ferrara curtailed production of chassis for REV Group after the Spartan acquisition, but do not allege that any of these subsidiaries sold chassis to competing manufacturers before the acquisition. *See id.* ¶¶ 124, 188. IPPs thus fail to show that REV Group's acquisition of Spartan's chassis business resulted in any anticompetitive effects, let alone substantial effects. As for DPPs, their complaint contains *zero* relevant factual allegations. *See* DPPC ¶¶ 113, 227.

Accordingly, Class Plaintiffs' Section 7 claims should be dismissed.

## III. DPPs Fail to Plead a Section 2 Attempted Monopolization Claim (DPP Counts 4–5)

DPPs also attempt to challenge the same acquisitions under Section 2 of the Sherman Act. DPPC ¶¶ 298–310. But these claims fail for the same reasons as their Section 7 claims—they are time barred and do not plead any violation of antitrust law. On the merits, the Section 2 claims fail for three independent reasons set forth in Defendants' Non-Class Memorandum, incorporated by reference herein and summarized below.

*First*, DPPs rely on implausible "shared monopoly" theories that courts have roundly rejected, whereby multiple Defendant families allegedly attempted to monopolize the same

relevant markets. *See* Non-Class Br. § II.A. Here DPPs, allege that AIP Defendants, the REV Group Defendants, the Oshkosh Defendants, and the BME Defendants *all* attempted to monopolize the same relevant markets. DPPC ¶¶ 299, 305. But monopolization is a single-entity offense, meaning only one firm can monopolize a market. They also allege that the REV Group, Oshkosh, and BME Defendants all increased their market shares during the relevant time period—a key indicator that a defendant is not "reasonably close to obtaining" monopoly power. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995).

*Second*, DPPs' market shares allegations are deficient. They rely on conclusory allegations that Defendants hold market shares of "more than 30%." DPPC ¶¶ 140–41, 143. "[T]here is ample authority" that such "bare assertions" of market share do not plausibly establish market power. *Facebook, Inc.*, 560 F. Supp. 3d at 18; *see* Non-Class Br. § II.B. Furthermore, "numerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove a dangerous probability of monopolization." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981); *see* Non-Class Br. § II.C. And DPPs rely on Pierce and the BME Defendants' "combined market share" with respect to the BME acquisition, DPPC ¶ 141, which improperly aggregates two competing firms, *see* Non-Class Br. 18 n.17.

*Third*, DPPs fail to plead specific intent to monopolize. DPPs do not plausibly allege any facts about the purported motive of these transactions beyond legal conclusions that they were anticompetitive. *See* Non-Class Br. § II.D.

Accordingly, DPPs' Section 2 claims should be dismissed.

**CONCLUSION**

For the reasons set forth above, the Court should dismiss DPPs' Amended Consolidated Complaint and all federal claims in IPPs' Second Amended Consolidated Complaint.

Dated: August 17, 2026

Respectfully submitted,

s/ *Daniel T. Flaherty*

Daniel T. Flaherty (Bar No. 1011357)
GODFREY & KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 273-5198
dflaherty@gklaw.com

Reid Schar (Bar No. 6243821)
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
(628) 267-6800
rschar@jenner.com

Douglas E. Litvack (Bar No. 1024973)
Jariel A. Rendell (Bar No. 1027023)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 637-6357
dlitvack@jenner.com
jrendell@jenner.com

Jacob P. Wentzel (Bar No. 6333530)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
jwentzel@jenner.com

*Counsel for Defendants Oshkosh Corporation and Pierce Manufacturing, Inc.*

s/ *Daniel J. Vaccaro*

Daniel J. Vaccaro (Bar No. 1018037)
Joseph L. Olson (Bar No. 1046162)
Ena M. Allen (Bar No. 1101342)
MICHAEL BEST & FRIEDRICH LLP
790 North Water Street, Suite 2500
Milwaukee, WI 53202
(414) 271-6560

djvccaro@michaelbest.com
jlolson@michaelbest.com
ena.allen@michaelbest.com

Arthur J. Burke (Bar No. 1175568)
DAVIS POLK & WARDWELL LLP
450 Lexington Ave
New York, NY 10017
(212) 450-4000
arthur.burke@davispolk.com

Sean Stefanik (Bar No. 5637913)
DAVIS POLK & WARDWELL LLP
1050 17th Street, NW
Washington, DC 20036
(202) 962-7000
sean.stefanik@davispolk.com

*Counsel for Defendants REV Group, LLC (formerly REV Group, Inc.), E-One, Inc., Kovatch Mobile Equipment Corp., Ferrara Fire Apparatus, Inc., Spartan Fire, LLC, Smeal SFA, LLC, Smeal LTC, LLC, and Detroit Truck Manufacturing, LLC*

s/ *Ashley B. Eickhof*

Ashley B. Eickhof (Bar No. 307143)
Creighton J. Macy (Bar No. 1002479)
Stephen T. Loertscher (Bar No. 18995)
BAKER & McKENZIE LLP
815 Connecticut Ave NW
Washington, DC 20006
(202) 452-7000
ashley.eickhof@bakermckenzie.com
creighton.macy@bakermckenzie.com
stephen.loertscher@bakermckenzie.com

David J. Turek (Bar No. 1035356)
Joshua S. Greenberg (Bar No. 1107959)
GASS TUREK LLC
241 North Broadway, Suite 300
Milwaukee, WI 53202
(414) 224-3445
turek@gassturek.com
greenberg@gassturek.com

*Counsel for Defendants Rosenbauer America, LLC, Rosenbauer South Dakota, LLC, and Rosenbauer Minnesota, LLC*

s/ *Paul C. Cuomo*
Paul C. Cuomo (Bar No. 457793)
Ed Duffy (Bar No. 359847)
Megan Tankel (Bar No. 90003303)
Alexander Kraszewski (Bar No. 1781948)
BAKER BOTTS LLP
700 K Street, NW
Washington, DC 20001
(202) 639-7700
paul.cuomo@bakerbotts.com
ed.duffy@bakerbotts.com
megan.tankel@bakerbotts.com
alexander.kraszewski@bakerbotts.com

Daniel E. Conley (Bar No. 1009443)
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
(414) 277-5000
daniel.conley@quarles.com

*Counsel for Defendants AIP, LLC, American Industrial Partners Capital Fund IV, LP, American Industrial Partners Capital Fund IV (Parallel), LP, AIP/CHC Holdings, LLC, AIP CF IV, LLC, and AIP/CHC Investors, LLC*

s/ *John P. Loringer*
John P. Loringer
Marcella S. Spoto
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
555 East Wells Street, Suite 1730
Milwaukee, WI 53202
(414) 292-3019
john.loringer@wilsonelser.com
marcella.spoto@wilsonelser.com

*Counsel for Defendant Fire Apparatus Manufacturers' Association*

s/ *Leo Caseria*
Leo Caseria (D.C. Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
(202) 747-1900
lcaseria@sheppard.com

Joy O. Siu (Cal. Bar No. 307610)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
(415) 774-3108
jsiu@sheppard.com

*Counsel for Defendants Boise Mobile Equipment, Inc. and BME Fire Trucks LLC for all matters other than People of the State of California, et al. v. REV Group, LLC, et al., No. 2:26-cv-00632*

s/ *Benjamin Price*
Benjamin Price (Cal. Bar No. 267400)
Keith G. Bremer (Cal. Bar No. 155920)
BREMER WHYTE BROWN & O'MEARA, LLP
20320 SW Birch Street
Newport Beach, CA 92660
(949) 221-1013
bprice@bremerwhyte.com

*Counsel for Boise Mobile Equipment, Inc. and BME Fire Trucks LLC in People of the State of California, et al. v. REV Group, LLC, et al., No. 2:26-cv-00632*

## GLOSSARY

Parties

| Term | Definition |
| --- | --- |
| AIP Defendants | AIP, LLC and AIP Investor Defendants collectively |
| AIP Investor Defendants | American Industrial Partners Capital Fund IV, LP, American Industrial Partners Capital Fund IV (Parallel), LP, AIP/CHC Holdings, LLC, AIP CF IV, LLC, and AIP/CHC Investors, LLC collectively |
| American Industrial Partners Capital Fund IV, LP | AIP Fund IV |
| Albuquerque | City of Albuquerque |
| Allentown | City of Allentown |
| Ann Arbor | City of Ann Arbor |
| Arcadia | City of Arcadia |
| Augusta | City of Augusta |
| Baltimore | Mayor & City Council of Baltimore |
| BME | BME Fire Trucks LLC |
| Boise Mobile | Boise Mobile Equipment, Inc. |
| BME Defendants | BME Fire Trucks LLC and Boise Mobile Equipment, Inc. collectively |
| Butte County | County of Butte |
| Claverack | Claverack Fire Protection District |
| Class Plaintiffs | All Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs collectively |
| Commack | Commack Fire Protection District |
| Defendants | All Defendants relevant to a given motion to dismiss collectively |
| Des Moines | City of Des Moines |
| DPPs | All Direct Purchaser Plaintiffs collectively (i.e., City of Augusta, Newstead Fire Company, Inc., City of Philadelphia, Metropolitan Government of Nashville & Davidson County, City of Revere, and Borough of Roseland) |
| DTM | Detroit Truck Manufacturing, LLC |
| Durango | Durango Fire Protection District |
| E-ONE | E-ONE, Inc. |
| Ebbetts Pass | Ebbetts Pass Fire Protection District |
| Emeryville | City of Emeryville |
| FAMA | Fire Apparatus Manufacturers' Association |
| Ferrara | Ferrara Fire Apparatus, Inc. |
| Fountain Valley | City of Fountain Valley |
| Fullerton | City of Fullerton |
| Green Bay | City of Green Bay |
| Gilbert | Town of Gilbert |

| Term | Definition |
|---|---|
| Hartford | City of Hartford |
| IPPs | All Indirect Purchaser Plaintiffs collectively (i.e., City of Arcadia, City of Ann Arbor, Claverack Fire District, Commack Fire District, Durango Fire Protection District, City of Fountain Valley, City of Fullerton, City of La Crosse, City of Las Vegas, City of Middletown, City of Milwaukee, City of New Brighton, City of Onalaska, City of Raleigh, City of Ridgeland, City of Rochester, Unified Government of Wyandotte County and Kansas City, Kansas, and The Water Witch Company) |
| KME | Kovatch Mobile Equipment Corporation |
| LA County | County of Los Angeles and Consolidated Fire Protection District of Los Angeles County collectively |
| La Crosse | City of La Crosse |
| Ladder Tower | Smeal LTC, LLC |
| Las Vegas | City of Las Vegas |
| Leominster | City of Leominster |
| Liberty | City of Liberty |
| Maxi-Métal | Maxi-Métal, Inc. |
| Middletown | City of Middletown |
| Milwaukee | City of Milwaukee |
| Nashville | Metropolitan Government of Nashville & Davidson County |
| New Brighton | City of New Brighton |
| Newstead | Newstead Fire Company, Inc. |
| NCAPs | All Non-Class Plaintiffs collectively, but excluding City of Leominster and City of Providence (i.e., County of Los Angeles and Consolidated Fire Protection District of Los Angeles County, County of San Diego and San Diego County Fire Protection District, City of San Diego, City of Oakland, City of Santa Barbara, County of Shasta, County of Butte, Ebbetts Pass Fire Protection District, Unified Fire Authority, City of Hartford, City of Portland, City of Allentown, City of Portsmouth, City of Green Bay, City of Santa Clara, City of Yonkers, City of Tucson, City of Albuquerque, City of Emeryville, City of Tempe, City of Mayor & City Council of Baltimore, City of Des Moines, City of Tacoma, City of Tuscaloosa, City of Tampa, Town of Gilbert, and City of Oxnard)5664`5 |
| Oakland | City of Oakland |
| Onalaska | City of Onalaska |
| Oshkosh | Oshkosh Corporation |
| Oshkosh Defendants | Oshkosh Corporation, Pierce Manufacturing, Inc, and Maxi-Métal, Inc. collectively |
| Oxnard | City of Oxnard |

| Term | Definition |
| --- | --- |
| Philadelphia | City of Philadelphia |
| Pierce | Pierce Manufacturing, Inc. |
| Portland | City of Portland, Oregon |
| Portsmouth | City of Portsmouth |
| Providence | City of Providence |
| Raleigh | City of Raleigh |
| REV Group | REV Group, LLC (formerly REV Group, Inc.) |
| REV Group Defendants | REV Group, LLC, E-One, Inc., Kovatch Mobile Equipment Corp., KME Global, LLC, KME Holdings, LLC, KME RE Holdings, LLC, Ferrara Fire Apparatus, Inc., FFA Holdco, Inc., FFA Acquisition Co., Inc., Ferrara Fire Apparatus Holding Company, Inc., Spartan Fire, LLC, Smeal SFA, LLC, Smeal LTC, LLC, Smeal Holding, LLC, and Detroit Truck Manufacturing, LLC collectively |
| Revere | City of Revere |
| Ridgeland | City of Ridgeland |
| Rochester | City of Rochester |
| Roseland | Borough of Roseland |
| Rosenbauer | Rosenbauer America, LLC, Rosenbauer Minnesota, LLC, and Rosenbauer South Dakota, LLC collectively |
| Rosenbauer America | Rosenbauer America, LLC |
| Rosenbauer MN | Rosenbauer Minnesota, LLC |
| Rosenbauer SD | Rosenbauer South Dakota, LLC |
| San Diego | City of San Diego |
| San Diego County | County of San Diego and San Diego County Fire Protection District collectively |
| Santa Barbara | City of Santa Barbara |
| Santa Clara | City of Santa Clara |
| Shasta County | County of Shasta |
| Smeal | Smeal SFA, LLC |
| Spartan | Spartan Fire, LLC |
| Tacoma | City of Tacoma |
| Tampa | City of Tampa |
| Tempe | City of Tempe |
| Tuscaloosa | City of Tuscaloosa |
| Tucson | City of Tucson |
| UFA | Unified Fire Authority |
| Water Witch | The Water Witch Company |
| Wyandotte County | Unified Government of Wyandotte County and Kansas City, Kansas |
| Yonkers | City of Yonkers |

Complaints

| Term | Definition |
|---|---|
| Albuquerque Compl. | ECF No. 1, *City of Albuquerque v. REV Group, Inc., et al.*, Case No. 26-cv-01031 |
| Baltimore Am. Compl. | ECF No. 25, *Mayor & City Council of Baltimore v. REV Group, Inc., et al.*, Case No. 26-cv-01099_ |
| Des Moines Am. Compl. | ECF No. 17, *City of Des Moines v. REV Group, LLC, et al.*, Case No. 26-cv-01104 |
| DPPC | Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint, ECF No. 59 |
| Emeryville Compl. | ECF No. 1, *City of Emeryville v. REV Group, Inc., et al.*, Case No. 26-cv-01030 |
| Gilbert Compl. | ECF No. 1, *Town of Gilbert v. REV Group, LLC, et al.*, Case No. 26-cv-01253 |
| IPPC | Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint, ECF No. 108, |
| Leo. Compl. | ECF No. 1, *City of Leominster v. Oshkosh Corp., et al.*, Case No. 26-cv-01105 |
| NCAPC | Direct (Non-Class) Action Plaintiffs' Consolidated Amended Complaint, ECF No. 53 |
| Oxnard Compl. | ECF No. 1, *City of Oxnard v. REV Group, LLC, et al.*, Case No. 26-cv-01254 |
| Prov. Compl. | ECF No. 1, *City of Providence v. Oshkosh Corp., et al.*, Case No. 26-cv-01198 |
| Tacoma Compl. | ECF No. 1, *City of Tacoma v. REV Group, Inc., et al.*, Case No. 26-cv-01106 |
| Tampa Compl. | ECF No. 1, *City of Tampa v. REV Group, LLC, et al.*, Case No. 26-cv-01120 |
| Tempe Compl. | ECF No. 1, *City of Tempe v. REV Group, Inc., et al.*, Case No. 26-cv-01098 |
| Tuscaloosa Compl. | ECF No. 1, *City of Tuscaloosa v. REV Group, LLC, et al.*, Case No. 26-cv-01119 |

Briefs

| Term | Definition |
|---|---|
| Class Brief/Br. | Memorandum in Support of Defendants' Joint Motion to Dismiss Class Plaintiffs' Consolidated Amended Complaints |
| IPP Brief/Br. | Memorandum in Support of Defendants' Joint Motion to Dismiss Indirect Purchaser Plaintiffs' State-Law Claims |
| Non-Class Brief/Br. | Memorandum in Support of Defendants' Joint Motion to Dismiss Non-Class Plaintiffs' Complaints |

| Term | Definition |
|---|---|
| Antitrust Standing Brief/Br. | Memorandum in Support of Defendants' Joint Motion to Dismiss for Lack of Antitrust Standing |
| Leo. & Prov. Brief/Br. | Memorandum in Support of Defendants' Joint Motion to Dismiss Leominster and Providence Complaints for Failure to State a Claim |
| REV Group Brief/Br. | Memorandum in Support of Defendant REV Group, LLC's Motion to Dismiss |
| Oshkosh Defs.' Brief/Br. | Memorandum in Support of Oshkosh Defendants' Motion to Dismiss |

<u>Acquisitions</u>

| Term | Definition |
|---|---|
| BME acquisition | Pierce's acquisition of a 25% interest in Boise Mobile through BME in 2021 |
| E-ONE acquisition | AIP Fund IV's acquisition of E-ONE in 2008 |
| Ferrara acquisition | REV Group's acquisition of Ferrara in 2017 |
| KME acquisition | REV Group's acquisition of KME in 2016 |
| Maxi-Métal acquisition | Oshkosh's acquisition of Maxi-Métal in 2022 |
| REV Group and AIP Fund IV acquisitions | AIP Fund IV's acquisition of E-ONE in 2008, REV Group's acquisition of KME in 2016, REV Group's acquisition of Ferrara in 2017, and REV Group's acquisition of Spartan in 2020 collectively |
| Spartan acquisition | REV Group's acquisition of Spartan in 2020 |

<u>Third Parties</u>

| Term | Definition |
|---|---|
| HGAC | Houston-Galveston Area Council |
| Rosenbauer AG | Rosenbauer International AG |
| Seagrave | Seagrave Fire Apparatus, LLC |