**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| IN RE: FIRE APPARATUS ANTITRUST LITIGATION | Case No. 2:26-md-03179-WCG<br><br>MDL No. 3179<br><br>Hon. William C. Griesbach |
| This document relates to:<br><br>*Non-Class Action Track* | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS NON-CLASS PLAINTIFFS' COMPLAINTS**

## TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

BACKGROUND ..... 4

A. The Fire Truck Industry ..... 4

B. The Parties ..... 5

C. Plaintiffs' Antitrust and Unfair Competition Claims ..... 6

LEGAL STANDARD ..... 9

ARGUMENT ..... 10

I. Plaintiffs' Acquisition-Related Claims Are Nearly All Time Barred ..... 10

A. Plaintiffs' Damages Claims Are Barred by the Statutes of Limitations ..... 11

B. Plaintiffs' Claims for Injunctive Relief Are Barred by the Statutes of Limitations or Laches ..... 14

II. Plaintiffs Fail to State Attempted Monopolization Claims with Respect to the Challenged Transactions ..... 16

A. Plaintiffs Fail to Allege a Dangerous Probability of Monopolization Because They Allege the "Dominance" of Multiple Firms in the Same Markets ..... 17

B. Plaintiffs Fail to Allege a Dangerous Probability of Monopolization Because Their Market Share Allegations Are Conclusory ..... 20

C. Plaintiffs Fail to Allege a Dangerous Probability of Monopolization with Respect to the Challenged Acquisitions in Any Event ..... 21

D. Plaintiffs Fail to Allege Specific Intent to Monopolize ..... 22

III. Plaintiffs Fail to State a Section 7 Claim with Respect to REV Group and the AIP Defendants ..... 22

A. Plaintiffs Fail to State a Section 7 Claim as to the E-ONE, KME, and Ferrara Acquisitions ..... 23

B. Plaintiffs Fail to State a Section 7 Claim as to the Spartan Acquisition ..... 24

C. Plaintiffs Fail to State a Claim Under Section 7 Even Accepting Their Legally Erroneous "Cumulative" Theory ........ 28

IV. Plaintiffs Fail to State a Section 7 Claim with Respect to the Maxi-Métal Acquisition ........ 29

V. Plaintiffs Fail to State an Antitrust Claim with Respect to the BME Acquisition ........ 33

A. Plaintiffs Fail to State a Section 7 Claim ........ 34

B. Plaintiffs Fail to State a Section 1 Claim ........ 36

C. Plaintiffs Fail to State a Section 2 Conspiracy to Monopolize Claim ........ 37

VI. Plaintiffs' Acquisition-Related Claims Fail Because Their Alleged Markets Are Legally Deficient ........ 39

VII. Plaintiffs Fail to State an Antitrust Claim Regarding Pierce Replacement Parts 41

A. Plaintiffs Plead Invalid Single-Brand Aftermarkets ........ 41

B. Plaintiffs Fail to State a Section 3 Exclusive Dealing Claim ........ 44

C. Plaintiffs Fail to State a Section 2 Conspiracy to Monopolize Claim ........ 47

VIII. Plaintiffs Fail to Adequately Plead State Law Claims ........ 48

A. Plaintiffs Fail to Plead State Law Antitrust Claims ........ 48

B. Plaintiffs Fail to Plead State Law Consumer Protection Claims ........ 49

CONCLUSION ........ 50

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) .......... 39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982) .......... 49

*Am. Home Healthcare Servs., Inc. v. Floyd Mem'l Hosp. & Health Servs.*,
2020 WL 3489361 (S.D. Ind. June 26, 2020) .......... 21

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) .......... 16

*Antoine L. Garabet, M.D., Inc. v. Autonomous Tech., Grp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) .......... 15

*Ariz. Republican Party v. Richer*,
257 Ariz. 237 (2024) .......... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 9

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983) .......... 45

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 9, 20, 26, 35, 38

*Birkley v. Amazon.com Servs. LLC*,
813 F. Supp. 3d 906 (E.D. Wis. 2025) .......... 9

*BOC Int'l, Ltd. v. FTC*,
557 F.2d 24 (2d Cir. 1977) .......... 30

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 39

*Cause of Action v. Chicago Transit Auth.*,
815 F.3d 267 (7th Cir. 2016) .......... 13

*Chateau De Ville Prods., Inc. v. Tams-Witmark Music Libr.*,
1977 WL 1370 (S.D.N.Y. Mar. 7, 1977) .......... 23

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .......... 50

*Chicago Bridge & Iron Co. N.V. v. Federal Trade Comm'n*,
534 F.3d 410 (5th Cir. 2008) ........................................................................................ 28

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)....................................................................45-46

*City of Huntington v. HUD*,
466 F. Supp. 3d 30 (D.D.C. 2020)................................................................................... 23

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019)............................................................................ 38, 48

*Cmty. Publishers, Inc. v. Donrey Corp.*,
892 F. Supp. 1146 (W.D. Ark. 1995) ............................................................................ 37

*Columbia Broad. Sys., Inc. v. FTC*,
414 F.2d 974 (7th Cir. 1969) ........................................................................................ 26

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ................................................................................. 11, 13

*Dailey v. Quality Sch. Plan, Inc.*,
380 F.2d 484 (5th Cir. 1967) ......................................................................................35-36

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019)............................................................................. 14

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018)......................................................................*passim*

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
703 F. Supp. 3d 862 (N.D. Ill. 2023)........................................................................ 42, 43

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ........................................................................................ 26

*Dehoog v. Inbev*,
2016 WL 5853733 (D. Or. July 22, 2016).................................................................... 36

*Denver & Rio Grande W. R.R. Co. v. United States*,
387 U.S. 485 (1967) ..................................................................................................... 34

*Deschutes Cnty. v. Pink Pit, LLC*,
320 Or. 336 (2020) ....................................................................................................... 14

*Dichello Distribs., Inc. v. AnheuserBusch*, LLC,
715 F. Supp. 3d 220 (D. Conn. 2024)............................................................................ 11

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996) ........ 44

*Eastman Kodak Co. v. Image Technology Services*,
504 U.S. 451 (1992) ........ 41, 42, 44

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021) ........ 50

*EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*,
2019 WL 3503240 (N.D. Tex. Aug. 1, 2019) ........ 20

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
2012 WL 3841397 (E.D. Wis. Sept. 5, 2012) ........ 10, 14

*Frantz v. U.S. Powerlifting Fed'n*,
1986 WL 12593 (N.D. Ill. Nov. 3, 1986) ........ 38

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) ........ 18

*FTC v. Advoc. Health Care*,
2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) ........ 33, 36

*FTC v. Advoc. Health Care,*
841 F.3d 460 (N.D. Ill. Feb., 2023) ........ 27

*FTC v. Atl. Richfield Co.*,
549 F.2d 289 (4th Cir. 1977) ........ 30

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) ........ 20, 28

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ........ 28

*FTC v. Meta Platforms Inc.*,
654 F. Supp. 3d 892 (N.D. Cal. 2023) ........ 30, 32

*FTC v. Meta Platforms, Inc.*,
811 F. Supp. 3d 67 (D.D.C. 2025) ........ 40

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023) ........ 26, 27

*FTC v. Tempur-Sealy*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ........ 27

*Fulani v. Hogsett*,
917 F.2d 1028 (7th Cir. 1990) .......... 15

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (9th Cir. 2010) .......... 15

*Great Escape, Inc. v. Union City Body Co.*,
791 F.2d 532 (7th Cir. 1986) .......... 22, 38

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs., & Antitrust Litig.*,
2024 WL 2846349 (E.D. Wis. June 5, 2024) .......... 42-43

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs., & Antitrust Litig.*,
151 F.4th 922 (7th Cir. 2025) .......... 17-18, 42, 43, 47

*Helena World Chronicle, LLC v. Google LLC*,
2026 WL 787882 (D.D.C. March 20, 2026) .......... 13

*Hon Hai Precision Indus. Co. v. Molex, Inc.*,
2009 WL 310890 (N.D. Ill. Feb. 9, 2009) .......... 20

*HoosierVac, LLC v. Scott*,
2025 WL 3899821 (N.D. Ind. Dec. 29, 2025) .......... 17

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
191 F.3d 813 (7th Cir. 1999) .......... 14, 15

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir1989) .......... 17

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
312 F. Supp. 3d 725 (N.D. Ill. 2018) .......... 17, 19-20

*Int'l Shoe Co. v. FTC*,
280 U.S. 291 (1930) .......... 29

*Lektro-Vend Corp. v. Vendo Co.*,
660 F.2d 255 (7th Cir. 1981) .......... 21, 22

*Lektro-Vend Corp. v. Vendo Corp.*,
500 F. Supp. 332 (N.D. Ill. 1980) .......... 32

*Lloyd's Material Supply Co., Inc. v. Regal Beloit Corp.*,
2017 WL 5172206 (C.D. Cal. June 27, 2017) .......... 11

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
2016 WL 5817176 (C.D. Ill. Sept. 30, 2016) .......... 45, 46, 48

*Midwestern Mach. v. Nw. Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) .......... 11, 12, 13

*Nat'l Black Expo v. Clear Channel Broad., Inc.*,
2007 WL 495307 (N.D. Ill. Feb. 8, 2007) .......... 35

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) .......... 15, 16

*Newcal Indus., Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 42, 44

*NRDC v. Browner*,
57 F.3d 1122 (D.C. Cir. 1995) .......... 23

*Nucap Indus., Inc. v. Robert Bosch LLC*,
273 F. Supp. 3d 986 (N.D. Ill. 2017) .......... 39

*O'Gorman v. City of Chicago*,
777 F.3d 885 (7th Cir. 2015) .......... 11

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 37

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) .......... 10

*Omega Env't, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) .......... 46-47

*People of State of Ill. ex rel. Edgar v. City of Chicago*,
942 F. Supp. 366 (N.D. Ill. 1996) .......... 49

*People of State of Ill. ex rel. Edgar v. City of Chicago*,
37 F.3d 474 (7th Cir. 1998) .......... 49

*Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018) .......... 22

*PNY Techs., Inc. v. SanDisk Corp.*,
2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .......... 45

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) .......... 40

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 19, 21

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ........ 39

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
381 F.3d 717 (7th Cir. 2004) ........ 44

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ........ 44, 45

*Saratoga Cnty. Chamber of Com., Inc. v. Pataki*,
100 N.Y.2d 801 (2003) ........ 14

*SC Inova., Inc. v. Uber Techs., Inc.*,
434 F. Supp. 3d 782 (N.D. Cal. 2020) ........ 19, 20

*Shuffle Tech Int'l, LLC v. Sci. Games Corp.*,
2015 WL 5934834 (N.D. Ill. Oct. 12, 2015) ........ 11, 14

*Siva v. Am. Bd. of Radiology*,
38 F.4th 569 (7th Cir. 2022) ........ 9

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ........ 22

*Stachowski v. Town of Cicero*,
425 F.3d 1075 (7th Cir. 2005) ........ 25

*Sterling Merchandising, Inc. v. Nestle, S.A.*,
656 F.3d 112 (1st Cir. 2011) ........ 27

*Subsolutions, Inc. v. Doctor's Assoc.*,
62 F. Supp. 2d 616 (D. Conn. 1999) ........ 50

*In re Surescripts Antitrust Litig.*,
608 F. Supp. 3d 629 (N.D. Ill. 2022) ........ 48

*Synopsys, Inc. v. ATopTech, Inc.*,
2015 WL 4719048 (N.D. Cal. Aug. 7, 2025) ........ 28

*Synthes, Inc. v. Emerge Med., Inc.*,
2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ........ 20

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ........ 45, 47

*In re Tecfidera Antitrust Litig.*,
791 F. Supp. 3d 852 (N.D. Ill. 2025) ........ 45

*In re Telescopes Antitrust Litig.*,
2026 WL 806693 (N.D. Cal. Mar. 23, 2026) .................... 11

*Tenneco, Inc. v. FTC*,
689 F.2d 346 (2d Cir. 1982) .................... 30

*Town of Glastonbury v. Metro. Dist. Comm'n*,
328 Conn. 326 (2018) .................... 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................... 49

*Tregenza v. Great Am. Comms. Co.*,
12 F.3d 717 (7th Cir. 1993) .................... 10

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
512 F.2d 1264 (9th Cir. 1975) .................... 47

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 WL 560593 (N.D. Cal. Feb. 15, 2011) .................... 49

*U.S. Anchor Mfg., Inc. v. Rule Indus.*,
7 F.3d 986 (11th Cir. 1993) .................... 21

*United States ex rel. John v. Hastert*,
82 F. Supp. 3d 750 (N.D. Ill. 2015) .................... 13

*United States v. Archer-Daniels-Midland Co.*,
781 F. Supp. 1400 (S.D. Iowa 1991) .................... 24

*United States v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018) .................... 26, 27

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019) .................... 24, 26

*United States v. Black & Decker Mfg. Co.*,
430 F. Supp. 729 (D. Md. 1976) .................... 32

*United States v. Coca-Cola Bottling Co. of L.A.*,
575 F.2d 222 (9th Cir. 1978) .................... 36

*United States v. Dairy Farmers of Am., Inc.*,
426 F.3d 850 (6th Cir. 2005) .................... 34

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) .................... 30

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ........................................................................................ 17

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974) ........................................................................................ 30, 32, 39

*United States v. Nat'l City Lines*,
186 F.2d 562 (7th Cir. 1951) ........................................................................................ 47

*United States v. Philadelphia. Nat'l Bank*,
374 U.S. 321 (1963) ........................................................................................ 33, 36

*United States v. Rockford Memorial Corp.*,
898 F.2d 1278 (7th Cir. 1990) ........................................................................................ 37

*United States v. Siemens Corp.*,
621 F.2d 499 (2d Cir. 1980) ........................................................................................ 30

*United States v. UnitedHealth Grp. Inc.*,
630 F. Supp. 3d 118 (D.D.C. 2022) ........................................................................................ 27

*United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*,
144 F.4th 976 (7th Cir. 2025) ........................................................................................ 16

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ........................................................................................ 48

*Washington v. Franciscan Health Sys.*,
388 F. Supp. 3d 1296 (W.D. Wash. 2019) ........................................................................................ 23, 24

*Winkler v. Gates*,
481 F.3d 977 (7th Cir. 2007) ........................................................................................ 50

*Wis. Small Businesses United, Inc. v. Brennan*,
393 Wis. 2d 308 (2020) ........................................................................................ 14

*Z Techs. Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) ........................................................................................ 11

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971) ........................................................................................ 10

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ........................................................................................ 45

**Statutes & Rules**

15 U.S.C. § 1 ........ 36

15 U.S.C. § 18 ........ 23, 29

15 U.S.C. § 15b ........ 10

Cal. Bus. & Prof. Code § 17200 ........ 50

Cal. Bus. & Prof. Code § 17203 ........ 50

Fed. R. Civ. P. 12(b)(6) ........ 9, 11, 17

**Other Authorities**

American Industrial Partners, "American Industrial Partners Announces Acquisition of E-ONE, Inc., a Subsidiary of Federal Signal Corporation," (Aug. 5, 2008), https://americanindustrial.com/american-industrial-partners-announces-acquisition-of-e-one-inc-a-subsidiary-of-federal-signal-corporation/ ........ 7

Phillip E. Areeda, Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Application* (5th ed. 2020) ........ 26, 34, 37

Pierce, Spare Parts Warranty Statement, https://www.pierceparts.com/_v/private/ attachments?acron=RS&fieldname= ResourceOriginalFile&fileName=wa0030%20100208.pdf&i=2aa9dfea-0530-11ee-83ab-0211cbea20fd ........ 43

Business Wire, "REV Group, Inc. Completes Acquisition of Spartan Emergency Response," (Feb. 3, 2020), https://www.businesswire.com/news/home/20200203005180/en/REV-Group-Inc.-Completes-Acquisition-of-Spartan-Emergency-Response ........ 12

U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023), https://www. justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf ........ 34

## INTRODUCTION[1]

Unlike the putative class plaintiffs, Non-Class Plaintiffs do not allege a conspiracy among competitors to restrain production, fix prices, or share information. Instead, they focus on other fringe theories to explain market conditions in the fire truck industry—conditions they, too, acknowledge were impacted by "pandemic-induced" demand, price increases, and supply shortages—involving a handful of acquisitions by certain Defendants. There is no allegation that Defendants collectively engaged in acquisitions to consolidate any market for fire apparatuses. Instead, the Complaint merely labels those independent business decisions—acquisitions by different companies, in different years, often in different alleged markets, spanning nearly two decades—a "scheme." But labels are not enough to survive dismissal.

What Plaintiffs seek to challenge are ordinary, publicly announced transactions, most of which were consummated many years ago. They do so through a scattershot approach, asking the Court to find each acquisition unlawful under a wide range of antitrust theories. But in alleging that Defendants' independent acquisitions each created a dangerous probability of monopolization in the same relevant markets, Plaintiffs give the game away: a single market cannot have several firms each dangerously close to monopolizing it. For this reason and others, Plaintiffs' theories are implausible, and their claims should all be dismissed on multiple, independent grounds.[2]

---

[1] The acronyms in this Motion are defined in the Glossary included in Defendants' Joint Motion to Dismiss Class Plaintiffs' Consolidated Amended Complaints.

[2] Defendants move to dismiss the Direct (Non-Class) Action Plaintiffs' Consolidated Amended Complaint (26-md-3179, ECF No. 53 (the "Complaint," also cited as "NCAPC")), as well as copycat complaints filed by ten other Non-Class Plaintiffs prior to July 8, 2026—Albuquerque (26-cv-01031), Emeryville (26-cv-01030), Tempe (26-cv-01098), Baltimore (26-cv-01099), Des Moines (26-cv-01104), Tacoma (26-cv-01106), Tuscaloosa (26-cv-01119), Tampa (26-cv-01120), Gilbert (26-cv-01253), and Oxnard (26-cv-01254). All of those plaintiffs are represented by the same outside counsel, the complaints are the same in relevant respects, and the claims should be dismissed for the same reasons. While this brief cites largely to the NCAPC, the allegations in the

*First*, the vast majority of Plaintiffs' claims challenging the alleged "roll up" acquisitions are untimely. The statute of limitations for damages claims under the Sherman Act and the Clayton Act is four years, and the transactions at issue here occurred between 2008 and 2022. Thus, with limited exceptions, Plaintiffs' claims based on those acquisitions are barred by the statute of limitations. Their federal law claims for injunctive relief are separately barred by the doctrine of laches. And their state law claims related to those same acquisitions—asserted under state antitrust and consumer protection statutes, nearly all of which are also subject to a four-year statute of limitations—are untimely for these same reasons (again with limited exceptions).

*Second*, Plaintiffs' attempted monopolization claims under Section 2 of the Sherman Act should be dismissed because Plaintiffs fail to plead a "dangerous probability" of achieving monopoly power or specific intent to monopolize. As to probability, Plaintiffs' allegations are self-defeating. Monopolization is a "*single entity*" offense, so Plaintiffs must allege a dangerous probability that a *single firm* will achieve monopoly power. But here, Plaintiffs allege that *multiple Defendants* are on the verge of monopolizing the same alleged markets. They go so far as to allege that the market is "oligopolistic"—which, even if true, would not state a claim under Section 2. As a result, Plaintiffs simply plead themselves out of court. As to specific intent, the Complaint does not allege any facts to show that Defendants undertook the relevant acquisitions with the intent to monopolize rather than to achieve legitimate business objectives. Were that not enough, their claims independently fail because their market share allegations, which are necessary to plead market power, are conclusory. Their claims related to REV Group's acquisitions and the BME

---

copycat complaints are identical in relevant part, and those complaints should be dismissed for the same reasons.

acquisition also fail because these conclusory allegations do not establish the minimum market share to plead market power (i.e., higher than 30% in the relevant markets).

*Third*, Plaintiffs fail to plead violations of Section 7 of the Clayton Act with respect to any of the challenged acquisitions. As to REV Group and the AIP Defendants, three of the four challenged acquisitions are alleged to violate Section 7 *only* when considered cumulatively. To survive dismissal, a plaintiff must plausibly allege that an *individual* acquisition substantially lessens competition or tends to create a monopoly. Plaintiffs do not show that any individual acquisition harmed competition, so their claims should be dismissed. Even assuming Plaintiffs could challenge these acquisitions cumulatively, their combined effect still would not substantially lessen competition.

Plaintiffs fare no better with respect to Oshkosh and Pierce's acquisitions. Oshkosh acquired Maxi-Métal, a *Canadian* manufacturer that primarily sells to the *Canadian* market. Plaintiffs offer only conclusory allegations—undermined by their own factual allegations—that Maxi-Métal would have had a more significant presence in the U.S. market but for the acquisition. And Pierce merely acquired a 25% ownership interest in a subsidiary of Boise Mobile, BME. Plaintiffs fail to establish any harm to competition—let alone substantial harm—from Pierce's minority, non-controlling interest in BME. On the contrary, they allege facts showing that the so-called "combination" between Pierce and Boise Mobile is a procompetitive collaboration to improve each competitor's wildland fire trucks. For similar reasons, Plaintiffs fail to allege that the BME acquisition was an unreasonable restraint on trade under Section 1 of the Sherman Act, or that there was any plausible conspiracy to monopolize under Section 2. And Plaintiffs' Section

7 claim against BME Defendants fails from the outset because Section 7 applies only to acquirers, and Plaintiffs allege that the BME Defendants were sellers, not acquirers.[3]

*Fourth*, Plaintiffs' alleged markets are legally deficient. Plaintiffs must plead a plausible, relevant product market in order to allege that any acquisition substantially lessened competition or threatened to create a monopoly. But Plaintiffs' putative markets depend on impermissibly conclusory allegations and are contradicted by their factual allegations.

*Fifth*, Plaintiffs' claims related to Pierce's alleged arrangements with replacement parts dealers under Section 2 of the Sherman Act and Section 3 of the Clayton Act rely on putative single-brand aftermarkets barred by Seventh Circuit precedent in the *Harley-Davidson* MDL, and Plaintiffs fail to allege that the arrangements substantially foreclose competition.

*Finally*, Plaintiffs' state law claims—asserted under antitrust and consumer protection statutes that largely mirror federal antitrust law, in relevant respects—hinge on the same deficient allegations as their federal law claims, and they fail for the same reasons.

## BACKGROUND[4]

### A. The Fire Truck Industry

Fire trucks are complex, specialized vehicles designed for use under emergency conditions to support the suppression of fires or the mitigation of other hazardous conditions. NCAPC ¶¶ 5, 99; *see also* Class Br. § A. Localities (e.g., counties and cities) or their fire departments purchase fire trucks either directly (from a manufacturer) or indirectly (from a dealer). *See, e.g.*, *id.* ¶¶ 148–50, 160. Fire trucks are expensive equipment, often built to customers' custom specifications, and have long lead times for delivery. *Id.* ¶¶ 97, 102, 106, 387–88, 393. The COVID-19 pandemic—

[3] The same goes for all of Plaintiffs' Section 7 claims against non-acquiring parties. *See infra* n.23.

[4] Defendants assume (but do not concede) the truth of the well-pleaded allegations.

which brought unprecedented demand that outstripped production capacity, as well as supply chain shortages and inflation—resulted in increased lead times and prices. *See id.* ¶¶ 15, 17, 18, 307, 338. Plaintiffs allege that custom trucks cost, on average, about twice as much today as they did in 2015, due at least in part to these factors. *See id.* ¶¶ 17, 327, 338, 387–88.[5]

### B. The Parties

Defendants fall into three categories: fire truck manufacturers (and affiliated entities), corporate parents of fire truck manufacturers, and former investors in one of the parent corporations.[6] With respect to the first two categories, Defendants that manufacture fire trucks, along with their corporate parents and other affiliated entities named as defendants, are listed in the table below. *See id.* ¶¶ 11, 63–68, 77–80, 126–30, 134–36.

| **Defendant Family** | **Corporate Parent** | **Manufacturer and Other Subsidiaries** |
| --- | --- | --- |
| REV Group Defendants | Rev Group, LLC ("REV Group"), f/k/a REV Group, Inc. | • Detroit Truck Manufacturing, LLC<br>• E-One, Inc. ("E-ONE")<br>• Ferrara Fire Apparatus, Inc. ("Ferrara")<br>    o FFA Holdco, Inc.,<br>    o FFA Acquisition Co., Inc.<br>    o Ferrara Fire Apparatus Holding Company, Inc.<br>• Kovatch Mobile Equipment Corp. ("KME")<br>    o KME Global, LLC<br>    o KME Holdings, LLC<br>    o KME RE Holdings LLC<br>• Smeal SFA, LLC ("Smeal")<br>• Smeal Holding, LLC ("Smeal Holding")<br>• Smeal LTC, LLC ("Ladder Tower")<br>• Spartan Fire, LLC ("Spartan") |
| Oshkosh Defendants | Oshkosh Corporation ("Oshkosh") | • Pierce Manufacturing, Inc. ("Pierce")<br>• Maxi-Métal, Inc. ("Maxi-Métal") |

[5] Plaintiffs do not allege overall price increases for wildland trucks but describe an "example" in which outstanding wildland trucks under a Cal FIRE contract increased by approximately 17% between 2017 and 2024. NCAPC ¶ 283.

[6] Neither Rosenbauer America, LLC nor any of its affiliates is named as a defendant in the NCAPC.

| Defendant Family | Corporate Parent | Manufacturer and Other Subsidiaries |
|---|---|---|
| BME Defendants | Boise Mobile Equipment, Inc. ("Boise Mobile") | • BME Fire Trucks, LLC ("BME") |

The third category consists of the AIP Defendants, including AIP, LLC and the five AIP Investor Defendants. AIP, LLC is a New York-based private equity company. *Id.* ¶ 69. The five AIP Investor Defendants are AIP funds that held an ownership interest in REV Group and its predecessor entity, and two affiliates of those funds. *Id.* ¶¶ 71–72. The AIP Investor Defendants sold most of their holdings of REV Group in March 2024 and no longer hold any interest in REV Group following its acquisition by Terex Corporation in February 2026. *See id.* ¶¶ 75, 273.

Plaintiffs are political subdivisions and fire agencies (or other affiliated municipal agencies or offices) in ten different states.[7] Some of those Plaintiffs also purport to bring consumer protection claims "in the name of Plaintiff the People of the State of California." *Id.* ¶ 23.

### C. Plaintiffs' Antitrust and Unfair Competition Claims

Plaintiffs allege that they paid higher prices and incurred longer lead times in connection with the purchase of fire trucks because of Defendants' anticompetitive conduct. Unlike Class Plaintiffs, Non-Class Plaintiffs do ***not*** allege a conspiracy among fire truck manufacturers to restrict production, fix prices, or exchange information. Instead, Plaintiffs focus on distinct conduct related to: (i) acquisitions by REV Group and AIP Fund IV; (ii) Oshkosh's acquisition of

[7] The Complaint alleges claims on behalf of the following 20 Non-Class Plaintiffs: County of Los Angeles and Consolidated Fire Protection District of Los Angeles County; County of San Diego and San Diego County Fire Protection District; City of San Diego; City of Oakland; City of Santa Barbara; County of Shasta; County of Butte; Ebbetts Pass Fire Protection District; Unified Fire Authority; City of Hartford; City of Portland, Oregon; City of Allentown; City of Portsmouth; City of Green Bay; City of Santa Clara; City of Yonkers; City of Tucson; and People of the State of California, acting by and through the Los Angeles County Counsel, Office of County Counsel, County of San Diego, and San Diego City Attorney's Office. As noted above, ten other Non-Class Plaintiffs also filed individual complaints before July 8, 2026. *See supra* n.2.

Maxi-Métal; (iii) Pierce's acquisition of a 25% ownership interest in BME; and (iv) Pierce's alleged agreements with its authorized replacement parts dealers.

### 1. Acquisitions of E-ONE, KME, Ferrara, and Spartan

The first challenged acquisition occurred in 2008—18 years ago—when AIP Fund IV[8] acquired E-ONE. *Id.* ¶ 70. Two years later, it combined E-ONE with three other "specialty vehicle" manufacturers in its portfolio to form Allied Specialty Vehicles, which was then renamed REV Group in 2015. *Id.* Following that branding, REV Group acquired (as relevant here) three other fire truck manufacturers: KME in 2016, Ferrara in 2017, and Spartan in 2020. *Id.* ¶¶ 65–67.

### 2. Oshkosh's Acquisition of Maxi-Métal

Maxi-Métal is a Canadian manufacturer based in Quebec. *Id.* ¶ 79. It entered into a partnership with Pierce in 2015, in which Maxi-Métal first offered custom fire trucks built on Pierce chassis through Pierce's Canadian dealer network. *Id.* ¶ 277. Then, in 2018, Maxi-Métal expanded its sales to the U.S., announcing that two lines of trucks built on commercial chassis would be sold under the "Contender" name through Pierce dealers. *Id.* ¶ 278. Maxi-Métal subsequently supplied trucks to customers in six states. *Id.* Plaintiffs allege Maxi-Métal's market shares in Canada—55% in Quebec and roughly 20% nationally—but do not allege its share of any U.S. market. *Id.* ¶ 275. Oshkosh completed an acquisition of Maxi-Métal on June 13, 2022. *Id.* ¶ 279. Plaintiffs allege the acquisition resulted "in a combined market share . . . exceeding 40% in the Custom Pumpers market" between Pierce and Maxi-Métal, but they do not allege Pierce's share before the acquisition or Maxi-Métal's contribution to that combined figure. *Id.* ¶ 294.

---

[8] *American Industrial Partners Announces Acquisition of E-ONE, Inc., a Subsidiary of Federal Signal Corporation*, Am. Indus. Partners (Aug. 5, 2008), https://americanindustrial.com/american-industrial-partners-announces-acquisition-of-e-one-inc-a-subsidiary-of-federal-signal-corporation/.

### 3. Pierce's Partial Acquisition of BME

On September 16, 2021, Pierce acquired a minority ownership interest in Boise Mobile in order to "facilitate greater collaboration between Pierce and Boise Mobile within the wildland market." *Id.* ¶ 280. Boise Mobile formed a new subsidiary, BME, in which Pierce purchased a 25% interest (with Boise Mobile retaining the other 75%) to accomplish the acquisition. *Id.* Following the acquisition, Boise Mobile moved from a factory-direct model to a dealer distribution model in which its wildland trucks are now sold through Pierce dealers. *Id.* ¶ 281. Boise Mobile and Pierce also began to engage in "[c]ollaboration and R&D . . . to design and develop state-of-the-art" wildland chassis for each company's wildland trucks. *Id.* ¶ 306; *see also id.* ¶ 305.

### 4. Pierce's Supply of Replacement Parts

In addition to selling fire trucks, Pierce operates a replacement parts and service business, called Pierce Aftermarket. *Id.* ¶ 342. Pierce generally sells replacement parts through authorized dealers. *Id.* ¶ 343. It supplies dealers with both Pierce-manufactured ("OEM") replacement parts and Pierce-branded "White-Label" replacement parts manufactured by third parties. *Id.* ¶¶ 349–50. Pierce offers a "material and workmanship" warranty and "custom chassis frame" warranty on its trucks, whose terms inform customers that the warranties may become void if customers repair or replace parts without written approval from the Pierce Customer Service Department or install non-Pierce-branded replacement parts without Pierce's authorization. *Id.* ¶ 364.

* * *

Based on the alleged conduct described above, the NCAPC asserts a total of 72 claims, which fall into four categories:

1. Plaintiffs allege that all of the challenged acquisitions violate Section 7 of the Clayton Act (Counts 1–3) and Section 2 of the Sherman Act (Counts 22–24 and 41). These claims concern allegedly unlawful acquisitions and attempted monopolization.

2. Plaintiffs allege that the BME acquisition also violates Section 1 of the Sherman Act as a "combination" in restraint of trade and Section 2 as a conspiracy to monopolize (Counts 40–41).

3. Plaintiffs allege that Pierce's arrangements with replacement parts dealers constitute exclusive dealing under Section 3 of the Clayton Act as exclusive dealing and attempted monopolization under Section 2 of the Sherman Act (Counts 55 and 56).

4. Plaintiffs assert claims under the antitrust and consumer protection laws of seven states (Counts 4–21, 25–39, 42–54, and 57–72), premised on the same conduct that gives rise to Plaintiffs' federal antitrust claims.

The complaints filed by the other Non-Class Plaintiffs after the consolidated amended complaint assert the same categories of claims.

## LEGAL STANDARD[9]

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). It must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory," and "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555, 562. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, the well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. Adherence to the plausibility standard is particularly important in antitrust cases "to avoid the potentially enormous expense of [antitrust] discovery in cases with no reasonably founded hope of success." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022).

[9] Unless stated otherwise, all quotes herein are "cleaned up." *See Birkley v. Amazon.com Servs. LLC*, 813 F. Supp. 3d 906, 910 (E.D. Wis. 2025) (Griesbach, J.) (adopting this convention).

## ARGUMENT

Plaintiffs' claims should all be dismissed for multiple independent reasons. Appendix A summarizes the bases for dismissal for each count alleged by the Non-Class Plaintiffs.

### I. Plaintiffs' Acquisition-Related Claims Are Nearly All Time Barred

Plaintiffs' claims seeking damages for alleged violations of the Clayton Act and the Sherman Act are subject to a four-year statute of limitations. 15 U.S.C. § 15b; *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). All of Plaintiffs' state law claims for damages are also subject to statutes of limitations of four years (or fewer), *other than* Plaintiffs' damages claims for violations of Wisconsin antitrust law, which are subject to a six-year statute of limitations. *See* App. B (detailing applicable statutes of limitations).[10] Plaintiffs' claims for injunctive relief under California, Connecticut, Iowa, Maryland, New Mexico, and Utah antitrust law are also subject to a statute of limitations of four years. *See id*. The statute of limitations provides a basis for dismissal at the pleading stage when a plaintiff "pleads facts that show his suit is time barred." *Tregenza v. Great Am. Commc'ns. Co.*, 12 F.3d 717, 718 (7th Cir. 1993).

While there is no statute of limitations for federal and certain state antitrust claims seeking injunctive relief, such claims are subject to the equitable defense of laches. *See, e.g.*, *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085–86 (9th Cir. 2014). In antitrust cases, the statute of limitations "creates a rebuttable presumption that a plaintiff's claim for injunctive relief is subject to a defense of laches if brought more than four years after the alleged violation." *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 2012 WL 3841397, at *3 (E.D. Wis. Sept. 5, 2012).

[10] The statute of limitations is three years for Connecticut's consumer protection statute; four years for California's antitrust and consumer protection statutes and for the antitrust statutes of Arizona, Connecticut, Iowa, Maryland, New Mexico, New York, Oregon, and Utah; and six years for Wisconsin's antitrust statute. (*See* App. B.)

All of Plaintiffs' claims against REV Group and the AIP Defendants are barred by the applicable statutes of limitations or laches. So are all of Plaintiffs' claims related to the BME acquisition and (other than their Wisconsin state law antitrust claims), and certain Plaintiffs' claims related to the Maxi-Métal acquisition (with the same exception). Plaintiffs do not allege any tolling doctrine to save their claims.

### A. Plaintiffs' Damages Claims Are Barred by the Statutes of Limitations

Dismissal under Rule 12(b)(6) is proper where it appears from the face of the complaint that a claim is outside the limitations period. *See O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015). "Section 7 claims typically accrue at the time a merger transpires." *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2015 WL 5934834, at *13 (N.D. Ill. Oct. 12, 2015); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) ("A Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition."); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014) (same). Parallel acquisition-related claims under Section 2 and Section 1 are treated similarly. *See, e.g.*, *Z Techs.*, 753 F.3d at 604–05 (dismissing claims challenging acquisition under Section 2 and Section 7 as time-barred because they were brought more than five years after the acquisition); *In re Telescopes Antitrust Litig.*, 2026 WL 806693, at *2 (N.D. Cal. Mar. 23, 2026) (Section 1). The same rule applies under the two applicable state consumer protection statutes.[11] This approach is rooted in common sense, as corporate acquisitions are generally publicized when they occur. *See Concord Boat*, 207 F.3d at 1050; *see also Midwestern Mach. Co. v. Nw. Airlines,*

[11] *See, e.g.*, *Lloyd's Material Supply Co. v. Regal Beloit Corp.*, 2017 WL 5172206, at *5 (C.D. Cal. June 27, 2017) (holding that claims under California's unfair competition law were untimely because they were brought more than four years after the challenged acquisition was consummated); *Dichello Distribs., Inc. v. AnheuserBusch*, LLC, 715 F. Supp. 3d 220, 267 (D. Conn. 2024) (holding that because the Connecticut Unfair Trade Practices Act "is an occurrence statute . . . [limitations] begins to run at the moment the act or omission complained of occurs").

*Inc.*, 392 F.3d 265, 272 (8th Cir. 2004) ("Mergers occur in the public eye, and at a reasonably certain date."); *see also* NCAPC ¶¶ 162, 280 (acknowledging public announcements of relevant acquisitions). The statute of limitations therefore bars Plaintiffs' acquisition-related claims in three respects.

*First*, Plaintiffs' Clayton Act and Sherman Act claims related to the E-ONE, KME, Ferrara, and Spartan acquisitions are all untimely. Accepting Plaintiffs' well-pleaded allegations as true, all four of those acquisitions occurred at least four years before the first Non-Class Plaintiff, LA County, filed its complaint on February 12, 2026 (*see* 26-cv-01468, ECF No. 1):

- The E-ONE acquisition was consummated and announced in 2008 (NCAPC ¶ 64), ***18 years*** before the LA County complaint;
- The KME acquisition was consummated and announced in 2016 (*id.* ¶ 65), ***ten years*** before the LA County complaint;
- The Ferrara acquisition was consummated and announced in 2017 (*id.* ¶ 66), ***nine years*** before the LA County complaint; and
- The Spartan acquisition was consummated and announced in February 2020 (*id.* ¶ 67), more than ***six years*** before the LA County complaint.

Plaintiffs' state law damages claims with respect to those acquisitions, nearly all of which are also subject to a four-year statute of limitations (*see* App. B), are likewise untimely. Even under Wisconsin's six-year statute of limitations—the longest limitation period for any of the state law claims—all of those acquisitions occurred more than six years before Portsmouth filed the first non-class action complaint asserting claims under Wisconsin antitrust law, on April 24, 2026. *See* 26-cv-00737, ECF No. 1. Thus, even the Wisconsin law claims are untimely with respect to these acquisitions because those claims were first asserted 6 years, 2 months, and 21 days after the most recent acquisition was consummated and publicly announced, on February 3, 2020.[12]

[12] *See, e.g.*, *REV Group, Inc. Completes Acquisition of Spartan Emergency Response*, Bus. Wire (Feb. 3, 2020), https://www.businesswire.com/news/home/20200203005180/en/REV-Group-

*Second*, Plaintiffs' federal claims related to the BME acquisition are likewise time barred because that acquisition was consummated in 2021 (*id.* ¶¶ 80, 135, 480, 489), ***five years*** before LA County filed its complaint in 2026. With the exception of the Wisconsin antitrust claim, Plaintiffs' state law claims with respect to that acquisition are also time barred.

*Third*, the Maxi-Métal acquisition, which was consummated on June 13, 2022, occurred more than four years before five Non-Class Plaintiffs filed suit.[13] Thus, as with the BME acquisition, those Plaintiffs' Clayton Act and Sherman Act claims—and all of their state law claims, *other than* the Wisconsin antitrust claim—are time barred, too.

Plaintiffs' allegations that they suffered injuries within the limitations period, such as inflated prices and reduced variation in apparatuses (*see, e.g.*, NCAPC ¶¶ 327, 329), do not make their claims timely. "Actions or effects like increases in price or reduction in quality . . . are mere 'inertial consequences' that one naturally expects to flow from an anticompetitive acquisition, and thus do not restart the limitations period." *Helena World Chron., LLC v. Google LLC*, 2026 WL 787882, at *17 (D.D.C. Mar. 20, 2026) (quoting *Concord Boat*, 207 F.3d at 1052); *see also Midwestern Mach.*, 392 F.3d at 271 ("Even if the merger itself was unlawful, the continued existence of the merged entity is not a continuing violation: It is simply the natural unabated inertial consequence of the merger."). The discovery rule—to the extent it applies to merger challenges—likewise does not save Plaintiffs' untimely claim. That rule "does not provide that a cause of action

Inc.-Completes-Acquisition-of-Spartan-Emergency-Response. The Court may take judicial notice of this and other press releases for the purpose of establishing that the fact of each acquisition was "in the public realm" as of the dates of the press releases. *See Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016) (courts "may take judicial notice of matters of public record," including information on public websites and other publicly accessible information); *United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015).

[13] Specifically, complaints by the City of Tacoma, City of Tuscaloosa, City of Tampa, Town of Gilbert, and City of Oxnard were filed more than four years after the Maxi-Métal acquisition closed.

accrues anytime a prospective plaintiff suffers an injury in the future" relative to a challenged merger. *Shuffle Tech*, 2015 WL 5934834, at *14. Were that the law, "plaintiffs entering concentrated markets could bring Section 7 suits based on the decades- or centuries-old mergers that initially concentrated them, so long as those plaintiffs sued within four years" of an alleged injury, rendering the statute of limitations "meaningless." *Id.*

Accordingly, the bulk of Plaintiffs' acquisition-related claims under federal and state law alike should be dismissed because they are barred by the applicable statutes of limitation.[14]

### B. Plaintiffs' Claims for Injunctive Relief Are Barred by the Statutes of Limitations or Laches

Where not barred by an applicable state statute of limitations,[15] Plaintiffs' acquisition-related claims for injunctive relief are barred by the doctrine of laches. Laches applies where there has been (i) an unreasonable lack of diligence by a plaintiff, and (ii) prejudice to a defendant arising therefrom. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).[16] Claims for injunctive relief under the antitrust laws brought outside of the limitations period are subject to a rebuttable presumption of laches. *Fond du Lac Bumper Exch.*, 2012 WL 3841397, at *3. Both prongs are satisfied here.

[14] The Court may dismiss Plaintiffs' damages claims even if it declines to dismiss Plaintiffs' claims for injunctive relief. *See, e.g., In re Dealer Management Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 530–34 (N.D. Ill. 2019).

[15] Plaintiffs' claims for both damages and injunctive relief under the state laws of California, Iowa, Maryland, New Mexico, and Utah, and the antitrust law of Connecticut, are barred by the applicable statutes of limitations. *See supra §* I, App. B.

[16] This is also the case under applicable state law. *See, e.g.*, *Ariz. Republican Party v. Richer*, 257 Ariz. 237, 246 (2024) (Arizona); *Town of Glastonbury v. Metro. Dist. Comm'n*, 328 Conn. 326, 341–42 (2018) (Connecticut); *Saratoga Cnty. Chamber of Com., Inc. v. Pataki*, 100 N.Y.2d 801, 816 (2003) (New York); *Deschutes Cnty. v. Pink Pit, LLC*, 306 Or. App. 563, 577 (2020) (Oregon); *Wis. Small Bus. United, Inc. v. Brennan*, 393 Wis. 2d 308, 317–18 (2020) (Wisconsin).

*First*, Plaintiffs' years-long delay in bringing this action was inexcusable. In assessing a laches defense, the relevant delay is the period from when the plaintiff should have known of its alleged injury until the initiation of the lawsuit. *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). Courts "use[] the four-year statute of limitations for damage actions," accruing from the same moment that an acquisition occurred, "as a guideline" for determining what amount[s] to undue delay." *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299–300 (D.C. Cir. 2023) (dismissing complaint on laches defense where plaintiffs "were on notice of [the] two major acquisitions at issue" because "[b]oth were publicized"). As explained above, the challenged acquisitions were well publicized at the time, and Plaintiffs fail to allege that they did not know (or could not have known) of the acquisitions or their alleged anticompetitive potential more than four years before they filed their complaints. Plaintiffs' lack of diligence is therefore unreasonable.

*Second*, Defendants would suffer prejudice from Plaintiffs' delay. Unwinding a consummated acquisition is a particularly "drastic" remedy causing "dramatic and certain . . . hardship" to the merging parties. *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1234–36 (8th Cir. 2010). Post-acquisition investments, including to integrate an acquired company, restructure workforces, or leverage a market position, suffice to establish prejudice. *See Meta*, 66 F.4th at 301 (finding prejudice because "[m]ergers 'normally lead to progressive integration of the assets and operations of the merged firms, and to investment and other business decisions that are contingent on the new situation'"); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1173 (C.D. Cal. 2000) (finding "serious prejudice and hardship" would be caused by divestiture given investment "spent on integrating the [merged] companies" and restructuring defendants' workforces); *Hot Wax*, 191 F.3d at 824 ("[I]nvestments to exploit [a market] position are sufficient prejudice to warrant the application of the doctrine of laches.").

Plaintiffs' own allegations demonstrate the significant prejudice that would result if their injunctive relief claims were to proceed. The relevant acquisitions were consummated between five and 18 years ago, and relevant Defendants have made substantial investments to integrate the acquired businesses. For example, Plaintiffs allege that REV Group Defendants "'developed an integrated product roadmap across . . . Fire Group brands to enable platforming and simplification' which would 'lead to the standardization of subassemblies,'" "work[ed] internally to 'converge designs' of the brands [REV Group] ha[s] consolidated," and "consolidat[ed]" KME and Ferrara manufacturing facilities. NCAPC ¶¶ 262, 267. Moreover, Pierce's acquisition of a 25% interest in BME Fire Trucks LLC in exchange for Boise Mobile's access to "[t]he extensive Pierce dealer network" allowed Boise Mobile to restructure its workforce and take advantage of labor efficiencies. *Id.* ¶¶ 160, 280–81. These efforts to "allocate [] firm resources" and "integrate" acquired businesses, *Meta*, 66 F.4th at 301, make clear that Defendants would suffer significant prejudice from Plaintiffs' requested injunctive relief.

## II. Plaintiffs Fail to State Attempted Monopolization Claims with Respect to the Challenged Transactions

Plaintiffs assert that all challenged acquisitions constitute attempted monopolization under Section 2 of the Sherman Act, but Plaintiffs fail to plead multiple elements of these claims.

Attempted monopolization refers to "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 785 (1946). A plaintiff asserting an attempted monopolization claim must plead: "(1) specific intent to monopolize, (2) exclusionary conduct directed to accomplishing this purpose, and (3) a dangerous probability of achieving monopoly power." *United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025).

Plaintiffs plead neither a dangerous probability of monopoly power nor specific intent. As to the former, they make the self-defeating allegation that distinct sets of Defendants are dominant in many of the same alleged markets. But multiple independent groups of Defendants cannot each be dangerously close to obtaining a monopoly in the same sector. As to specific intent, Plaintiffs fail to plausibly allege that the challenged acquisitions were motivated by anything other than legitimate business purposes. For each reason, Plaintiffs' attempted monopolization claims cannot survive under Rule 12(b)(6).

### A. Plaintiffs Fail to Allege a Dangerous Probability of Monopolization Because They Allege the "Dominance" of Multiple Firms in the Same Markets

Plaintiffs' allegations do not support—and, in fact, undermine—any suggestion that Defendants had a dangerous probability of monopolizing the alleged markets. Attempted monopolization, like monopolization, is a single-entity offense—that is, Plaintiffs must allege a dangerous probability that a single firm will achieve monopoly power. *See Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir. 1989). Monopoly power, in turn, is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *see Ind. Grocery*, 864 F.2d at 1414. Accordingly, courts reject attempted monopolization claims where the allegations establish that the alleged market is oligopolistic or includes other formidable competitors, because these facts are inconsistent with a dangerous probability that a *single* firm will gain power to control prices or exclude competition.[17] Exemplifying this logic, the Seventh Circuit recently dismissed an attempted monopolization

[17] *See, e.g.*, *HoosierVac, LLC v. Scott,* 2025 WL 3899821, at *7 (N.D. Ind. Dec. 29, 2025) ("[I]t makes absolutely no sense for Plaintiffs to allege that every single one of [Plaintiff's] competitors seek to obtain a monopoly of the hydrovac industry. That is the exact opposite of a monopoly."); *Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 731 (N.D. Ill. 2018) ("[Plaintiff[]] acknowledges the existence of a number of competitors . . . which in itself suggests [Defendant] does not have a dangerous proximity of monopoly power.").

claim based in part on allegations that "identifie[d] nearly a dozen brands the [defendant] compete[d] with and suggest[ed] there [we]re many more" in *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 935 (7th Cir. 2025)—another MDL that was assigned to this Court.

Plaintiffs' attempted monopolization claims with respect to the challenged acquisitions fail under these principles. They allege that multiple different sets of Defendants attempted to monopolize each of the putative relevant markets—specifically:

- The REV Group Defendants, AIP Defendants, the Oshkosh Defendants, and the BME Defendants all attempted to monopolize the alleged Custom Pumpers market, NCAPC ¶¶ 650, 662, 671;
- The REV Group Defendants, AIP Defendants, and the Oshkosh Defendants all attempted to monopolize the alleged Custom Pumpers market, *id.* ¶¶ 650, 662;
- The REV Group Defendants, AIP Defendants all attempted to monopolize the Custom Chassis, Custom Aerial, and Custom Quint markets, *id.* ¶ 650; and
- The Oshkosh and BME Defendants both attempted to monopolize the Wildland Fire Apparatus market, *id.* ¶¶ 662, 671.[18]

Numerous allegations highlight the paradox at the heart of Plaintiffs' claims. For example, Plaintiffs describe *both* the REV Group and the Oshkosh Defendants as "holding dominant positions" in the Fire Apparatus market. *Id.* ¶ 101; *see also id.* ¶ 125. Plaintiffs also claim that multiple Defendants each hold substantial shares of the same relevant markets:

- "[I]n the U.S. Custom Pumpers market the REV Group Defendants hold more than a 25% share. The Oshkosh Defendants hold more than a 40% share of this market." *Id.* ¶ 291.

---

[18] To be clear, the Oshkosh and BME Defendants are separate sets of Defendants, despite Plaintiffs' efforts to lump them together. BME is a subsidiary of Boise Mobile in which Pierce merely holds a minority interest. NCAPC ¶ 280. And both Pierce and Boise Mobile sell competing wildland trucks. *See id.* ¶ 305. Entities that compete or have the potential to compete cannot be considered a "single entity" for antitrust purposes. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1149 (9th Cir. 2003).

- "[I]n the U.S. Custom Aerials and Custom Quints markets the REV Group Defendants hold an approximately 20% share. The Oshkosh Defendants hold more than a 55% share of those markets." *Id.* ¶ 292.

- "[I]n the U.S. Custom Chassis market the REV Group Defendants hold an approximately 30% share. The Oshkosh Defendants hold more than a 50% share . . . ." *Id.* ¶ 297.

- "[I]n the broader relevant market to manufacture and sell Fire Apparatuses to purchasers in the [U.S.], the REV Group Defendants hold a share in excess of 30%. . . . [T]he combined share of the Oshkosh Defendants and BME Defendants far exceeds 30%; and the combined share of the Oshkosh Defendants and Maxi-Métal far exceeds 30%." *Id.* ¶ 301.

Indeed, Plaintiffs allege not only the *existence* of competitors with substantial market share, but their *expansion* during the relevant period. *Id.* ¶¶ 258–84. Competitors' expansion is a key indicator that a defendant lacks monopoly power and is not "reasonably close to obtaining it." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) ("Prior expansion by competitors would suggest that the defendant during that expansion lacked the market power to control market wide output in the first place."). Moreover, Defendants themselves are not the only relevant competitors: Plaintiffs admit that at least five other firms—"Rosenbauer, Sutphen, Seagrave, HME Ahrens-Fox, and US Fire Apparatus"—compete in the alleged U.S. Fire Apparatus market and one or more alleged submarkets. NCAPC ¶¶ 137–42. Plaintiffs repeatedly allege purchases of fire trucks from unspecified "non-Defendant manufacturers" as well, suggesting that additional third parties also compete in the alleged relevant markets. *See, e.g.*, *id.* ¶¶ 427, 449, 463, 466.

These allegations emphatically defeat any attempt to show a dangerous probability of monopolization. Plaintiffs themselves describe the market as "oligopolistic." *Id.* ¶ 21. And even if this characterization were accurate, it would not suffice to state a Section 2 claim. *See SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 793–94 (N.D. Cal. 2020) (dismissing monopolization and attempted monopolization claims against Uber based on allegations that Uber maintained a "disciplined oligopoly" with Lyft). The Court thus should follow the path of others

in this circuit and dismiss attempted monopolization claims where the pleadings failed to allege a dangerous probability of success by a single entity. *See Int'l Equip. Trading*, 312 F. Supp. 3d at 731; *Hon Hai Precision Indus. Co. v. Molex, Inc.*, 2009 WL 310890, at *3 (N.D. Ill. Feb. 9, 2009).

### B. Plaintiffs Fail to Allege a Dangerous Probability of Monopolization Because Their Market Share Allegations Are Conclusory

Plaintiffs' attempted monopolization claims also fail because they do not plausibly allege Defendants' respective market shares. As explained above, Plaintiffs assert that Defendants hold shares ranging from "more than [] 25%" to "more than [] 55%" of the alleged markets, but they offer no factual allegations support those figures. *See* NCAPC ¶¶ 291–92, 294, 297, 299, 301. "[T]here is ample authority" that such "bare assertions" of market share are "too conclusory to plausibly establish market power in any context." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (collecting cases in holding that allegation of market share "in excess of 60%" was insufficient).[19] Indeed, Plaintiffs fail to offer "any clue as to how [they] calculated [their] noncommittal market-share number[s]," much less facts to support their calculations. *Facebook*, 560 F. Supp. 3d at 20. Their market share allegations are especially deficient because they claim that the alleged markets are "oligopolistic" and identify numerous manufacturers that compete in those markets. NCAPC ¶¶ 21, 137; *see Uber Tech.*, 434 F. Supp. 3d at 788. As a result, Plaintiffs' claims fail to cross the line "from 'conceivable to plausible.'" *Facebook*, 560 F. Supp. 3d at 20 (quoting *Twombly*, 550 U.S. at 570).

[19] *See also, e.g.*, *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (allegation of "over 50% market share" was a "threadbare recital unsupported by factual allegations [that] the Court need not accept . . . as true"); *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (same).

### C. Plaintiffs Fail to Allege a Dangerous Probability of Monopolization with Respect to the Challenged Acquisitions in Any Event

Even if the Court were to credit Plaintiff's conclusory market share allegations, Plaintiffs' claims still fail. "Numerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove a dangerous probability of monopolization." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981); *see also, e.g.*, *Am. Home Healthcare Servs., Inc. v. Floyd Mem'l Hosp. & Health Servs*., 2020 WL 3489361, at *12 (S.D. Ind. June 26, 2020) ("A twenty percent market share does not support a dangerous probability of monopolization."); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) ("[B]ecause [defendant] possessed less than 50% of the market" throughout the period when the "alleged predation" occurred, "there was no dangerous probability of success" at the relevant time.).

Here, Plaintiffs allege that the REV Group Defendants hold only a "***25% share***" in the U.S. Custom Pumpers market, a "***20% share***" in the U.S. Custom Aerials and Custom Quints markets, and a "***30% share***" in the U.S. Custom Chassis market. NCAPC ¶¶ 291, 292, 297 (emphases added). Under well-established law, these alleged market shares are "presumptively insufficient" to allege a dangerous probability of monopolization, and Plaintiffs plead nothing to overcome the presumption as to these markets. *Rebel Oil*, 51 F.3d at 1438; *see also Lektro-Vend Corp.*, 660 F.2d at 271 ("[N]umerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove a dangerous probability of monopolization.").

Plaintiffs' allegation that "the *combined* share of the Oshkosh Defendants and BME Defendants" exceeds 30% in the U.S. Fire Apparatus and Wildland Fire Apparatus markets likewise do not suffice. NCAPC ¶¶ 299, 301 (emphasis added). The Oshkosh and BME Defendants are separate defendant families that offer competing wildland fire trucks, linked only by a (pro-competitive) minority interest. *Id.* ¶¶ 280, 305. Plaintiffs also allege that each family

separately attempted to monopolize these markets. *Id.* ¶¶ 662, 671. Yet Plaintiffs fail to allege either family's *individual* market share. *See id.* ¶ 299. Plaintiffs thus fail to plead that either the Oshkosh or BME Defendants have sufficient market power for the BME acquisition to have created a dangerous probability of achieving either family's monopoly in the relevant markets.

### D. Plaintiffs Fail to Allege Specific Intent to Monopolize

The Complaint also lacks plausible allegations of specific intent to monopolize. Beyond sprinkling the adverbs "deliberately" and "intentionally" throughout their allegations (*e.g.*, NACPC ¶¶ 15, 379, 381), Plaintiffs plead no concrete facts suggesting that any Defendant intended to monopolize any market. At best, their allegations portray aggressive rivals trying to grow their businesses (*see supra* § II.A–B)—hallmarks of "an intent to compete vigorously," not an "intent to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *see also Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986) ("[T]he mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize."). For the same reason, Plaintiffs cannot rely on the principle that "[s]pecific intent may be inferred from predatory conduct." *Great Escape*, 791 F.2d at 541. They plead no such conduct here, failing to show that the challenged acquisitions were "predominantly motivated" by anything other than "legitimate business purposes." *See Lektro-Vend*, 660 F.2d at 272 (rejecting attempted monopolization claim based in part on acquisitions); *see also infra* § V. This pleading failure alone warrants dismissal of the acquisition-related attempted monopolization claims. *See, e.g.*, *Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 341 (3d Cir. 2018) (holding that plaintiff failed to plead specific intent for attempted monopolization claim).

## III. Plaintiffs Fail to State a Section 7 Claim with Respect to REV Group and the AIP Defendants

In addition to the fact that their claims under Section 7 of the Clayton Act are untimely (*see*

*supra* § I), Plaintiffs also fail to state the elements of a Section 7 claim as to the E-ONE, KME, Ferrera, and Spartan acquisitions. *First*, Plaintiffs allege that three of those acquisitions (E-ONE, KME, and Ferrara), violate Section 7 only "when considered cumulatively." NCAPC ¶ 475. But a plaintiff must plausibly allege that the "effect" of an ***individual*** acquisition "may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 18. Because there are no allegations that any of those acquisitions, standing alone, violate Section 7, Plaintiffs' claim as to those transactions should be dismissed. *Second*, Plaintiffs independently fail to state a claim as to the acquisition of Spartan. *Third*, even if—contrary to law—the Court were to consider all four acquisitions cumulatively, Plaintiffs have still failed to plausibly allege a violation of Section 7.

### A. Plaintiffs Fail to State a Section 7 Claim as to the E-ONE, KME, and Ferrara Acquisitions

Section 7 of the Clayton Act prohibits any "person" from "acquir[ing]" corporate assets or stock if "the effect of *such acquisition* may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). As a matter of statutory interpretation, Congress's use of "such" typically indicates its intent to reference only one item. *See NRDC v. Browner*, 57 F.3d 1122, 1126 (D.C. Cir. 1995) ("such deficiency" means a "specific deficiency" and not more than one); *City of Huntington v. HUD*, 466 F. Supp. 3d 30, 33 (D.D.C. 2020) ("such funds" means "particular unused funds"). And indeed, Section 7 refers to "such acquisition" in the singular.

While courts may "incorporate trends in the industry" into a Section 7 analysis, they may "not find a violation of the Clayton Act in an earlier transaction based only on analysis which incorporates a later transaction." *Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1301 (W.D. Wash. 2019); *Chateau De Ville Prods., Inc. v. Tams-Witmark Music Libr.*, 1977 WL 1370, at *4 (S.D.N.Y. Mar. 7, 1977) ("Even if the end result may be a substantial lessening of competition, a corporation is not prohibited from making a series of small, independent

acquisitions so long as no one of the acquisitions—considered separately—is large enough to violate section 7 on its own."). Incorporating effects of separate acquisitions occurring years later into that analysis confounds the causal chain and is inherently at odds with Section 7's forward-looking mandate. *See United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1402 (S.D. Iowa 1991) ("This statutory language [of Section 7] requires proof of a causal connection between the acquisition and a reasonable probability of future injury to the competitive process."); *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (plaintiff must prove that merger is "*likely to be* anticompetitive" (emphasis added)).

Accordingly, to state a claim under Section 7, a plaintiff must "plausibly allege" that *an individual acquisition* creates "an appreciable danger" of anticompetitive effects in the relevant market. *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2017). As to the E-ONE, KME, and Ferrara acquisitions, Plaintiffs do not allege any "appreciable danger" of anticompetitive effects for any of those transactions standing alone. Plaintiffs do not allege how any of these individual acquisitions changed the concentration in, or REV Group Defendants' share of, any relevant market, nor that any alleged anticompetitive effects were caused by any individual acquisition. Rather, they allege only that the acquisitions violated Section 7 when considered "cumulatively." NCAPC ¶ 475. As in *Franciscan Health*, Plaintiffs improperly seek to "find a violation of the Clayton Act" as to an acquisition "based only on analysis which incorporates . . . later transaction[s]." 388 F. Supp. 3d at 1301. This warrants dismissal of their claim as to the E-ONE, KME, and Ferrara acquisitions.

### B. Plaintiffs Fail to State a Section 7 Claim as to the Spartan Acquisition

Plaintiffs also fail to state a Section 7 claim as to the Spartan acquisition. As an initial matter, because Plaintiffs allege that the Spartan acquisition violated Section 7 in the alleged Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets only when considered

cumulatively with the E-ONE, KME, and Ferrara acquisitions (NCAPC ¶ 472–73), their claim fails as to these markets for the reasons stated above. Plaintiffs' allegation that the acquisition of Spartan on its own violated Section 7 in the alleged Custom Chassis market fares no better. Plaintiffs allege two categories of harms from the acquisition of Spartan: (i) a reduction of horizontal competition between E-ONE, KME, and Ferrara, on the one hand, and Spartan, on the other, in the Custom Chassis market (*id.* ¶¶ 304, 307, 308, 313, 324); and (ii) a risk of foreclosure of "independent Custom Apparatus builders" on the theory that REV Group's ownership of Spartan permits it to "dictate the supply of" Custom Chassis to those competitors (*id*. ¶¶ 309, 311, 314). Plaintiffs fail to state a claim under either theory.

As to their horizontal theory, Plaintiffs concede that "E-ONE, KME, and Ferrara have not historically supplied their Custom Chassis to competing apparatus builders" (NCAPC ¶ 313) and therefore have not competed head to head with Spartan for sales to custom apparatus builders. Plaintiffs allege that the four companies nonetheless were "in competition with each other" for Custom Chassis sales because fire departments "historically" chose among the four companies when purchasing *finished* apparatuses (i.e., Custom Pumpers, Custom Aerials, or Custom Quints). *Id*. ¶ 304. But the Complaint is devoid of allegations that Custom Chassis, as opposed to other aspects of finished fire apparatuses, constrained the companies' pricing or influenced customers' purchasing behavior. Plaintiffs allege nothing indicating that purported competition for finished apparatuses plausibly represents a proxy for competition for Custom Chassis, and the Court is "not required to accept . . . unwarranted factual inferences" contained within the complaint when deciding a motion to dismiss. *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005).

To salvage their horizontal theory as to Spartan, Plaintiffs revert to unsupported hypotheses about E-ONE, KME, and Ferrara's future behavior. These firms, Plaintiffs allege, would "swoop

in and start competing" with Spartan to supply Custom Chassis were "Spartan [to] increase[] its Custom Chassis prices to other apparatus builders or restrict[] supply." NCAPC ¶ 313. At the pleading stage, a plaintiff must do more than offer mere speculation regarding firms' future behavior. *See Twombly*, 550 U.S. at 569 (holding speculation about entry insufficient at the pleading stage because "firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable" (quoting Areeda & Hovenkamp ¶ 307d (Supp. 2025)). Plaintiffs fail to do so. The Complaint is entirely devoid of factual allegations regarding (i) E-ONE, KME, or Ferrara's plans to begin selling Custom Chassis to third-party apparatus builders; (ii) the extent to which they would have been successful; and (iii) the effect on competition had they begun making such sales. Where, as here, a complaint "offers only speculation as to how" companies would distribute their products following an acquisition, dismissal is warranted. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (dismissing Clayton Act claim where allegations of reduced competition rested on speculative assumptions regarding firms' hypothetical responses to an acquisition).

As to Plaintiffs' vertical theory, "there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers," "in part because many vertical mergers create vertical integration efficiencies between purchasers and seller." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 192–94 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). In analyzing vertical acquisitions, courts assess whether "the combined firm (1) has the ability to" and "(2) has the incentive to" "foreclose" its competitors, generally by withholding from competitors a product supplied by either of the firms merging, in a way in which "competition would probably be substantially lessened as a result of the withholding." *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023); *see also Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974, 980 (7th

Cir. 1969) ("The Supreme Court in analyzing vertical mergers has looked to the extent of foreclosure and its relation to the structure of the market"). Accordingly, to state a Section 7 claim for a vertical merger, Plaintiffs must allege an appreciable danger of anticompetitive effects caused by foreclosure in the relevant markets. *Advoc. Health Care Network*, 841 F.3d at 467; *AT&T Inc.*, 310 F. Supp. 3d at 193.

Plaintiffs do not do so. Even if the REV Group Defendants attained some technical "ability" not to supply downstream rivals, the Complaint alleges that rivals still have access to the remaining 70% of Custom Chassis supply (NCAPC ¶ 297), which indicates that REV Group lacks the ability to anticompetitively *foreclose* those rivals. *Cf. Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) ("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent . . . ."). Plaintiffs also fail on the incentive prong. Plaintiffs do not allege any "past behavior" by REV Group to restrict supply of Custom Chassis (or any other product) to any customer. *See FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 834 (S.D. Tex. 2025) ("Courts evaluating incentive to foreclose look to the acquiring firm's past behavior."). Nor do Plaintiffs even allege that it ultimately "would be profitable" for the REV Group Defendants to forgo profits from sales of Custom Chassis because of some speculative advantage obtained by weakening competing fire apparatus manufacturers by doing so. *See id.* Accordingly, because there is "no incentive to foreclose, then there is no probability of foreclosure and the alleged concomitant anticompetitive effect." *Microsoft*, 681 F. Supp. 3d at 1090.[20]

---

[20] Plaintiffs also allege that, by supplying Custom Chassis to other manufacturers, REV Group Defendants get to "peer into their rivals' playbooks," which "discourages independent apparatus builders from investing in unique features or aggressive pricing strategies." NCAPC ¶ 315–16. Plaintiffs' unsupported and conclusory allegation that REV Group will misuse competitively sensitive information deserves no weight because it ignores the "legal, reputational, and financial" disincentives to REV Group were it to do so. *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 149 (D.D.C. 2022).

### C. Plaintiffs Fail to State a Claim Under Section 7 Even Accepting Their Legally Erroneous "Cumulative" Theory

Even if the E-ONE, KME, Ferrara, and Spartan acquisitions were, contrary to law, considered in the aggregate, Plaintiffs still would fail to state a claim. To plead a Section 7 claim, a plaintiff must allege, among other things, that an acquisition *resulted* (or would result) in a significant increase in concentration in a relevant market. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001). To do so, Plaintiffs must, at minimum, allege the level of market concentration prior to and immediately after the challenged acquisition and the change *attributable to* the acquisition. *Chicago Bridge & Iron Co. N. V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008) (to establish a prima facie Section 7 case plaintiff must allege that the "transaction in question will significantly increase market concentration").

Plaintiffs fail to do so. As to pre-merger concentration, the Complaint alleges significant fluctuations—specifically, the relevant markets were "already concentrated" before 2008 (NCAPC ¶ 302); then became "deconcentrated" in or around 2016 (*id.* ¶ 4); and then became "fragmented" as of 2017 (*id.* ¶ 7). Without a specific baseline level of concentration in the markets in which they allege anticompetitive harm, Plaintiffs fail to adequately allege any increase in concentration required to state a claim under Section 7.[21] *See, e.g.*, *Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048, at *6 (N.D. Cal. Aug. 7, 2025) (dismissing Section 7 claim where plaintiff

[21] Plaintiffs' allegations regarding the levels and changes in the Herfindahl-Hirschman Index ("HHI"), a measure of market concentration used by federal agencies to evaluate mergers, do not create a valid "presumpti[on]" that any acquisition was anticompetitive. NCAPC ¶¶ 289–90. Plaintiffs allege that the challenged acquisitions are "presumptively unlawful" under the current Merger Guidelines based on HHIs in relevant markets. *Id.* ¶¶ 295–96. But the Merger Guidelines do not have the force of law and are "not binding on the courts." *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 434 n.13 (5th Cir. 2008). In any event, mere conclusory assertions about HHI changes—which are inconsistent with Plaintiffs' other allegations that the market "deconcentrated" (NCAPC ¶ 4) and "fragmented" (*id.* ¶ 7) during certain periods—do not alone justify a finding that any merger significantly increased market concentration. *Cf. Facebook*, 560 F. Supp. 3d at 18 (dismissing antitrust claim based upon conclusory market share statistics).

did not "allege[] any facts showing the state of the market," including market shares of acquired companies, "before the challenged acquisitions").

Plaintiffs' allegations regarding the *current* concentration levels of the relevant markets (*see* NCAPC ¶¶ 295–96, 298–99) fail to address this deficiency. The most recent challenged acquisition (Spartan) occurred in 2020, before intervening events—i.e., Pierce's 2021 combination with BME (*id.* ¶ 11) and Oshkosh's 2022 acquisition of Maxi-Métal (*id.* ¶ 12)—that allegedly "entrenched and extended Defendants' dominance in" "increasingly consolidating" markets (*id.* ¶¶ 324–25). In other words, these developments occurred after the challenged acquisitions and, under Plaintiffs' allegations, impact the current concentration of the alleged markets. Accordingly, Plaintiffs have not plausibly alleged that the REV Group acquisitions *caused* a significant increase in market concentration, and Plaintiffs' Section 7 claim as to these acquisitions must be dismissed.

## IV. Plaintiffs Fail to State a Section 7 Claim with Respect to the Maxi-Métal Acquisition

Plaintiffs do not plausibly plead that Oshkosh's 2022 acquisition of Maxi-Métal lessened existing competition in any way. Plaintiffs allege that Maxi-Métal is a Canadian manufacturer that primarily sells to the Canadian market and had sold in the U.S in limited ways and only through a partnership with Pierce prior to the acquisition. NCAPC ¶¶ 275, 320. Plaintiffs therefore invoke two *potential* competition doctrines in an effort to plead that the Maxi-Métal violated Section 7: the actual potential entrant doctrine and the perceived potential entrant doctrine. *See id.* ¶¶ 319–20. Plaintiffs do not state a claim under either doctrine.

For starters, Plaintiffs' actual potential competition theory is not legally cognizable. Section 7 is concerned with transactions that may substantially "lessen competition," 15 U.S.C. § 18, not transactions that may impact *future* competition. In keeping with Section 7's plain statutory language, the Supreme Court long ago observed that an acquisition cannot "produce the forbidden result" if it does not affect "pre-existing substantial competition." *Int'l Shoe Co. v.*

*FTC*, 280 U.S. 291, 298 (1930). The Supreme Court has since declined to revisit its precedent and bless the actual potential competition doctrine, twice "leav[ing] for another day" the question of whether Section 7 applies to a transaction that "leave[s] competition in the marketplace exactly as it was, neither hurt nor helped." *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973); *see also United States v. Marine Bancorporation*, 418 U.S. 602, 625–26 (1974). Likewise, appellate courts that have considered the actual potential entrant doctrine have overwhelmingly refused to adopt it, accepting it only arguendo to find that the plaintiff would lose even if it were a valid theory. *See Tenneco, Inc. v. FTC*, 689 F.2d 346, 351–55 (2d Cir. 1982); *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980); *BOC Int'l, Ltd. v. FTC*, 557 F.2d 24, 25 (2d Cir. 1977); *FTC v. Atl. Richfield Co.*, 549 F.2d 289, 294–95 (4th Cir. 1977).

Here, too, Plaintiffs fail to satisfy the actual potential entrant doctrine even if it were valid. This doctrine requires Plaintiffs to show (i) a reasonable probability, meaning "a likelihood noticeably greater than fifty percent," that Maxi-Métal would have meaningfully entered the U.S. Custom Pumpers market in the near future absent the acquisition; and (ii) a "substantial likelihood" that Maxi-Métal's meaningful entry would have "produc[ed] deconcentration of that market or other significant procompetitive effects." *See FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 925–27 (N.D. Cal. 2023); *cf.* NCAPC ¶ 319 (alleging the acquisition "eliminated any probability that Maxi-Métal would meaningfully enter the U.S. market"). Plaintiffs plead neither element.

Plaintiffs offer only speculation, undercut by other allegations, that Maxi-Métal "would have meaningfully entered the U.S. Custom Pumpers market through alternative means absent the acquisition." NCAPC ¶ 320. Plaintiffs allege that Maxi-Métal expanded its sales to the United States in 2018, *id.* ¶ 278, yet remained "on the edge of the U.S. market" for over four years before the acquisition, *id.* ¶ 319. They allege that Maxi-Métal "was expanding its market share in the

[U.S.] at the expense of its competitors, including Pierce" at the time of the acquisition, *id.* ¶ 320, but pointedly decline to allege Maxi-Métal's U.S. market share or any change in Pierce's market share at any time between 2018 and the acquisition. Plaintiffs further allege that Pierce enabled Maxi-Métal's entrance into the U.S. market to begin with, through a partnership in which two lines of Maxi-Métal trucks were sold through the Pierce dealer network. *Id.* ¶ 278. Indeed, according to Plaintiffs, "almost no customers" import Canadian fire trucks into the U.S. if the manufacturer has no dealer presence in the U.S., which Maxi-Métal inferably did not have on its own. *Id.* ¶ 242. Plaintiff thus concede that Maxi-Métal depended on Pierce to make inroads in the U.S. market, and they allege no facts suggesting that Maxi-Métal would or could have expanded its presence independent of Pierce. By the same token, Maxi-Métal's alleged "steps to expand its presence" in the U.S. since 2018 occurred in the context of the same partnership with Pierce and was driven by "demand" from Pierce dealers (in addition to Canadian dealers). *Id.* ¶ 320. It also is telling that Plaintiffs decline to allege Maxi-Métal's market share after the acquisition—it may well be that Maxi-Métal's market share has increased, even at Pierce's expense, since the transaction. Without more, Plaintiffs have not plausibly alleged a probability noticeably greater than 50% that Maxi-Métal would have meaningfully entered the U.S. market through alternative means in the near future absent the acquisition.

Plaintiffs likewise offer mere speculation that Maxi-Métal would have deconcentrated the U.S. Custom Pumpers market or provided other significant procompetitive effects absent the acquisition. Plaintiffs posit that Maxi-Métal "would have exploited . . . backlogs and price hikes to grow its share and deconcentrate the highly concentrated Custom Pumpers market." *Id.* Their factual allegations again undermine this bare assertion. Plaintiffs notably do not allege that Maxi-Métal produced any meaningful deconcentration between its initial entry in 2018 and 2022. On

the contrary, Plaintiffs allege that the market became even more concentrated during that time. *See, e.g.*, *id.* ¶ 295. The allegedly "continuing oligopolistic structure" of the market preceding the acquisition "belies any realistic possibility for deconcentration or other procompetitive effect." *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 768 (D. Md. 1976). Plaintiffs also do not allege that Maxi-Métal would have meaningfully deconcentrated any market after "unprecedented demand" began leading to backlogs and price hikes during the pandemic. NCAPC ¶ 338. Moreover, Plaintiffs identify numerous non-defendant manufacturers of custom pumpers without alleging that any of them took steps to deconcentrate the U.S. market in response to price hikes and backlogs. *Id.* ¶¶ 137–42. Plaintiffs therefore provide no basis to infer a substantial likelihood that Maxi-Métal would have had a significant procompetitive effect on the U.S. market absent the acquisition.

Plaintiffs fare no better with the perceived potential entrant doctrine, which looks to the acquisition's impact on Maxi-Métal's competitive influence "by virtue of its presence on the fringes of the market." *Meta Platforms*, 654 F. Supp. 3d at 938. To satisfy this doctrine, Plaintiffs must allege that Maxi-Métal "possessed the 'characteristics, capabilities, and economic incentive to render it a perceived potential [meaningful] entrant'" and that its "'premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market.'" *Id.* (quoting *Bancorporation*, 418 U.S. at 625). Plaintiffs again plead neither element. The Complaint fails to show that Maxi-Métal's presence "on the edge of the U.S. market," NCAPC ¶ 319, did anything to temper the alleged oligopolistic behavior amongst existing market participants. *See Lektro-Vend Corp. v. Vendo Corp.*, 500 F. Supp. 332, 362 (N.D. Ill. 1980) (rejecting perceived potential competition claim in absence of such a showing). On the contrary, Plaintiffs allege that such behavior continued unabated notwithstanding Maxi-Métal's nascent

entrance into the U.S. market in 2017. *See, e.g.*, NCAPC ¶ 295. Nor do Plaintiffs plausibly allege that competitors perceived Maxi-Métal as a threat to meaningfully enter the U.S. market absent the acquisition. As discussed above, Plaintiffs allege that Maxi-Métal only entered the U.S. market in partnership with Pierce to begin with, and fail to allege facts showing that Maxi-Métal would or could have expanded its presence in the market independent of Pierce.

Plaintiffs separately suggest that the Maxi-Métal acquisition violated Section 7 because it "resulted in a combined market share of Pierce and Maxi-Métal exceeding 40% in the Custom Pumpers market and was therefore presumptively illegal" under "Supreme Court precedent." NCAPC ¶¶ 290, 294. This theory misapplies the Supreme Court's decision in *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963). To establish a prima facie case that a merger will substantially lessen competition under that precedent, Plaintiffs must show that the merger "would result in 'a firm controlling an undue percentage share of the relevant market' *as well as* 'a significant increase in the concentration of firms in that market.'" *FTC v. Advoc. Health Care*, 2017 WL 1022015, at *7 (N.D. Ill. Mar. 16, 2017) (quoting *Philadelphia Nat'l Bank*, 374 U.S. at 363 (emphasis added)). Plaintiffs fail to plead the second prong. They allege only that the acquisition resulted in a combined market share over 30% (and in conclusory fashion at that, *see supra* § II.B), without saying anything about the extent to which the acquisition *increased* concentration. *See* DPP ¶ 143. Plaintiffs thus fail to plead that the transaction substantially *lessened* competition and fail to establish a prima facie case under *Philadelphia Nat'l Bank*.

## V. Plaintiffs Fail to State an Antitrust Claim with Respect to the BME Acquisition

The final transaction at issue is Pierce's 2021 acquisition of a 25% ownership interest in Boise Mobile through its subsidiary BME. NCAPC ¶ 280. Plaintiffs challenge this acquisition (including the alleged "collaboration" between Pierce and Boise Mobile resulting from it) under Clayton Act Section 7 and Sherman Act Sections 1 and 2. Each claim fails.

### A. Plaintiffs Fail to State a Section 7 Claim

Plaintiffs' Section 7 claim fails for two reasons. *First*, as to the Oshkosh Defendants, Plaintiffs fail to allege a reasonable probability that the BME acquisition may substantially lessen or has substantially lessened competition in the relevant markets. "A company need not acquire control of another company in order to violate the Clayton Act," *Denver & Rio Grande W. R.R. Co. v. United States*, 387 U.S. 485, 501 (1967), but "a Section 7 plaintiff must demonstrate some mechanism by which the challenged [partial] acquisition causes anticompetitive effects," *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 858 (6th Cir. 2005). This is no easy feat in the case of a minority interest: Whereas a "total acquisition necessarily substitutes common control for independent competition," a "non-controlling acquisition has no intrinsic threat to competition at all." Areeda and Hovenkamp ¶ 1203d (Supp. 2025).

Here, Plaintiffs allege no mechanism by which Pierce's noncontrolling interest in Boise Mobile may cause anticompetitive effects. In the few cases where courts have sustained Section 7 claims challenging partial acquisitions, the acquisitions at the very least "gave the acquiring party the ability to influence competitive behavior," such as through a voting interest, the right to appoint board members, or other governance rights. *See Dairy Farmers*, 426 F.3d at 858.[22] Plaintiffs simply parrot these cases with conclusory allegations that "through their ownership interest, Oshkosh and Pierce can and do actively influence and direct the BME Defendants," without alleging any facts to support these bare assertions. NCAPC ¶¶ 322, 480, 481. Plaintiffs notably do not allege that Pierce's 25% interest in BME provides Pierce (much less Oshkosh) any voting interest, right to appoint board members, or other governance rights with respect to Boise Mobile. Nor do they allege any ways in which Pierce (much less Oshkosh) has in fact influenced or

[22] *See also* U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, at 28 (identifying the same factors).

controlled Boise Mobile's competitive behavior since the acquisition. Plaintiffs' conclusory allegations that the acquisition allows the Oshkosh Defendants to influence or direct the BME Defendants to the contrary should be disregarded under *Twombly*.

Plaintiffs likewise fail to plead any anticompetitive effects from the BME acquisition. On the contrary, Plaintiffs allege that the acquisition has had facially *pro*competitive effects. *First*, "Boise Mobile moved from a factory direct model to a dealer distribution model" in which its trucks are now available through Pierce's nationwide dealer network, thereby making them more widely available. NCAPC ¶ 281. *Second*, Boise Mobile and Pierce are "collaborating . . . . to design and develop state-of-the-art" wildland chassis, thereby improving the quality of each company's trucks. *Id.* ¶ 306. To that point, Plaintiffs' conclusory assertion that the acquisition "eliminated" competition between Pierce and Boise Mobile (*id.* ¶¶ 281, 306) is belied by their recognition that both Pierce and Boise Mobile continue to sell competing wildland trucks (*see id.* ¶¶ 147, 220, 283, 305). Their assertion that the acquisition "substantially diminishes the Oshkosh Defendants' incentive to compete with the BME Defendants" is equally implausible. *Id.* ¶ 323. Given that Pierce owns a mere 25% interest in BME, economic common sense dictates that Pierce remains fully incentivized to sell its own trucks. And Plaintiffs' contention that the acquisition was the cause of alleged price hikes under Boise Mobile's contract with CAL FIRE is sheer speculation, especially given the many intervening causes Plaintiffs allege during the five years between the contract date and the price hikes—including the pandemic and all the "problems" it "brought on" for fire truck manufacturers. *See id.* ¶¶ 18, 283. Against this backdrop, Plaintiffs' conclusory assertions of anticompetitive effect, *e.g.*, *id.* ¶ 674, need not be accepted, *see Nat'l Black Expo v. Clear Channel Broad., Inc.*, 2007 WL 495307, at *9 (N.D. Ill. Feb. 8, 2007).

*Second*, as to the BME Defendants, Plaintiffs have not alleged that they engaged in *any*

acquisition at all, and therefore they cannot be liable under Section 7. *Dailey v. Quality Sch. Plan, Inc.*, 380 F.2d 484, 488 (5th Cir. 1967) ("§ 7 by its terms proscribes only the acquiring corporation."); *see also United States v. Coca-Cola Bottling Co. of L.A.*, 575 F.2d 222, 227 (9th Cir. 1978) (Section 7 "proscribes only the act of acquiring, not selling"); *Dehoog v. Inbev*, 2016 WL 5853733, at *5 (D. Or. July 22, 2016) (collecting cases).[23]

Plaintiffs also fail to establish a prima facie case that the BME acquisition violates Section 7 under *Philadelphia Nat'l Bank*. As noted above, Plaintiffs allege only that the Oshkosh and BME Defendants' "combined" shares of the U.S. Fire Apparatus and Wildland Fire Apparatus markets exceed 30%, without alleging either set of Defendants' individual shares of those markets. NCAPC ¶¶ 299, 301. Nor do Plaintiffs allege the extent to which the acquisition increased concentration in either of those markets, as they must. *Advoc. Health Care*, 2017 WL 1022015, at *7.[24, 25]

### B. Plaintiffs Fail to State a Section 1 Claim

Plaintiffs next challenge the BME acquisition as an unlawful combination under Section 1 of the Sherman Act, which prohibits any "contract, combination . . . , or conspiracy[] in restraint of trade." 15 U.S.C. § 1. This claim is duplicative of Plaintiffs' Section 7 claim and fails for the same reasons. While "[t]here is not a great deal of merger and acquisition litigation under Section

[23] Claims against the other acquired entities that Plaintiffs name as defendants in their Section 7 claims, including KME, Ferrara, Spartan Fire, Smeal, Ladder Tower, Detroit Truck Manufacturing, and Maxi-Métal, fail for the same reason.

[24] Plaintiffs' conclusory allegations that the BME acquisition increased HHI by more than 100 the U.S. Fire Wildland Fire Apparatus market and that the post-transaction HHI exceeded 2,000 in that market, NCAPC ¶ 300, is insufficient for the same reason as Plaintiffs' reliance on HHI with respect to the E-ONE, KME, Ferrera, and Spartan acquisitions. *See supra* n.21.

[25] Plaintiffs' theory that the Maxi-Métal and BME acquisitions violate Section 7 "when considered as a series," NCAPC ¶ 484, is legally deficient for the same reasons discussed above with respect to the E-ONE, KME, Ferrera, and Spartan acquisitions, *see supra* § IV.A. It also fails given that Plaintiffs do not show either acquisition lessened competition in the U.S. Fire Apparatus market.

1 of the Sherman Act," it is clear that transactions challenged under Section 1 "should be evaluated by the same substantive standards as those applied under Section 7 of the Clayton Act." *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1173 (W.D. Ark. 1995); *see also United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1281 (7th Cir. 1990) ("We doubt whether there is a substantive difference today between the standard for judging the lawfulness of a merger challenged under section 1 of the Sherman Act and the standard for judging the same merger challenged under section 7 of the Clayton Act."); Areeda ¶ 906 (Supp.. 2025) (stating that Section 1 "is now largely superfluous in merger litigation" given the convergence of standards under Section 1 and Section 7). Indeed, Plaintiffs do not plausibly allege that the BME acquisition unreasonably restrains trade under Section 1 for the same reasons they do not plausibly allege that it substantially lessens competition under Section 7. *Cf. Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) ("This Court's precedents have thus understood § 1 to outlaw only *unreasonable* restraints."). As discussed above, Plaintiffs do not allege that Pierce's 25% ownership interest provides it with any mechanism for controlling, influencing, or directing the BME Defendants' competitive behavior. They allege that the acquisition has had facially *pro*competitive effects: it has expanded the BME Defendants' distribution and led to collaboration to improve each brand's wildland trucks, without disincentivizing Pierce from competing with the BME Defendants. And Plaintiffs offer only conclusions and speculation that the acquisition has restrained trade in any way. *See supra* § VI.A. Plaintiffs thus equally fail to state a claim under Section 1.

### C. Plaintiffs Fail to State a Section 2 Conspiracy to Monopolize Claim[26]

Plaintiffs' conspiracy to monopolize claim under Section 2 of the Sherman Act fares no better. Plaintiffs must plausibly allege "1) the existence of a combination or conspiracy, 2) overt

[26] Plaintiffs' Section 2 attempted monopolization claim with respect to the BME acquisition fails for the reasons discussed *supra* § II.

acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540–41 (7th Cir. 1986). Plaintiffs attempt to plead only the first element, and thus allege nothing to create an inference of a conspiracy to obtain monopoly power. *See Frantz v. U.S. Powerlifting Fed'n*, 1986 WL 12593, at *3 (N.D. Ill. Nov. 3, 1986) (plaintiff must allege "actions by the defendant from which a conspiracy may be inferred" absent direct evidence of a conspiracy).

For starters, the overt acts for purposes of a conspiracy to monopolize claim "must . . . constitute anticompetitive conduct," which is synonymous with a restraint of trade under Section 1. *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019). Plaintiffs' conspiracy to monopolize claim thus fails initially for the same reason as their Section 1 claim: they do not identify any acts in restraint of trade. The alleged overt acts consist of Pierce's acquisition of a 25% ownership interest in Boise Mobile and their "collaboration" with respect to the development and distribution of wildland fire trucks. NCAPC ¶ 851. As discussed above, Plaintiffs do not show that Pierce's minority interest has any tendency to harm competition, and the alleged collaboration is facially procompetitive, notwithstanding Plaintiffs' speculative and conclusory allegations to the contrary. *See supra* §§ V.A–B.

For similar reasons, Plaintiffs also fail to allege specific intent to monopolize. Plaintiffs' conclusory allegation of specific intent is insufficient under *Twombly*, and they offer no direct evidence of intent. *See* NCAPC ¶ 850. "Specific intent may be inferred from predatory conduct," which is "broadly defined as conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986). But again, Plaintiffs do not allege any such conduct. The activity they identify—Pierce's acquiring a minority interest in

BME and Pierce collaborating with the BME Defendants on distribution and R&D—obviously does not independently violate the antitrust laws. There are clearly legitimate business justifications for such conduct given its facially procompetitive effects. And Plaintiffs offer no non-speculative allegations showing any damage or destruction to competition resulting from the acquisition or collaboration. *See supra* §§ V.A–B. Plaintiffs therefore fail to plausibly any of the elements of their conspiracy to monopolize claim.

## VI. Plaintiffs' Acquisition-Related Claims Fail Because Their Alleged Markets Are Legally Deficient

Antitrust claims require "a precise market definition in order to demonstrate that a defendant wields market power." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (determining the relevant markets "is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act"). "To establish a relevant market, a plaintiff must define both a geographic [] and a product market." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017). Plaintiffs' alleged product markets are legally deficient.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Plaintiffs fail to "allege[] facts explaining why the products included in the market[s] are substitutes for one another." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022) (emphases omitted).

Plaintiffs' omnibus "Fire Apparatus" market fails for the same reason as Class Plaintiffs' alleged markets. *See* Class Brief § II.B.2.a. That market collapses every apparatus type into one, even though Plaintiffs admit that the market includes "distinct apparatus type[s]" with "distinct customers" and "distinct characteristics" that each serve "specific need[s]." NCAPC ¶¶ 211, 229.

The Fire Apparatus market thus comprises products that are not reasonably interchangeable. It also does not constitute a viable cluster market because consumers do not purchase fire trucks as a group, but rather on an individual basis per their "specific needs." NCAPC ¶ 211. While non-substitutable products can sometimes be grouped together where "competitive conditions are similar for each" product market, *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014), that is not the case here. Plaintiffs' allegation that "competitive conditions" across apparatus types are "similar enough," NCAPC ¶ 229, is conclusory. It is also contradicted by allegations that demand conditions for different types of trucks vary significantly based on factors like community density, topography, climate, budgets, and firefighter preferences. *Id.* ¶ 266.

Plaintiffs' narrower submarkets also fail. Plaintiffs carve the industry into separate markets for Custom Pumpers, Custom Aerials, Custom Quints, Custom Chassis, and Wildland Fire Apparatus, but plead none of the required facts explaining why each type of truck is not interchangeable with others. Indeed, their allegations cut the other way. Plaintiffs allege, for example, that Custom Quints "must be able to perform the functions of both an aerial and a pumper," NCAPC ¶ 205—an allegation of overlap with two other markets, rather than separation from them. They also allege multiple types of wildland trucks with very different purposes, from fire suppression to supplying water to carrying crew. *Id.* ¶ 219. They allege that custom apparatuses "tend to" or "typically" differ in price from "commercial" apparatuses, *id.* ¶¶ 194, 215—hedged language conceding no actual boundary, and saying nothing about how customers would respond if custom prices rose. And tellingly, Plaintiffs include only conclusory recitations of the hypothetical monopolist test, *id.*, ¶¶ 198–99, 218, 226, 231—"the leading way" to define a product market in antitrust cases, *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 96 (D.D.C. 2025).

Plaintiffs' alleged Custom Chassis, Custom Pumpers, Custom Aerials, Custom Quints, and Wildland Fire Apparatus markets therefore equally fail as a matter of law.

Absent a plausible product market, Plaintiffs fail to plead that any of the challenged acquisitions had anticompetitive effects.

## VII. Plaintiffs Fail to State an Antitrust Claim Regarding Pierce Replacement Parts

Aside from acquisitions, Plaintiffs challenge alleged arrangements between Pierce and its authorized replacement parts dealers that "force[] its customers to purchase [Pierce-branded] replacement parts" under Clayton Act Section 3 (exclusive dealing) and Sherman Act Section 2 (conspiracy to monopolize). NCAPC ¶ 364. Each claim fails for multiple independent reasons.

### A. Plaintiffs Plead Invalid Single-Brand Aftermarkets

Plaintiffs' replacement parts claims fail in the first instance because they are premised on legally deficient single-brand aftermarkets. The alleged markets for these claims are "U.S. markets for replacement parts for Pierce Fire Apparatuses," consisting of "[t]he market for each replacement part for use in a Pierce Fire Apparatus to replace the original part installed in the apparatus"—e.g., "the market for replacement air conditioning compressors to replace the original air conditioning compressor installed in a Pierce Fire Apparatus." NCAPC ¶¶ 347, 356.

A single brand of a product or service can constitute a relevant market for antitrust purposes "[i]n rare circumstances." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 961 (N.D. Ill. 2018). The Supreme Court's decision in *Eastman Kodak Co. v. Image Technology Services*, 504 U.S. 451 (1992), is the seminal case on this issue. In *Kodak*, the defendant (Kodak) initially sold copiers that could be serviced either by Kodak or by various independent service organizations, but changed its policy to limit the availability of replacement parts to those organizations *after* selling a large number of copiers, forcing customers to switch to Kodak for servicing. *Id.* at 456–58. Because Kodak had thus "locked in" many customers with sunken costs

by changing its policy to dominate the parts and services aftermarkets, the Supreme Court held that the proposed single-brand aftermarket was viable. *Id.* at 476–77.

Lower courts have viewed *Kodak* to stand for the proposition that the viability of a single-brand market "depends on the consumer's unawareness of the supplier's aftermarket power and its terms when it purchased the primary-market product." *In re Dealer Mgmt.*, 313 F. Supp. 3d at 962–63 (collecting cases). As a result, "the law prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers *knowingly and voluntarily* gave to the defendant." *Id.* at 963 (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008)); *accord In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 893 (N.D. Ill. 2023). Determining whether an alleged single-brand aftermarket is viable thus requires "an inquiry into whether a consumer's selection of a particular brand in the [primary] market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket," and whether "consumers entered into such contracts knowing that they were agreeing to such a commitment." *Newcal*, 513 F.3d at 1049.

The Seventh Circuit adopted this standard in the *In re Harley-Davidson* MDL on appeal from this Court. The plaintiffs in that case alleged *Kodak*-style lock-in claims based on Harley-Davidson's conditioning warranty coverage for its motorcycles on customers' exclusive use of Harley-Davidson replacement parts. 151 F.4th at 933. The Seventh Circuit affirmed this Court's dismissal because the complaint established that plaintiffs knew from warranty documents they "received when [they] purchased [their] motorcycle[s]," and which were also available on Harley Davidson's website, that they would lose warranty coverage if they used non-Harley-Davidson parts. *Id.* at 936. Consistent with this Court, the Seventh Circuit also reasoned that forgoing the remainder of a limited warranty was not "the kind of switching costs the [Supreme] Court was

referring to in *Kodak*." *Id.* at 937; *accord In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs., & Antitrust Litig.*, 2024 WL 2846349, at *6–9 (E.D. Wis. June 5, 2024).

*In re Harley-Davidson* forecloses Plaintiffs' alleged single-brand aftermarkets. Just like in that case, Plaintiffs allege that Pierce forces its customers to purchase Pierce replacement parts "through provisions in its product various warranties" stating that the warranties "may become void" if customers use non-Pierce-branded parts. NCAPC ¶ 364. Also like in *In re Harley-Davidson*, Plaintiffs allege that these warranty terms are "provided to customers as part of the purchase agreement for an apparatus." *Id.* Plaintiffs further allege that Pierce maintains a "Pierce Aftermarket website which provides resources, manuals, diagrams, training, and technical support to customers," *id.* ¶ 342, and also contains Pierce's warranty terms, just like Harley-Davidson's website.[27] Thus, Plaintiffs allege precisely the type of single-brand aftermarkets this Court and the Seventh Circuit squarely rejected in *In re Harley-Davidson*.

Confirming that their alleged single-brand aftermarkets are not viable under *Kodak*, Plaintiffs plead neither of the scenarios where courts have recognized such markets. The first occurs where the defendant changes its aftermarket policies or practices after the consumer has made a significant expenditure in the primary market. *In re Deere*, 703 F. Supp. 3d at 893; *In re Dealer Mgmt.*, 313 F. Supp. 3d at 964. The second occurs where the customer is unable to determine life-cycle costs when purchasing the primary product because the requisite information is difficult or impossible to acquire at the time of purchase. *In re Deere*, 703 F. Supp. 3d at 893; *In re Dealer Mgmt.*, 313 F. Supp. 3d at 964. Plaintiffs offer no facts invoking either scenario.

---

[27] *See* Pierce, Spare Parts Warranty Statement, https://www.pierceparts.com/_v/private/attachments?acron=RS&fieldname=ResourceOriginalFile&fileName=wa0030%20100208.pdf&i=2aa9dfea-0530-11ee-83ab-0211cbea20fd. The Court may take judicial notice of this webpage for the same reasons discussed *supra* n.12.

They allege neither that Pierce changed its aftermarket policies or practices after they purchased Pierce trucks nor that they were unable to calculate lifecycle costs at the time of purchase.

Plaintiffs' alleged single-brand aftermarkets independently fail because they do not allege that "[c]ompetition in the initial market . . . does not necessarily suffice to discipline anticompetitive practices in the aftermarket." *Newcal*, 513 F.3d at 1050; *see also Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 762 (7th Cir. 1996) (expressing doubt that *Kodak* "supports a tie-in theory for parts when the principal market is highly competitive"). Plaintiffs merely allege that a hypothetical monopolist in the proposed single-brand aftermarkets could raise prices without customers "substitut[ing] away to other *replacement parts*." NCAPC ¶ 347 (emphasis added). That has it backward: Plaintiffs must allege that price increases for Pierce replacement parts would not cause customers to switch to other products in the *initial* or primary market—i.e., to buy trucks from Pierce's competitors. Plaintiffs not only fail to do so, they allege that customers have plenty of other options in the primary markets in which Pierce sells trucks, including the REV Group Defendants and numerous non-defendant manufacturers in the various custom fire truck markets, and the BME Defendants, E-ONE, and HME in the wildland market. *See* NCAPC ¶¶ 126–32, 135, 137–42, 400. Such robust competition in the alleged primary markets inferably suffices to discipline anticompetitive conduct in the alleged aftermarkets.

### B. Plaintiffs Fail to State a Section 3 Exclusive Dealing Claim

Plaintiffs' Section 3 claim independently fails because Plaintiffs do not plausibly allege that Pierce's alleged exclusive dealing arrangements with replacement parts dealers substantially foreclose competition in the alleged aftermarkets.

"Rather than condemning exclusive dealing, courts often approve [it] because of [its] procompetitive benefits." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004). "Because of those recognized procompetitive effects, exclusive dealing must be

analyzed under the Rule of Reason." *In re Dealer Mgmt.*, 313 F. Supp. 3d at 956; *cf. Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) (rule of reason applies under both Section 3 of the Clayton Act and Section 1 of the Sherman Act). "Under that standard, exclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue." *In re Dealer Mgmt.*, 313 F. Supp. 3d at 957. Courts consider factors set forth in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), to assess whether exclusive dealing causes substantial foreclosure, including "the duration of the contracts," "the share of the market foreclosed by [the] contracts," and "whether a firm can reach the market through alternative channels of distribution." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016); *cf. In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 865 (N.D. Ill. 2025) (considering these factors on a motion to dismiss).

Plaintiffs' exclusive dealing claims fail because they offer no factual allegations regarding these or other factors bearing on the analysis. For instance, courts routinely hold that short-term exclusive contracts are lawful. *See, e.g.*, *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *4–5 (N.D. Cal. Apr. 25, 2014) (dismissing claims where alleged exclusivity contracts were "much shorter" than the three- to five-year contracts found lawful in other cases); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237–38 (1st Cir. 1983) (holding that two-year contracts were not exclusionary). Courts have similarly held that "easily terminable" contracts are not exclusionary. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 287 (3d Cir. 2012); *see also Roland*, 749 F.2d at 395 ("Exclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3."). Here, however, the Complaint is silent as to the duration and terminability of Pierce's alleged contracts or arrangements with its replacement parts dealers. Nor do Plaintiffs provide even basic allegations about the geographic scope, enforcement mechanism,

or any other features of the arrangements. The absence of any relevant details concerning these arrangements dooms Plaintiffs' Section 3 claim. *See Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 2011 WL 1225912, at *15 (N.D. Cal. Apr. 1, 2011) ("Without allegations as to . . . the length of the agreements, etc.," plaintiff "does not adequately state a plausible exclusive dealing claim").

Plaintiffs also fail to allege any facts regarding the market share foreclosed by the alleged exclusivity arrangements. "Courts typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market to proceed with a claim." *Methodist*, 2016 WL 5817176, at *8. Here, however, Plaintiffs allege facts showing there is *no* foreclosure in the alleged aftermarkets. According to Plaintiffs, the alleged exclusivity arrangements prohibit Pierce-authorized dealers from selling "non-Pierce proprietary replacement parts" without voiding a customer's warranty. NCAPC ¶ 967; *see also id.* ¶ 341. But "Pierce proprietary replacement parts" as Plaintiffs use that term include so-called White-Label parts "manufactured for Pierce by third-party manufacturers." *Id.* ¶ 350. For example, Plaintiffs allege that a manufacturer called Horton makes White-Label fan clutches for Pierce trucks that is "virtually identical" to the fan clutches Horton manufactures for "many different manufacturers' apparatuses." *Id.* ¶ 351. In other words, the alleged exclusivity arrangements ***include parts manufactured by competitors***. The challenged arrangements thus do not prevent dealers from selling "replacement parts for Pierce Fire Apparatuses of competitors of Pierce" at all, contrary to Plaintiffs' assertion. NCAPC ¶¶ 973, 979. Given that competitors can and do manufacture authorized "Pierce proprietary replacement parts," Plaintiffs do not plausibly plead that the alleged arrangements foreclose ***any*** competition in the alleged aftermarkets.[28]

[28] While Plaintiffs allege that Pierce "is the sole supplier" in certain replacement parts markets, NCAPC ¶ 356, it is unclear whether that accounts for White-Label parts, and to the extent it does, they do not allege that the exclusivity arrangements are responsible for the absence of competition.

On top of that, Plaintiffs do not allege that customers cannot purchase non-Pierce-branded parts from other distributors. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–63 (9th Cir. 1997) (noting that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern" because competitors may be able to "reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution"). Plaintiffs allege only that a customer's warranty may be voided for using non-Pierce-branded parts. NCAPC ¶ 364. As the Seventh Circuit held in *In re Harley-Davidson*, that is not "the kind of switching costs the [Supreme] Court was referring to in *Kodak*." 151 F.4th at 937. Indeed, given that Plaintiffs allege no facts about the duration of these warranties, and fire trucks allegedly have "exceptionally long operational lifespan[s]," NCAPC ¶ 369, that consequence may well be immaterial to the vast majority of purchasing decisions, minimizing any degree of foreclosure caused by the alleged exclusivity arrangements.

### C. Plaintiffs Fail to State a Section 2 Conspiracy to Monopolize Claim

Plaintiffs recast their flawed exclusive dealing claim as a conspiracy to monopolize under Section 2 of the Sherman Act. *See* NCAPC ¶¶ 965–67. This claim fails for the same reasons.[29]

An even "greater showing of anti-competitive effect is required to establish a Sherman Act violation than a § 3 Clayton Act violation in exclusive-dealing or requirements contracts cases." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1275 (9th Cir. 1975). "The existence of this heavier burden is rooted in the language of the two statutes; the Sherman Act speaks of actual restraints of trade while § 3 of the Clayton Act speaks of effects of

---

[29] Although foreclosed by Circuit precedent, *see United States v. Nat'l City Lines*, 186 F.2d 562 (7th Cir. 1951), Defendants also contend that Plaintiffs' conspiracy to monopolize claim fails for the additional reason that they do not allege monopoly power. Plaintiffs allege that Pierce is a monopolist only in certain relevant markets, and they provide no factual allegations supporting their conclusory allegations of monopoly power even in these markets. *See* NCAPC ¶ 356.

arrangements which may substantially lessen competition or tend to create a monopoly." *Id.* As the Supreme Court held in *Tampa Electric*, if an exclusivity agreement "does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by" Sections 1 or 2 of the Sherman Act. 365 U.S. at 335; *see, e.g.*, *Methodist*, 2016 WL 5817176, at *8.

That Plaintiffs allege a conspiracy to monopolize instead of monopolization or attempted monopolization under Section 2 does not change the outcome. "The rule of reason analysis for exclusive dealing applies with equal force" to conspiracy to monopolize claims. *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 653 (N.D. Ill. 2022); *accord City of Rockford*, 360 F. Supp. 3d at 756–57; *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *6, *12 (N.D. Ill. Sept. 28, 2015). This standard derives from the second element of a conspiracy to monopolize claim—anticompetitive acts in furtherance of the conspiracy. *See City of Rockford*, 360 F. Supp. 3d at 756. After all, it would make no sense if Plaintiffs could salvage their Section 2 claim, despite failing to show a substantial foreclosure of competition, by recasting it as a conspiracy to monopolize. Plaintiffs' Section 2 claim thus falls with their Section 3 claim.

## VIII. Plaintiffs Fail to Adequately Plead State Law Claims

Plaintiffs' state law claims are premised on the same speculative theories and deficient allegations that underpin their federal law claims and fail for many of the same reasons. Appendix A identifies all of the bases for dismissal for each claim.

### A. Plaintiffs Fail to Plead State Law Antitrust Claims

Plaintiffs assert claims under ten state antitrust statutes (*see* App. B), all of which overlap with the state statutes under which the IPPs assert claims. These claims fail for several reasons, including that they are untimely (i.e., just like Plaintiffs' federal claims), that Plaintiffs lack standing, that their claims necessarily fail along with their federal claims, and that Plaintiffs fail to plead the requisite elements, among other reasons (i.e., just like the IPPs' state law antitrust claims).

### B. Plaintiffs Fail to Plead State Law Consumer Protection Claims

Plaintiffs also assert claims under the consumer protection statutes of California (also at issue in the IPPs' Complaint) and Connecticut (not at issue in the IPPs' Complaint). All fail.

Plaintiffs' California UCL claims based on allegedly unlawful acquisitions consummated prior to February 12, 2022 are untimely. *Supra* § I. They also fail for a separate threshold reason: Plaintiffs lack Article III standing. These claims purport to be brought on behalf of the People of the State of California by the LA County and San Diego County Offices of County Counsel and the San Diego City Attorney's Office in the stead of the California Attorney General. "Unlike private litigants, the Attorney General has statutory authority to sue under the UCL and need not demonstrate standing." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 560593, at *6 (N.D. Cal. Feb. 15, 2011). Plaintiffs here have no such recourse, and the existence of a statutory cause of action "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021).

Plaintiffs fail to allege any concrete harm. They do not allege harm to the physical or economic health and well-being of California residents, as required to show a quasi-sovereign interest conferring *parens patriae* standing. *See People of State of Ill. ex rel. Edgar v. City of Chicago*, 942 F. Supp. 366, 374 (N.D. Ill. 1996) *vacated on other grounds*, 37 F.3d 474 (7th Cir. 1998). That ends the inquiry. Absent a direct injury to itself, the State (or here, its purportedly deputized representatives) "must express a quasi-sovereign interest" and cannot assert private interests of its residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Plaintiffs do not allege *any* cognizable injury-in-fact to California residents anyway. They allege only that "the public at large" has been harmed in the form of "higher taxes and budget

shifts." NCAPC ¶ 384. That alleged harm falls squarely within "the rule barring adjudication of generalized grievances" in federal court. *Winkler v. Gates*, 481 F.3d 977, 979–80 (7th Cir. 2007).[30]

Plaintiffs' Connecticut Unfair Trade Practices Act (CUTPA) claims fail for many of the same reasons as other state law claims at issue in this MDL. CUTPA's three-year statute of limitations means that Plaintiffs' CUTPA claims predicated on the challenged acquisitions, all of which were consummated prior to April 10, 2023 (three years before Hartford filed the first Non-Class action complaint asserting CUTPA claims, on April 10, 2026 (*see* Case No. 26-cv-00731, ECF No. 1)) are untimely. *Supra* § I. Moreover, because Plaintiffs do not plausibly plead an antitrust violation, their CUTPA claim, which is premised on alleged antitrust violations, also fails. *See Subsolutions, Inc. v. Doctor's Assoc.*, 62 F. Supp. 2d 616, 629 (D. Conn. 1999) (dismissing CUTPA claim where "plaintiffs have failed to state an antitrust claim").

## CONCLUSION

For the foregoing reasons, the Non-Class Plaintiffs' Complaints should be dismissed.

[30] In addition to lacking standing, Plaintiffs' California UCL claims fail in any event. In particular, the UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §§ 17200, 17203. "[W]hen [a] plaintiff's claim under the unfair prong overlaps entirely with the conduct alleged in the fraudulent and unlawful prongs of the UCL, [claims under] the unfair prong . . . cannot survive if the claims under the other two prongs do not survive." *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021); *see also Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct."). Here, Plaintiffs' claims under the unlawful prong fail because they are premised on predicate violations of federal law, and their claims under the unfair prong fail because they challenge the same alleged "anticompetitive conduct" as the unlawful prong. *See* NCAPC ¶¶ 1066–68, 1071–73, 1076–78.

Dated: August 17, 2026

Respectfully submitted,

s/ *Daniel T. Flaherty*

Daniel T. Flaherty (Bar No. 1011357)
GODFREY & KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 273-5198
dflaherty@gklaw.com

Reid Schar (Bar No. 6243821)
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
(628) 267-6800
rschar@jenner.com

Douglas E. Litvack (Bar No. 1024973)
Jariel A. Rendell (Bar No. 1027023)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 637-6357
dlitvack@jenner.com
jrendell@jenner.com

Jacob P. Wentzel (Bar No. 6333530)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
jwentzel@jenner.com

*Counsel for Defendants Oshkosh Corporation, Pierce Manufacturing, Inc., and Maxi-Métal, Inc.*

s/ *Daniel J. Vaccaro*

Daniel J. Vaccaro (Bar No. 1018037)
Joseph L. Olson (Bar No. 1046162)
Ena M. Allen (Bar No. 1101342)
MICHAEL BEST & FRIEDRICH LLP
790 North Water Street, Suite 2500
Milwaukee, WI 53202
(414) 271-6560
djvccaro@michaelbest.com
jlolson@michaelbest.com
ena.allen@michaelbest.com

Arthur J. Burke (Bar No. 1175568)
DAVIS POLK & WARDWELL LLP
450 Lexington Ave
New York, NY 10017
(212) 450-4000
arthur.burke@davispolk.com

Sean Stefanik (Bar No. 5637913)
DAVIS POLK & WARDWELL LLP
1050 17th Street, NW
Washington, DC 20036
(202) 962-7000
sean.stefanik@davispolk.com

*Counsel for Defendants REV Group, LLC (formerly REV Group, Inc.), E-One, Inc., Kovatch Mobile Equipment Corp., KME Global, LLC, KME Holdings, LLC, KME RE Holdings, LLC, Ferrara Fire Apparatus, Inc., FFA Holdco, Inc., FFA Acquisition Co., Inc., Ferrara Fire Apparatus Holding Company, Inc., Spartan Fire, LLC, Smeal SFA, LLC, Smeal LTC, LLC, Smeal Holding, LLC, and Detroit Truck Manufacturing, LLC*

s/ *Paul C. Cuomo*
Paul C. Cuomo (Bar No. 457793)
Ed Duffy (Bar No. 359847)
Megan Tankel (Bar No. 90003303)
Alexander Kraszewski (Bar No. 1781948)
BAKER BOTTS LLP
700 K Street, NW
Washington, DC 20001
(202) 639-7700
paul.cuomo@bakerbotts.com
ed.duffy@bakerbotts.com
megan.tankel@bakerbotts.com
alexander.kraszewski@bakerbotts.com

Daniel E. Conley (Bar No. 1009443)
Nathan J. Oesch (Bar No. 1101380)
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
(414) 277-5000
daniel.conley@quarles.com
nathan.oesch@quarles.com

*Counsel for Defendants AIP, LLC, American Industrial Partners Capital Fund IV, LP, American Industrial Partners Capital Fund IV (Parallel), LP, AIP/CHC Holdings, LLC, AIP CF IV, LLC, and AIP/CHC Investors, LLC*

s/ *Leo Caseria*

Leo Caseria (D.C. Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
(202) 747-1900
lcaseria@sheppard.com

Joy O. Siu (Cal. Bar No. 307610)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
(415) 774-3108
jsiu@sheppard.com

*Counsel for Defendants Boise Mobile Equipment, Inc. and BME Fire Trucks LLC for all matters other than People of the State of California, et al. v. REV Group, LLC, et al., No. 2:26-cv-00632*

s/ *Benjamin Price*

Benjamin Price (Cal. Bar No. 267400)
Keith G. Bremer (Cal. Bar No. 155920)
BREMER WHYTE BROWN & O'MEARA, LLP
20320 SW Birch St. Newport Beach, CA 92660
(949) 221-1013
bprice@bremerwhyte.com

*Counsel for Boise Mobile Equipment, Inc. and BME Fire Trucks LLC in People of the State of California, et al. v. REV Group, LLC, et al., No. 2:26-cv-00632*