**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

IN RE: FIRE APPARATUS ANTITRUST LITIGATION

Case No. 2:26-md-3179-WCG

Hon. William C. Griesbach

**NON-CLASS ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS NON-CLASS PLAINTIFFS' COMPLAINTS (ECF NO. 154)**

*This Document Relates To: Non-Class Action Plaintiff Track*

PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Los Angeles County Counsel; COUNTY OF LOS ANGELES; CONSOLIDATED FIRE PROTECTION DISTRICT OF LOS ANGELES COUNTY,

*Plaintiffs*,

v.

REV GROUP, INC., et al.,

*Defendants*.

Case No. 2:26-cv-00632-WCG

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Office of County Counsel, County of San Diego; COUNTY OF SAN DIEGO; SAN DIEGO COUNTY FIRE PROTECTION DISTRICT,<br><br>*Plaintiffs*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00635-WCG |
| PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Diego City Attorney's Office; and THE CITY OF SAN DIEGO,<br><br>*Plaintiffs*,<br><br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00729-WCG |
| EBBETTS PASS FIRE PROTECTION DISTRICT,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00633-WCG |
| CITY OF SANTA BARBARA,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00634-WCG |

| | |
|---|---|
| COUNTY OF BUTTE,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00727-WCG |
| COUNTY OF SHASTA,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00728-WCG |
| CITY OF OAKLAND,<br><br>*Plaintiff*,<br><br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00810-WCG |
| CITY OF SANTA CLARA,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00891-WCG |

| | |
|---|---|
| UNIFIED FIRE AUTHORITY,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants.* | Case No. 2:26-cv-00684-WCG |
| CITY OF HARTFORD,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants.* | Case No. 2:26-cv-00731-WCG |
| CITY OF PORTLAND, OREGON,<br><br>*Plaintiff*,<br><br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants.* | Case No. 2:26-cv-00732-WCG |
| CITY OF ALLENTOWN,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants.* | Case No. 2:26-cv-00811-WCG |
| CITY OF PORTSMOUTH,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants.* | Case No. 2:26-cv-00737-WCG |

| | |
|---|---|
| CITY OF GREEN BAY,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00819-WCG |
| CITY OF YONKERS,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00974-WCG |
| CITY OF TUCSON,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-00972-WCG |
| CITY OF EMERYVILLE,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01030-WCG |
| CITY OF ALBUQUERQUE,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01031-WCG |

| | |
|---|---|
| CITY OF TEMPE,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01098-WCG |
| MAYOR & CITY COUNCIL OF BALTIMORE,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, INC., et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01099-WCG |
| CITY OF DES MOINES,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, LLC, et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01104-WCG |
| CITY OF TACOMA,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, LLC, et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01106-WCG |
| CITY OF TUSCALOOSA,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, LLC, et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01119-WCG |

| | |
|---|---|
| CITY OF TAMPA,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, LLC, et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01120-WCG |
| TOWN OF GILBERT,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, LLC, et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01253-WCG |
| CITY OF OXNARD,<br><br>*Plaintiff*,<br>v.<br><br>REV GROUP, LLC, et al.,<br><br>*Defendants*. | Case No. 2:26-cv-01254-WCG |

## TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………………...…1

NCAPs' APPARATUS CLAIMS ARE TIMELY ............................................................................ 3

NCAPs PLAUSIBLY ALLEGE DEFENDANTS ENGAGED IN UNFAIR COMPETITION ........................................................................................................ 12

NCAPs PLAUSIBLY ALLEGE ANTITRUST LAW VIOLATIONS IN RELEVANT MARKETS FOR FIRE APPARATUSES AND CHASSIS ........................................................ 15

I. NCAPs Allege Direct Evidence of Harm to Competition, Obviating the Need for an Elaborate Market Analysis ........................................................................ 15

II. NCAPs' Relevant Markets Are Plausible ............................................................... 16

III. The Complaints Establish Prima Facie § 7 Violations Under Several Theories of Harm ......................................................................................... 23

A. Each Defendant Group's Mergers and Acquisitions Are Appropriately Considered Cumulatively.................................................................... 26

B. NCAPs State a § 7 Claim as to the Spartan Acquisition Alone ............................ 29

C. NCAPs State a § 7 Claim as to the Maxi-Métal Acquisition............................... 31

D. NCAPs State a § 7 Claim—and Sherman Act § 1 Restraint-of-Trade and Sherman Act § 2 Conspiracy-to-Monopolize Claim—as to the BME Acquisition ....................................................................................... 33

IV. The Complaints Adequately Allege that Each Defendant Group Attempted to Monopolize One or More Relevant Markets.............................................................................. 36

NCAPs ALLEGE FACTS ESTABLISHING THAT OSHKOSH AND PIERCE ENGAGED IN EXCLUSIVE DEALING AND MONOPOLIZATION IN PIERCE PARTS MARKETS........... 45

V. The Markets for Pierce Replacement Parts Are Well-Defined Markets ........................... 45

A. Defendants Are Wrong that NCAPs Must Meet Kodak's Standards.................... 46

B. In the Alternative, NCAPs Have Pled Kodak-Style Lock-In............................... 47

VI. NCAPs Allege Substantial Harm to Competition in the Relevant Markets...................... 48

CONCLUSION………………………………………………………………………..……50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Health-Care Serv. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ........ 69

*Albani v. S. Ariz. Anesthesia Servs., P.C.*,
1997 U.S. Dist. LEXIS 16245 (D. Ariz. Jan. 22, 1997) ........ 57

*Alfred L. Snapp & Son v. Puerto Rico*,
458 U.S. 592 (1982) ........ 18, 19

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
183 F.3d 568 (7th Cir. 1999) ........ 31, 36, 37

*Am. Home Healthcare Servs., Inc. v. Floyd Mem'l Hosp. & Health Servs.*,
2020 U.S. Dist. LEXIS 112871 (S.D. Ind. June 26, 2020) ........ 61

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ........ 14

*Am. Spirit & Cheer Essentials, Inc. v. Varsity Brands, LLC,*
2022 U.S. Dist. LEXIS 254674 (W.D. Tenn. Mar. 30, 2022) ........ 77

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ........ 60, 63, 68

*Amerigas Propane, L.P. v. BP Am., Inc.*,
691 F. Supp. 2d 844 (N.D. Ill. 2010) ........ 58, 59

*Artuso Pastry Foods Corp. v. Packaging Corp. of Am.*,
2026 U.S. Dist. LEXIS 200638 (N.D. Ill. Sep. 4, 2026) ........ 13

*Ash Grove Cement Co.*,
577 F.2d 1368 (9th Cir. 1978) ........ 46

*Ash Grove Cement Co.*,
85 F.T.C. 1123 (1975) ........ 46

*Aspen Highlands v. Aspen Skiing Co.*,
738 F.2d 1509 (10th Cir. 1984) ........ 42

*Associated Inv. Co. v. Williams Assocs. IV*,
230 Conn. 148 (1994) ........ 24

*Beatrice Foods Co. v. FTC*,
540 F.2d 303 (7th Cir. 1976) ........ 29, 30, 70

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .......... 4, 6, 9, 10

*Billy Goat IP LLC v. Billy Goat Chip Co. LLC*,
2018 U.S. Dist. LEXIS 132410 (N.D. Ill. Aug. 7, 2018) .......... 16

*Brager & Co. v. Leumi Sec. Corp.*,
429 F. Supp. 1341 (S.D.N.Y. 1977) .......... 6

*Brager & Co. v. Leumi Sec. Corp.*,
646 F.2d 559 (2d Cir. 1980) .......... 6

*Bristol Tech., Inc. v. Microsoft Corp.*,
42 F. Supp. 2d 153 (D. Conn. 1998) .......... 24

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) .......... 24, 61

*Broadway Theatre Corp. v. Buena Vista Pictures Distrib.*,
2002 U.S. Dist. LEXIS 27368 (D. Conn. 2002) .......... 24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 37

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 27, 31, 36, 40, 46, 70

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) .......... 9

*Burch v. Goodyear Tire & Rubber Co.*,
554 F.2d 633 (4th Cir. 1977) .......... 20

*Cada v. Baxter Healthcare Corp.*,
920 F.2d 446 (7th Cir. 1990) .......... 11

*California v. Sutter Health Sys.*,
217 F.3d 846 (9th Cir. 2000) .......... 45

*California v. Sutter Health Sys.*,
84 F. Supp. 2d 1057 (N.D. Cal. 2000) .......... 45

*California. v. Am. Stores Co.*,
495 U.S. 271 (1990) .......... 17

*Californians for Disability Rts. v. Mervyn's, LLC*,
39 Cal. 4th 223 (2006) .......... 17

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) .......... 40

*Carpenter Tech. Corp. v. Allegheny Techs., Inc.*,
646 F. Supp. 2d 726 (E.D. Pa. 2009) .......... 61

*Casino Queen Marquette, Inc. v. Sci. Games Corp.*,
2022 U.S. Dist. LEXIS 90237 (N.D. Ill. May 19, 2022) .......... 4, 12

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) .......... 22, 23

*Chateau De Ville Prod., Inc. v. Tams-Witmark Music Libr., Inc.*,
1977 U.S. Dist. LEXIS 17045 (S.D.N.Y. Mar. 7, 1977) .......... 44

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .......... 22

*Chi. Bridge & Iron Co. N.V. v. FTC*,
534 F.3d 410 (5th Cir. 2008) .......... 44

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
2011 U.S. Dist. LEXIS 35969 (N.D. Cal. Apr. 1, 2011) .......... 76

*City of Mishawaka, et al. v. American Elec. Power Co.*,
616 F.2d 976 (7th Cir. 1980) .......... 42

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) .......... 55

*Cliff Food Stores, Inc. v. Kroger, Inc.*,
417 F.2d 203 (5th Cir.1969) .......... 60

*Columbia Broad. Sys., Inc. v. FTC*,
414 F.2d 974 (7th Cir. 1969) .......... 46

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .......... 7, 8, 10

*Connecticut v. Sandoz, Inc.*,
2025 U.S. Dist. LEXIS 214944 (D. Conn. Oct. 31, 2025) .......... 4, 6, 12, 17

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .......... 42

*Corrente v. Charles Schwab Corp.*,
2023 U.S. Dist. LEXIS 31415 (E.D. Tex. Feb. 24, 2023) .......... 16

*Costar Grp. Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) ........................................................................ 25

*Credit Bureau Reports, Inc. v. Retail Credit Co.*,
358 F. Supp. 780 (S.D. Tex. 1971) ........................................................................ 41

*Credit Bureau Reports, Inc. v. Retail Credit Co.*,
476 F.2d 989 (5th Cir. 1973) ........................................................................ 41

*Dale v. Deutsche Telekom AG*,
2023 U.S. Dist. LEXIS 196872 (N.D. Ill. Nov. 2, 2023) .................................. 8, 25, 40

*Data Capture Sols.-Repair Inc. v. Symbol Techs., Inc.*,
520 F. Supp. 2d 343 (D. Conn. 2007). ........................................................................ 24

*Dennis v. Andersons Inc.*,
2022 U.S. Dist. LEXIS 250885 (N.D. Ill. May 3, 2022) ........................................... 25

*Denver & Rio Grande W.R. Co. v. United States*,
387 U.S. 485 (1967) ........................................................................ 51

*Dodge Data & Analytics LLC v. iSqFt, Inc.*,
183 F. Supp. 3d 855 (S.D. Ohio 2016) ........................................................................ 60

*DSM Desotech Inc. v. 3D Sys. Corp.*,
2009 U.S. Dist. LEXIS 5980 (N.D. Ill. Jan. 26, 2009) .......................................... 56, 64

*DSM Desotech Inc. v. 3D Sys. Corp.*,
749 F.3d 1332 (Fed. Cir. 2014) ........................................................................ 27

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
637 F.3d 435 (4th Cir. 2011) ........................................................................ 75

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992) ........................................................................ 70, 74

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021) ........................................................................ 22

*Ekco Prods. Co. v. FTC*,
347 F.2d 745 (7th Cir. 1965) ........................................................................ 31, 38

*Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*,
2024 U.S. Dist. LEXIS 236177 (S.D. Tex. Sep. 27, 2024) ........................................ 41

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ........................................................................ 21, 22

*Equip. Corp. v. Uniq Digit. Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996) .......... 71, 72

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*,
2019 U.S. Dist. LEXIS 129084 (N.D. Tex. Aug. 1, 2019) .......... 65

*Fair Isaac Corp. v. TransUnion, LLC*,
2019 U.S. Dist. LEXIS 51011 (N.D. Ill. Mar. 27, 2019) .......... 77

*Feldman v. Jackson Mem'l Hosp.*,
571 F. Supp. 1000 (S.D. Fla. 1983) .......... 59

*Feldman v. Jackson Mem'l Hosp.*,
752 F.2d 647 (11th Cir. 1985) .......... 59

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) .......... 37, 39

*Fourqurean v. NCAA*,
143 F.4th 859 (7th Cir. 2025) .......... 28

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) .......... 53

*FTC v. Advoc. Health Care Network*,
841 F.3d 460 (7th Cir. 2016) .......... 32, 47

*FTC v. Coca-Cola Co.*,
641 F. Supp. 1128 (D.D.C. 1986) .......... 42

*FTC v. Coca-Cola Co.*,
829 F.2d 191 (D.C. Cir. 1987) .......... 42

*FTC v. Deere & Co.*,
2025 U.S. Dist. LEXIS 109177 (N.D. Ill. June 9, 2025) .......... 20, 72

*FTC v. Edwards Lifescis. Corp.*,
2026 U.S. Dist. LEXIS 19409 (D.D.C. Jan. 9, 2026) .......... 25

*FTC v. Facebook, Inc.*,
581 F. Supp. 3d 34 (D.D.C. 2022) .......... 55

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) .......... 66

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) .......... 37

*FTC v. Henkel AG & Co. KGaA*,
2026 U.S. Dist. LEXIS 206134 (S.D.N.Y. Aug. 14, 2026) .......... 25

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) .......... 25

*FTC v. Meta Platforms Inc.*,
2023 U.S. Dist. LEXIS 222277 (N.D. Cal. Jan. 31, 2023) .......... 49

*FTC v. Meta Platforms, Inc.*,
654 F. Supp. 3d 892 (N.D. Cal. 2023) .......... 27, 49

*FTC v. Procter & Gamble Co.*,
386 U.S. 568 (1967) .......... 38, 47

*FTC v. Staples, Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) .......... 33

*FTC v. Tapestry, Inc.*,
755 F. Supp. 3d 386 (S.D.N.Y. 2024) .......... 32

*FTC v. Wilh. Wilhelmsen Holding ASA.*,
341 F. Supp. 3d 27 (D.D.C. 2018) .......... 34

*Gen. Foods Corp. v. FTC*,
386 F.2d 936 (3d Cir. 1967) .......... 38

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
810 F.2d 795 (8th Cir. 1987) .......... 55

*George Lussier Enter., Inc. v. Subaru of New Eng., Inc.*,
1999 U.S. Dist. LEXIS 19769 (D.N.H. Dec. 13, 1999) .......... 73

*Georgia v. Pa. R.R. Co.*,
324 U.S. 439 (1945) .......... 20

*Great Escape, Inc. v. Union City Body Co.*,
791 F.2d 532 (7th Cir. 1986) .......... 54, 56, 57

*Harnischfeger Corp. v. Paccar, Inc.*,
474 F. Supp. 1151 (E.D. Wis.) .......... 37

*Harnischfeger Corp. v. Paccar, Inc.*,
624 F.2d 1103 (7th Cir. 1979) .......... 37

*Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*,
296 Conn. 315 (2010) .......... 24

*Heatransfer Corp. v. Volkswagenwerk, A.G.*,
553 F.2d 964 (5th Cir. 1977) .......... 71, 72

*Helena World Chron., LLC v. Google LLC*,
2026 U.S. Dist. LEXIS 59599 (D.D.C. Mar. 20, 2026) .......... 9

*Hon Hai Precision Indus. Co. v. Molex, Inc.*,
2009 U.S. Dist. LEXIS 9165 (N.D. Ill. Feb. 9, 2009) .......... 65

*Hoosiervac, LLC v. Scott*,
2025 U.S. Dist. LEXIS 269909 (N.D. Ind. Dec. 29, 2025) .......... 66

*Hosp. Corp. of Am. v. FTC*,
807 F.2d at 1384 (7th Cir. 1986) .......... 41, 48

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
191 F.3d 813 (7th Cir. 1999) .......... 15

*Hyundai Motor Am., Inc. v. Direct Techs. Int'l, Inc.*,
2018 U.S. Dist. LEXIS 146780 (W.D.N.C. Aug. 29, 2018) .......... 77

*Illinois ex rel. Edgar v. City of Chi.*,
942 F. Supp. 366 (N.D. Ill. 1996) .......... 21

*Illinois v. SDS W. Corp.*,
640 F. Supp. 2d 1047 (C.D. Ill. 2009) .......... 20

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) .......... 38, 45, 46, 47

*In re Automatic Card Shufflers Litig.*,
2026 U.S. Dist. LEXIS 69440 (N.D. Ill. Mar. 31, 2026) .......... 26

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .......... 13

*In re Buspirone Pat. & Antitrust Litig.*,
185 F. Supp. 2d 363 (S.D.N.Y. 2002) .......... 6

*In re Copper Antitrust Litig.*,
436 F.3d 782 (7th Cir. 2006) .......... 11

*In re Dairy Farmers of Am., Inc*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) .......... 28

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) .......... 74

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
703 F. Supp. 3d 862 (N.D. Ill. 2023) .... 72, 73

*In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*,
2013 U.S. Dist. LEXIS 29865 (D.N.J. Mar. 5, 2013) .... 75

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*,
336 F. Supp. 3d 1256 (D. Kan. 2018) .... 6

*In re Evanston Nw. Corp. Antitrust Litig.*,
2015 U.S. Dist. LEXIS 198712 (N.D. Ill. May 28, 2015) .... 4

*In re Evanston Nw. Healthcare Corp. Antitrust Litig.*,
2016 U.S. Dist. LEXIS 122684 (Sep. 9, 2016) .... 7, 8, 9, 12, 14

*In re Generic Pharms. Pricing Antitrust Litig.*,
605 F. Supp. 3d 672 (E.D. Pa. 2022) .... 19

*In re Harley-Davidson Aftermkt. Parts Mktg., Sales Pracs. & Antitrust Litig.*,
151 F.4th 922 (7th Cir. 2025) .... 65, 69, 71

*In re Ins. Antitrust Litig.*,
938 F.2d 919 (9th Cir. 1991) .... 20

*In re JUUL Labs Inc.*,
555 F. Supp. 3d 932 (N.D. Cal. 2021) .... 48, 52

*In re Keurig Green Mountain Coffee Antitrust Litig.*,|
383 F. Supp. 3d 187 (S.D.N.Y. 2019) .... 75

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) .... 11

*In re Mushroom Direct Purchaser Antitrust Litig.*,
514 F. Supp. 2d 683 (E.D. Pa. 2007) .... 57

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
562 F. Supp. 2d 392 (E.D.N.Y. 2008) .... 58, 59, 61

*In re Surescripts Antitrust Litig.*,
608 F. Supp. 3d 629 (N.D. Ill. 2022) .... 54, 57, 75

In re Telescopes Antitrust Litig.,
832 F. Supp. 3d 980 (N.D. Cal. 2026) .... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 U.S. Dist. LEXIS 17793 (N.D. Cal. Feb. 15, 2011) .... 18

*In re Tobacco II Cases*,
46 Cal. 4th 298, 320 (2009) .................... 18

*In re Wholesale Grocery Prods. Antitrust Litig.*,
752 F.3d 728 (8th Cir. 2014) .................... 5

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) .................... 66

*Int'l Bus. Machs. Corp. v. United States*,
298 U.S. 131 (1936) .................... 70

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
312 F. Supp. 3d 725 (N.D. Ill. 2018) .................... 65

*Jefferson Parish Hosp. v. Hyde*,
466 U.S. 2 (1984) .................... 75

*Jones v. Varsity Brands, LLC*,
618 F. Supp. 3d 725 (W.D. Tenn. 2022) .................... 55

*Julius Nasso Concrete Corp. v. Dic Concrete Corp.*,
467 F. Supp. 1016 (S.D.N.Y. 1979) .................... 7

*Kaiser Aluminum & Chem. Corp. v. FTC*,
652 F.2d 1324 (7th Cir. 1981) .................... 29, 30

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*,
452 F.2d 579 (7th Cir. 1971) .................... 55, 60

*Kent Literary Club of Wesleyan Univ. v. Wesleyan Univ.*,
338 Conn. 189 (2021) .................... 24

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) .................... 5, 9

*L.G. Balfour Co. v. FTC*,
442 F.2d 1 (7th Cir. 1971) .................... 28

*Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*,
636 F. Supp. 1513 (S.D. Ind. 1986) .................... 36, 45, 53, 67

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024) .................... 72, 73

*Lektro-Vend Corp. v. Vendo Co.*,
660 F.2d 255 (7th Cir. 1981) .................... 59, 60

*Lektro-Vend Corp. v. Vendo Corp.*,
500 F. Supp. 332 (N.D. Ill. 1980) .......... 50

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) .......... 75

*LG Display Co. v. Madigan*,
665 F.3d 768 (7th Cir. 2011) .......... 19

*Mayor & City Couns. of Balt. v. Actelion Pharms. Ltd.*,
995 F.3d 123 (4th Cir. 2021) .......... 6

*Meijer, Inc. v. 3M*,
2005 U.S. Dist. LEXIS 13995 (E.D. Pa. July 13, 2005) .......... 5

*Metrix Warehouse Inc. v. Daimler-Benz Aktiengesellschaft*,
828 F.2d 1033 (4th Cir. 1987) .......... 70, 72

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) .......... 8, 10, 13

*Miss. River Corp. v. FTC*,
454 F.2d 1083 (8th Cir. 1972) .......... 38, 46

*Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*,
63 F.3d 1540 (10th Cir. 1995) .......... 64

*Mytinger & Casselberry, Inc. v. FTC*,
301 F.2d 534 (D.C. Cir. 1963) .......... 75

*Nationwide Biweekly Admin., Inc. v. Superior Court*,
9 Cal. 5th 279 (2020) .......... 23

*Nevada v. Bank of Am. Corp.*,
672 F.3d 661 (9th Cir. 2012). .......... 19

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.D.C. 2023) .......... 16

*New York v. Microsoft Corp.*,
209 F. Supp. 2d 132 (D.D.C. 2002) .......... 20, 21

*Newcal Indus. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 73, 74

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021) .......... 54, 55, 66

*Paddock Publ'ns v. Chi. Tribune Co.*,
1995 U.S. Dist. LEXIS 15784 (N.D. Ill. Oct. 23, 1995) ... 43

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) ... 53

*Panini Am., Inc. v. Fanatics, Inc.*,
2025 U.S. Dist. LEXIS 42143, (S.D.N.Y. Mar. 10, 2025) ... 40

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*,
826 F.2d 712 (7th Cir. 1987) ... 69, 72

*Pennsylvania v. Eagle Rock Resort Co., LLC*,
2026 U.S. Dist. LEXIS 69683 (M.D. Pa. Mar. 31, 2026) ... 20, 21

*Pennsylvania. v. Ctr. Lane Partners, LLC*,
2024 U.S. Dist. LEXIS 206697 (W.D. Pa. Nov. 14, 2024) ... 17

*People ex rel. Harris v. Black Hawk Tobacco, Inc.*,
197 Cal. App. 4th 1561 (2011) ... 21

*People v. Kroger Co.*,
2024 U.S. Dist. LEXIS 184740 (C.D. Cal. Oct. 9, 2024) ... 19

*People v. Pac. Land Rsch. Co.*,
20 Cal. 3d 10 (1977) ... 20

*Phila. Taxi Ass'n v. Uber Techs.*,
886 F.3d 332 (3d Cir. 2018) ... 57

*Photovest Corp. v. Fotomat Corp.*,
606 F.2d 704 (7th Cir. 1979) ... 28

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) ... 28

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) ... 25

*Polypore Int'l, Inc. v. FTC*,
686 F.3d 1208 (11th Cir. 2012) ... 46

*Progressive W. Ins. Co. v. Superior Court*,
135 Cal. App. 4th 263 (2005) ... 23

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) ... 32, 33

*Purex Corp. v. Procter & Gamble Co.*,
596 F.2d 881 (9th Cir. 1979) .......... 38

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .......... 74

*Rebel Oil Co. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 60

*Reifert v. S. Cent. Wis. MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) .......... 27

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
381 F.3d 717 (7th Cir. 2004) .......... 26

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) .......... 68

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) .......... 27

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) .......... 15

*Sandisk Corp. v. Kingston Tech. Co.*,
2010 U.S. Dist. LEXIS 152534 (W.D. Wis. Nov. 15, 2010) .......... 61

*SC Innovations, Inc. v. Uber Techs., Inc.*,
434 F. Supp. 3d 782 (N.D. Cal. 2020) .......... 66

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020) .......... 32

*Shuffle Tech Int'l, LLC v. Sci. Games Corp.*,
2015 U.S. Dist. LEXIS 138741 (N.D. Ill. Oct. 12, 2015) .......... 9, 14

*Sidney Hillman Ctr. of Rochester v. Abbott Lab'ys, Inc.*,
782 F.3d 922 (7th Cir. 2015) .......... 4

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
2000 U.S. Dist. LEXIS 2604 (S.D.N.Y. Mar. 9, 2000) .......... 38

*SolarCity Corp. v. Salt River Project Agric. Improvement*,
2015 U.S. Dist. LEXIS 146904 (D. Ariz. Oct. 27, 2015) .......... 45

*Spectrum Sports v. McQuillan*,
506 U.S. 447 (1993) .......... 54

*Standard Oil Co. v. United States*,
337 U.S. 293 (1949) ........ 69, 76

*Stanley Works v. FTC*,
469 F.2d 498 (2d Cir. 1972) ........ 39

*Stepp v. Ford Motor Credit Co.*,
623 F. Supp. 583 (E.D. Wis. 1985) ........ 28

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
988 F.3d 690 (4th Cir. 2021) ........ 15, 46

*Suggs v. United States*,
256 F. App'x 804 (7th Cir. 2007) ........ 4

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
2026 U.S. App. LEXIS 24440 (9th Cir. Aug. 13, 2026) ........ 72

*Synthes, Inc. v. Emerge Med., Inc.*,
2012 U.S. Dist. LEXIS 140251 (E.D. Pa. Sep. 28, 2012) ........ 65

*Tampa Elec. Co. v. Nash. Coal Co.*,
365 U.S. 320 (1961) ........ 74

*Tasty Baking Co. v. Ralston Purina*,
653 F. Supp. 1250 (E.D. Pa. 1987) ........ 63, 64

*Texas v. Blackrock, Inc.*,
2025 U.S. Dist. LEXIS 147891 (E.D. Tex. Aug. 1, 2025) ........ 26

*Texas v. Google LLC*,
764 F. Supp. 3d 500 (E.D. Tex. 2025) ........ 19, 20, 21

*Times-Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953) ........ 56

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ........ 28

*Toyota Motor Sales, Inc. v. Allen Interchange LLC*,
2023 U.S. Dist. LEXIS 141122 (D. Minn. Aug. 14, 2023) ........ 70, 77

*Toys "R" Us v. FTC*,
221 F.3d 928 (7th Cir. 2000) ........ 25, 59

*TransWeb, LLC v. 3M Innovative Props. Co.*,
2011 U.S. Dist. LEXIS 59095 (D.N.J. June 1, 2011) ........ 61

*Twin City Sportserv. v. Charles O. Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982)........................................................................ 43, 61, 75

*U.S. Anchor Mfg. v. Rule Indus.*,
7 F.3d 986, (11th Cir. 1993)............................................................... 59, 60, 61, 63, 67

*U.S. Gypsum Co. v. Ind. Gas Co.*,
350 F.3d 623 (7th Cir. 2003)........................................................................................ 13

*U.S. Steel Corp. v. FTC*,
426 F.2d 592 (6th Cir. 1970)........................................................................................ 46

*U.S. v. Nat'l Steel Corp.*,
26 F.R.D. 599 (S.D. Tex. 1960) .................................................................................... 41

*United States v. Aluminum Co. of Am.*,
377 U.S. 271 (1964)...................................................................................................... 60

*United States v. Aluminum Co. of Am.*,
148 F.2d 416 (2d Cir. 1945).......................................................................................... 45

*United States v. Apple, Inc.*,
2025 U.S. Dist. LEXIS 123842 (D.N.J. June 30, 2025)............................................... 20

*United States v. Baker Hughes, Inc.*,
908 F.2d 981 (D.C. Cir. 1990). ..................................................................................... 36

*United States v. Black & Decker Mfg. Co.*,
430 F. Supp. 729 (D. Md. 1976).................................................................................... 50

*United States v. Coca-Cola Bottling Co.*,
575 F.2d 222 (9th Cir. 1978)......................................................................................... 17

*United States v. Cont'l Can Co.*,
378 U.S. 441 (1964)............................................................................................... 30, 48

*United States v. Dairymen, Inc.*,
1983 U.S. Dist. LEXIS 16355 (W.D. Ky. June 9, 1983) .............................................. 76

*United States v. Dairymen, Inc.*,
758 F.2d 654 (6th Cir. 1985)......................................................................................... 76

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005)..................................................................... 68, 69, 76, 77

*United States v. E.I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)........................................................................................... 6, 26, 51

*United States v. El Paso Nat. Gas Co.*,
376 U.S. 651 (1964)........................................................................................ 46

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973)........................................................................................ 48

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974)........................................................................................ 63

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ........................................................... 67

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)................................................................................. 31, 55

*United States v. Healthco, Inc.*,
387 F. Supp. 258 (S.D.N.Y. 1975) ................................................................ 41

*United States v. Jerrold Electronics Corp.*,
187 F. Supp. 545 (E.D. Pa. 1960) .................................................................. 41

*United States v. Jerrold Electronics Corp.*,
365 U.S. 567 (1961)........................................................................................ 42

*United States v. Jos. Schlitz Brewing Co.*,
253 F. Supp. 129 (N.D. Cal. 1966) ................................................................ 42

*United States v. Jos. Schlitz Brewing Co.*,
385 U.S. 37 (1966).......................................................................................... 42

*United States v. Marine Bancorp.*,
418 U.S. 602 (1974)................................................................................. 38, 49

*United States v. Microsoft Corp.*,
253 F.3d 34 (2001).......................................................................................... 69

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966)................................................................................. 37, 39

*United States v. Penn-Olin Chem. Co.*,
378 U.S. 158 (1964)................................................................................. 39, 52

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)................................................................................. 36, 48

*United States v. Rockford Mem'l Corp.*,
898 F.2d 1278 (7th Cir. 1990) ........................................................... 37, 42, 68

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ........ 53

*United States v. Sungard Data Sys., Inc.*,
172 F. Supp. 2d 172 (D.D.C. 2001) ........ 45

*United States v. Times Mirror Co.*,
274 F. Supp. 606 (C.D. Cal. 1967) ........ 39

*United States v. Times Mirror Co.*,
390 U.S. 12 (1968) ........ 39

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) ........ 53

*United States v. UnitedHealth Group Inc.*,
630 F. Supp. 3d 118 (D.D.C. 2022) ........ 45

*United States v. Von's Grocery Co.*,
384 U.S. 270 (1966) ........ 39, 48

*United States v. Wilson Sporting Goods Co*.,
288 F. Supp. 543 (N.D. Ill. 1968) ........ 38

*Uriel Pharm. Health & Welfare Plan v. Advoc. Aurora Health, Inc.*,
2023 U.S. Dist. LEXIS 251745 (E.D. Wis. Apr. 28, 2023) ........ 56

*US Airways, Inc. v. Sabre Holdings Corp.*,
2022 U.S. Dist. LEXIS 53622 (S.D.N.Y. Mar. 24, 2022) ........ 63, 66

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ........ 4

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........ 74

*Virgin Atl. Airways Ltd. v. Brit. Airways, PLC*,
872 F. Supp. 52 (S.D.N.Y. 1994) ........ 58

*Wagner v. Magellan Health Servs., Inc.*,
121 F. Supp. 2d 673 (N.D. Ill. 2000) ........ 57

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
669 F. Supp. 2d 895 (N.D. Ill. 2009) ........ 58, 62, 64

*Wi-LAN Inc. v. LG Elecs. Inc.*,
382 F. Supp. 3d 1012 (S.D. Cal. 2019) ........ 57

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
511 F. Supp. 2d 372 (S.D.N.Y. 2007) .......... 75

*Yamaha Motor Co. v. FTC*,
657 F.2d 971 (8th Cir. 1981) .......... 39, 49

*Z Techs. Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) .......... 10, 13

*Zenith Radio Corp. v. Hazeltine Rsch.*,
401 U.S. 321 (1971) .......... 5

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......... 14

Cal. Bus. & Prof. Code § 17203 .......... 12

Cal. Bus. & Prof. Code § 17204 .......... 12

Cal. Bus. & Prof. Code § 17206 .......... 12

Clayton Act § 4b,
15 U.S.C. § 15b .......... 5

Clayton Act § 7,
15 U.S.C. § 18 .......... 23, 33

Conn. Gen. Stat. §§ 42-110b .......... 15

Conn. Gen. Stat. §§ 42-110g .......... 15

Sherman Act § 1,
15 U.S.C. § 1 .......... 28

Sherman Act § 4,
15 U.S.C. § 4 .......... 5

Wis. Stat. Ann. § 133.18(2) .......... 11

**Other Authorities**

2 Earl W. Kintner et al., *Federal Antitrust Law* § 16.12 (2026) .......... 55

Class Action Compl., *City of La Crosse v. Oshkosh Corp.*, No. 1:25-cv-01252-BBC (E.D. Wis. Aug. 20, 2025), ECF No. 1 .......... 14

Order at 4, *In re Fire Apparatus Antitrust Litig.*, No. 2:26-md-3179 (E.D. Wis. July 13, 2026), ECF No. 126 .......... 14

U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines (2023).... 27, 37, 38, 39, 41, 45, 62

This case presents straightforward anticompetitive conduct that courts have held illegal for more than a century. Non-Class Action Plaintiffs ("NCAPs") are directly injured purchasers and law enforcement agencies that courts routinely hold have standing to challenge such competition-law violations. NCAPs' claims, requesting damages and equitable relief for injury they suffered each time they paid a higher price, and the ongoing injury they will suffer as they have no choice but to continue making purchases in competitively distorted markets, are non-controversially held timely where, as here, they sue within four years of each injury.

While NCAPs' claims and theories of relief are typical of over a century of cases in which courts found illegal similar conduct in similarly concentrated markets causing similar injury, the facts and circumstances of this case are anything but typical. NCAPs are not purchasers of televisions or concert tickets. They are cities and counties that must procure Fire Apparatuses to keep their communities safe. No matter how expensive Fire Apparatuses get, NCAPs must keep buying them. NCAP CAC (ECF No. 53) ("CAC") ¶¶ 5, 258.

Almost 20 years ago, private equity firm American Industrial Partners ("AIP") determined this economic reality was an "opportunity" for profit. If only the industry could be consolidated, AIP could affect marketwide output by shutting down plants, triggering the rapid accumulation of years-long backlog lines and sky-high prices. *Id.* ¶¶ 4-7, 69, 256-58.

That is exactly what AIP set in motion. It formed a web of funds; bought then-dominant manufacturer E-ONE in 2008; and between 2017 and 2020 combined E-ONE with KME, Ferrara, and Spartan, the latter of which had just finished consolidating Smeal, Ladder Tower, US Tanker Fire Apparatus, and Detroit Truck Manufacturing. *Id.* ¶¶ 6-8, 259-60. Eight former competitors—comprising approximately 40% of the market—were now commonly owned and controlled. *Id.* ¶¶ 8, 130-33, 301; *see* Ex. 1 (depicting acquisitions). Having accumulated

sufficient market power to turn the Fire Apparatus market into their own piggy bank, in late 2021, AIP and REV announced they would reduce their manufacturing capacity by shutting down two historic KME plants, leaving a single plant in Holden, Louisiana to produce all KME and Ferrara apparatuses. CAC ¶¶ 10, 261. As production wound down in 2022, backlogs began to soar and prices began to skyrocket. *Id.* AIP and REV celebrated. *See id.* ¶¶ 10, 262-64, 332.

Pierce Manufacturing, an Oshkosh subsidiary and the most dominant U.S. Fire Apparatus manufacturer, *id.* ¶ 11, benefited from the AIP/REV consolidation scheme. *Id.* ¶¶ 327, 379-82. The reduced output catalyzed by the 2022 plant shutdowns created a supply-demand imbalance that allowed all manufacturers to raise prices. *Id.* By Q3 2022, Oshkosh, too, was celebrating its "all-time high" backlog and resulting pricing power. *Id*. ¶¶ 13, 284.

Pierce and Oshkosh took actions to keep it that way. Canadian manufacturer Maxi-Métal had already started to distribute its Custom Pumpers in the United States. With Maxi-Métal poised to make further inroads (at lower prices), Oshkosh and Pierce saw Maxi-Métal as a threat. So in 2022, they bought it. *Id*. ¶¶ 278-79, 318-20.

Pierce had also identified Boise Mobile Equipment ("BME"), the leading specialized builder of Wildland Apparatuses, as a competitive threat. Around 2017, Boise Mobile had secured several large orders by offering extremely low pricing via its factory-direct distribution model. CAC ¶¶ 281, 283. Rather than invest in a full line of Wildlands and compete with BME, in 2021 Pierce acquired an ownership interest in it and began "collaborating" with this competitor. *Id.* ¶¶ 11, 135, 280, 306. Almost immediately thereafter, BME began imposing price increases. *Id.* ¶ 389. Meanwhile, Pierce has remained on the sidelines of the Wildland market, letting BME dominate it and raise prices while Pierce takes a 25% cut. *Id.* ¶ 323.

Today, a Custom Pumper that used to cost $500,000 is selling for over $1.2 million. *Id.*

¶¶ 387, 423. A Custom Aerial that used to cost $1 million is selling for over $2 million. *Id.* ¶ 408. A Type 3 Wildland Apparatus that used to cost less than $300,000 is being quoted at nearly $700,000. *Id.* ¶¶ 283, 423. It takes four to five years from the time a fire department places an order to receive the truck. *Id.* ¶¶ 370, 383. These conditions have created a crisis. Fire Apparatuses are a necessity. Without them, cities and counties cannot protect their communities. They are now being stretched to the limit, forced to extend the life of older apparatuses and make cuts to other essential services to fund Defendants' market-consolidation tax. CAC ¶¶ 384-85.

On top of their apparatus consolidation scheme, Oshkosh and Pierce have entered into exclusive dealing agreements with their authorized parts dealers and engaged in other anticompetitive conduct to monopolize the markets for replacement parts for Pierce apparatuses. CAC ¶¶ 14, 340-77. As a result of these restraints, Pierce apparatus owners pay two to four times as much as they would in a competitive market for replacement parts. *Id.* ¶¶ 16, 372.

Our nation's competition laws, including Clayton Act § 3 and § 7, Sherman Act § 1 and § 2, and state-law analogues, have long outlawed the kinds of acquisitive and anticompetitive schemes Defendants have parasitically plotted and carried out on the backs of localities and taxpayers across America. Defendants have variously violated all of these laws, and none of their arguments for dismissal withstands scrutiny. As shown below, NCAPs' claims are timely, they allege plausible relevant markets, and the alleged facts establish Defendants' conduct may substantially lessen competition, restrain trade, and pose a dangerous probability of monopolization. The Court should deny Defendants' Motion.

**NCAPS' APPARATUS CLAIMS ARE TIMELY**

Timeliness is "an affirmative defense and thus normally (and here) is not properly resolved at the Rule 12(b)(6) stage." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th

Cir. 2022). A "demanding standard" applies, asking whether "the plaintiff pleads itself out of court." *Id.*[1] Defendants do not meet this standard.

Defendants advocate for a rigid rule—"that, without exception, all merger-based antitrust claims expire four years after the merger." *In re Evanston Nw. Corp. Antitrust Litig.* ("*Evanston Nw. I*"), 2015 U.S. Dist. LEXIS 198712, *10-11 (N.D. Ill. May 28, 2015) (rejecting this rule, citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979)); *see* Br. at 11-13. Courts overwhelmingly reject this proposition as "not the law." *Connecticut v. Sandoz, Inc.*, 2025 U.S. Dist. LEXIS 214944, *38 (D. Conn. Oct. 31, 2025) (quoting *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997))). As *Wholesale Grocery* explained in the analogous context of market-division agreements that lessen competition, by Defendants' logic, "two parties could agree to divide markets [or here, merge] for the purpose of raising prices, wait four years to raise prices, then reap the profits of their illegal [conduct] with impunity because any antitrust claims would be time barred." *Wholesale Grocery*, 752 F.3d at 736. Such a rule contradicts longstanding precedent establishing that, under Clayton Act § 4, "[g]enerally, a cause of action accrues and the statute begins to run when a defendant commits an act *that injures* a plaintiff[]." *Zenith Radio Corp. v. Hazeltine Rsch.*, 401 U.S. 321, 338 (1971) (emphasis added).

Accordingly, "it has long been held that 'a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period.'" *Meijer, Inc. v. 3M*, 2005 U.S.

---

[1] *See also Casino Queen Marquette, Inc. v. Sci. Games Corp.*, 2022 U.S. Dist. LEXIS 90237, *8-9 (N.D. Ill. May 19, 2022); *Sidney Hillman Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015); *Suggs v. United States*, 256 F. App'x 804, 805 (7th Cir. 2007)).

Dist. LEXIS 13995, *9 (E.D. Pa. July 13, 2005) (quoting *Berkey*, 603 F.2d at 296). This is because "[t]he pertinent overt act [i]s each sale at a supracompetitive price," since "it [i]s the Defendant's sale—not the alleged underlying [anticompetitive] act . . .—that injured the purchaser." *Sandoz*, 2025 U.S. Dist. LEXIS 214944, *36-37.[2] "So long as a monopolist continues to use the power it has gained illicitly [before the limitations period] to overcharge its customers [within the limitations period], it has no [timeliness defense]." *Berkey*, 603 F.2d at 295.[3] These cases apply irrespective of whether the underlying act was price-fixing, market-allocation, or merging, because the relevant statutes apply to all antitrust claims. 15 U.S.C. §§ 4, 15b. Indeed, the District of Illinois recently applied *Berkey* to a § 7 merger case, holding "where a merger only produces anticompetitive effects post-merger, the statute of limitations begins to run not when the merger transpired, but when the injury occurred." *In re Evanston Nw. Healthcare Corp. Antitrust Litig.* ("*Evanston Nw. II*"), 2016 U.S. Dist. LEXIS 122684, *44-48 (Sep. 9, 2016) (collecting cases); *see Julius Nasso Concrete Corp. v. Dic Concrete Corp.*,467 F. Supp. 1016, 1023 (S.D.N.Y. 1979) (holding plaintiff's § 7 claim accrued when defendants took anticompetitive actions, not when mergers "which made [those] actions possible" took place).

Defendants are wrong that the higher prices and delivery delays they only recently imposed on NCAPs were the "inertial consequences" of their mergers. Br. at 13. The cases

---

[2] After all, "intercorporate relationships" (i.e., mergers and acquisitions) "c[an] work their evil . . . at *or any time after* the acquisition, depending upon the circumstances of the particular case." *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 596-97 (1957) (emphasis added) (reversing and remanding to district court to determine equitable relief necessary to address anticompetitive effects of merger that occurred 30 years earlier).

[3] *See also In re Buspirone Pat. & Antitrust Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002); *see, e.g.*, *Mayor & City Couns. of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 132 (4th Cir. 2021); *Brager & Co. v. Leumi Sec. Corp.,* 429 F. Supp. 1341, 1349 (S.D.N.Y. 1977), *aff'd*, 646 F.2d 559 (2d Cir. 1980); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1329 (D. Kan. 2018).

Defendants cite hold that "merely holding or using assets in the same manner as at the time of acquisition" is an inertial consequence of an acquisition. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000); *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004). Here, Defendants' price increases, enabled by their mergers, were anything but inevitable. *E.g.*, CAC ¶¶ 10, 15, 261-63, 270-71, 283, 332, 334. And they did not implement them immediately.[4] NCAPs' claims thus accrued each time they paid a higher price or suffered a delay *enabled by* Defendants' mergers. *See, e.g.*, *Evanston Nw. II*, 2016 U.S. Dist. LEXIS 122684, *47 (N.D. Ill. Sep. 9, 2016) (merger claims accrued after defendants took "post-merger anti-competitive acts—increasing the price of . . . services so as to allegedly overcharge [plaintiffs] for those services," "not from the date of the merger that made that act possible").[5]

Defendants' cases do not apply. *See* Br. at 11-12. In *Midwestern Mach.*, the "plaintiff's injury [wa]s immediate," and yet the plaintiff waited *11 years* to file suit. 392 F.3d at 269, 276. Similarly, in *Concord Boat*, the court recognized that in "Section 7 actions," "'[t]he limitations period . . . starts to run at 'the point the act first causes injury,'" but held plaintiffs' claims untimely because "the[ir] injury accrued in 1986," the year of the challenged acquisitions. 207 F.3d at 1051 (quoting *Klehr*, 521 U.S. at 190-91). And in many of Defendants' cited cases, plaintiffs were potential *competitors* of defendants, not purchasers. *See Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2015 U.S. Dist. LEXIS 138741, *36 (N.D. Ill. Oct. 12, 2015); *Helena World*

---

[4] See illustrative apparatus prices and delivery timelines over time at CAC ¶¶ 407, 418, 463, 442, 456, 394, 458, 394, 396-97, 435, 387, 407, 463-64, 469, 442, 452, 469, 409, 423, 370, 412, 467, 470; Albuquerque Compl. ¶ 319-20; Gilbert Compl. ¶ 321.

[5] To be clear, these price increases far exceed any relevant measure of inflation and were caused by Defendants' illegal consolidation schemes. CAC ¶¶ 17, 285-86, 326-27. The Court may not credit Defendants' competing pandemic-supply-chain narrative (Br. at 4-5). *See, e.g.*, *Dale v. Deutsche Telekom AG*, 2023 U.S. Dist. LEXIS 196872, *30-31, 42 (N.D. Ill. Nov. 2, 2023).

*Chron., LLC v. Google LLC*, 2026 U.S. Dist. LEXIS 59599, *2 (D.D.C. Mar. 20, 2026). Different timeliness standards apply to competitor-plaintiffs versus purchaser-plaintiffs. *See Evanston Nw. II*, 2016 U.S. Dist. LEXIS 122684, *27-28.[6] Moreover, unlike the would-be market entrants in *Shuffle Tech*, 2015 U.S. Dist. LEXIS 138741, *43-44, NCAPs are purchasers in the market who cannot avoid their injury. The rule advocated by Defendants would "lend[] a potential windfall to companies that merge into monopoly in year zero but then only begin to exploit their market power after year four," and would leave purchasers injured by anticompetitive conduct "without recourse." *Evanston Nw. I*, 2015 U.S. Dist. LEXIS 198712, *10-11.

Finally, in *Midwestern Mach.* and *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014), as well as *Concord Boat*, plaintiffs failed to cite *Berkey*, and argued only that the continuing violations doctrine, hold-and-use doctrine, and/or speculative damages doctrine extended the statute of limitations—not that they were only injured when they paid an overcharge. *See Evanston Nw. I*, 2015 U.S. Dist. LEXIS 198712, *11 (noting *Z Techs.* and *Midwestern Mach.* plaintiffs failed to cite *Berkey*). Thus, "the Court could agree with [those courts] that the continuing violation doctrine does not apply to merger cases and still decide against [defendant] by relying on *Berkey*, all without contradicting anything in *Z Tech*[*s.*]." *Id.* at *11.[7] Indeed, in invoking the continuing violation doctrine, Defendants "obfuscate[] the difference between, on the one hand, an 'overt act' necessary to show the existence of a [violation], and, on the other hand, an 'injurious act' causing damages within the limitations

---

[6] *See Berkey*, 603 F.2d at 295 ("Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."); *see Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984).

[7] *In re Telescopes Antitrust Litig.* is inapposite. In that case, plaintiffs failed to raise *Berkey* and conceded their merger claim was untimely. 832 F. Supp. 3d 980, 984 (N.D. Cal. 2026).

period." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993).

In fact, the law in the Seventh Circuit is even more favorable to plaintiffs. This Circuit recognizes the discovery rule in federal antitrust cases. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Relatedly, all federal courts recognize the doctrine of fraudulent concealment, which tolls the statute of limitations where the defendant took affirmative acts to prevent plaintiff from "suing in time." *Copper*, 436 F.3d at 791. Applying the foregoing case law, taking into account the discovery rule and the doctrine of fraudulent concealment, for each NCAP, a new cause of action accrued each time it discovered it had incurred injury (e.g., paid an overcharge) and connected that injury to Defendants' anticompetitive conduct. *See, e.g.*, *Evanston II*, 2016 U.S. Dist. LEXIS 122684, *34 (Plaintiffs "could not have discovered that they suffered any injury as a result of the merger until they knew that [defendant] had illegally overcharged them.").

Defendants incorrectly insist that "Plaintiffs do not allege any tolling doctrine." Br. at 11. While Defendants did not hide their *mergers*, NCAPs allege they *did* fraudulently conceal the impetus for their price increases by affirmatively blaming the COVID-19 pandemic. CAC ¶¶ 18, 338-39. It was only years later, when Congress and news outlets covered the crisis, that cities and counties were on notice of the true cause of their injuries. *Id.* ¶ 339. Thus, to the extent Defendants began imposing overcharges and delivery delays earlier than the four years prior to the filing of the relevant complaint, NCAPs may recover damages for those injuries. *See, e.g.*, *Sandoz*, 2025 U.S. Dist. LEXIS 214944, *51; *id.* at *60-61; *id.* at *77-79 (holding same, where "Defendants appeared to falsely blame increased prices on increases in material costs").[8]

[8] *See also, e.g.*, *Casino Queen*, 2022 U.S. Dist. LEXIS 90237, *8-9 (denying motion to dismiss

The hold-and-use doctrine presents an alternative basis for the timeliness of NCAPs' claims. Under this doctrine, "'different uses of assets can justify restarting the statute of limitations' for a Clayton Act violation." *Z Techs.*, 753 F.3d at 604 (quoting *Midwestern Mach.*, 392 F.3d at 272, 275). Here, in April 2022, the REV Group Defendants shut down two plants that came with the KME acquisition, which "directly resulted in worse terms for customers," including a resulting explosion in delivery delays and price increases marketwide. CAC ¶¶ 261-62, 307, 394-97. These plant closures occurred around six months after the Pierce-BME combination and just two months before Oshkosh acquired Maxi-Métal. *Id.* ¶¶ 279-80; *see U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 628 (7th Cir. 2003) ("[O]ld activity . . . is not immunized, if the potential for a reduction in output is created or realized more recently as market conditions change.").[9] Thus, NCAPs allege "new market effects have been felt due to the

---

plaintiff-purchasers' claims that they paid overcharges resulting from conduct that "date[d] back" over a decade"); *Artuso Pastry Foods Corp. v. Packaging Corp. of Am.*, 2026 U.S. Dist. LEXIS 200638, *56-57 (N.D. Ill. Sep. 4, 2026) (rejecting defendants' timeliness argument for dismissal and finding persuasive "Plaintiff's argument that only the 'cumulative effect' of Defendants' price announcements could have triggered notice."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 806, 808-09 (N.D. Ill. 2017) (denying motion to dismiss because "a reasonable person would not have been able to connect those dots until public reports and government investigations into [the challenged] conduct . . . began to appear").

[9] While some NCAPs filed their complaints after April 2026 (four years after the plant closure), all NCAPs' statutes of limitations have been tolled pending the filing of the first class action complaint in August 2025, which was less than four years after the closure of these plants. Thus, even if April 2026 were used as a timeliness cutoff date, all NCAPs' claims against the AIP and REV Group Defendants are timely. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552-53 (1974) ("the commencement of the original class suit tolls the running of the statute for all purported members of the class"); Class Action Compl. ¶¶ 78-79, *City of La Crosse v. Oshkosh Corp.*, No. 1:25-cv-01252-BBC (E.D. Wis. Aug. 20, 2025), ECF No. 1 [hereinafter *La Crosse* Compl.]; *see* Order at 4, *In re Fire Apparatus Antitrust Litig.*, No. 2:26-md-3179 (E.D. Wis. July 13, 2026), ECF No. 126 (approving notice sent to all putative class members advising them based on *Am. Pipe* tolling that "[w]hile the proposed class action is pending, you do not need to sue the same parties on the same claims as those asserted in the proposed class actions").

mergers [and] the market has changed in such a way as to render old mergers newly anticompetitive," and "defendants undertook measures to change the nature of the prior acquisitions in a way that affected the marketplace or diminished competition," which Defendants' own cited cases recognize make NCAPs' claims timely. *Shuffle Tech*, 2015 U.S. Dist. LEXIS 138741, *43; *accord Evanston Nw. II*, 2016 U.S. Dist. LEXIS 122684, *43-48.

Because NCAPs' request for damages is timely, so is their request for injunctive relief. As Defendants admit (Br. at 10), "the four-year statute of limitations in 15 U.S.C. § 15b furnishes a guideline for computation of the laches period." *Casino Queen*, 2022 U.S. Dist. LEXIS 90237, *7 n.4 (quoting *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014)); *see also Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 718 (4th Cir. 2021).

Regarding Defendants' laches arguments (Br. at 14-16), NCAPs' allegations support that NCAPs were diligent in bringing suit. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999) (defendant must demonstrate plaintiff's "unreasonable lack of diligence" and resulting prejudice); *see supra*, pp. 5-6, 8-9. Defendants point out that each of the acquisitions was publicly announced. But NCAPs did not know they would suffer injury, and did not suffer injury, at the time of the acquisitions. *Id.* Moreover, Defendants' argument ignores the cumulative nature of each defendant family's series of acquisitions. E-ONE, KME, Ferrara, and Spartan were only combined into a single economic enterprise in 2020, CAC ¶¶ 8, 260, and as discussed, only began causing damages to NCAPs later still. The remaining acquisitions—of BME by Pierce, and of Maxi-Métal by Oshkosh—all occurred within the limitations period. *See*

---

For the same reasons, if the accrual date were the Pierce-BME combination (which was consummated in September 2021, CAC ¶ 280) or Oshkosh's acquisition of Maxi-Métal (which closed in June 2022, *id.* ¶ 279), under *Am. Pipe* all of NCAPs' claims challenging these acquisitions are timely under federal law. *See La Crosse* Compl. ¶ 43. *Contra* Br. at 13 n.13.

*supra*, pp. 9-10 & n.9. On these facts, Defendants cannot prove unreasonable delay.[10]

Nor do the Complaints establish that injunctive relief would prejudice Defendants. It is true that NCAPs seek a divestiture order, but that is not the only injunctive relief they seek or that the Court can order, *see* CAC ¶¶ 22, 385, and therefore whether divestiture would be a "drastic" remedy (Br. at 15) is irrelevant. "Plaintiffs have adequately pleaded a claim for violations of the Clayton Act. Thus, whether divestiture or another form of injunctive relief is appropriate . . . will ultimately turn on a balancing of the equitable principles presented by the facts of this case," and does not bear on the sufficiency of the pleadings. *Corrente v. Charles Schwab Corp*., 2023 U.S. Dist. LEXIS 31415, *18-19 (E.D. Tex. Feb. 24, 2023).[11]

Finally, because NCAPs' federal claims are timely, so are their state-law claims. *See* App. B. *See generally Sandoz*, 2025 U.S. Dist. LEXIS 214944.[12]

---

[10] *New York v. Meta Platforms, Inc.* is inapposite. 66 F.4th 288 (D.D.C. 2023). There, State AGs effectively conceded that if they, as "sovereigns," were not "exempt from laches," their injunctive-relief-only claims were properly treated as having accrued at the time of the mergers and barred by laches. *Id.* at 296, 299, 300. NCAPs make no such concessions and are not state governments but rather ordinary cities and counties acting as private purchasers. (County and City Counsel do bring claims in their law enforcement capacity under the California UCL, but those claims are subject to a four-year statute of limitations, not laches. *See* App. B, C4.)

[11] *See also, e.g.*, *Billy Goat IP LLC v. Billy Goat Chip Co. LLC*, 2018 U.S. Dist. LEXIS 132410, *12-13 (N.D. Ill. Aug. 7, 2018) (factual laches issues precluded dismissal). That said, it bears emphasizing that a divestiture is "the most important of antitrust remedies" in merger cases because "[i]t is simple, relatively easy to administer, and sure." *E. I. du Pont de Nemours*, 366 U.S. at 330-31; *see California. v. Am. Stores Co.*, 495 U.S. 271, 280-81 (1990); *see, e.g.*, *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222 (9th Cir. 1978) (remedy of rescission available in lawsuit filed post-consummation); *Pennsylvania. v. Ctr. Lane Partners, LLC*, 2024 U.S. Dist. LEXIS 206697, *19-21 (W.D. Pa. Nov. 14, 2024).

[12] Wisconsin antitrust law provides a six-year statute of limitations. *See* Wis. Stat. Ann. § 133.18(2); App. B, row 13. Thus, even if Defendants' "merger-accrual" rule were the law, the Wisconsin NCAPs' claims are timely, because the first class action was filed months prior to February 2026 (six years after AIP/REV's last acquisition, of Spartan). *See supra*, n.9; *infra*, Section III.A (series of acquisitions are considered cumulatively).

**NCAPs PLAUSIBLY ALLEGE DEFENDANTS ENGAGED IN UNFAIR COMPETITION**

Defendants spend the bulk of their Motion targeting NCAPs' federal-law claims, barely addressing County and City Counsel's California UCL claims or Hartford's Connecticut Unfair Trade Practices Act ("CUTPA") claim. *See* CAC ¶¶ 23, 1065-98; App. A. These claims survive.

The California UCL empowers County and City Counsel to "prosecute[]" "[a]ctions for relief . . . in the name of the people of the State of California." Cal. Bus. & Prof. Code § 17204. The standing of County and City Counsel to file a UCL action does "not depend on a showing of injury or damage." *Californians for Disability Rts. v. Mervyn's, LLC*, 39 Cal. 4th 223, 228 (2006) (discussing legislative history); *see* Cal. Bus. & Prof. Code §§ 17203, 17206; *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009); App. D, I3. The very case Defendants cite establishes that, unlike "private litigants," public prosecutors "need not demonstrate standing." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 U.S. Dist. LEXIS 17793, *39 (N.D. Cal. Feb. 15, 2011). Defendants' assertion that "Plaintiffs here"—County and City Counsel in the name of the People—"have no such recourse" (Br. at 49) is contradicted by their own case and incorrect.

Defendants are on no stronger ground arguing that County and City Counsel "lack Article III standing." Br. at 49. Allegations of "harm to the physical or economic health and well-being of California residents" is sufficient to "show a quasi-sovereign interest conferring *parens patriae* standing." *Id.*; *see Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 602 (1982).[13] Contrary to Defendants' suggestion, "[t]o decide whether a state's interest pertains to 'its residents in general'"—and thus confers standing—"a court should consider the direct *and*

[13] As courts have recognized, public prosecutor actions under the UCL and similar consumer protection statutes in the name of the People are actions brought by the government on behalf of and to protect the welfare of their citizens and, thus, *parens patriae* suits. *See People v. Kroger Co.*, 2024 U.S. Dist. LEXIS 184740, *6-7 (C.D. Cal. Oct. 9, 2024); *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 670 (9th Cir. 2012).

*indirect* effects of the alleged injury." *LG Display Co. v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011) (quoting *Snapp*, 458 U.S. at 607) (emphasis added); *see, e.g.*, *Texas v. Google LLC*, 764 F. Supp. 3d 500, 521 (E.D. Tex. 2025). "An 'alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* [if] the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *LG Display*, 665 F.3d at 771 (quoting *Snapp*, 458 U.S. at 607). Under these standards, "[p]reventing antitrust harms to a state's citizenry is a recognized quasi-sovereign interest" conferring Article III standing. *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 680 (E.D. Pa. 2022) (citing *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991)).[14]

Under this precedent, County and City Counsel have Article III standing to pursue their UCL claims in the name of the People to "maint[ain] . . . the integrity of markets . . . operating within its boundaries" and "prevent[] . . . its citizens' revenues from being wrongfully extracted from the state." *Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047, 1050-51 (C.D. Ill. 2009).[15] Indeed, County and City Counsel allege substantial, broad-based harm to the California economy and the health and welfare of its citizens. *See* CAC ¶¶ 285-339, 378-85, 1065-79. These are not

---

[14] *See also United States v. Apple, Inc.*, 2025 U.S. Dist. LEXIS 123842, *47 (D.N.J. June 30, 2025) ("'[S]ignificant[] hamper[ing] [of] competition' by a monopolist is enough for Article III standing.") (quoting *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150 (D.D.C. 2002)); *Texas v. Google*, 764 F. Supp. 3d at 507-10 (collecting cases); *see, e.g.*, *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 450-51 (1945); *Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 634-35 (4th Cir. 1977); *FTC v. Deere & Co.*, 2025 U.S. Dist. LEXIS 109177, *30-31 (N.D. Ill. June 9, 2025); *Pennsylvania v. Eagle Rock Resort Co., LLC*, 2026 U.S. Dist. LEXIS 69683, *12-14 (M.D. Pa. Mar. 31, 2026).

[15] See *People v. Pac. Land Rsch. Co.*, 20 Cal. 3d 10, 17 (1977) ("An action filed by the People seeking injunctive relief and civil penalties is fundamentally a law enforcement action designed to protect the public and not to benefit private parties."); *People ex rel. Harris v. Black Hawk Tobacco, Inc.*, 197 Cal. App. 4th 1561, 1571 (2011) ("California has an important state interest in enforcing the unfair competition law."); *Eagle Rock Resort*, 2026 U.S. Dist. LEXIS 69683, *7-9 (where, as here, an enforcer seeks penalties, it "cannot be a nominal plaintiff").

"generalized grievances." Br. at 50 (citing an inapposite taxpayer-standing case). These are concrete harms resulting from substantially lessened competition, which courts for decades have recognized state enforcers have standing to challenge and rectify.[16]

As for the merits of the People's UCL claims, "[a]s relevant here, the UCL prohibits 'any [1] unlawful, [2] unfair or [3] fraudulent business act or practice.'" *Epic Games, Inc. v. Apple, Inc.* ("*Epic II*"), 67 F.4th 946, 1000 (9th Cir. 2023) (quoting Cal. Bus. & Prof. Code § 17200). Contrary to Defendants' misleading argument (Br. at 50 & n.30), "a practice may be deemed unfair" under the second prong "even if not specifically proscribed by some other law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999).[17] Defendants cite *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001), but that case held much more narrowly that "when a federal antitrust claim suffers from . . . a *categorical legal bar*"—such as Major League Baseball's antitrust exemption—"the conduct underlying the antitrust claim cannot be deemed unfair pursuant to the UCL." *Epic II*, 67 F.4th at 1001. By contrast, when a federal antitrust claim suffers from a mere "proof deficiency"—as Defendants argue here (Br. at 50 n.30)—Defendants are not automatically immunized from a separate unfair-prong claim, even premised on the same conduct. *See id.*; *Cel-Tech*, 20 Cal. 4th at 180; *see, e.g.*, *Epic II*, 67 F.4th at 999-1002 (affirming finding that plaintiff failed to show Sherman Act § 1 violation but same conduct violated UCL).

Because Defendants' only argument for dismissal of the UCL claims is their incorrect

[16] By contrast, the complaint in *Illinois ex rel. Edgar v. City of Chi.* was "bereft of any allegations" of harm to the health and well-being of the state's residents. 942 F. Supp. 366, 374 (N.D. Ill. 1996). And it is irrelevant to the *parens patriae* standing analysis that "the complained-of injuries to [California's] citizens are identical to injuries felt by citizens elsewhere." *Texas v. Google*, 764 F. Supp. 3d at 521; *accord New York v. Microsoft*, 209 F. Supp. 2d at 151-52.

[17] *Eidmann v. Walgreen Co.* is an inapposite fraud case. 522 F. Supp. 3d 634 (N.D. Cal. 2021). County and City Counsel here do not allege a fraudulent-prong claim at all.

argument that those claims rise or fall with NCAPs' federal claims, the UCL claims survive. Those claims are subject to a different test, which asks whether the conduct violated the policy or spirit of the antitrust laws or whether the gravity of the harm caused by the conduct outweighs any claimed utility. *See Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal. 5th 279, 303 & n.10 (2020); *Progressive W. Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 285-86 (2005); *Cel-Tech*, 20 Cal. 4th at 186-87. This is the crux of the entire Complaint: Defendants' anticompetitive conduct had no redeeming motivation or utility and has caused reduced output and higher prices. *See* CAC ¶¶ 285-339, 367-77. The same general standards govern Hartford's CUTPA claims,[18] which survive.[19] *See also* App. C, rows 2, 5.

**NCAPS PLAUSIBLY ALLEGE ANTITRUST LAW VIOLATIONS IN RELEVANT MARKETS FOR FIRE APPARATUSES AND CHASSIS**

Defendants similarly offer no valid reason for dismissing NCAPs' antitrust claims.

**I. NCAPs Allege Direct Evidence of Harm to Competition, Obviating the Need for an Elaborate Market Analysis**

Defendants suggest their relevant-market arguments are case-dispositive. But "market share and barriers to entry are merely surrogates for determining the existence of [market] power," *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007), and, in turn, whether the challenged conduct has "the potential for genuine adverse effects on competition." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986). "[D]irect evidence of anticompetitive

---

[18] *See* Conn. Gen. Stat. §§ 42-110b, 42-110g; *Kent Literary Club of Wesleyan Univ. v. Wesleyan Univ.*, 338 Conn. 189, 232 (2021) (holding acts that offend public policy, are unethical or oppressive, or cause substantial injury to consumers, violate CUTPA); *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350-51 (2010); *Associated Inv. Co. v. Williams Assocs. IV*, 230 Conn. 148, 158 (1994) (holding CUTPA is construed liberally); *Broadway Theatre Corp. v. Buena Vista Pictures Distrib.*, 2002 U.S. Dist. LEXIS 27368, *12 (D. Conn. 2002).

[19] *See, e.g.*, *Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 173-74 (D. Conn. 1998); *Data Capture Sols.-Repair Inc. v. Symbol Techs., Inc.*, 520 F. Supp. 2d 343, 351 (D. Conn. 2007).

effects"—such as reduced output or increased prices as NCAPs allege here—renders market critiques largely irrelevant. *Toys "R" Us v. FTC* ("*TRU*"), 221 F.3d 928, 937 (7th Cir. 2000).[20]

NCAPs' specific factual allegations describe in detail how Defendants, through their illegal conduct, eliminated head-to-head competition, restrained consumer choice, reduced output, increased prices, and degraded quality. *See* CAC ¶¶ 15-18, 259-64, 266-69, 278-79, 280-82, 284-86, 304-07, 318-21, 327-28, 330-33, 383, 401-03, 407. Taken together, these allegations of "actual detrimental effects" tied to Defendants' conduct are precisely the kind of evidence that make an elaborate analysis of relevant markets, shares, and entry barriers unnecessary. Because NCAPs have more than plausibly alleged the "rough contours" of their relevant markets, *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004), the Court need read no further to conclude NCAPs have plausibly alleged harm to competition.

## II. NCAPs' Relevant Markets Are Plausible

NCAPs also allege harm to competition with indirect evidence—namely, through Defendants' high shares of plausible relevant markets with high barriers to entry and expansion.

A relevant product market includes all "products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." *E.I. du Pont de Nemours*, 351 U.S. at 404; *see Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir.

---

[20] *See Ind. Fed'n*, 476 U.S. at 460-61; *see also PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 & n.7 (9th Cir. 2022); *see, e.g.*, *Dennis v. Andersons Inc.*, 2022 U.S. Dist. LEXIS 250885, *29-31 (N.D. Ill. May 3, 2022) (finding allegations of anticompetitive effects "plausibly suggest[ed] that Defendants had significant market power"); *Costar Grp. Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1069-70 (9th Cir. 2025); *FTC v. Edwards Lifescis. Corp.*, 2026 U.S. Dist. LEXIS 19409, *80-81 (D.D.C. Jan. 9, 2026) (plaintiff may show harm to competition through evidence that acquisition eliminates substantial head-to-head competition); *Deutsche Telekom AG*, 2023 U.S. Dist. LEXIS 196872, *41-44; *FTC v. Henkel AG & Co. KGaA*, 2026 U.S. Dist. LEXIS 206134, *114-16 (S.D.N.Y. Aug. 14, 2026); *In re Automatic Card Shufflers Litig.*, 2026 U.S. Dist. LEXIS 69440, *16 (N.D. Ill. Mar. 31, 2026); *Texas v. Blackrock, Inc.*, 2025 U.S. Dist. LEXIS 147891, *27-28 (E.D. Tex. Aug. 1, 2025).

2006) (holding products must be "good substitutes for one another"); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1340 (Fed. Cir. 2014); *see also* U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines (2023) [hereinafter Merger Guidelines] § 4.3.A (discussing "Hypothetical Monopolist Test" ("HMT")). While the HMT provides one analysis of substitution, *see FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892, 912 (N.D. Cal. 2023), a "well-defined" product market may also "be determined by examining such practical indicia as industry or public recognition of the []market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).[21] "The ultimate objective of the [*Brown Shoe*] criteria is to delineate markets which conform to areas of effective competition and to the realities of competitive practice." *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir. 1971). Ultimately, "market definition is a deeply fact-intensive inquiry," so "courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market." *Fourqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir. 2025) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).[22]

***Custom Chassis Market***. Every Custom Pumper, Custom Aerial, and Custom Quint is built on a Custom Chassis. CAC ¶ 183. The distinction between Custom Chassis and commercial

[21] *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (Bork, J.); *see also Stepp v. Ford Motor Credit Co.*, 623 F. Supp. 583, 590 (E.D. Wis. 1985) (recognizing *Brown Shoe* factors as indicia of cross-elasticity); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir. 1979) (same).

[22] *See Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070-71 (N.D. Ill. 2016) (relevant market-based dismissal proper "only when it is certain that 'the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way'") (quoting *In re Dairy Farmers of Am., Inc*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)).

chassis therefore frames each of those narrower submarkets of Fire Apparatuses. NCAPs' allegations explain precisely why Custom Chassis (and therefore Custom Apparatuses) are not interchangeable with their commercial counterparts. *Id.* ¶¶ 183-89, 190-93, 196, 214. The industry recognizes these peculiarities too. *Id.* ¶ 197. Purchasers confirm that non-interchangeability by paying roughly twice as much for Custom Chassis. *Id.* ¶¶ 194-95; *see Beatrice Foods Co. v. FTC*, 540 F.2d 303, 309 (7th Cir. 1976). Custom Chassis have particular customers and a limited set of manufacturers. CAC ¶¶ 196, 200, 211. The National Fire Protection Association's ("NFPA") engineering demands, heavy capital costs, and low production volumes, *id.* ¶¶ 251-53, further limit the "cross-elasticity of supply" between custom and commercial chassis. *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1330 (7th Cir. 1981). Given these alleged facts, a hypothetical monopolist of Custom Chassis could profitably impose a small but significant non-transitory increase in price ("SSNIP"). CAC ¶¶ 198-99.

***Custom Pumper, Aerial, and Quint Markets***. Because every Custom Pumper, Custom Aerial, and Custom Quint rides on a Custom Chassis, the same distinctions in characteristics, price, customers, and vendors separate each from its commercial counterpart. *Id.* ¶¶ 184, 214, 216. NCAPs' further allegations explain why the three types are not interchangeable with each other or with other Fire Apparatuses, such that the competitive effects of Defendants' conduct should be assessed in "narrower submarkets" for each type. *See id.* ¶¶ 103-21, 202-13.[23]

---

[23] Defendants contend that because Custom Quints perform the functions of both pumpers and aerials, the three must be interchangeable. Br. at 40. But NCAPs clearly allege that fleet composition turns on staffing and tactical needs. *See* CAC ¶¶ 120-21, 205. Price differentials reinforce this distinction, as a department needing only a pumper will not pay roughly twice as much for a quint, and a department able to afford only one custom apparatus will not substitute two. *See id.* ¶¶ 387-88. In sum, limited functional overlap does not equate to reasonable interchangeability. *See Kaiser Aluminum*, 652 F.2d at 1330 (citing *United States v. Cont'l Can*

***Fire Apparatus Market***. NCAPs also allege a relevant market for Fire Apparatuses subject to NFPA's Standard 1900, which according to NFPA include "Automotive Fire Apparatus" and "Wildland Fire Apparatus." *Id.* ¶¶ 99, 145, 227-28. The Complaints plead numerous practical indicia supporting this market under *Brown Shoe*. The industry recognizes Automotive and Wildland Fire Apparatuses as a distinct category governed by NFPA Standard 1900, and manufacturers market themselves as Fire Apparatus builders. *Id.* ¶¶ 227-28. The constituent products are "typically offered or marketed together by the same sellers, fire apparatus manufacturers, to the same set of buyers, local fire departments." *Id.* ¶ 228. Cooperative purchasing organizations solicit proposals for "Firefighting Apparatuses and Fire Service Vehicles" and score bidders on the "Breadth of Offered . . . Products." *Id.* ¶¶ 248-49.

Fire Apparatuses also possess distinctive characteristics and uses. They are purpose-built to respond to fires in emergency conditions and must satisfy NFPA requirements. *Id.* ¶ 230. Other emergency vehicles are not reasonably interchangeable because they lack the required specialized design and capabilities. *Id.* Fire Apparatuses serve an identifiable customer base—local fire departments—with specialized operational and fleet requirements, *id.* ¶¶ 228, 250, and are served by an identifiable supplier base. *Id.* ¶¶ 230, 245. And Defendants market multiple apparatus types to fire departments through established dealer networks that also provide service and support. *Id.* ¶¶ 160, 180, 247. Establishing a dealer service and support network, and NFPA compliance, present barriers to entry across the alleged market. *See id.* ¶¶ 247, 230, 246. And Fire Apparatuses share a common U.S. geographic market. *Id.* ¶¶ 232-43. NCAPs also allege

---

*Co.*, 378 U.S. 441, 457-458 (1964)); *Beatrice Foods*, 540 F.2d at 308 ("The mere fact that several products are limited substitutes for one another and thus form a broad product market is not dispositive of whether they form a relevant product market for antitrust purposes.").

marketwide procurement practices and switching costs that favor incumbent apparatus manufacturers and impede entry. *Id.* ¶ 250. The Fire Apparatus market thus satisfies the HMT test. *Id.* ¶¶ 230-31, 244. Plaintiffs therefore plausibly plead a Fire Apparatus market that "reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).[24]

Defendants' objection to this market cannot prevail merely because NCAPs also allege distinct submarkets. As *Brown Shoe* recognizes, "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." 370 U.S. at 325. NCAPs' allegation that a Custom Pumper is not a substitute for a Custom Quint does not foreclose clustering those markets for common competitive analysis where their competitive conditions are sufficiently similar. CAC ¶¶ 202, 227; see *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-66 (6th Cir. 2014). Indeed, by arguing that pumpers and quints are in the same market under a loose standard of substitutability (Br. at 40), Defendants essentially concede the appropriateness of the broader Fire Apparatus market.

Defendants' insistence that a cluster market depends on purchasing products "as a group" overlooks the alternative basis for clustering that their own brief acknowledges. Br. at 40. The Seventh Circuit recognizes that a cluster can comprise a relevant product market "if the cluster is itself an object of consumer demand," *Sharif Pharm., Inc. v. Prime Therapeutics, LLC,* 950 F.3d 911, 918 (7th Cir. 2020) (quoting *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016)), while other courts have also permitted clustering where constituent products face

[24] *See, e.g.*, *Ekco Prods. Co. v. FTC*, 347 F.2d 745, 748 (7th Cir. 1965) (affirming § 7 violation in market for "commercial meat-handling equipment, consisting of two different kinds of equipment with related uses"); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 574 (7th Cir. 1999) (affirming preliminary injunction of merger shown to affect "(1) the worldwide market for wide body landing gear; (2) the worldwide market for narrow body landing gear; and (3) the worldwide market for military landing gear").

sufficiently similar competitive conditions to warrant a common competitive effects analysis. *See ProMedica Health Sys.*, 749 F.3d at 565-566; *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 440-41 (S.D.N.Y. 2024). And *Advocate* itself cited authority permitting clustering "for analytical convenience." 841 F.3d at 467-68 (citing *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016)). That similar-conditions rationale applies here. As *ProMedica* explains, defining an individual market through demand substitution presents a separate question from deciding whether distinct markets can be clustered for common competitive analysis. 749 F.3d at 567-68. Clustering under the latter rationale does not require joint purchases of the constituent products.

Here, NCAPs allege both that each apparatus type "serves a specific need that cannot be easily fulfilled by other types" and that "the competitive conditions for the manufacture and sale of Fire Apparatuses in this broad market are similar enough" to allow for analyzing the competitive effects of Defendants' conduct on all Fire Apparatuses together. CAC ¶ 229. The manufacturing, distribution, procurement, and geographic allegations above supply factual support for that common analysis. Although the Complaints acknowledge additional suppliers and less demanding standards for certain commercial and ancillary apparatuses sold "under different competitive conditions," *id.* ¶ 216, NCAPs allege that those differences coexist with shared manufacturing, distribution, procurement, and geographic constraints sufficient to support common analysis. *Id.* ¶¶ 229-30, 232-43, 245-50.

Moreover, Defendants' examples of differing "demand conditions" (Br. at 40) concern variations in fire departments' operational needs and product preferences. But such differences do not, by themselves, negate the alleged similarities in manufacturing capabilities, NFPA compliance requirements, distribution, and geographic scope. CAC ¶¶ 230, 232-43, 245-50. The Complaints allege that, despite its acquired companies' differentiated products and customer

needs, REV developed an integrated product roadmap to standardize subassemblies and converge its brands' designs, and embarked on a program to transition apparatuses onto common platforms. *Id.* ¶¶ 266-69. These allegations support the inference that a manufacturer can serve differentiated customer requirements through shared production capabilities.

Nor does clustering require every supplier to offer every constituent product. In *FTC v. Wilh. Wilhelmsen Holding ASA*, the court accepted a cluster despite a supplier offering only one constituent product, explaining that competitive conditions need only be similar, not indistinguishable. 341 F. Supp. 3d 27, 49 n.3 (D.D.C. 2018). BME's specialized product range therefore does not itself defeat clustering. CAC ¶¶ 220, 227.

NCAPs further plausibly allege that Defendants hold substantial shares in several constituent markets and in the broader Fire Apparatus market. *Id.* ¶¶ 291-92, 299, 301. Defendants' conduct has caused substantial price increases for Custom Apparatuses, Wildland Fire Apparatuses, and commercial apparatuses. *Id.* ¶¶ 283, 387-88, 407-10, 442-43, 469. Taken together, the pleaded practical indicia and competitive conditions plausibly support the Fire Apparatus market.

***Wildland Fire Apparatus Market***. The Complaints also allege a narrower "market to build and supply apparatuses that qualify as Wildland Fire Apparatuses under the NFPA Standards." *Id.* ¶ 219. NCAPs allege numerous practical indicia of this submarket under *Brown Shoe*. NFPA separately defines Wildland Fire Apparatuses as a "[f]ire apparatus primarily used for wildland fire response," indicating industry recognition of a distinct category. *Id.* ¶¶ 99, 219. Manufacturers market their Wildland Apparatuses as a distinct category within their product portfolios, *id.* ¶¶ 221-22, and Pierce described its combination with BME as affecting "the wildland market." *Id.* ¶ 224. Wildland Apparatuses also have peculiar characteristics, including

NFPA requirements that they climb and descend steep grades. Manufacturers emphasize "pump-and-roll" capabilities for attacking fires while navigating "rough off-road terrain." *Id.* ¶¶ 221-23. Wildland Apparatuses serve distinct customers—namely, fire departments facing difficult environments where regular apparatuses have difficulty maneuvering. *Id.* ¶¶ 146, 225. And Wildland Apparatuses come from both specialized vendors like BME, and manufacturers with broader apparatus portfolios, including Pierce and REV Group, through its subsidiaries. *Id.* ¶¶ 147, 220.

As explained above, differing product functions do not preclude clustering where competitive conditions are sufficiently similar. *Contra* Br. at 40. Here, the Complaints allege that Wildland Apparatus types are primarily manufactured by the same companies in similar facilities for similar customers and must satisfy NFPA standards for Wildland Fire Apparatuses. CAC ¶ 226. Those allegations, together with the shared distribution and entry constraints discussed above, support common competitive analysis. *Id.* ¶¶ 160, 223, 226, 245-50.

NCAPs also allege substantial price increases across Wildland Apparatus types: Type 3 prices roughly doubled, *id.* ¶¶ 409, 443, while Type 6 apparatuses more than doubled in price. *Id.* ¶ 427. NCAPs further plausibly allege that a hypothetical monopolist of all Wildland Fire Apparatuses could profitably impose a SSNIP. *Id.* ¶ 226. These allegations suffice at this stage.

## III. The Complaints Establish Prima Facie § 7 Violations Under Several Theories of Harm

Clayton Act § 7 prohibits mergers whose effects may be substantially to lessen competition or tend to create a monopoly. 15 U.S.C. § 18. Mergers can violate § 7 under numerous theories of harm. *See generally Brown Shoe*, 370 U.S. at 321-22. First, a merger that eliminates head-to-head competition between firms or results in actual anticompetitive effects

violates § 7. *See supra*, § I. Second, "[t]he Supreme Court instructed that":

> a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*, 636 F. Supp. 1513, 1520 (S.D. Ind. 1986) (quoting *United States v. Phila. Nat'l Bank* ("*PNB*"), 374 U.S. 321, 363 (1963)); *see United States v. Baker Hughes, Inc.*, 908 F.2d 981, 983 (D.C. Cir. 1990). NCAPs can establish this presumption by showing (1) the merged firm's market share is 30% or more, *PNB*, 374 U.S. at 364-65, or (2) the merger screates a market with an HHI greater than 1,800 and increases HHI by at least 100 points. *AlliedSignal*, 183 F.3d at 574 n.3.[25]

Third, a merger may "hurt consumers, as by making it easier for the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282-83 (7th Cir. 1990).[26] Fourth, a vertical merger may produce a merged firm that possesses both the ability and incentive to foreclose dependent rivals from critical inputs or distribution channels, thereby acting as a "clog on competition." *Ford Motor Co. v. United States*, 405 U.S. 562, 570-71 (1972).[27] Fifth, a

---

[25] *See also United States v. Pabst Brewing Co*., 384 U.S. 546, 551-52 (1966); *FTC v. H.J. Heinz Co*., 246 F.3d 708, 716 (D.C. Cir. 2001); Merger Guidelines § 2.1 (Guideline 1). "The HHI estimates market concentration by summing the squares of the market shares of every firm in the market." *AlliedSignal*, 183 F.3d at 574 n.3.

[26] *See also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 229-30 (1993) (merger can create "excessive concentration" and, with it, the risk of "oligopolistic price coordination"); Merger Guidelines § 2.3 (Guideline 3).

[27] *See also Harnischfeger Corp. v. Paccar, Inc*., 474 F. Supp. 1151, 1158 (E.D. Wis.), *aff'd*, 624 F.2d 1103 (7th Cir. 1979); *Illumina, Inc. v. FTC,* 88 F.4th 1036, 1051, 1053 (5th Cir. 2023); Merger Guidelines § 2.5 (Guideline 5). A vertical transaction is especially suspect where it

merger may entrench or extend a firm's already dominant position by raising entry barriers or weakening existing competitive constraints. *See United States v. Wilson Sporting Goods Co*., 288 F. Supp. 543, 548 (N.D. Ill. 1968).[28] Sixth, mergers can substantially lessen competition by eliminating the reasonable probability of entry or expansion by a potential rival that would have introduced competition. *See United States v. Marine Bancorp.*, 418 U.S. 602, 630 (1974).[29] Finally, courts may enjoin a merger when it tends to accelerate an industry trend toward consolidation. *See United States v. Von's Grocery Co.*, 384 U.S. 270, 276-77 (1966).[30]

Defendants' acquisitions violate § 7 under these theories of harm. CAC ¶¶ 285-86:

- Defendants' acquisitions have resulted in lower output, lower quality, and higher prices, *id.* ¶¶ 307, 326-39, and have eliminated substantial competition between firms previously competing head-to-head to offer the same products, *id.* ¶¶ 304-07, 322-23;

- Defendants' acquisitions have enabled them to control high shares of concentrated markets, establishing a presumption that they violated § 7, *id.* ¶¶ 287-302;

- Defendants' combinations have transformed the once-fragmented relevant markets into highly concentrated oligopolies, meaningfully increasing the risk of coordination among the remaining firms, *id.* ¶¶ 308-09, 315-16, 322-23;

---

intensifies an existing industry trend toward vertical integration. *See Miss. River Corp. v. FTC*, 454 F.2d 1083, 1092-93 (8th Cir. 1972); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp*., 2000 U.S. Dist. LEXIS 2604, *81 (S.D.N.Y. Mar. 9, 2000).

[28] *See also FTC v. Procter & Gamble Co.*, 386 U.S. 568, 570, 577-78 (1967); *Gen. Foods Corp. v. FTC*, 386 F.2d 936, 944 (3d Cir. 1967); Merger Guidelines § 2.6 (Guideline 6); *see, e.g.*, *Purex Corp. v. Procter & Gamble Co.*, 596 F.2d 881, 884 (9th Cir. 1979); *Ekco*, 347 F.2d at 753 (7th Cir.).

[29] *See Ford Motor*, 405 U.S. at 587; Merger Guidelines § 2.4 (Guideline 4); *see, e.g.*, *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964); *Yamaha Motor Co. v. FTC*, 657 F.2d 971, 980-81 (8th Cir. 1981) (holding the acquisition of a potential entrant violated §7).

[30] *See also Pabst Brewing*, 384 U.S. 546; *Stanley Works v. FTC*, 469 F.2d 498 (2d Cir. 1972); *United States v. Times Mirror Co.*, 274 F. Supp. 606 (C.D. Cal. 1967), *aff'd*, 390 U.S. 12 (1968).

- Oshkosh's acquisition of Maxi-Métal has foreclosed competition and discouraged new entrants into the Custom Chassis market, *id.* ¶ 310;

- The Spartan acquisition gave the REV Group Defendants the power to raise rivals' costs and neutralize price competition in the markets for Custom Pumpers, Custom Aerials, and Custom Quints by controlling the price and availability of Custom Chassis, *id.* ¶¶ 311-17;

- By acquiring Maxi-Métal, Oshkosh preemptively eliminated a well-capitalized entrant into the U.S. Custom Pumpers market who would have undercut the pricing power of the domestic incumbents and introduced substantial additional competition into that market, *id.* ¶¶ 318-21;

- REV Group and the AIP Defendants' acquisitions of E-ONE, Ferrara, KME, and Spartan, and the Oshkosh Defendants' acquisitions of Maxi-Métal and an interest in the BME Defendants, have entrenched and extended Defendants' dominance in the relevant markets, *id.* ¶ 324;

- Defendants' acquisitions have cemented an industry trend towards consolidation. *Id.* ¶ 325.[31]

### *A. Each Defendant Group's Mergers and Acquisitions Are Appropriately Considered Cumulatively*

Contrary to Defendants' assertions (Br. at 23-24), § 7 addresses the following "problem":

> Where several large enterprises are extending their power by *successive small acquisitions, the cumulative effect* of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply.

*Brown Shoe*, 370 U.S. at 333-34 (quoting legislative history) (emphasis added); *see Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 125 (1986) (Stevens, J., dissenting). Echoing this principle, the Merger Guidelines § 2.8 (Guideline 8) provides that individual acquisitions may be considered "in light of the cumulative effect of related patterns or business strategies." Thus in *Hosp. Corp. of Am. v. FTC*, the Seventh Circuit evaluated the aggregated effects of two

[31] *See, e.g.*, *Deutsche Telekom AG*, 2023 U.S. Dist. LEXIS 196872, *28-30 (denying motion to dismiss merger challenge where plaintiffs similarly "allege[d] *how* the merger reduced competition"); *Panini Am., Inc. v. Fanatics, Inc.*, 2025 U.S. Dist. LEXIS 42143, *31-32 (S.D.N.Y. Mar. 10, 2025) (denying motion to dismiss).

acquisitions. 807 F.2d at 1384, 1388 (7th Cir. 1986). In *United States v. Healthco, Inc.*, the court held although there were "four separate acquisitions" at issue, they could "be viewed in the aggregate" because they were related. 387 F. Supp. 258, 271 (S.D.N.Y. 1975).[32] Indeed, the Supreme Court has commanded that antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (collecting cases).[33] The foregoing precedent establishes that a series of related mergers by an economic enterprise are properly evaluated together for their cumulative effects. Further reinforcing this common-sense principle, there is little "substantive difference today between the standard for judging the lawfulness of a merger challenged under section 1 of the Sherman Act and the standard for judging the same merger challenged under section 7 of the Clayton Act." *Rockford Mem'l*, 898 F.2d at 1281. Yet Defendants cannot dispute that courts generally evaluate the cumulative effects of *all* of a defendant's related contracts in considering whether it violated § 1.[34] This is so despite

[32] *See also Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F. Supp. 780, 794-95 (S.D. Tex. 1971) (§ 7 reaches "a series of acquisitions"), *aff'd*, 476 F.2d 989 (5th Cir. 1973); *Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*, 2024 U.S. Dist. LEXIS 236177, *29 (S.D. Tex. Sep. 27, 2024) (denying motion to dismiss complaint premised on "a series of acquisitions"); *U.S. v. Nat'l Steel Corp.*, 26 F.R.D. 599, 602-03 (S.D. Tex. 1960). Consistent with these cases, courts frequently condemn mergers based on defendants' history of prior acquisitions. *See, e.g.*, *United States v. Jerrold Electronics Corp.*, 187 F. Supp. 545, 567 (E.D. Pa. 1960), *aff'd per curiam*, 365 U.S. 567 (1961); *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128, 1136 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987); *United States v. Jos. Schlitz Brewing Co.*, 253 F. Supp. 129, 136 (N.D. Cal. 1966), *aff'd per curiam*, 385 U.S. 37 (1966).

[33] This requirement is not limited to conspiracy cases. *See, e.g.*, *City of Mishawaka, et al. v. American Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) (various acts of a monopoly cannot be evaluated in a vacuum); *Aspen Highlands v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n.18 (10th Cir. 1984) (six parts of monopolization scheme "should be viewed as a whole").

[34] *See, e.g.*, *Brown v. Amazon.com, Inc.*, 2023 U.S. Dist. LEXIS 158801, *25-27 (W.D. Wash. Sep. 7, 2023) ("[I]t was proper for the district court to have aggregated the contracts in the

the fact that § 1, like § 7's reference to a singular "acquisition," refers to a singular "contract, combination . . . , or conspiracy." 15 U.S.C. § 1. This § 1 precedent puts to rest any argument that § 7 does not consider the aggregate effects of a series of mergers.

Accordingly, the effects of the AIP/REV acquisitions of E-ONE, KME, Ferrara, and Spartan—consummated pursuant to the same acquisitive plan—are properly considered together to determine whether, in the aggregate, they violated § 7.[35] Defendants' authorities (Br. at 23-24) do not establish otherwise, and instead stand for the limited propositions that unrelated transactions cannot be aggregated, that plaintiff must allege facts showing the state of the market before the challenged acquisitions, or that at later stages plaintiffs must put forth sufficient evidence of relatedness. Indeed, in *Chateau De Ville Prod., Inc. v. Tams-Witmark Music Libr., Inc.*, the court denied the Rule 12(b)(6) motion because the acquisition of multiple collections of licenses—or a "pattern thereof"—could substantially lessen competition. 1977 U.S. Dist. LEXIS 17045, *11-12 (S.D.N.Y. Mar. 7, 1977). And in *Chi. Bridge & Iron Co. N.V. v. FTC*, the court recognized that facts concerning competitive relationships, market structure, and market history such as NCAPs allege here can establish competitive harm apart from HHI calculations. 534 F.3d

relevant market in order to assess the Sherman Act violations resulting from these contracts.") (quoting *Twin City Sportserv. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir. 1982)); *Paddock Publ'ns v. Chi. Tribune Co.*, 1995 U.S. Dist. LEXIS 15784, *15-36 (N.D. Ill. Oct. 23, 1995) (holding "aggregation of individual exclusive licenses or contracts" was "appropriate").

[35] *See* CAC ¶¶ 2-10, 69-76, 83, 256-60 (acquisitive plan); *id.* ¶¶ 291-98, 301-02 (alleging levels of and changes in market shares and concentrations pre- and post- the series of acquisitions); *id.* ¶¶ 258-73, 285-86, 295-96, 298, 302, 304, 307-08, 309, 311, 313-14, 324-25, 472-73, 475 (all four acquisitions, considered together, lessened competition and constitute a violation). Contrary to Defendants' misleading assertion (Br. at 28), nowhere do NCAPs allege the pre-acquisition markets were "deconcentrated." The Complaints allege they were "*relatively* deconcentrated" versus their post-acquisition levels. CAC ¶ 4 (emphasis added); *see id.* ¶ 6. Paragraph 7 likewise merely recounts REV's own description of an industry containing "small and fragmented manufacturers." *Id.* ¶ 7. Neither of these allegations is an admission of low concentration levels.

410, 431-33 (5th Cir. 2008).

Finally, Defendants cannot defeat NCAPs' allegations by substituting their own account of industry consolidation. *See* Br. at 29. The Complaints expressly allege that AIP and REV's acquisitions themselves produced the pleaded increases in concentration. CAC ¶¶ 295-96, 298, 302, 304. The degree to which later Oshkosh transactions affected concentration bears only on how much of today's concentration is attributable to REV.

### ***B. NCAPs State a § 7 Claim as to the Spartan Acquisition Alone***

In addition, the Spartan acquisition alone was an unlawful merger. It eliminated a major, direct competitor from highly concentrated markets and qualifies for the presumption of illegality, and by acquiring its rivals' most critical supplier (of Custom Chassis), REV Group gained the ability and additional incentive to raise rivals' costs and restrict their supply of essential inputs, as well as access to their competitively sensitive build data, chilling competition. *Id.* ¶¶ 129, 260, 297-98, 304, 307-09, 311-17, 324-25, 473; *see Illumina*, 88 F.4th at 1051-55.[36]

Defendants argue that Spartan and the other REV subsidiaries could be considered horizontal Custom Chassis competitors only if the latter sold chassis to third-party builders, like Spartan does. Br. at 25-26. Defendants are incorrect; "vertically integrated firms are also included [as market participants] to the extent that their inclusion accurately reflects their competitive significance." Merger Guidelines § 4.4.A.[37] Here, NCAPs allege E-ONE, KME, and

[36] *See, e.g.*, *Laidlaw*, 636 F. Supp. at 1517 (finding it "devastating" for a firm "engaged in head to head bidding wars" with rival to "gain access to [its] confidential information"). *United States v. UnitedHealth Group Inc.* turned on the record at trial; it did not hold that competitively sensitive information-sharing cannot support a § 7 violation as a matter of law. 630 F. Supp. 3d 118, 123, 145-50 (D.D.C. 2022). *Contra* Br. at 27 n.20.

[37] *See also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945); *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, at 193, 186 (D.D.C. 2001); *SolarCity*

Ferrara's competitive significance: They were capable of supplying competing chassis to apparatus builders if Spartan increased chassis prices or restricted supply. CAC ¶¶ 297-98.[38] Defendants implicitly acknowledge this, arguing next that if, as alleged, REV Group accounts for approximately 30% of Custom Chassis production, 70% necessarily remains available to independent apparatus builders. But as discussed, that 70% does not currently supply competing builders. *Id.* ¶¶ 254-55. Spartan—and now, its affiliates E-ONE, Ferrara, and KME—thus control close to 100% of third-party supply. *Id.* ¶¶ 143, 260, 312.[39] *Jeld-Wen* illustrates the competitive significance of eliminating such an important supplier to independent downstream rivals where the remaining upstream suppliers are vertically integrated. 988 F.3d at 699-700, 711-13; *see also Illumina*, 88 F.4th at 1054. Moreover, E-ONE, Ferrara, and KME all previously competed with Spartan to sell Custom Chassis straight to cities and counties as part of Custom Apparatuses. CAC ¶ 184. That horizontal competition has been eliminated.[40]

Defendants' argument that REV lacks an incentive to foreclose rivals likewise fails. Br. at 27. Threatening chassis price increases or delivery delays would deter aggressive apparatus pricing and protect REV's apparatus margins, with gains plausibly outweighing any lost chassis

---

*Corp. v. Salt River Project Agric. Improvement*, 2015 U.S. Dist. LEXIS 146904, *22-23 (D. Ariz. Oct. 27, 2015); *California v. Sutter Health Sys*., 84 F. Supp. 2d 1057, 1067 (N.D. Cal. 2000), *aff'd*, 217 F.3d 846 (9th Cir. 2000).

[38] *See United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 660 (1964); *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1214 (11th Cir. 2012).

[39] In any event, 30% foreclosure is sufficient for an illegal vertical merger under § 7. *See, e.g.*, *Brown Shoe*, 370 U.S. at 332-33, 327 (foreclosure of 6.5% of the national children's shoes market); *U.S. Steel Corp. v. FTC*, 426 F.2d 592 (6th Cir. 1970) (11%); *Ash Grove Cement Co*., 85 F.T.C. 1123 (1975), *aff'd*, 577 F.2d 1368 (9th Cir. 1978) (18.5%); *Miss. River*, 454 F.2d at 1093 (24%). *See generally Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974, 980-81 (7th Cir. 1969) (holding percentage foreclosed "cannot itself be decisive," and the market's "structure, history and probable future" must also be considered).

[40] *See also* Opp. to Standing MTD § III.D at 9-10.

profits. CAC ¶¶ 184, 311-12; *see Illumina,* 88 F.4th at 1052-53. Foreclosure need not entail a complete cutoff of chassis sales. *Id.* at 1053. Nor must NCAPs allege prior supply restrictions to plead a plausible incentive to foreclose: there is "no requirement that the anticompetitive power manifest itself in anticompetitive action" before § 7 applies. *Procter & Gamble*, 386 U.S. at 577.

### *C. NCAPs State a § 7 Claim as to the Maxi-Métal Acquisition*

Defendants wrongly frame the Maxi-Métal acquisition entirely as a potential competition claim. But as the Complaints allege, this acquisition (1) eliminated not only likely future competition, CAC ¶¶ 318-20, but also (2) *existing* competition: at the time of the acquisition, Maxi-Métal already "was competing with Pierce," and was "expanding its market share in the United States at the expense of its competitors, including Pierce." *Id.* ¶¶ 12, 276, 278, 318, 320.[41] The acquisition is also suspect because (3) it arose in the context of an industry trend towards consolidation. *Id.* ¶¶ 324-25. And [4] finally it:

> foreclosed competition and discouraged new entrants into the Custom Chassis market, who now have no reasonable possibility of relying on a large and growing apparatus builder like Maxi-Métal to purchase their Custom Chassis.

*Id.* ¶ 310; *see supra*, pp. 24-25 (discussing entrenchment cases). The Maxi-Métal acquisition is thus illegal under four independent theories of competitive harm.

Defendants' contention that the Clayton Act concerns only existing competition, "not transactions that may impact *future* competition" (Br. at 30) has it backwards. Section 7 "look[s]

[41] Implicitly acknowledging NCAPs allege Maxi-Métal is an *existing* competitor, Defendants argue NCAPs were required to allege the precise increase in concentration this acquisition caused. Br. at 33. But there is no such requirement. *FTC v. Advoc. Health Care* did not impose a pleading requirement; it addressed the preliminary injunction standard. 2017 U.S. Dist. LEXIS 37707. And *In re JUUL Labs Inc.* rejected the argument that plaintiff must supply HHI calculations at the pleading stage. 555 F. Supp. 3d 932, 964 (N.D. Cal. 2021). *See Cont'l Can*, 378 U.S. at 458. Particularly where, as here, the markets were already concentrated, "the importance of preventing even slight increases in concentration" is even greater. *Id.* at 461-62 (quoting *PNB*, 374 U.S. at 365 n.42).

not merely to the actual present effect of a merger but instead to its effect upon future competition." *Von's Grocery*, 384 U.S. at 277; *see Hosp. Corp.*, 807 F.2d at 1389 (Section 7 calls for a "predictive judgment" and requires "appreciable danger" of competitive harm).

Defendants fare no better in suggesting that actual potential competition is not a cognizable § 7 theory. To the contrary, the Supreme Court has expressly recognized its viability. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531-32 (1973); *FTC v. Meta Platforms Inc.*, 2023 U.S. Dist. LEXIS 222277, *68 (N.D. Cal. Jan. 31, 2023) ("doctrine has been applied by multiple [courts]," including one "affirmed by the Supreme Court"). The very decision Defendants invoke so recognized, rejecting that the doctrine was a "dead-letter." *Meta*, 654 F. Supp. 3d at 926. And in *Yamaha Motor Co. v. FTC*, the Eighth Circuit expressly affirmed a finding of a § 7 violation based on actual potential competition. 657 F.2d 971, 977-80 (8th Cir. 1981); *see also id.* at 977-78 (recounting elements: (1) that "the alleged potential entrant had 'available feasible means' for entering the relevant market, and [2] 'that those means offer(ed) a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects'") (quoting *Marine Bancorp.*, 418 U.S. at 633).

NCAPs readily satisfy that standard at the pleading stage. Defendants argue NCAPs have not alleged a probability "noticeably greater than 50%" that Maxi-Métal "would have meaningfully entered the U.S. Custom Pumpers market." Br. at 30-31 (quoting *Meta*, 654 F. Supp. 3d at 927). But *Meta* applied that evidentiary standard after a preliminary-injunction hearing, not on a motion to dismiss.[42] More fundamentally, Defendants ignore what NCAPs

[42] Likewise, *United States v. Black & Decker Mfg. Co.* recognized the potential competition doctrine applies in concentrated markets, 430 F. Supp. 729, 744-45 (D. Md. 1976), but rejected the government's claim *after trial* and based on an extensive record, which showed the opposite of what NCAPs allege here. *Id.* at 767-69.

allege: Maxi-Métal had already begun entering the United States and was expanding its presence there. CAC ¶¶ 12, 278, 318-20. Nor does Maxi-Métal's pre-acquisition dependence on Pierce to reach U.S. customers (Br. at 31) defeat NCAPs' potential-competition theory. To the contrary, it *establishes* the first element of the claim: Maxi-Métal, a "well-capitalized" and "well-resourced" firm with access to a national dealer network, had feasible means to enter and expand. CAC ¶¶ 318, 320. Whether Maxi-Métal would have secured independent U.S. distribution as its U.S. demand grew is a fact question that cannot be resolved against NCAPs on the pleadings. The Complaints also allege that Maxi-Métal's continued expansion would have produced significant procompetitive effects. *See id.* ¶¶ 276, 278-79, 320.

NCAPs also adequately allege perceived potential competition: that Maxi-Métal's presence on the market's fringe tempered the conduct of existing participants. *See Lektro-Vend Corp. v. Vendo Corp.*, 500 F. Supp. 332, 362-63 (N.D. Ill. 1980); CAC ¶¶ 279, 319. *Lektro-Vend* does not support dismissal. After trial, that court rejected such a claim because plaintiffs made "no showing whatever" that the potential entrant's premerger presence had tempered oligopolistic behavior. *Lektro-Vend*, 500 F. Supp. at 362. Here, NCAPs' allegations to the contrary must be credited at this early stage of the case. *See* CAC ¶¶ 279, 319.

### ***D. NCAPs State a § 7 Claim—and Sherman Act § 1 Restraint-of-Trade and Sherman Act § 2 Conspiracy-to-Monopolize Claim—as to the BME Acquisition***

Pierce's acquisition of a 25% ownership interest in BME, which facilitated these former rivals' "collaboration" rather than competition, CAC ¶¶ 11, 280-81, 306, also violates § 7. Defendants place substantial weight on Pierce's "mere" 25% interest. Br. at 35. But § 7 does not require acquisition of control; instead it expressly reaches the acquisition of "any part" of another company's stock. 15 U.S.C. § 18. And courts have repeatedly rejected the proposition that an

acquisition must confer control to violate § 7; the ultimate inquiry is the acquisition's effect on competition. *See Denver & Rio Grande W.R. Co. v. United States*, 387 U.S. 485, 501 (1967).[43]

Here, NCAPs allege far more than a passive minority interest. Pierce and Boise Mobile were independent, head-to-head competitors in Wildland Apparatuses when Pierce acquired its 25% interest in Boise Mobile's subsidiary, BME Fire Trucks (referred to together as "BME" here). CAC ¶¶ 280-81. Pierce and BME publicly described the transaction as a "Strategic Alliance/Partnership" intended to "facilitate greater collaboration." *Id.* ¶ 280. As the Complaints allege, Pierce's financial stake in its rival has diminished its own incentive to compete. *Id.* ¶ 323. Pierce can avoid investing in a full line of Wildlands and let its BX Wildland product decline, while sharing in higher BME prices through its ownership stake. *Id.* ¶ 323; *see Dairy Farmers*, 426 F.3d at 860-61. The Complaints' allegations bear this out: When a municipality sought an alternative to BME's mid-contract price increases, Pierce quoted more than $500,000 per unit, far above BME's contract price, along with a longer delivery timeline. CAC ¶ 283.

Furthermore, pursuant to the "collaboration," no other dealer than those in Pierce's dealer network can distribute BME apparatuses, *id.* ¶ 281, giving Pierce a direct role in its rival's route to market. Pierce and BME also now collaborate on R&D for Wildland Apparatuses on which they previously competed, *id.* ¶ 306, and Pierce's ownership interest permits the Oshkosh Defendants to influence BME's pricing, R&D, capacity, marketing, and other competitive initiatives. *Id.* ¶ 322. Those allegations supply a plausible mechanism by which the partial acquisition has lessened competition, *see Dairy Farmers*, 426 F.3d at 860-61, and Defendants' competing narrative that the combination has been procompetitive (Br. at 35-36, 39) cannot be

---

[43] *See also United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 859-61 (6th Cir. 2005); *see, e.g.*, *E.I. du Pont de Nemours*, 353 U.S. at 588, 606 (23% ownership unlawful).

credited at this stage. Defendants are also wrong (Br. at 36) that NCAPs must establish a *PNB* presumption to state a claim, *see JUUL Labs*, 555 F. Supp. 3d at 964-65, but in any event, NCAPs allege market shares and HHIs giving rise to this presumption. CAC ¶¶ 299-301.[44] Finally, the partial acquisition of BME—already the dominant Wildland provider—by Pierce—the most dominant Fire Apparatus provider—has entrenched Pierce's dominance in the latter market, dissuaded new entrants, and raised barriers to entry, an independent basis for a § 7 violation. *See* CAC ¶¶ 322, 324; *Laidlaw*, 636 F. Supp. at 1521 (condemning merger of first and second largest providers, even with combined share of only 10%).

For similar reasons, the Pierce-BME combination is a § 1 agreement in restraint of trade. The kind of market-allocation arrangement between Pierce and BME alleged in the Complaints, a cut of the rents "in return for staying out of the market" which "produc[es] . . . [a] monopoly return while dividing that return between the [competitors]," *FTC v. Actavis, Inc.*, 570 U.S. 136, 154 (2013), has long been per se illegal. *See, e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 47-49 (1990).[45] A rule of reason analysis produces the same result, given Pierce and BME have market power in the Wildland market, together controlling over 30% of sales, and over 60% of the submarket for Type 3 apparatuses, CAC ¶¶ 299, 301, and NCAPs allege their combination has harmed competition. *Id.* ¶¶ 282, 286, 306, 322-23; *see, e.g.*, *Actavis*, 570 U.S. at 156-57.

These same facts establish the elements of a § 2 conspiracy-to-monopolize claim. *See In*

---

[44] Nor are the BME Defendants beyond § 7's reach as mere "sellers." Br. at 3-4, 35-36. The combination was accomplished by forming a new entity, BME Fire Trucks, in which Boise Mobile took a 75% interest and Pierce a 25% interest. CAC ¶ 280. Section 7 undisputably applies. *See Penn-Olin Chem.,* 378 U.S. at 167-68. *See also* NCAP Opp. to Oshkosh MTD at 8 & n.4 (sellers like BME are liable under Sherman Act § 1).

[45] *See also, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

*re Surescripts*, 608 F. Supp. 3d 629, 648 (N.D. Ill. 2022); CAC ¶¶ 323, 849-50 (agreement or combination); *id.* ¶¶ 280-83, 306, 323, 389, 851 (overt acts); *id.* ¶¶ 232-33, 283 (substantial effect on commerce); *infra*, pp. 37-38 (specific intent). As in *Surescripts*, Pierce "chose to help [BME] secure [market share] in exchange for a commission [i.e., share of profits]," thus violating § 2. 608 F. Supp. 3d at 650; *see also, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 483-84 (9th Cir. 2021) ("jury could have inferred that Synta agreed to help Sunny acquire Meade . . . to engage in [a] market allocation scheme"); *see* CAC ¶¶ 305, 323.[46]

## IV. The Complaints Adequately Allege that Each Defendant Group Attempted to Monopolize One or More Relevant Markets

NCAPs also allege all three elements of attempted monopolization with respect to each acquisition or set of acquisitions: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

***Anticompetitive Conduct***. First, it is undisputed that "[a]n acquisition or series of acquisitions that threaten to achieve monopoly power," such as NCAPs have alleged here, "may establish the requisite conduct and specific intent for an attempt to monopolize." 2 Earl W. Kintner et al., *Federal Antitrust Law* § 16.12 (2026) (collecting cases); *see City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 755 (N.D. Ill. 2019).[47]

---

[46] By contrast, in *Great Escape, Inc. v. Union City Body Co.*, plaintiff asked the court to infer anticompetitive effects and intent merely from the act of "a buyer simply terminat[ing] one at will contract and enter[ing] into another." 791 F.2d 532, 540-42 (7th Cir. 1986).

[47] *See also, e.g.*, *Grinnell*, 384 U.S. at 576 ("acquisitions" were an anticompetitive "device"); *Optronic Techs.*, 20 F.4th at 483 (defendant anticompetitively "seize[d] control" of the market "by acquiring Meade"); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 757 (W.D. Tenn. 2022) ("the Court will consider these acquisitions as part of the aggregate of Defendants' alleged anticompetitive conduct"); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598-99 (7th Cir. 1971); *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 54, 57 (D.D.C. 2022).

***Specific Intent***. Specific intent refers to "an overall anticompetitive intent expressed through [defendant's] actions to destroy competition or build monopoly." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802 (8th Cir. 1987) (citing *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953)). Intent "may be inferred from anticompetitive conduct." *Uriel Pharm. Health & Welfare Plan v. Advoc. Aurora Health, Inc.*, 2023 U.S. Dist. LEXIS 251745, *16 (E.D. Wis. Apr. 28, 2023) (citing *Great Escape*, 791 F.2d at 541); *see DSM Desotech Inc. v. 3D Sys. Corp.*, 2009 U.S. Dist. LEXIS 5980, *30 (N.D. Ill. Jan. 26, 2009) ("same evidence . . . used to prove predatory conduct often establishes specific intent as well").

As explained above, the Complaints exhaustively detail Defendants' anticompetitive conduct from which the Court can infer intent. *See supra*, pp. 1-3, 23-36. Moreover, NCAPs specifically allege anticompetitive intent. *See* CAC ¶¶ 653, 684, 715, 746, 777, 811 (AIP/REV); *id.* ¶¶ 664, 695, 726, 757, 789, 823 (Oshkosh); *id.* ¶¶ 674, 705, 736, 767, 800, 834 (BME). Nothing more is required at this stage, particularly because "evidence of intent is often in the control of the defendants." *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000).[48] The Court cannot credit Defendants' counternarrative under which Defendants allegedly did not attempt to monopolize but rather innocently "tr[ied] to grow their businesses." Br. at 22; *see, e.g.*, *Albani v. S. Ariz. Anesthesia Servs., P.C.*, 1997 U.S. Dist. LEXIS 16245, *8-9 (D. Ariz. Jan. 22, 1997). Nor were NCAPs required to allege that Defendants' unlawful acquisitions were "predominantly motivated by anything other than legitimate purposes" (Br. at

[48] *Accord Surescripts*, 608 F. Supp. 3d at 651; *see, e.g.*, *Wi-LAN Inc. v. LG Elecs. Inc.*, 382 F. Supp. 3d 1012, 1024-25 (S.D. Cal. 2019); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700-701 (E.D. Pa. 2007).

22), as Defendants' own cited case, *Great Escape*, makes clear. 791 F.2d at 541.[49]

***Dangerous Probability of Monopolization***. NCAPs also plausibly allege a dangerous probability that AIP/REV, the Oshkosh Defendants, and BME will monopolize the relevant markets affected by their respective combinations—a question which is "heavily fact-dependent," *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008) (citing *Virgin Atl. Airways Ltd. v. Brit. Airways, PLC*, 872 F. Supp. 52, 63-64 (S.D.N.Y. 1994) (collecting cases)), and "best addressed on a motion for summary judgment or at trial." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 901-02 (N.D. Ill. 2009).

"The Seventh Circuit has held that market share, while an indicator of market power, is not always determinative." *Id.* at 901. Thus, "[i]n evaluating 'dangerous probability,' courts must consider the firm's 'capacity to commit the offense, the scope of its objective, and the character of its conduct.'" *Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 850 (N.D. Ill. 2010) (quoting *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981)). Plaintiff must show a degree of market power, which it can prove with direct or indirect evidence. *Amerigas*, 691 F. Supp. 2d at 850 (quoting *TRU*, 221 F.3d at 937).

If plaintiff relies solely on indirect evidence of market power, "[g]enerally speaking, a defendant must have a significant market share—probably at least 20% of the relevant market—before a dangerous probability of achieving actual monopoly could be found." *Feldman v. Jackson Mem'l Hosp.*, 571 F. Supp. 1000, 1011 (S.D. Fla. 1983), *aff'd*, 752 F.2d 647 (11th Cir. 1985). However, where barriers to entry and expansion and market concentrations are high, the

---

[49] *Phila. Taxi Ass'n v. Uber Techs.*, 886 F.3d 332 (3d Cir. 2018), is inapposite. There, plaintiff did not seek to infer anticompetitive intent from anticompetitive conduct. *Id.* at 341.

market is trending towards consolidation, and/or the other firms in the market are limited in their ability to "vary [their] output," *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 999-1000 (11th Cir. 1993), a relatively lower market share percentage, or the failure to allege market share at all, will not justify dismissal at the pleadings stage. *See Payment Card*, 562 F. Supp. 2d at 402.[50]

Defendants are thus wrong (Br. at 21-22) that there is an absolute numerical market-share cutoff. Indeed, Defendants' own cited case cautions that "'one must be particularly wary of the numbers game of market percentage when considering an "attempt to monopolize" suit' under the dangerous probability standard." *U.S. Anchor*, 7 F.3d 986 at 999 (quoting *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir.1969)). Defendants' other cited cases (Br. at 21) stand for the much narrower proposition that a market share below 30-40% *on its own*—without all of the other factors NCAPs have pled—is insufficient.[51]

---

[50] *See also Dodge Data & Analytics LLC v. iSqFt, Inc.*, 183 F. Supp. 3d 855, 869 (S.D. Ohio 2016) ("much lower market shares" than 50% "may support such a claim when there are strong barriers to entry"); *Kearney & Trecker*, 452 F.2d at 597-98 (controlling "about one-third of th[e] market" insufficient for monopolization but potentially sufficient for attempted monopolization).

Defendants are thus wrong that "courts reject attempted monopolization claims where the allegations establish that the alleged market is oligopolistic." Br. at 17. To the contrary, the foregoing cases establish mergers and acquisitions are of *heightened* concern in markets that are already concentrated. *See also United States v. Aluminum Co. of Am.*, 377 U.S. 271, 278-79 (1964); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 793 (1946).

[51] *Lektro-Vend*, 660 F.2d at 271; *Rebel Oil Co. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995); *Am. Home Healthcare Servs., Inc. v. Floyd Mem'l Hosp. & Health Servs.*, 2020 U.S. Dist. LEXIS 112871, *35 (S.D. Ind. June 26, 2020); *U.S. Anchor*, 7 F.3d at 1001; *see Payment Card*, 562 F. Supp. 2d at 401 ("[C]ourts rarely grant dismissal of Section 2 claims on the basis of insufficient market share, unless the plaintiff rests its claims on market share allegations to the exclusion of other evidence."); *Sandisk Corp. v. Kingston Tech. Co.*, 2010 U.S. Dist. LEXIS 152534, *16-17 (W.D. Wis. Nov. 15, 2010) ("facts other than market share alone can support a claim for attempted monopolization"); *see, e.g.*, *Twin City Sportserv.*, 676 F.2d at 1300-01, 1309 (24% market share plus anticompetitive conduct sufficient); *Broadcom*, 501 F.3d at 318-19 (failure to allege defendant's market share not fatal); *Carpenter Tech. Corp. v. Allegheny Techs., Inc.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. 2009) (same); *TransWeb, LLC v. 3M Innovative Props. Co.*, 2011 U.S. Dist. LEXIS 59095, *53-54 (D.N.J. June 1, 2011) (same).

Here, all of NCAP's alleged facts support a dangerous probability of monopolization. To be clear, the *only* defendant enterprise alleged to have attempted to monopolize the Custom Chassis, Custom Aerial, and Custom Quint markets is AIP/REV. CAC ¶¶ 651, 653, 662, 672. As to these markets, NCAPs allege:

- Extremely high barriers to entry and expansion, *id.* ¶¶ 245-55;
- Industry trend toward consolidation, *id.* ¶¶ 325, 125-44; 258-60, 279-90;
- High concentration levels in these markets, *id.* ¶ 296 ("the U.S. Custom Aerials and Custom Quints markets are highly concentrated, with HHIs exceeding 3,000"); *id.* ¶ 298 ("the U.S. Custom Chassis market is highly concentrated, with HHIs exceeding 3,500");[52]
- REV Group's significant market share in these markets, *id.* ¶ 292 (approximately 20% share of Custom Aerial and Custom Quint markets); *id.* ¶ 297 (approximately 30% share of the Custom Chassis market); and
- Direct evidence of anticompetitive effects of AIP/REV's acquisitions—restricted output, higher prices, reduced quality, *id.* ¶¶ 261-270, 285-86, 326-39.

*See also Walter Kidde*, 669 F. Supp. 2d at 902 (complaint alleging similar facts survives).

As for the Wildland market, NCAPs allege that the Pierce-BME combination is an attempt to have BME—a single enterprise—monopolize that market, for which Oshkosh, Pierce, and the BME Defendants are liable. CAC ¶¶ 662-63, 665, 672-73, 675. NCAPs allege:

- The same extremely high barriers to entry and expansion, *see supra*;
- The same industry trend toward consolidation, *see supra*, with the most dominant Fire Apparatus manufacturer, Pierce, acquiring an ownership stake in the most prominent specialized Wildland Fire Apparatus manufacturer, BME, CAC ¶ 305-06;
- High concentration levels in this market, *id.* ¶ 300 (HHI exceeds 2,000);

[52] As a reference point, "[m]arkets with an HHI greater than 1,800 are highly concentrated." Merger Guidelines at 5 § 2.1 (Guideline 1).

- The BME Defendants' significant market share in these markets, *see id.* ¶ 11 ("Defendant Boise Mobile Equipment, Inc., the leading specialized builder of wildland fire apparatuses in the United States"); *id.* ¶ 80 (same); *id.* ¶ 306 (same); *id.* ¶ 673 ("BME Defendants possess market power in the Wildland Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share"); *id.* ¶ 299 (combined share of Oshkosh and BME Defendants "far exceeds 30%"; combined share of submarket for Type 3 Wildland Fire Apparatuses is 60%).[53]

- Direct evidence of anticompetitive effects of the Pierce-BME combination in the Wildland market—restricted output, higher prices, reduced quality, *id.* ¶¶ 281-83, 285-86, 326.

As for the Custom Pumper and broader Fire Apparatus markets, NCAPs allege that only *two* Defendant groups—AIP/REV and the Oshkosh Defendants—attempted to monopolize these markets. As in *US Airways, Inc. v. Sabre Holdings Corp.*, Defendants cite "no controlling case law to suggest that an entity cannot be liable under § 2 for exercising the power to control prices or exclude competition in a market because some other entity also exercises the same power in that market." 2022 U.S. Dist. LEXIS 53622, *34-35 (S.D.N.Y. Mar. 24, 2022); *see* Br. at 17-20.[54] Here, AIP/REV and the Oshkosh enterprise are each only one acquisition away from obtaining monopoly shares of the Custom Pumper and Fire Apparatus markets; indeed, if they were to merge with each other, the combined entity would be the largest Custom Pumper and Fire Apparatus manufacturer in the country, with shares well above 65%. *See* CAC ¶¶ 291, 301. It is

[53] Pierce and BME's combined share of the market reflects the portion immediately available to BME as a result of its combination with Pierce and is thus highly relevant. CAC ¶¶ 280-83, 305-06, 323; *see U.S. Anchor*, 7 F.3d 986 at 999-1000; *see, e.g.*, *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 499-504 (1974) (measuring market power in terms of possession or likely near-term acquisition of uncommitted reserves instead of overall sales); *Tasty Baking Co. v. Ralston Purina*, 653 F. Supp. 1250, 1270-71 (E.D. Pa. 1987) ("the participating companies would have controlled between 60 and 90% of the relevant market"). Regardless, NCAPs could amend to add BME's specific market share, which by itself exceeds 30%.

[54] *See, e.g.*, *Am. Tobacco*, 328 U.S. at 783, 796 (affirming finding that three manufacturers attempted to monopolize and monopolized the same market).

thus uncontroversial to hold that the acquisitions they have each separately carried out are attempts *well* along the road to a monopoly. *See, e.g.*, *Tasty Baking*, 653 F. Supp. at 1269-70, 1267. NCAPs allege:

- The same extremely high barriers in these markets, *see supra*, p. 40;
- The same industry trend toward consolidation, *see supra*, p. 40;
- High concentration levels in these markets, *see* CAC ¶ 295 (Custom Pumpers market HHI exceeds 2,300); *id.* ¶ 302 (Fire Apparatus market HHI exceeds 1,800);
- The REV and Oshkosh enterprises' high shares of these markets, *id.* ¶ 291 (REV holds "more than a 25% share" and Oshkosh holds "more than a 40% share" of the Custom Pumpers market); *id.* ¶ 301 (REV holds a share of the Fire Apparatus market "in excess of 30%," with REV President claiming REV controls "about 40% of the fire truck business," and Oshkosh's share "far exceeds 30%"); *see id.* ¶¶ 102, 291-92 (of Custom Fire Apparatuses, which make up the majority of Fire Apparatuses, Oshkosh sell 40% of all Custom Pumpers and more than 55% of all Custom Aerials and Quints);
- Direct evidence of anticompetitive effects of AIP/REV's and Oshkosh's acquisitions—restricted output, higher prices, reduced quality, *id.* ¶¶ 261-70, 281-86, 326-39.

Particularly at the pleading stage, NCAPs' allegations are more than sufficient.[55]

NCAPs' robust allegations contrast starkly with the cases cited by Defendants, where the complaints were "virtually devoid of allegations regarding [defendant's] market share, let alone any of the other factors," *Synthes, Inc. v. Emerge Med., Inc.*, 2012 U.S. Dist. LEXIS 140251, *34-35 (E.D. Pa. Sep. 28, 2012);[56] alleged defendant's share of the *wrong* market, *Synthes*, 2012

[55] *See, e.g.*, *DSM Desotech Inc.*, 2009 U.S. Dist. LEXIS at *7-8 (attempted monopolization claim could proceed despite three major competitors in the market); *Walter Kidde*, 669 F. Supp. 2d at 902; *see also, e.g.*, *Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 63 F.3d 1540, 1554 (10th Cir. 1995); *Tasty Baking*, 653 F. Supp. at 1267.

[56] *See Hon Hai Precision Indus. Co. v. Molex, Inc.*, 2009 U.S. Dist. LEXIS 9165, *8 (N.D. Ill. Feb. 9, 2009) (same).

U.S. Dist. LEXIS 140251, *36; *Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 731 (N.D. Ill. 2018); failed to define the relevant market at all, *EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*, 2019 U.S. Dist. LEXIS 129084, *55 (N.D. Tex. Aug. 1, 2019); or affirmatively alleged a "vast" and "robust" market, including "many more" than "a dozen" separate competitors, and "short-lived" restraints (as opposed to permanent mergers), *In re Harley-Davidson Aftermkt. Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 935-36 (7th Cir. 2025) ; or conceded that defendant "could never" gain monopoly power. *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414-15 (7th Cir. 1989).

Furthermore, unlike those plaintiffs—who pursued a "speculative" joint monopoly or "disciplined oligopoly" theory[57]—NCAPs' "§ 2 claim[s] [are] not based on multiple entities' shared control of the market." *US Airways*, 2022 U.S. Dist. LEXIS 53622, *35; *see supra*, pp. 39-41; *see also, e.g.*, *Optronic Techs.*, 20 F.4th at 482. And unlike in *FTC v. Facebook, Inc.*, NCAPs do not allege an "unusual" market, but rather "a more typical goods market"—Fire Apparatuses and Chassis—for which even a bare market share allegation is not conclusory because the court can "reasonably infer how Plaintiff arrived at its calculations." 560 F. Supp. 3d 1, 4, 18 (D.D.C. 2021). Here, no inference is necessary: NCAPs disclose they used proportion of units sold. *E.g.*, CAC ¶ 299. Finally, unlike in *U.S. Anchor*—a predatory pricing case in which defendant's market share "*declined* sharply" over the course of its predation, 7 F.3d 986 at 999—Defendants engaged in permanent acquisitions, not temporary price reductions, and their respective shares have only gone up. CAC §§ III.A, III.B, III.C.1.

---

[57] *Ind. Grocery*, 864 F.2d at 1415-16; *Hoosiervac, LLC v. Scott*, 2025 U.S. Dist. LEXIS 269909, *3-4, 22 (N.D. Ind. Dec. 29, 2025); *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 793-94 (N.D. Cal. 2020).

Defendants falsely assert that "Plaintiffs allege . . . the[] *expansion* [of Defendants' competitors] during the relevant period." Br. at 19 (citing CAC ¶¶ 258-84). The only allegations are that Defendants have cut supply and competitors are unable to expand to maintain capacity in the market. CAC ¶¶ 326-39, 138-42. That Boise Mobile and Maxi-Métal were only able to start distributing throughout the United States by using Pierce's dealer network, far from demonstrating independent competitor expansion, illustrates the excessive entry barriers in these markets and that Pierce holds the keys to the kingdom. The CAC paragraphs cited by Defendants describe Defendants' anticompetitive acquisitions, not expansion by rivals. *Id.* ¶¶ 258-84.

Defendants suggest if there are "a number of competitors" in the market, then no one firm has a dangerous probability of monopolizing it. Br. at 17 n.17. To the contrary, "[e]ven if some small firms survive in an otherwise monopolized market, they may be quite content to follow the high prices set by the dominant firm, thus leaving the market effectively anticompetitive." *Laidlaw*, 636 F. Supp. at 1520.[58] NCAPs acknowledge the existence of a set of fringe competitors, but allege they are competitively insignificant and have followed Defendants' higher pricing in these highly concentrated markets. CAC ¶¶ 138-42, 291-302, 308, 378-82; *see Rockford Mem'l*, 898 F.2d at 1283.

For the same reasons NCAPs have adequately alleged violations of federal law, they have also alleged violations of analogous state antitrust laws. *See also* App. C, col. B, D (establishing NCAPs satisfied State AG notice and substantial-effect-on-intrastate-commerce requirements).

[58] *See, e.g.*, *United States v. Google LLC*, 778 F. Supp. 3d 797, 855-56, 818 n.10 (E.D. Va. 2025) (Google monopolized ad exchange market including at least six other competitors, with 54-65% share); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184 (3d Cir. 2005) (manufacturer that "dominated the industry consisting of 12-13 manufacturers" violated § 2); *Am. Tobacco*, 328 U.S. at 795 (finding three manufacturers that together accounted for 70% of production, with "[t]he balance . . . com[ing] from six other companies," each monopolized the relevant market).

**NCAPs ALLEGE FACTS ESTABLISHING THAT OSHKOSH AND PIERCE ENGAGED IN EXCLUSIVE DEALING AND MONOPOLIZATION IN PIERCE PARTS MARKETS**

Pierce and Oshkosh (for purposes of this section, "Pierce") have also engaged in exclusive dealing and other anticompetitive conduct to dominate relevant markets for replacement parts for Pierce apparatuses, enabling Pierce to charge two to four times competitive prices, in violation of Clayton Act § 3, Sherman Act § 2 (conspiracy), and state-law exclusive dealing, monopolization, and attempted monopolization laws. *See* App. A. With the exception of conspiracy to monopolize (whose elements are discussed *supra*, pp. 35-36, these laws generally require plaintiff to define the relevant market and allege harm to competition through the foreclosure of competitors. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 392 (7th Cir. 1984); *Dentsply*, 399 F.3d at 191-196 (3d. Cir. 2005); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (2001).[59] Contrary to Defendants' Motion, NCAPs allege both.

**V. The Markets for Pierce Replacement Parts Are Well-Defined Markets**

The alleged relevant markets for replacement parts for Pierce apparatuses are plausible. When a part on a Pierce Fire Apparatus—which a fire department purchases and keeps in its fleet for 10-20 years, CAC ¶ 383—breaks, the fire department must replace the part with a new one that can serve the same purpose. *Id.* ¶¶ 344-45, 353. Only such parts are suitable alternatives. *Id.* ¶¶ 344, 347; *see Harley-Davidson*, 151 F.4th at 933; *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 (7th Cir. 1987) ("Repair parts and finished goods have been expressly held to be separate products . . . ."). The *Brown Shoe* factors all confirm that markets for replacement parts for Pierce apparatuses are distinct and plausible. *See* CAC ¶¶ 344-53; *see also*

[59] Clayton Act § 3 requires a lesser showing of harm to competition than Sherman Act § 1. *See Standard Oil Co. v. United States*, 337 U.S. 293, 311-12 (1949); *see, e.g.*, *Advanced Health-Care Serv. v. Radford Cmty. Hosp.*, 910 F.2d 139, 153 (4th Cir. 1990). NCAPs meet either standard, and therefore focus on Sherman Act precedent here.

*Beatrice Foods*, 540 F.2d at 308.[60] These markets are not limited to Pierce-branded parts (*contra* Br. at 41); they include any competing product that can replace the given part in a Pierce truck (though as discussed, Pierce's conduct has substantially foreclosed them all). CAC ¶¶ 344, 351, 358, 367. Such market definition based on a distinct set of customers is grounded in first principles of market definition.[61]

Defendants assert the relevant markets are "not viable" because they are the type of "single-brand aftermarkets" that courts have disallowed after *Kodak*. Br. at 43. The opposite is true. As the dissent in *Kodak* recognized, the ruling has effectively allowed plaintiffs to "readily label[] single-brand power over aftermarket products 'market power' sufficient to permit an antitrust plaintiff to invoke the per se rule against tying." *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451 (1992) (Scalia, J., dissenting). Nor does *Harley-Davidson* warrant dismissal. Br. at 43. The Seventh Circuit did not reject the viability of the single-brand aftermarket concept; it merely found that plaintiff had failed to allege a tying claim within such a market. *Harley-Davidson*, 151 F.4th at 936-37.

### *A. Defendants Are Wrong that NCAPs Must Meet* **Kodak***'s Standards*

Defendants believe the *Kodak* framework governs, and therefore the only way NCAPs can establish their relevant markets is to plead *Kodak* "scenarios." Br. at 43. Defendants are incorrect. *Kodak* narrowly held that when a manufacturer requires customers in its "primary market" (here, Fire Apparatuses) to also purchase parts or service from the manufacturer,

---

[60] *See, e.g.*, *Metrix Warehouse Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1037 (4th Cir. 1987) ("replacement parts market"); *see also Toyota Motor Sales, Inc. v. Allen Interchange LLC*, 2023 U.S. Dist. LEXIS 141122, *12 (D. Minn. Aug. 14, 2023) ("Toyota Captive Parts for Non-Warranty Repairs").

[61] *See Brown Shoe*, 370 U.S. at 325; *Kodak*, 504 U.S. at 453; *Int'l Bus. Machs. Corp. v. United States*, 298 U.S. 131, 136 (1936) ("tabulating cards suitable for appellant's machines").

plaintiff can establish a tying violation *even if* the manufacturer lacks market power in the primary market—but only if the plaintiff pleads certain characteristics of the market. *See Digit. Equip. Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 762-63 (7th Cir. 1996). But NCAPs' alleged replacement parts markets stand on their own as valid antitrust markets, irrespective of the *Kodak* framework. *See, e.g.*, *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980-81 (5th Cir. 1977) ("nothing . . . persuades us to overturn the finding . . . that the relevant market in considering Section 2 of the Sherman Act was the manufacture and sale of air-conditioners for only Volkswagen, Porsche and Audi automobiles throughout the world.").

But even if NCAPs' claims were evaluated under *Kodak*, the claims are viable because NCAPs allege that Pierce has market power in the "foremarkets" for Fire Apparatuses. *See* CAC ¶¶ 291-92 (Pierce controls 40-55% of the Custom Fire Apparatus markets). As courts have explained, there is thus no need to resort to the *Kodak* exception where, as here, NCAPs have pled market power in the foremarket. *Surgical Instrument*, 2026 U.S. App. LEXIS 24440, *32.[62]

### B. *In the Alternative, NCAPs Have Pled* Kodak*-Style Lock-In*

In any event, NCAPs also satisfy the *Kodak* exception, under which lock-in is established even in the absence of market power in the foremarket (1) when defendant changes a policy after the purchase, *see, e.g.*, *Digit. Equip.*, 73 F.3d at 763; *Kodak*, 504 U.S. at 457-58; or (2) where the

---

[62] *See Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 2026 U.S. App. LEXIS 24440, *35 (9th Cir. Aug. 13, 2026) (*Kodak* applies "only in situations where the defendant lacks market power in a competitive foremarket and the plaintiff instead alleges a '*Kodak*-style' antitrust claim based on the defendant's market power in a single-brand aftermarket"); *see also FTC v. Deere & Co*., 2025 U.S. Dist. LEXIS 109177, *8-9 (N.D. Ill. June 9, 2025); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 891 (N.D. Ill. 2023); *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 840 (N.D. Cal. 2024).

These recent holdings follow from cases decided prior to *Kodak* where courts found relevant markets for parts when plaintiffs alleged market power upstream. *See, e.g.*, *Sterling Elec.*, 826 F.2d at 718-19; *Metrix Warehouse*, 828 F.2d at 1037; *Heatransfer*, 553 F.2d at 978.

customer cannot adequately determine the lifetime cost of the product. *See Deere & Co.*, 703 F. Supp. 3d at 893-96. Lifecycle pricing is particularly difficult for costly durable goods as it requires substantial information and sophisticated analysis. *See Kodak*, 504 U.S. at 473.[63] Here, NCAPs allege lock-in under either prong. CAC ¶¶ 348-49, 353, 360-63, 366, 369-75.

The primary illegal conduct is not (as in *Harley-Davidson*) conditional short-term warranty coverage but rather long-term exclusive deals that prevent NCAPs from purchasing replacement parts other than from Pierce for the life of their vehicles. *See* 151 F.4th at 936; CAC ¶¶ 358, 366, 369-75. Like the plaintiffs in *Kodak*, NCAPs would need to purchase a new apparatus to avoid the restraints. And, again unlike *Harley-Davidson*, NCAPs allege extremely uncompetitive markets for replacement parts (with Pierce holding a 70-100% share),[64] and NCAPs' lack of access to competitive alternatives. 151 F.4th at 935; CAC ¶ 377. NCAPs are also precisely the type of buyer *Kodak* recognized may not be able to engage in lifecycle pricing because of procurement budgeting rules. *See Kodak*, 504 U.S. at 475; CAC ¶¶ 248, 369-71.

## VI. NCAPs Allege Substantial Harm to Competition in the Relevant Markets

Given NCAPs allege exclusive dealing and monopolization, that law applies—not tying, and not *Kodak*. To plead an exclusive deal is anticompetitive, plaintiff must plausibly allege substantial foreclosure of competition. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d

---

[63] *See, e.g.*, *Tesla*, 737 F. Supp. 3d at 844; *George Lussier Enter., Inc. v. Subaru of New Eng., Inc.*, 1999 U.S. Dist. LEXIS 19769, *15-17 (D.N.H. Dec. 13, 1999).. Lack of information is particularly problematic where defendant has market power in the primary market. *Deere & Co.*, 703 F. Supp. 3d at 895-96, 899.

[64] Pierce's ability to "to restrain trade in [the Pierce parts] []market[s]," *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008), is not based on "contractual rights that consumers knowingly and voluntarily gave to the defendant" (Br. at 42), as was the case in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 433-38 (3d Cir. 1997), but rather on Pierce's "unique position," *Newcal*, 513 F.3d at 1050, as NCAPs' provider of Fire Apparatuses.

931, 958 (N.D. Ill. 2018); *see Tampa Elec. Co. v. Nash. Coal Co.*, 365 U.S. 320, 327 (1961). It is enough for plaintiff to allege (1) "evidence of market structure" and (2) "exclusionary effect" of defendant's conduct. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020); *see In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, 2013 U.S. Dist. LEXIS 29865, *40 (D.N.J. Mar. 5, 2013). While courts do not require a specific percentage,[65] as Pierce concedes, a 30-40% foreclosure rate in markets with high barriers to entry is sufficient. Br. at 46; *see Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 45-46 (1984) (O'Connor, J., concurring).

NCAPs satisfy this standard, alleging the restraints have foreclosed 70-100% of each relevant market, with 0-30% captured by competing manufacturers. CAC ¶ 356.[66] NCAPs also allege the exclusive agreements are of unlimited duration: A lucrative parts and service business is essential to the financial existence of Pierce's parts dealers, who therefore have no choice but to abide by Pierce's terms, essentially indefinitely. CAC ¶¶ 358, 366.[67] NCAPs also allege extremely high barriers to entry and expansion—not the least of which are Pierce's exclusive dealing contracts. CAC ¶¶ 355, 368. Furthermore, Pierce manufactures its apparatuses so a

---

[65] *In re Keurig Green Mountain Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 237 (S.D.N.Y. 2019); *see, e.g.*, *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 390 (S.D.N.Y. 2007); *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011); *LePage's Inc. v. 3M*, 324 F.3d 141, 158-59 (3d Cir. 2003); *Surescripts*, 608 F. Supp. 3d at 655.

[66] Even if replacement parts for *any* truck (not just Pierce's) were included, NCAPs still allege substantial foreclosure. Pierce controls 40-55% of the relevant apparatus markets, which means its restraints—which foreclose 70-100% of the parts markets—foreclose 28-55% of markets for parts for all manufacturers' apparatuses. *See Mytinger & Casselberry, Inc. v. FTC*, 301 F.2d 534, 537-38 (D.C. Cir. 1963); *see, e.g.*, *Twin City Sportserv.*, 676 F.2d at 1298 (24% foreclosure); *Standard Oil*, 337 U.S. at 295 (23%).

[67] *See Dentsply*, 399 F.3d at 185 (even terminable-at-will contracts can be illegal); *United States v. Dairymen, Inc.*, 1983 U.S. Dist. LEXIS 16355, *26-27 (W.D. Ky. June 9, 1983), *aff'd*, 758 F.2d 654 (6th Cir. 1985) (one-year exclusive dealing contracts deemed unlawful). *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 2011 U.S. Dist. LEXIS 35969 (N.D. Cal. Apr. 1, 2011), cited by Pierce, is inapposite. Br. at 46. There, the exclusive dealing agreement applied only to one retailer, 7-Eleven, and plaintiff pled no facts at all supporting substantial foreclosure.

substantial portion of the parts can only be replaced by a Pierce-manufactured part. *Id.* ¶¶ 360-63. This means from a fire department's outsider perspective, it has no way of knowing whether it even *can* obtain a non-Pierce-branded part from a non-Pierce authorized dealer that will work in its apparatus. *Id.* ¶¶ 352, 355. Moreover, many fire departments rely on Pierce-authorized dealers not just for parts, but for service—i.e., to *install* the part. *Id.* ¶ 365.

There is thus virtually no opening for a competing manufacturer to sell parts to Pierce apparatus owners, which is why Pierce controls 70-100% of the markets. *Id.* ¶¶ 356, 367. The overwhelmingly predominant channel of distribution—Pierce-authorized parts dealers—will not sell competing manufacturers' Pierce parts. *Id.* ¶ 358-59. And, as discussed, there is little ability or incentive for fire departments to source parts that will work in their Pierce apparatuses from non-Pierce-authorized dealers. Pierce is thus wrong in asserting that NCAPs failed to allege "whether a firm can reach the market through alternative channels of distribution." Br. at 45; *see, e.g.*, *Dentsply*, 399 F.3d at 191-196.[68] Finally—and although this is not required—NCAPs also allege Pierce's conduct has caused reduced availability and prices that are double, triple, or even quadruple levels that would prevail in a competitive market. CAC ¶¶ 368, 376. Nothing more is required at this stage, and the Court should deny Defendants' Motion.[69]

---

[68] The manufacturers with which Pierce contracts to create Pierce-branded parts sold by Pierce are not Pierce's competition. *Contra* Br. at 46. Horton, for example, generally cannot sell its lower-priced, non-Pierce-branded fan clutch to Pierce apparatus owners because of Pierce's restraints, and thus cannot discipline Pierce's prices. CAC ¶¶ 350-52, 358.

[69] *See, e.g.*, *Toyota Motor Sales*, 2023 U.S. Dist. LEXIS 141122, *17-18, 25 (monopolization); *Fair Isaac Corp. v. TransUnion, LLC*, 2019 U.S. Dist. LEXIS 51011, *4 (N.D. Ill. Mar. 27, 2019) (attempt); *Hyundai Motor Am., Inc. v. Direct Techs. Int'l, Inc.*, 2018 U.S. Dist. LEXIS 146780, *7-8 (W.D.N.C. Aug. 29, 2018) (exclusive dealing); *Am. Spirit & Cheer Essentials, Inc. v. Varsity Brands, LLC,* 2022 U.S. Dist. LEXIS 254674, *47-52 (W.D. Tenn. Mar. 30, 2022) (exclusive dealing).

Dated October 16, 2026

Respectfully Submitted,

By: /s/ Catherine S. Simonsen

Catherine S. Simonsen (CA SBN 307325)
Thomas G. Mattes (CA SBN 355010)
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Tel: (917) 747-5196
Fax: (646) 357-8447
Email: catherine@simonsensussman.com
E-mail: thomas.mattes@simonsensussman.com

Shaoul Sussman (NY SBN 5820782)
Nico Gurian (NY SBN 5590591)
Nathan Soderstrom (NY SBN 4718847)
Braden Fain (NY SBN 6198287)
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Tel: (646) 693-3929
Fax: (646) 357-8447
Email: shaoul@simonsensussman.com
Email: nico.gurian@simonsensussman.com
Email: nathan@simonsensumssman.com
Email: braden.fain@simonsensussman.com

Nicolas A. Stebinger (DC SBN 984080)
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (202) 384-3130
Fax: (646) 357-8447
Email: nicolas@simonsensussman.com

Jason J. Julius (CA SBN 249036)
Lindsay R. Stevens (CA SBN 256811)
**BARON & BUDD, P.C.**
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel: (858) 251-7424
Fax: (214) 523-6600
Email: jjulius@baronbudd.com
Email: lstevens@baronbudd.com

*Lead Counsel for Non-Class Action Plaintiffs People of the State of California, acting by and through the Los Angeles County Counsel, County of Los Angeles, and Consolidated Fire Protection District of Los Angeles County; People of the State of California, acting by and through the Office of County Counsel, County of San Diego, County of San Diego, and San Diego County Fire Protection District; People of the State of California, acting by and through the San Diego City Attorney's Office, and City of San Diego; Ebbetts Pass Fire Protection District; City of Santa Barbara; County of Butte; County of Shasta; City of Oakland; City of Santa Clara; Unified Fire Authority; City of Hartford; City of Portland, Oregon; City of Allentown; City of Portsmouth; City of Green Bay; City of Yonkers; City of Tucson; City of Emeryville; City of Albuquerque; City of Tempe; Mayor & City Council of Baltimore; City of Des Moines; City of Tacoma; City of Tuscaloosa; City of Tampa; Town of Gilbert; City of Oxnard*

-

# EXHIBIT 1

## Defendant Entities, Ownership, Affiliations, and Combinations

## The AIP and REV Group Defendants

## The Oshkosh and BME Defendants



# APPENDIX A

## NCAP Claims

# APPENDIX A

| Row | Column | A | B | C | D |
|---|---|---|---|---|---|
| | | | Apparatus | | |
| 1 | | | Clayton § 7 | | |
| 2 | **Plaintiff** | **State Law** | **AIP & REV Group Defs.** | **Oshkosh Defs.** | **BME Defs.** |
| 3 | People of the State of California | CA | [redacted] | | |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 5 | County of San Diego and San Diego County Fire Protection District | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 6 | City of San Diego | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 7 | City of Oakland | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 8 | City of Santa Barbara | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 9 | County of Shasta | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 10 | County of Butte | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 11 | Ebbetts Pass Fire Protection District | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 12 | City of Santa Clara | CA | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 13 | City of Emeryville | CA | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 14 | City of Oxnard | CA | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 15 | Unified Fire Authority | UT | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 16 | City of Hartford | CT | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 17 | City of Portland | OR | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 18 | City of Allentown | WI | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 19 | City of Portsmouth | WI | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 20 | City of Green Bay | WI | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 21 | City of Tacoma | WI | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 22 | City of Tuscaloosa | WI | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 23 | City of Tampa | WI | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 24 | City of Yonkers | NY | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 25 | City of Tucson | AZ | CAC Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | CAC Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 26 | City of Tempe | AZ | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 27 | Town of Gilbert | AZ | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 28 | City of Albuquerque | NM | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 29 | City of Baltimore | MD | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |
| 30 | City of Des Moines | IA | Count 1 (Clayton Act § 7, 15 U.S.C. § 18) | Count 2 (Clayton Act § 7, 15 U.S.C. § 18) | Count 3 (Clayton Act § 7, 15 U.S.C. § 18) |

# APPENDIX A

| Row | Column | E | F | G |
|---|---|---|---|---|
| | | Apparatus | | |
| 1 | | State-Law Sherman § 1 | | |
| 2 | **Plaintiff** | **AIP & REV Group Defs.** | **Oshkosh Defs.** | **BME Defs.** |
| 3 | People of the State of California | [redacted] | | |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | | | |
| 5 | County of San Diego and San Diego County Fire Protection District | | | |
| 6 | City of San Diego | | | |
| 7 | City of Oakland | | | |
| 8 | City of Santa Barbara | | | |
| 9 | County of Shasta | | | |
| 10 | County of Butte | | | |
| 11 | Ebbetts Pass Fire Protection District | | | |
| 12 | City of Santa Clara | | | |
| 13 | City of Emeryville | | | |
| 14 | City of Oxnard | | | |
| 15 | Unified Fire Authority | CAC Count 4 (Utah Code Ann. § 76-16-510(1)) | CAC Count 5 (Utah Code Ann. § 76-16-510(1)) | CAC Count 6 (Utah Code Ann. § 76-16-510(1)) |
| 16 | City of Hartford | CAC Count 7 (Conn. Gen. Stat. §§ 35-26, 35-28) | CAC Count 8 (Conn. Gen. Stat. §§ 35-26, 35-28) | CAC Count 9 (Conn. Gen. Stat. §§ 35-26, 35-28) |
| 17 | City of Portland | CAC Count 10 (Oregon Antitrust Law, Or. Rev. Stat. § 646.725) | CAC Count 11 (Oregon Antitrust Law, Or. Rev. Stat. § 646.725) | CAC Count 12 (Oregon Antitrust Law, Or. Rev. Stat. § 646.725) |
| 18 | City of Allentown | CAC Count 13 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | CAC Count 14 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | CAC Count 15 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 19 | City of Portsmouth | CAC Count 13 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | CAC Count 14 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | CAC Count 15 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 20 | City of Green Bay | CAC Count 13 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | CAC Count 14 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | CAC Count 15 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 21 | City of Tacoma | Count 4 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | Count 5 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | Count 6 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 22 | City of Tuscaloosa | Count 4 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | Count 5 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | Count 6 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 23 | City of Tampa | Count 4 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | Count 5 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) | Count 6 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 24 | City of Yonkers | CAC Count 16 (Donnelly Act, N.Y. Gen. Bus. Law § 340(1)) | CAC Count 17 (Donnelly Act, N.Y. Gen. Bus. Law § 340(1)) | CAC Count 18 (Donnelly Act, N.Y. Gen. Bus. Law § 340(1)) |
| 25 | City of Tucson | CAC Count 19 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) | CAC Count 20 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) | CAC Count 21 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) |
| 26 | City of Tempe | Count 7 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) | Count 8 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) | Count 9 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) |
| 27 | Town of Gilbert | Count 4 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) | Count 5 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) | Count 6 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) |
| 28 | City of Albuquerque | Count 4 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1) | Count 5 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1) | Count 6 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1) |
| 29 | City of Baltimore | Count 17 (Maryland Antitrust Act § 11-204(a)(1)) | Count 18 (Maryland Antitrust Act § 11-204(a)(1)) | Count 19 (Maryland Antitrust Act § 11-204(a)(1)) |
| 30 | City of Des Moines | Count 17 (Iowa Competition Law § 553.4) | Count 18 (Iowa Competition Law § 553.4) | Count 19 (Iowa Competition Law § 553.4) |

# APPENDIX A

| Row \ Column | | H | I | J |
|---|---|---|---|---|
| Row | | Apparatus | | |
| 1 | | Sherman § 2 Attempt | | |
| 2 | **Plaintiff** | **AIP & REV Group Defs.** | **Oshkosh Defs.** | **BME Defs.** |
| 3 | People of the State of California | [redacted] | | |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 5 | County of San Diego and San Diego County Fire Protection District | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 6 | City of San Diego | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 7 | City of Oakland | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 8 | City of Santa Barbara | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 9 | County of Shasta | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 10 | County of Butte | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 11 | Ebbetts Pass Fire Protection District | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 12 | City of Santa Clara | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 13 | City of Emeryville | Count 4 (Sherman Act § 2, 15 U.S.C. § 2) | Count 5 (Sherman Act § 2, 15 U.S.C. § 2) | Count 6 (Sherman Act § 2, 15 U.S.C. § 2) |
| 14 | City of Oxnard | Count 4 (Sherman Act § 2, 15 U.S.C. § 2) | Count 5 (Sherman Act § 2, 15 U.S.C. § 2) | Count 6 (Sherman Act § 2, 15 U.S.C. § 2) |
| 15 | Unified Fire Authority | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 16 | City of Hartford | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 17 | City of Portland | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 18 | City of Allentown | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 19 | City of Portsmouth | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 20 | City of Green Bay | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 21 | City of Tacoma | Count 7 (Sherman Act § 2, 15 U.S.C. § 2) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Sherman Act § 2, 15 U.S.C. § 2) |
| 22 | City of Tuscaloosa | Count 7 (Sherman Act § 2, 15 U.S.C. § 2) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Sherman Act § 2, 15 U.S.C. § 2) |
| 23 | City of Tampa | Count 7 (Sherman Act § 2, 15 U.S.C. § 2) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Sherman Act § 2, 15 U.S.C. § 2) |
| 24 | City of Yonkers | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 25 | City of Tucson | CAC Count 22 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 23 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 24 (Sherman Act § 2, 15 U.S.C. § 2) |
| 26 | City of Tempe | Count 4 (Sherman Act § 2, 15 U.S.C. § 2) | Count 5 (Sherman Act § 2, 15 U.S.C. § 2) | Count 6 (Sherman Act § 2, 15 U.S.C. § 2) |
| 27 | Town of Gilbert | Count 7 (Sherman Act § 2, 15 U.S.C. § 2) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Sherman Act § 2, 15 U.S.C. § 2) |
| 28 | City of Albuquerque | Count 7 (Sherman Act § 2, 15 U.S.C. § 2) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Sherman Act § 2, 15 U.S.C. § 2) |
| 29 | City of Baltimore | Count 4 (Sherman Act § 2, 15 U.S.C. § 2) | Count 5 (Sherman Act § 2, 15 U.S.C. § 2) | Count 6 (Sherman Act § 2, 15 U.S.C. § 2) |
| 30 | City of Des Moines | Count 4 (Sherman Act § 2, 15 U.S.C. § 2) | Count 5 (Sherman Act § 2, 15 U.S.C. § 2) | Count 6 (Sherman Act § 2, 15 U.S.C. § 2) |

# APPENDIX A

| Row | Column | K | L | M |
|---|---|---|---|---|
| | | Apparatus | | |
| 1 | | State-Law Sherman § 2 Attempt | | |
| 2 | **Plaintiff** | **AIP & REV Group Defs.** | **Oshkosh Defs.** | **BME Defs.** |
| 3 | People of the State of California | [redacted] | [redacted] | [redacted] |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | [redacted] | [redacted] | [redacted] |
| 5 | County of San Diego and San Diego County Fire Protection District | [redacted] | [redacted] | [redacted] |
| 6 | City of San Diego | [redacted] | [redacted] | [redacted] |
| 7 | City of Oakland | [redacted] | [redacted] | [redacted] |
| 8 | City of Santa Barbara | [redacted] | [redacted] | [redacted] |
| 9 | County of Shasta | [redacted] | [redacted] | [redacted] |
| 10 | County of Butte | [redacted] | [redacted] | [redacted] |
| 11 | Ebbetts Pass Fire Protection District | [redacted] | [redacted] | [redacted] |
| 12 | City of Santa Clara | [redacted] | [redacted] | [redacted] |
| 13 | City of Emeryville | [redacted] | [redacted] | [redacted] |
| 14 | City of Oxnard | [redacted] | [redacted] | [redacted] |
| 15 | Unified Fire Authority | CAC Count 25 (Utah Code Ann. § 76-16-510(2)) | CAC Count 26 (Utah Code Ann. § 76-16-510(2)) | CAC Count 27 (Utah Code Ann. § 76-16-510(2)) |
| 16 | City of Hartford | CAC Count 28 (Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27) | CAC Count 29 (Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27) | CAC Count 30 (Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27) |
| 17 | City of Portland | CAC Count 31 (Oregon Antitrust Law, Or. Rev. Stat. § 646.730) | CAC Count 32 (Oregon Antitrust Law, Or. Rev. Stat. § 646.730) | CAC Count 33 (Oregon Antitrust Law, Or. Rev. Stat. § 646.730) |
| 18 | City of Allentown | CAC Count 34 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 35 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 36 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 19 | City of Portsmouth | CAC Count 34 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 35 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 36 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 20 | City of Green Bay | CAC Count 34 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 35 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 36 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 21 | City of Tacoma | Count 10 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 11 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 12 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 22 | City of Tuscaloosa | Count 10 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 11 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 12 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 23 | City of Tampa | Count 10 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 11 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 12 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 24 | City of Yonkers | [redacted] | [redacted] | [redacted] |
| 25 | City of Tucson | CAC Count 37 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | CAC Count 38 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | CAC Count 39 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) |
| 26 | City of Tempe | Count 10 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | Count 11 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | Count 12 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) |
| 27 | Town of Gilbert | Count 10 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | Count 11 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | Count 12 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) |
| 28 | City of Albuquerque | Count 10 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-2) | Count 11 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-2) | Count 12 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-2) |
| 29 | City of Baltimore | Count 7 (Maryland Antitrust Act § 11-204(a)(2)) | Count 8 (Maryland Antitrust Act § 11-204(a)(2)) | Count 9 (Maryland Antitrust Act § 11-204(a)(2)) |
| 30 | City of Des Moines | Count 7 (Iowa Competition Law § 553.5) | Count 8 (Iowa Competition Law § 553.5) | Count 9 (Iowa Competition Law § 553.5) |

# APPENDIX A

| | Column | N | O | P |
|---|---|---|---|---|
| Row | | Apparatus | Apparatus | Apparatus |
| 1 | | Sherman § 1 Combination | Sherman § 2 Conspiracy | State-Law Sherman § 1 |
| 2 | Plaintiff | Pierce, Oshkosh, BME Defs. | Pierce, Oshkosh, BME Defs. | Pierce, Oshkosh, BME Defs. |
| 3 | People of the State of California | [redacted] | [redacted] | [redacted] |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 5 | County of San Diego and San Diego County Fire Protection District | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 6 | City of San Diego | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 7 | City of Oakland | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 8 | City of Santa Barbara | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 9 | County of Shasta | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 10 | County of Butte | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 11 | Ebbetts Pass Fire Protection District | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 12 | City of Santa Clara | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 13 | City of Emeryville | Count 7 (Sherman Act § 1, 15 U.S.C. § 1) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 14 | City of Oxnard | Count 7 (Sherman Act § 1, 15 U.S.C. § 1) | Count 8 (Sherman Act § 2, 15 U.S.C. § 2) | Count 9 (Cal. Bus. & Prof. Code § 16720 et seq.) |
| 15 | Unified Fire Authority | [redacted] | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 43 (Utah Code Ann. § 76-16-510(1)) |
| 16 | City of Hartford | [redacted] | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 45 (Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26, -28) |
| 17 | City of Portland | [redacted] | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 47 (Oregon Antitrust Law, Or. Rev. Stat. § 646.725) |
| 18 | City of Allentown | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 49 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 19 | City of Portsmouth | CAC Count 40 (Sherman Act § 1, 15 U.S.C. § 1) | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 49 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 20 | City of Green Bay | [redacted] | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 49 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 21 | City of Tacoma | Count 13 (Sherman Act § 1, 15 U.S.C. § 1) | Count 14 (Sherman Act § 2, 15 U.S.C. § 2) | Count 15 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 22 | City of Tuscaloosa | Count 13 (Sherman Act § 1, 15 U.S.C. § 1) | Count 14 (Sherman Act § 2, 15 U.S.C. § 2) | Count 15 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 23 | City of Tampa | Count 13 (Sherman Act § 1, 15 U.S.C. § 1) | Count 14 (Sherman Act § 2, 15 U.S.C. § 2) | Count 16 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(1)) |
| 24 | City of Yonkers | [redacted] | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 51 (Donnelly Act, N.Y. Gen. Bus. Law § 340(1)) |
| 25 | City of Tucson | [redacted] | CAC Count 41 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 53 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) |
| 26 | City of Tempe | [redacted] | Count 13 (Sherman Act § 2, 15 U.S.C. § 2) | Count 15 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) |
| 27 | Town of Gilbert | [redacted] | Count 13 (Sherman Act § 2, 15 U.S.C. § 2) | Count 14 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1402) |
| 28 | City of Albuquerque | [redacted] | Count 13 (Sherman Act § 2, 15 U.S.C. § 2) | Count 15 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1) |
| 29 | City of Baltimore | [redacted] | Count 11 (Sherman Act § 2, 15 U.S.C. § 2) | Count 10 (Maryland Antitrust Act § 11-204(a)(1)) |
| 30 | City of Des Moines | [redacted] | Count 11 (Sherman Act § 2, 15 U.S.C. § 2) | Count 10 (Iowa Competition Law § 553.4) |

# APPENDIX A

| Row | Column | Q | R | S |
|---|---|---|---|---|
| | | Apparatus | Pierce Parts | Pierce Parts |
| 1 | | State-Law Sherman § 2 Conspiracy | Clayton § 3 | State-Law Clayton § 3 |
| 2 | **Plaintiff** | **Pierce, Oshkosh, BME Defs.** | **Oshkosh Defs.** | **Oshkosh Defs.** |
| 3 | People of the State of California | | | |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 5 | County of San Diego and San Diego County Fire Protection District | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 6 | City of San Diego | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 7 | City of Oakland | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 8 | City of Santa Barbara | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 9 | County of Shasta | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | | |
| 10 | County of Butte | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | | |
| 11 | Ebbetts Pass Fire Protection District | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 12 | City of Santa Clara | CAC Count 42 (Cal. Bus. & Prof. Code § 16720 et seq.) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | CAC Count 57 (Cal. Bus. & Prof. Code § 16727) |
| 13 | City of Emeryville | Count 9 (Cal. Bus. & Prof. Code § 16720 et seq.) | Count 11 (Clayton Act § 3, 15 U.S.C. § 14) | Count 12 (Cal. Bus. & Prof. Code § 16727) |
| 14 | City of Oxnard | Count 9 (Cal. Bus. & Prof. Code § 16720 et seq.) | Count 11 (Clayton Act § 3, 15 U.S.C. § 14) | Count 12 (Cal. Bus. & Prof. Code § 16727) |
| 15 | Unified Fire Authority | CAC Count 44 (Utah Code Ann. § 76-16-510(2)) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 16 | City of Hartford | CAC Count 46 (Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27) | | |
| 17 | City of Portland | CAC Count 48 (Oregon Antitrust Law, Or. Rev. Stat. § 646.730) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 18 | City of Allentown | CAC Count 50 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | | |
| 19 | City of Portsmouth | CAC Count 50 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 20 | City of Green Bay | CAC Count 50 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 21 | City of Tacoma | Count 16 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 18 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 22 | City of Tuscaloosa | Count 16 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 18 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 23 | City of Tampa | Count 15 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | Count 18 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 24 | City of Yonkers | CAC Count 52 (Donnelly Act, N.Y. Gen. Bus. Law § 340(1)) | | |
| 25 | City of Tucson | CAC Count 54 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | CAC Count 56 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 26 | City of Tempe | Count 14 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | | |
| 27 | Town of Gilbert | Count 15 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | Count 17 (Clayton Act § 3 15 U.S.C. § 14) | |
| 28 | City of Albuquerque | Count 14 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-2) | Count 17 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 29 | City of Baltimore | Count 12 (Maryland Antitrust Act § 11-204(a)(2)) | Count 14 (Clayton Act § 3, 15 U.S.C. § 14) | |
| 30 | City of Des Moines | Count 12 (Iowa Competition Law § 553.5) | Count 14 (Clayton Act § 3, 15 U.S.C. § 14) | |

# APPENDIX A

| Row | Column | T | U | V |
|---|---|---|---|---|
| | | Pierce Parts | Pierce Parts | Pierce Parts |
| 1 | | Sherman § 2 Conspiracy | State-Law Sherman § 1 (Unlawful Trust) | State-Law Sherman § 2 Monopolization |
| 2 | Plaintiff | Oshkosh Defs. | Oshkosh Defs. | Oshkosh Defs. |
| 3 | People of the State of California | | | |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 5 | County of San Diego and San Diego County Fire Protection District | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 6 | City of San Diego | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 7 | City of Oakland | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 8 | City of Santa Barbara | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 9 | County of Shasta | | | |
| 10 | County of Butte | | | |
| 11 | Ebbetts Pass Fire Protection District | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 12 | City of Santa Clara | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | CAC Count 58 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 13 | City of Emeryville | Count 10 (Sherman Act § 2, 15 U.S.C. § 2) | Count 13 (Cal. Bus. & Prof. Code § 16720 et seq.) | |
| 14 | City of Oxnard | Count 10 (Sherman Act § 2, 15 U.S.C. § 2) | Count 13 (Cal. Bus. & Prof. Code § 16720 et seq. ) | |
| 15 | Unified Fire Authority | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | | CAC Count 59 (Utah Code Ann. § 76-16-510(2)) |
| 16 | City of Hartford | | | |
| 17 | City of Portland | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | | CAC Count 61 (Oregon Antitrust Law, Or. Rev. Stat. § 646.730) |
| 18 | City of Allentown | | | |
| 19 | City of Portsmouth | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | | CAC Count 63 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 20 | City of Green Bay | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | | CAC Count 63 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 21 | City of Tacoma | Count 17 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 19 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 22 | City of Tuscaloosa | Count 17 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 19 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 23 | City of Tampa | Count 17 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 19 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) |
| 24 | City of Yonkers | | | |
| 25 | City of Tucson | CAC Count 55 (Sherman Act § 2, 15 U.S.C. § 2) | | CAC Count 65 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) |
| 26 | City of Tempe | | | |
| 27 | Town of Gilbert | Count 16 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 18 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) |
| 28 | City of Albuquerque | Count 16 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 18 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-2) |
| 29 | City of Baltimore | Count 13 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 15 (Maryland Antitrust Act § 11-204(a)(2)) |
| 30 | City of Des Moines | Count 13 (Sherman Act § 2, 15 U.S.C. § 2) | | Count 15 (Iowa Competition Law § 553.5) |

# APPENDIX A

| Row | Column | W | X | Y | Z |
|---|---|---|---|---|---|
| | | Pierce Parts | Apparatus + Parts | | |
| 1 | | State-Law Sherman § 2 Attempt | UCL/UTPA | | |
| 2 | Plaintiff | Oshkosh Defs. | AIP & REV Group Defs. | Oshkosh Defs. | BME Defs. |
| 3 | People of the State of California | [redacted] | CAC Count 67 (UCL - Cal. Bus. & Prof. Code § 17200) | CAC Count 68 (UCL - Cal. Bus. & Prof. Code § 17200) | CAC Count 69 (UCL - Cal. Bus. & Prof. Code § 17200) |
| 4 | County of Los Angeles and Consolidated Fire Protection District of Los Angeles | [redacted] | [redacted] | [redacted] | [redacted] |
| 5 | County of San Diego and San Diego County Fire Protection District | [redacted] | [redacted] | [redacted] | [redacted] |
| 6 | City of San Diego | [redacted] | [redacted] | [redacted] | [redacted] |
| 7 | City of Oakland | [redacted] | [redacted] | [redacted] | [redacted] |
| 8 | City of Santa Barbara | [redacted] | [redacted] | [redacted] | [redacted] |
| 9 | County of Shasta | [redacted] | [redacted] | [redacted] | [redacted] |
| 10 | County of Butte | [redacted] | [redacted] | [redacted] | [redacted] |
| 11 | Ebbetts Pass Fire Protection District | [redacted] | [redacted] | [redacted] | [redacted] |
| 12 | City of Santa Clara | [redacted] | [redacted] | [redacted] | [redacted] |
| 13 | City of Emeryville | [redacted] | [redacted] | [redacted] | [redacted] |
| 14 | City of Oxnard | [redacted] | [redacted] | [redacted] | [redacted] |
| 15 | Unified Fire Authority | CAC Count 60 (Utah Code Ann. § 76-16-510(2)) | [redacted] | [redacted] | [redacted] |
| 16 | City of Hartford | [redacted] | CAC Count 70 (Conn. Gen. Stat. § 42-110g(a)) | CAC Count 71 (Conn. Gen. Stat. § 42-110g(a)) | CAC Count 72 (Conn. Gen. Stat. § 42-110g(a)) |
| 17 | City of Portland | CAC Count 62 (Oregon Antitrust Law, Or. Rev. Stat. § 646.730) | [redacted] | [redacted] | [redacted] |
| 18 | City of Allentown | [redacted] | [redacted] | [redacted] | [redacted] |
| 19 | City of Portsmouth | CAC Count 64 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | [redacted] | [redacted] | [redacted] |
| 20 | City of Green Bay | CAC Count 64 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | [redacted] | [redacted] | [redacted] |
| 21 | City of Tacoma | Count 20 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | [redacted] | [redacted] | [redacted] |
| 22 | City of Tuscaloosa | Count 20 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | [redacted] | [redacted] | [redacted] |
| 23 | City of Tampa | Count 20 (Wisconsin Antitrust Law, Wis. Stat. Ann. § 133.03(2)) | [redacted] | [redacted] | [redacted] |
| 24 | City of Yonkers | [redacted] | [redacted] | [redacted] | [redacted] |
| 25 | City of Tucson | CAC Count 66 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | [redacted] | [redacted] | [redacted] |
| 26 | City of Tempe | [redacted] | [redacted] | [redacted] | [redacted] |
| 27 | Town of Gilbert | Count 19 (Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1403) | [redacted] | [redacted] | [redacted] |
| 28 | City of Albuquerque | Count 19 (New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-2) | [redacted] | [redacted] | [redacted] |
| 29 | City of Baltimore | Count 16 (Maryland Antitrust Act § 11-204(a)(2)) | [redacted] | [redacted] | [redacted] |
| 30 | City of Des Moines | Count 16 (Iowa Competition Law § 553.5) | [redacted] | [redacted] | [redacted] |

# APPENDIX B

## Statutes of Limitations

## APPENDIX B

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 1 | **Federal Law** | 4 years<br><br>15 U.S.C. § 15b ("Any action to enforce any cause of action under ... this title shall be forever barred unless commenced within four years after the cause of action accrued.") | *See Casino Queen Marquette, Inc. v. Sci. Games Corp.* , 2022 U.S. Dist. LEXIS 90237, at *7 n.4 (N.D. Ill. May 19, 2022) ("[T]he four-year statute of limitations in 15 U.S.C. § 15b furnishes a guideline for computation of the laches period") (citation omitted). | N/A | Discovery Rule<br><br>*In re Copper Antitrust Litig.* , 436 F.3d 782, 789 (7th Cir. 2006); *see also In re EpiPen Direct Purchaser Litig.* , 2021 U.S. Dist. LEXIS 8362, at *21 n.9 (D. Minn. Jan. 15, 2021) (noting that "[t]he Seventh Circuit follows [the discovery rule] ... but most other circuits, including the Eighth Circuit, do not," and instead follow injury-occurrence) (citing *In re Sulfuric Acid Antitrust Litig.* , 703 F.3d 1004, 1014 (7th Cir. 2012); *Granite Falls Bank v. Henrikson* , 924 F.2d 150, 153 (8th Cir. 1991)). | *In re Copper Antitrust Litig.* , 436 F.3d 782, 790-92 (7th Cir. 2006) (applying fraudulent concealment to antitrust claims). |
| 2 | **Arizona – Uniform State Antitrust Act** | 4 years<br><br>Ariz. Rev. Stat. § 44-1410 ("An action under section 44-1408 to recover damages is barred if it is not commenced within four years after the cause of action accrues.") | *See Ariz. Republican Party v. Richer* , 257 Ariz. 237, 246 (2024) (laches "is an affirmative defense" requiring a showing of unreasonable conduct and prejudice). | Ariz. Rev. Stat. § 44-1412 ("It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes.") | Injury-Occurrence<br><br>*Connecticut v. Sandoz, Inc.* , 2025 U.S. Dist. LEXIS 214944, at *89 (D. Conn. Oct. 31, 2025) ("Arizona courts would likely apply the injury-occurrence rule to AUSAA claims.") | *Walk v. Ring* , 202 Ariz. 310, 319 (2002) (the doctrine of fraudulent concealment is "well-rooted in Arizona law"). |
| 3 | **California – Cartwright Act** | 4 years<br><br>Cal. Bus. & Prof. Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within four years after the cause of action accrued.") | 4 years<br><br>Cal. Bus. & Prof. Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within four years after the cause of action accrued."). | No | Discovery Rule and/or Injury-Occurrence<br><br>*Aryeh v. Canon Bus. Sols., Inc.* , 55 Cal. 4th 1185, 1194-95 (2013) (rejecting as "wrong" the premise that federal antitrust decisions barring delayed-discovery accrual apply fully to the Cartwright Act, because federal interpretations are "at most instructive, not conclusive" in construing that Act); *In re Cal. Bail Bond Antitrust Litig.* , 2020 U.S. Dist. LEXIS 92836, at *60 (N.D. Cal. Apr. 13, 2020) (refusing to reject plaintiff's argument that discovery rule applies to Cartwright Act). | *Aryeh v. Canon Bus. Sols., Inc.* , 55 Cal. 4th 1185, 1192 (2013) ("The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale."). |

## APPENDIX B

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 4 | **California – Unfair Competition Law** | N/A | 4 years<br><br>Cal. Bus. & Prof. Code § 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued."). | No | Discovery Rule and/or Injury-Occurrence<br><br>*Aryeh v. Canon Bus. Sols., Inc.* , 55 Cal. 4th 1185, 1191 (2013) ("The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues."); *id.* at 1196 ("[T]he UCL is governed by common law accrual rules to the same extent as any other statute. … The common law last element accrual rule is the default …, while exceptions to that rule apply precisely to the extent the preconditions for their application are met, as would be true under any other statute."); *id.* at 1191-92 ("To align the actual application of the limitations defense more closely with the policy goals animating it, the courts and the Legislature have over time developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods. These doctrines may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both. The most important of these doctrines, the discovery rule, where applicable, postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action .... Equitable tolling, in turn, may suspend or extend the statute of limitations when a plaintiff has reasonably and in good faith chosen to pursue one among several remedies and the statute of limitations' notice function has been served .... The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale .... The continuing violation doctrine aggregates | *Aryeh v. Canon Bus. Sols., Inc.* , 55 Cal. 4th 1185, 1192 (2013) ("The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale."). |

**APPENDIX B**

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 4 (cont.) | **California – Unfair Competition Law** (cont.) | | | | a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them. … Finally, under the theory of continuous accrual, a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period."). *Contra Lloyd's Material Supply Co., Inc. v. Regal Beloit Corp.* , 2017 U.S. Dist. LEXIS 215225, at *11 n.3 (C.D. Cal. June 27, 2017) (cited by Defs. at Joint MTD NCAP Compls. at 11 n.11) (where, unlike here, there were no "allegations of ongoing antitrust activity"). | |
| 5 | **Connecticut – Antitrust Act** | 4 years<br><br>Conn. Gen. Stat. § 35-40 ("Any action under sections 35-34 and 35-35, shall be forever barred unless commenced within four years after the cause of action shall have accrued.") | 4 years<br><br>Conn. Gen. Stat. § 35-40 ("Any action under sections 35-34 and 35-35, shall be forever barred unless commenced within four years after the cause of action shall have accrued.") | Conn. Gen. Stat. § 35-44b ("It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.") | Discovery Rule (if 7th Cir. law is followed) or Injury-Occurrence (if other federal circuit law is followed) (*see* Row 1). | Conn. Gen. Stat. § 52-595 ("If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."). |

## APPENDIX B

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 6 | **Connecticut – Unfair Trade Practices Act** | 3 years<br><br>Conn. Gen. Stat. § 42-110g(f) ("An action under this section may not be brought more than three years after the occurrence of a violation of this chapter.") | 3 years<br><br>Conn. Gen. Stat. § 42-110g(f) ("An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."). | No | Separate accrual at occurrence of each violation, but "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." *Giglio v. Conn. Light & Power Co.* , 180 Conn. 230, 241, 429 A.2d 486, 491 (1980) (quoting *Handler v. Remington Arms Co.* , 144 Conn. 316, 321 (1957)); *see Broadway Theatre Corp. v. Buena Vista Pictures Distrib.* , 2002 U.S. Dist. LEXIS 27368, at *20-21 (D. Conn. Sept. 19, 2002). *Dichello Distribs., Inc. v. AnheuserBusch, LLC* , 715 F. Supp. 3d 220 (D. Conn. 2024), cited by Defs. at Joint MTD NCAP Compls. at 11 n.11, itself treated enforcement acts within the three-year window as actionable. *Id.* at 268. | Conn. Gen. Stat. § 52-595 ("If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."); *see Curto v. Hartmann* , 235 Conn. App. 40, 49-54 (2025) (holding that fraudulent concealment under § 52-595 tolled the statute of limitations for plaintiff's CUTPA claim). |
| 7 | **Iowa – Competition Law** | 4 years<br><br>Iowa Competition Law § 553.16(2) ("Suit under section 553.12 must be commenced within four years after the cause of action accrues or, if there is a fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later.") | 4 years<br><br>Iowa Competition Law § 553.16(2) ("Suit under section 553.12 must be commenced within four years after the cause of action accrues or, if there is a fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later."). | Iowa Competition Law § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."). | Discovery Rule (if 7th Cir. law is followed) or Injury-Occurrence (if other federal circuit law is followed) (*see* Row 1). | Iowa Competition Law § 553.16(2) ("Suit under section 553.12 must be commenced within four years after the cause of action accrues or, if there is a fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later."). |

## APPENDIX B

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 8 | **Maryland – Antitrust Act** | 4 years<br><br>Md. Code Ann., Com. Law § 11-209(d)(1) ("An action brought to enforce this subtitle shall be commenced within 4 years after the cause of action accrues.") | 4 years<br><br>Md. Code Ann., Com. Law § 11-209(d)(1) ("An action brought to enforce this subtitle shall be commenced within 4 years after the cause of action accrues."). | Md. Code Ann., Com. Law § 11-202(a)(2) ("It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters."). | Discovery Rule<br><br>*Windesheim v. Larocca* , 443 Md. 312, 327 (2015) (discovery rule "generally applicable in all civil actions"). | Md. Code Ann., Cts. & Jud. Proc. § 5-203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."). |
| 9 | **New Mexico – Antitrust Act** | 4 years<br><br>N.M. Stat. Ann. § 57-1-12(B) ("An action brought under the provisions of Section 57-1-3 NMSA 1978 to recover damages is barred if it is not commenced within four years after the cause of action accrues or within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the cause of action, whichever is later.") | *Garcia v. Garcia* , 111 N.M. 581, 588 (1991) (outlining four elements defendants must prove to assert a laches defense and noting that "[t]he defense of laches is not favored, and it should be applied sparingly"). | N.M. Stat Ann. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws."). | Discovery Rule<br><br>N.M. Stat. Ann. § 57-1-12(B) ("An action brought under the provisions of Section 57-1-3 NMSA 1978 to recover damages is barred if it is not commenced within four years after the cause of action accrues or within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the cause of action, whichever is later.") | N.M. Stat. Ann. § 37-1-7 ("In actions for relief, on the ground of fraud or mistake, and in actions for injuries to, or conversion of property, the cause of action shall not be deemed to have accrued until the fraud, mistake, injury or conversion complained of, shall have been discovered by the party aggrieved."). |
| 10 | **New York – Donnelly Act** | 4 years<br><br>N.Y. Gen. Bus. Law § 340(5) ("An action to recover damages caused by a violation of this section must be commenced within four years after the cause of action has accrued.") | *In re Flamenbaum* , 22 N.Y.3d 962, 965 (2013) (noting that laches is an affirmative defense requiring a showing that a party failed to exercise reasonable diligence and that such failure prejudiced the opposing party). | *People v. Rattenni* , 81 N.Y.2d 166, 171 (1993) (The Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.") (citation omitted). | Discovery Rule (if 7th Cir. law is followed) or Injury-Occurrence (if other federal circuit law is followed) (*see* Row 1). | *People v. Liberty Mut. Ins. Co.* , 52 A.D.3d 378, 379-80 (N.Y. App. Div. 2008) (applying fraudulent concealment to Donnelly Act claims). |

## APPENDIX B

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 11 | **Oregon – Antitrust Law** | 4 years<br><br>Or. Rev. Stat. § 646.800 ("An action under ORS 646.780 (Recovery of treble damages) to recover damages shall be commenced within four years after the cause of action accrued.") | *See Deschutes Cnty. v. Pink Pit, LLC* , 306 Or. App. 563, 577 (2020) (noting that laches requires a party asserting the defense to show an unreasonable delay in raising a claim, full knowledge of all relevant facts on the part of the party bringing a claim, and substantial prejudice to party asserting the defense); *Oregon State Bar v. Wright* , 309 Ore. 37, 41 (1990) (application of laches "is guided by the most closely analogous statute of limitations"). | Or. Rev. Stat. § 646.715(2) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705."). | Discovery Rule<br><br>*In re Packaged Seafood Prods. Antitrust Litig.* , 242 F. Supp. 3d 1033, 1108 (S.D. Cal. 2017) (concluding that the Oregon Antitrust Law uses the discovery rule) (citing *Rice v. Rabb* , 354 Or. 721, 728 (2014)). | *In re Copper Antitrust Litig.* , 436 F.3d 782, 790-92 (7th Cir. 2006) (applying fraudulent concealment to federal antitrust claims). |
| 12 | **Utah – Antitrust Act** | 4 years<br><br>Utah Code Ann. § 76-16-503(2) ("Any other action pursuant to this part is barred if the action is not commenced within four years after the cause of action accrues.") | 4 years<br><br>Utah Code Ann. § 76-16-503(2) ("Any other action pursuant to this part is barred if the action is not commenced within four years after the cause of action accrues . . . ."). | Utah Code Ann. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."). | Discovery Rule (if 7th Cir. law is followed) or Injury-Occurrence (if other federal circuit law is followed) (*see* Row 1). | *Fitzgerald v. Spearhead Invs.* , 493 P.3d 644, 652 (Utah 2021) ("Equitable discovery may be invoked in response to a statute of limitations defense when the plaintiff was unaware of the facts underlying a cause of action because of the defendant's fraudulent concealment."). |

## APPENDIX B

| Col. | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| **Row** | **Law** | **Damages** | **Equitable Relief** | **Harmonization with Federal Law** | **Discovery/Injury-Occurrence** | **Fraudulent Concealment** |
| 13 | **Wisconsin – Antitrust Law** | 6 years<br><br>Wis. Stat. Ann. § 133.18(2) ("A civil action for damages or recovery of payments under this chapter is barred unless commenced within 6 years after the cause of action accrued.") | *See Wis. Small Bus. United, Inc. v. Brennan* , 393 Wis. 2d 308, 318 (2020) (noting that laches is an affirmative defense requiring a party raising the defense to show that a party unreasonably delayed in bringing a claim, a second party lacked knowledge that the first party would bring a claim, and that the second party was prejudiced by the delay). | *Carlson & Erickson Builders v. Lampert Yards* , 190 Wis. 2d 650, 665 (1995) ("[T]he Wisconsin legislature intended to follow interpretations of the federal act for those sections of ch. 133 that were patterned after the federal Sherman Act."). | Discovery Rule<br><br>Wis. Stat. Ann. § 133.18(4) ("A cause of action arising under this chapter does not accrue until the discovery, by the aggrieved person, of the facts constituting the cause of action."). | *In re Copper Antitrust Litig.* , 436 F.3d 782, 790-92 (7th Cir. 2006) (applying fraudulent concealment to federal antitrust claims). |

# APPENDIX C

## Miscellaneous Defenses

# APPENDIX C

| Columns | | A | B | C | D |
|---|---|---|---|---|---|
| **Row** | **State** | **Rises with Federal Claims** | **Nexus to Intrastate Commerce** | **Presumption Against Extraterritoriality (AIP Defendants Only)** | **Other Reasons Raised by Defendants** |
| 1 | **Arizona Uniform State Antitrust Act** | Opp. to MTD NCAP Compls. at 44. | *United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under state antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), *aff'd in part, rev'd in part on other grounds* , 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam); *see also In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in states where plaintiffs purchased the product).<br><br>*Distinguish Vantage Mobility Int'l LLC v. Kersey Mobility LLC* , 2020 U.S. Dist. LEXIS 11822, at *22 (D. Ariz. Jan. 24, 2020) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (no alleged conduct occurred in Arizona; case involved "solely sales in the Washington market"). | *See* Ariz. Rev. Stat. §§ 44-1402, -1403 (declaring unlawful combinations, monopolies, etc., "any part of which is within this state"); *Jones v. Varsity Brands LLC* , 618 F. Supp. 3d 725, 763 (W.D. Tenn. 2022) (Arizona Antitrust Act's "intrastate effects requirement is met at the pleading stage by a plaintiff's allegations ... claiming that the anticompetitive conduct caused supracompetitive price effects in the relevant jurisdictions"). | Each Arizona-based NCAP notified the Arizona Attorney General upon the filing of its complaint. Counsel for NCAPs stand ready to provide proof of notice. *See In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 817 (N.D. Ill. 2017) (refusing to dismiss where plaintiffs represented that they had filed notice to Arizona AG). |
| 2 | **California Unfair Competition Law** | N/A | N/A - *see* Joint MTD NCAP Compls. App. A (omitting this argument as to this law) | *See* Opp. to AIP Br. at II.C (citing *Sullivan v. Oracle Corp.* , 51 Cal. 4th 1191 (2011); *Adobe Sys. Inc. v. Blue Source Grp., Inc.* , 125 F. Supp. 3d 945, 972 (N.D. Cal. 2015); *Norwest Mortg., Inc. v. Superior Court* , 72 Cal. App. 4th 213, 223 (1999); *People ex rel. Mosk v. Nat'l Research Co. of Cal.* , 201 Cal. App. 2d 765, 776-77 (1962)). | Defendants' assertion that NCAPs' UCL claims should be dismissed because they fail to allege specific facts as to fraud or deception and fail to allege consumer reliance (Joint MTD NCAP Compls., App. A.) is irrelevant because NCAPs do not allege a UCL fraudulent-prong claim. Opp. to MTD NCAP Compls. at 14 n.17. |
| 3 | **California Cartwright Act** | Opp. to MTD NCAP Compls. at 44. | N/A - *see* Joint MTD NCAP Compls. App. A (omitting this argument as to this law) | N/A - *see* AIP Br. App. B (omitting this argument as to this law) | N/A |

## APPENDIX C

| Columns | | A | B | C | D |
|---|---|---|---|---|---|
| **Row** | **State** | **Rises with Federal Claims** | **Nexus to Intrastate Commerce** | **Presumption Against Extraterritoriality (AIP Defendants Only)** | **Other Reasons Raised by Defendants** |
| 4 | **Connecticut Antitrust Act** | Opp. to MTD NCAP Compls. at 44. | *United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under state antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), *aff'd in part, rev'd in part on other grounds* , 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam); *see also In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in states where plaintiffs purchased the product).<br><br>*Distinguish Miami Prods. & Chem. Co. v. Olin Corp.* , 546 F. Supp. 3d 223, 242-44 (W.D.N.Y. 2021) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (dismissing claims in states with no alleged sales but finding "Plaintiffs have sufficiently alleged intrastate effects" in states where Plaintiffs alleged a sale was made). | *See* Conn. Gen. Stat. § 35-30 (declaring that the Connecticut Antitrust Act applies to contracts, combinations, etc. "when any part thereof was entered into or effectuated in whole or in part in this state"); *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC* , 2026 U.S. Dist. LEXIS 142499, at *29 (W.D.N.Y. June 26, 2026) ("The language 'effectuated in whole or in part' is sufficiently broad to support application [of the Connecticut Antitrust Act] where the effects of an antitrust conspiracy occur in Connecticut."). | NCAPs bringing claims under Connecticut law allege purchases only after its *Illinois Brick* repealer took effect on October 1, 2018. CAC ¶¶ 448-50. *See Staley v. Gilead Scis., Inc.* , 446 F. Supp. 3d 578, 629 (N.D. Cal. 2020) (barring claims for purchases made prior to state's *Illinois Brick* repeal and permitting claims for purchases made thereafter). |
| 5 | **Connecticut Unfair Trade Practices Act** | N/A | N/A - *see* Joint MTD NCAP Compls. App. A (omitting this argument as to this law) | *See* Conn. Gen. Stat. § 42-110a(4) (defining "trade" and "commerce" as the advertising, sale, lease, or distribution of services or property "in this state"); *Titan Sports, Inc. v. Turner Broad. Sys.* , 981 F. Supp. 65, 72 n.5 (D. Conn. 1997) ("[S]o long as the complaint alleges that the injury, i.e., 'economic impact' occurred in Connecticut, the plaintiff has stated a claim under CUTPA."). | N/A |
| 6 | **Iowa Competition Law** | Opp. to MTD NCAP Compls. at 44. | United States v. Microsoft Corp., 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under state antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), aff'd in part, rev'd in part on other grounds, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam); see also In re Broiler Chicken Antitrust Litig., 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in states where plaintiffs purchased the product). | N/A - *see* AIP Br. App. B (omitting this argument as to this law) | N/A |

# APPENDIX C

| Columns | | A | B | C | D |
|---|---|---|---|---|---|
| **Row** | **State** | **Rises with Federal Claims** | **Nexus to Intrastate Commerce** | **Presumption Against Extraterritoriality (AIP Defendants Only)** | **Other Reasons Raised by Defendants** |
| 6 (cont.) | **Iowa Competition Law (cont.)** | | *Distinguish Nemickas v. Linn Cnty. Anesthesiologists, P.C.* , 2018 Iowa App. LEXIS 474, at *3 (Iowa Ct. App. May 16, 2018) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (upholding dismissal for lack of antitrust standing, not for failure to allege nexus to intrastate commerce, and merely citing to the § 553.3(6) definition for "Relevant market" which includes the "geographical area of ... competition ... , all or any part of which is within this state"). | | |
| 7 | **Maryland Antitrust Act** | Opp. to MTD NCAP Compls. at 44. | *United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under state antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), *aff'd in part, rev'd in part on other grounds* , 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam); *see also In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in states where plaintiffs purchased the product).<br><br>*Distinguish Miami Prods. & Chem. Co. v. Olin Corp.* , 546 F. Supp. 3d 223, 242-44 (W.D.N.Y. 2021) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (dismissing claims in states with no alleged sales but finding "Plaintiffs have sufficiently alleged intrastate effects" in states where Plaintiffs alleged a sale was made); *California v. Infineon Techs. AG* , 531 F. Supp. 2d 1124, 1157 (N.D. Cal. 2007) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (no allegations of sales within Maryland; no "economic activity within the State of Maryland is implicated"). | N/A - *see* AIP Br. App. B (omitting this argument as to this law) | NCAPs bringing claims under Maryland law allege purchases only after its *Illinois Brick* repealer took effect on October 1, 2017. Baltimore Am. Compl. ¶ 320. *See Staley v. Gilead Scis., Inc.* , 446 F. Supp. 3d 578, 629 (N.D. Cal. 2020) (barring claims for purchases made prior to state's *Illinois Brick* repeal and permitting claims for purchases made thereafter). |

# APPENDIX C

| Row | State | Rises with Federal Claims | Nexus to Intrastate Commerce | Presumption Against Extraterritoriality (AIP Defendants Only) | Other Reasons Raised by Defendants |
|---|---|---|---|---|---|
| Columns | | A | B | C | D |
| 8 | **New Mexico Antitrust Act** | Opp. to MTD NCAP Compls. at 44. | *United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under state antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), *aff'd in part, rev'd in part on other grounds* , 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam); *see also In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in states where plaintiffs purchased the product).<br><br>*Distinguish Miami Prods. & Chem. Co. v. Olin Corp.* , 546 F. Supp. 3d 223, 242-44 (W.D.N.Y. 2021) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (dismissing claims in states with no alleged sales but finding "Plaintiffs have sufficiently alleged intrastate effects" in states where Plaintiffs alleged a sale was made). | N/A - *see* AIP Br. App. B (omitting this argument as to this law) | N/A |
| 9 | **New York Donnelly Act** | Opp. to MTD NCAP Compls. at 44. | *United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under New York antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), *aff'd in part, rev'd in part on other grounds* , 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam).<br><br>*Distinguish H-Quotient, Inc. v. Knight Trading Grp., Inc.* , 2005 U.S. Dist. LEXIS 1924, at *12 (S.D.N.Y. Feb. 7, 2005) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (out-of-state plaintiff suing out-of-state defendants for conduct in a national market); *see also In re Dealer Mgmt. Sys. Antitrust Litig.* , 680 F. Supp. 3d 919, 984 (N.D. Ill. 2023) (citing *H-Quotient* and finding "supracompetitive prices within New York" sufficient because "anticompetitive conduct may be challenged under New York law even if it does not primarily affect intrastate commerce"); *In re Interest Rate Swaps Antitrust Litig.* , 261 F. Supp. 3d 430, 499 (S.D.N.Y. 2017) (denying dismissal, citing *H-Quotient,* where plaintiff alleged effects on intrastate commerce, as shown in part by Plaintiffs' status as New York residents). | N/A - *see* AIP Br. App. B (omitting this argument as to this law) | N/A |

# APPENDIX C

| Row | State | A<br>Rises with Federal Claims | B<br>Nexus to Intrastate Commerce | C<br>Presumption Against Extraterritoriality (AIP Defendants Only) | D<br>Other Reasons Raised by Defendants |
|---|---|---|---|---|---|
| 10 | **Oregon Antitrust Law** | Opp. to MTD NCAP Compls. at 44. | *United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 55 (D.D.C. 2000) (concluding that any intrastate-impact requirement under state antitrust law was met where the defendant did business in every state and its conduct harmed companies that "transact business in, and employ citizens of," each plaintiff state), *aff'd in part, rev'd in part on other grounds* , 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam); *see also In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in states where plaintiffs purchased the product).<br><br>*Distinguish Miami Prods. & Chem. Co. v. Olin Corp.* , 546 F. Supp. 3d 223, 242-44 (W.D.N.Y. 2021) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (dismissing claims in states with no alleged sales but finding "Plaintiffs have sufficiently alleged intrastate effects" in states where Plaintiffs alleged a sale was made). | *See* Or. Rev. Stat. § 646.715 (reaches "interstate trade or commerce involving an actual or threatened injury to a person or property located in this state"); *W.J. Seufer Land Co. v. Nat'l Rest. Supply Co.* , 266 Or. 92, 103-04 (1973) (legislature intended Chapter 646 to be given "broadest possible application consistent with limitations imposed upon the states" and "trade or commerce within this state" reaches transactions planned "for delivery in Oregon" regardless of where defendants reside or where goods originally manufactured). | N/A |
| 11 | **Utah Antitrust Act** | Opp. to MTD NCAP Compls. at 44. | N/A - *see* Joint MTD NCAP Compls. App. A (omitting this argument as to this law) | *See* Utah Code Ann. § 76-16-501(6) (defining "trade or commerce" as "all economic activity" relating to a commodity, service, or business activity, with no geographic limitation); *King Drug Co. of Florence v. Cephalon, Inc.* , 702 F. Supp. 2d 514, 539 (E.D. Pa. 2010) (rejecting argument that the Utah Antitrust Act applies only to primarily intrastate conduct). | The Utah Antitrust Act does not require Attorney General notice for non-class action claims. Utah Code Ann. § 76-16-511(9). |

# APPENDIX C

| Columns | | A | B | C | D |
|---|---|---|---|---|---|
| **Row** | **State** | **Rises with Federal Claims** | **Nexus to Intrastate Commerce** | **Presumption Against Extraterritoriality (AIP Defendants Only)** | **Other Reasons Raised by Defendants** |
| 12 | **Wisconsin Antitrust Law** | Opp. to MTD NCAP Compls. at 44. | *See Olstad v. Microsoft Corp.* , 284 Wis. 2d 224, 229 (2005) (holding that the Wisconsin Antitrust Act does not apply only to intrastate commerce and reaches interstate commerce where, e.g., "actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin"); *see also In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (finding substantial intrastate effects in Wisconsin where plaintiffs purchased the product in Wisconsin).<br><br>*Distinguish In re Dealer Mgmt. Sys. Antitrust Litig.* , 362 F. Supp. 3d 510, 549 (N.D. Ill. 2019) (cited by Defs. at Joint MTD NCAP Compls. at App. A) (no party resided or did business in Wisconsin and plaintiffs made no allegations of conduct in Wisconsin). | *See* Wis. Stat. Ann. § 133.03(1)-(2) (prohibiting combinations and conspiracies "in restraint of trade or commerce" and monopolization of "any part of trade or commerce," with no geographic limitation); *Olstad v. Microsoft Corp.* , 284 Wis. 2d 224, 229 (2005) (Wisconsin Antitrust Act reaches, *inter alia* , conduct that "'substantially affects' the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside the state."); *accord In re Flonase Antitrust Litig.* , 692 F. Supp. 2d 524, 535 (E.D. Pa. 2010) (drug manufacturer's non-Wisconsin conduct of filing of sham petitions with FDA to delay entry of generic version of drug into market led to higher prices for manufacturer's drug in many states, including Wisconsin, sufficiently to meet the "substantially affects" standard). | N/A |

# APPENDIX D

## Standing

# APPENDIX D

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisi-tions** | **Restraint of Trade/ Trust** | **Monopoliza-tion, Attempt, Conspiracy** | **Exclu-sive Dealing** | **Unfair Competi-tion/ Unfair Practices** | **Harmonization Statute?** |
| 1 | Federal Law | All NCAPs Except People of the State of California | Clayton Act § 7, 15 U.S.C. § 18 | Sherman Act § 1, 15 U.S.C. § 1 | Sherman Act § 2, 15 U.S.C. § 2 | Clayton Act § 3, 15 U.S.C. § 14 | - | N/A |
| 2 | Arizona Uniform State Antitrust Act | CAC Arizona Plaintiff City of Tucson; City of Tempe; Town of Gilbert | - | Ariz. Rev. Stat. § 44-1402 | Ariz. Rev. Stat. § 44-1403 | - | - | Ariz. Rev. Stat. § 44-1412 ("It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes.") |

# APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages- *Illinois Brick* Applies?** | **Standing-Damages** |
| 1 | Federal Law | CAC ¶ 1098 pursuant to Clayton Act § 16, 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws"); *see Wilk v. Am. Med. Ass'n* , 895 F.2d 352, 364 (7th Cir. 1990) ("To seek an injunction under § 16 of the Clayton Act, a private plaintiff must allege 'threatened loss or damage "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."'") (quoting *Cargill, Inc. v. Monfort of Colo. Inc.* , 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* , 429 U.S. 477, 489 (1977))). | Yes | CAC ¶ 1098 pursuant to Clayton Act § 4, 15 U.S.C. § 15 ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States .... , and shall recover threefold the damages by him sustained")); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* , 459 U.S. 519, 545 (1983) (holding that whether a plaintiff may recover damages under § 4 of the Clayton Act depends on "the nature of the [plaintiff's] injury ... the relationship between the alleged antitrust violation and the [plaintiff's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy"). |
| 2 | Arizona Uniform State Antitrust Act | CAC ¶¶ 630, 639, 647 [Arizona Law Pl.: Tucson]; Tempe Compl. ¶¶ 347, 356, 364, 375, 387, 397, 413, 421; Gilbert Compl. ¶¶ 358, 367, 375, 416, 427, 450, 458, 481, 490 (citing Ariz. Rev. Stat. § 44-1408 ("A. The state, a political subdivision or any public agency ... injured in its business or property by a violation of this article may bring an action for ... damages sustained.... B. A person threatened with injury or injured in his business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it shall increase recovery to an amount not in excess of three times the damages sustained.")); *see* Ariz. Rev. Stat. § 44-1401 ("'Person' means an individual, corporation, business trust, partnership, association or any other legal entity."); *see also In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* , 383 F. Supp. 3d 187, 263 (S.D.N.Y. 2019) (holding that "the Arizona Supreme Court would not apply the *AGC* factors" even to damages claims, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See Bunker's Glass Co. v. Pilkington PLC* , 206 Ariz. 9 (2003) (holding that indirect purchasers may sue under the Arizona Uniform State Antitrust Act) | CAC ¶¶ 629, 638, 646 [Arizona Law Pl.: Tucson]; Tempe Compl. ¶¶ 346, 355, 363, 373, 385, 396, 412, 420; Gilbert Compl. ¶¶ 357, 366, 374, 415, 426, 449, 457, 480, 489 (citing Ariz. Rev. Stat. § 44-1408 ("A. The state, a political subdivision or any public agency . . . injured in its business or property by a violation of this article may bring an action for ... damages sustained .... B. A person threatened with injury or injured in his business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it shall increase recovery to an amount not in excess of three times the damages sustained.")); *see* Ariz. Rev. Stat. § 44-1401 ("'Person' means an individual, corporation, business trust, partnership, association or any other legal entity."); *see also In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* , 383 F. Supp. 3d 187, 263 (S.D.N.Y. 2019) (holding that "the Arizona Supreme Court would not apply the *AGC* factors") (citing *Bunker's Glass Co. v. Pilkington PLC* , 206 Ariz. 9 (2003); *Bunker's Glass Co. v. Pilkington PLC* , 202 Ariz. 481, 486 (Ct. App. 2002) (Arizona's antitrust law "must be liberally construed to carry out the purpose of protecting consumers."), *aff'd* , 206 Ariz. 9 (2003). |

## APPENDIX D

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisi-tions** | **Restraint of Trade/ Trust** | **Monopoliza-tion, Attempt, Conspiracy** | **Exclu-sive Dealing** | **Unfair Competi-tion/ Unfair Practices** | **Harmonization Statute?** |
| 3 | California Unfair Competi-tion Law | People of the State of California, brought by Los Angeles and San Diego County Counsel and San Diego City Counsel | - | - | - | - | Cal. Bus. & Prof. Code § 17200 | No |
| 4 | California Cart-wright Act | CAC California Non-People Plaintiffs, City of Emeryville, City of Oxnard | - | Cal. Bus. & Prof. Code § 16720 | - | Cal. Bus. & Prof. Code § 16727 | - | No |

# APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages-*Illinois Brick* Applies?** | **Standing-Damages** |
| 3 | California Unfair Competi-tion Law | CAC ¶¶ 1068, 1073, 1078 (citing Cal. Bus. & Prof. Code § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, *but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state* .") (emphasis added)); *In re Tobacco II Cases* , 46 Cal. 4th 298, 314 (2009) (quoting *Californians for Disability Rts. v. Mervyn's, LLC* , 39 Cal. 4th 223, 228-29 (2006)) (explaining that § 17204's standing requirements, as incorporated into § 17203 for representative claims, "do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor"). | N/A | N/A |
| 4 | California Cart-wright Act | CAC ¶¶ 864, 982, 989; Emeryville Compl. ¶¶ 401, 421, 428; Oxnard Compl. ¶¶ 406, 426, 433 (citing Cal. Bus. & Prof. Code § 16750(a) ("Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor ... to recover ... preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by courts generally under the laws of this state and the rules governing these proceedings....")); *see In re Cal. Gasoline Spot Mkt. Antitrust Litig.* , 2022 U.S. Dist. LEXIS 142582, at *14 (N.D. Cal. Aug. 9, 2022) (holding that "in light of the California Supreme Court's repeated instruction that federal antitrust law does not control interpretation of the Cartwright Act, the California Supreme Court would not find the rationale set forth in *Vinci* persuasive and would not apply *AGC* " even to damages claims, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")); *see also Cal. Dental Ass'n. v. Cal. Dental Hygienists' Ass'n.* , 222 Cal. App. 3d 49, 61 (1990) (holding that a plaintiff could "bring its claim for injunctive relief, to restrain alleged violations of public law which threaten injury"). | No. *See* Cal. Bus. & Prof. Code § 16750(a) ("This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant.") | CAC ¶¶ 863, 981, 988; Emeryville Compl. ¶¶ 400, 420, 427; Oxnard Compl. ¶¶ 405, 425, 432 (citing Cal. Bus. & Prof. Code § 16750(a) ("Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor ... to recover three times the damages sustained by him or her....")); *see In re Cal. Gasoline Spot Mkt. Antitrust Litig.* , 2022 U.S. Dist. LEXIS 142582, at *14 (N.D. Cal. Aug. 9, 2022) ("In light of the California Supreme Court's repeated instruction that federal antitrust law does not control interpretation of the Cartwright Act, the California Supreme Court would not find the rationale set forth in *Vinci* persuasive and would not apply *AGC* ." (citation omitted)); *see also Kolling v. Dow Jones & Co.* , 137 Cal. App. 3d 709, 723 (1982) (the "'standing to sue' requirement is merely a rule that an action for violation of the antitrust laws may be maintained only by a party within the 'target area' of the antitrust violation, and not by one incidentally injured thereby .... An 'antitrust injury' must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful."); *In re Cipro Cases I & II* , 61 Cal. 4th 116, 160-61 (2015) ("The Cartwright Act is broader in range and deeper in reach than the Sherman Act." (citation omitted)). |

## APPENDIX D

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisitions** | **Restraint of Trade/ Trust** | **Monopolization, Attempt, Conspiracy** | **Exclusive Dealing** | **Unfair Competition/ Unfair Practices** | **Harmonization Statute?** |
| 5 | Connecticut Antitrust Act | CAC Connecticut Plaintiff | - | Conn. Gen. Stat. §§ 35-26 & 35-28 | Conn. Gen. Stat. § 35-27 | - | - | Conn. Gen. Stat. § 35-44b ("It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.") |
| 6 | Connecticut Unfair Trade Practices Act | CAC Connecticut Plaintiff | - | - | - | - | Conn. Gen. Stat. § 42-110b | No |

# APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages-*Illinois Brick* Applies?** | **Standing-Damages** |
| 5 | Connect-icut Antitrust Act | CAC ¶¶ 527, 536, 544, 719, 730, 740, 888, 896 (citing Conn. Gen. Stat. § 35-34 ("The state or any person, including, but not limited to, a consumer, may sue for injunctive relief, both temporary or permanent, against threatened loss or damage to its property or business by any violation of this chapter. In such actions the court shall follow the rules and principles governing the granting of injunctive relief.")); *see Tremont Pub. Advisors, LLC v. Conn. Res. Recovery Auth.* , 333 Conn. 672, 691 (2019) (Connecticut Supreme Court applying federal antitrust standing test because "we follow federal precedent when we interpret the [antitrust] act unless the text of the anti-trust statutes, or other pertinent state law, requires us to interpret it differently" (citation omitted)). | No. *See* Conn. Gen. Stat. § 35-46a ("In any action ... seeking treble damages under section 35-35, a defendant ... [m]ay not assert as a defense that the defendant did not deal directly with the person on whose behalf the action is brought."). | CAC ¶¶ 526, 535, 543, 718, 729, 739, 887, 895 (citing Conn. Gen. Stat. § 35-35 ("The state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs.")). The Connecticut Supreme Court "follow[s] federal precedent when we interpret the act unless the text of our anti-trust statutes [i.e., its *Illinois Brick* repealer], or other pertinent state law, requires us to interpret it differently." *Tremont Pub. Advisors, LLC v. Conn. Res. Recovery Auth.* , 333 Conn. 672, 691 (2019). Thus, "to have standing to bring a claim under the [Connecticut] antitrust act, a plaintiff must adequately plead both that it has suffered an antitrust injury and that it is an efficient enforcer of the antitrust act," *id.* at 692, with the efficient enforcer analysis guided by the *AGC* factors as informed by Connecticut's allowance of claims by indirect purchasers, *id.* at 680 n.7; Conn. Gen. Stat. § 35-46a. |
| 6 | Connect-icut Unfair Trade Practices Act | CAC ¶¶ 1084, 1090, 1096 (citing Conn. Gen. Stat. § 42-110g(a) ("Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business .... The court ... may provide such equitable relief as it deems necessary or proper.")); *see Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.* , 287 Conn. 208, 218-19 (2008) ("When plaintiffs seek only equitable relief, ascertainable loss and causation may be proven 'by establishing, through a reasonable inference, or otherwise, that the defendant's unfair trade practice has caused the plaintiff injury. . . . The fact that a plaintiff fails to prove a particular loss or the extent of the loss does not foreclose the plaintiff from obtaining *injunctive relief* and attorney's fees pursuant to CUTPA if the plaintiff is able to prove by a preponderance of the evidence that an unfair trade practice has occurred and a reasonable inference can be drawn by the trier of fact that the unfair trade practice has resulted in a loss to the plaintiff.'" (quoting *Serv. Rd. Corp. v. Quinn* , 241 Conn. 630, 644 (1997) (emphasis in original)); *see also Murphy v. McNamara* , 36 Conn. Supp. 183, 197 (Super. Ct. 1979) ("In order to fulfill its remedial purposes, the [CUTPA] must be construed to give the individual standing to bring suit for an actual or threatened loss. This is made clear by the provision of § 42-110g (d) which allows for attorney's fees in a class action where there is 'no monetary recovery, but other relief is granted.'"). | No. *See Soto v. Bushmaster Firearms Int'l, LLC* , 331 Conn. 53, 89 (2019) ("Nothing in the text of the statute indicates that the right afforded by § 42-110g(a) is enjoyed only by persons who have done business of some sort with a defendant."). | CAC ¶¶ 1084, 1090, 1096 (citing Conn. Gen. Stat. § 42-110g(a) ("Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages .... The court may, in its discretion, award punitive damages ....")); *see Soto v. Bushmaster Firearms Int'l, LLC* , 331 Conn. 53, 89-94 (2019) ("the statute plainly and unambiguously authorizes *anyone* who has suffered an ascertainable financial loss as a result of an unfair trade practice to bring a CUTPA action" as long as "the purportedly unfair trade practice is alleged to have directly and proximately caused the plaintiff's injuries") (emphasis in original). |

# APPENDIX D

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisi-tions** | **Restraint of Trade/ Trust** | **Monopoliza-tion, Attempt, Conspiracy** | **Exclu-sive Dealing** | **Unfair Competi-tion/ Unfair Practices** | **Harmonization Statute?** |
| 7 | Iowa Competi-tion Law | City of Des Moines | - | Iowa Competition Law § 553.4 | Iowa Competition Law § 553.5 | - | - | Iowa Competition Law § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."). |
| 8 | Maryland Antitrust Act | City of Baltimore | - | Md. Code Ann., Com. Law § 11-204(a)(1) | Md. Code Ann., Com. Law § 11-204(a)(2) | - | - | Md. Code Ann., Com. Law § 11-202(a)(2) ("It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters."). |

## APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages-*Illinois Brick* Applies?** | **Standing-Damages** |
| 7 | Iowa Competi-tion Law | Des Moines Am. Compl. ¶¶ 390, 401, 412, 419, 435, 458, 475, 484, 492 (citing Iowa Competition Law § 553.12 ("The state or a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to . . . [p]revent or restrain conduct prohibited under this chapter and remove the conduct's effect by injunction, divestiture, divorcement, dissolution of domestic enterprises right to do business in this state, compelling the forfeiture or restraint of the issuance of a certificate of incorporation, permit to transact business, license, or franchise, or granting other equitable relief."); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to damages claims brought by purchaser plaintiffs, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See Comes v. Microsoft Corp.* , 646 N.W.2d 440, 445 (Iowa 2002) ("[T]he Iowa Competition Law creates a cause of action for all consumers, regardless of one's technical status as a direct or indirect purchaser"). | Des Moines Am. Compl. ¶¶ 389, 400, 411, 418, 434, 457, 474, 483, 491 (citing Iowa Competition Law § 553.12 ("The state or a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to . . . [r]ecover actual damages resulting from conduct prohibited under this chapter [and] [r]ecover, at the court's discretion, exemplary damages which do not exceed twice the actual damages . . . if all of the following apply: a. The trier of fact determines that the prohibited conduct is willful or flagrant. b. The person bringing suit is not the state.")); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 815-16 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to claims brought by purchaser plaintiffs and distinguishing *Southard v. Visa* , 734 N.W.2d 192, 198 (Iowa 2007), where the Iowa Supreme Court applied the *AGC* factors to *non-purchaser* plaintiffs); *see also Nemickas v. Linn Cnty. Anesthesiologists, P.C.* , 2018 Iowa App. LEXIS 474, at *11 (Iowa Ct. App. May 16, 2018) (applying the *AGC* factors to a non-purchaser plaintiff). |
| 8 | Maryland Antitrust Act | Baltimore Am. Compl. ¶¶ 394, 405, 415, 423, 439, 462, 471, 479, 488, 496 (citing Md. Code Ann., Com. Law § 11-209(b) ("The United States, the State, and any political subdivision organized under the authority of the State is a person having standing to bring an action under this subsection ... A person whose business or property has been injured or threatened with injury by a violation of § 11-204 of this subtitle may maintain an action ... for an injunction . . . against any person who has committed the violation regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation.")); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to damages claims brought by purchaser plaintiffs, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16."))). | No. *See* Md. Code Ann., Com. Law § 11-209(b)(2)(i) ("A person whose business or property has been injured or threatened with injury by a violation of § 11-204 of this subtitle may maintain an action for damages or for an injunction or both against any person who has committed the violation regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation."). | Baltimore Am. Compl. ¶¶ 393, 404, 414, 422, 438, 461, 470, 478, 487, 495 (citing Md. Code Ann., Com. Law § 11-209(b) ("The United States, the State, and any political subdivision organized under the authority of the State is a person having standing to bring an action under this subsection ... A person whose business or property has been injured or threatened with injury by a violation of § 11-204 of this subtitle may maintain an action for damages ... against any person who has committed the violation regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation."); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 815-16 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to claims brought by purchaser plaintiffs); *see also Waldorf Shopping Mall v. Great Atl. & Pac. Tea Co.* , 1984 Md. Cir. Ct. LEXIS 1 (Feb. 16, 1984) (applying *AGC* factors to Maryland Antitrust Act, but before Maryland's *Illinois Brick* repealer was enacted). |

# APPENDIX D

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisi-tions** | **Restraint of Trade/ Trust** | **Monopoliza-tion, Attempt, Conspiracy** | **Exclu-sive Dealing** | **Unfair Competi-tion/ Unfair Practices** | **Harmonization Statute?** |
| 9 | New Mexico Antitrust Act | City of Albuquerque | - | N.M. Stat. Ann. § 57-1-1 | N.M. Stat. Ann. § 57-1-2 | - | - | N.M. Stat § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws."). |
| 10 | New York Donnelly Act | CAC New York Plaintiff, City of White Plains | - | N.Y. Gen. Bus. Law § 340 et seq. | N.Y. Gen. Bus. Law § 340 et seq. | - | - | *People v. Rattenni* , 81 N.Y.2d 166, 171 (1993) (The Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.") (citation omitted). |

# APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages-*Illinois Brick* Applies?** | **Standing-Damages** |
| 9 | New Mexico Antitrust Act | Albuquerque Compl. ¶¶ 355, 364, 372, 413, 424, 434, 450, 458, 481, 490 (citing N.M. Stat. Ann. § 57-1-3 ("[A]ny person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57-1-1 or 57-1-2 NMSA 1978 may bring an action for appropriate injunctive relief.")); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to damages claims brought by purchaser plaintiffs, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See* N.M. Stat. Ann. § 57-1-3(A) ("[A]ny person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57-1-1 or 57-1-2 NMSA 1978 may bring an action for appropriate injunctive relief, up to threefold the damages sustained"). | Albuquerque Compl. ¶¶ 354, 363, 371, 412, 423, 433, 449, 457, 480, 489 (citing N.M. Stat. Ann. § 57-1-3 ("Any person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57-1-1 or 57-1-2 NMSA 1978 may bring an action for ... up to threefold the damages sustained, plus costs and reasonable attorneys' fees."); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 815-16 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to claims brought by purchaser plaintiffs and distinguishing *Nass-Romero v. Visa USA, Inc.* , 279 P.3d 772, 780 (N.M. Ct. App. 2012), where a New Mexico appellate court applied the *AGC* factors to non-purchaser plaintiffs). |
| 10 | New York Donnelly Act | CAC ¶¶ 605, 614, 622, 938, 946 (citing N.Y. Gen. Bus. Law § 340 et seq.); *see Eagle Spring Water Co. v. Webb & Knapp, Inc.* , 236 N.Y.S.2d 266, 282 (N.Y. Sup. Ct. 1962) (granting an injunction for violations of the Donnelly Act where the court "found that the plaintiff is threatened with irreparable injury"); *Peekskill Theatre v. Advance Theatrical Co. of N.Y.* , 206 A.D. 138, 140 (N.Y. App. Div. 1923) (in a claim brought under N.Y. Gen. Bus. Law § 340, "the plaintiff is not confined to his action at law for damages; but the strong arm of equity can stop this unlawful interference by injunction; and to this equitable power plaintiff has appealed"); *In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to damages claims brought by purchaser plaintiffs, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See* N.Y. Gen. Bus. Law § 340(6) ("In any action pursuant to this section, the fact that the state, or any political subdivision or public authority of the state, or any person who has sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery"). | CAC ¶¶ 605, 614, 622, 938, 946 (citing N.Y. Gen. Bus. Law § 340 et seq. ("The state, or any political subdivision or public authority of the state, or any person who shall sustain damages by reason of any violation of this section, shall recover three-fold the actual damages sustained thereby, as well as costs not exceeding ten thousand dollars, and reasonable attorneys' fees."); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 815-16 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to claims brought by purchaser plaintiffs and distinguishing *Ho v. Visa U.S.A. Inc.* , 787 N.Y.S.2d 677 (Sup. Ct. 2004), where a New York trial court applied the AGC factors to non-purchaser plaintiffs). |

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisitions** | **Restraint of Trade/ Trust** | **Monopolization, Attempt, Conspiracy** | **Exclusive Dealing** | **Unfair Competition/ Unfair Practices** | **Harmonization Statute?** |
| 11 | Oregon Antitrust Law | CAC Oregon Plaintiff | - | Or. Rev. Stat. § 646.725 | Or. Rev. Stat. § 646.730 | - | - | Or. Rev. Stat. § 646.715(2) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705"). |
| 12 | Utah Antitrust Act | CAC Utah Plaintiff | - | Utah Code Ann. § 76-16-510(1) | Utah Code Ann. § 76-16-510(2) | - | - | Utah Code Ann. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."). |

# APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages-*Illinois Brick* Applies?** | **Standing-Damages** |
| 11 | Oregon Antitrust Law | CAC ¶¶ 552, 561, 569, 750, 761, 771, 904, 912, 1016, 1025 (citing Or. Rev. Stat. § 646.770 ("Any person, including the state or a public body, threatened with injury to the person's business or property from a violation of ORS 646.725 (Prohibited acts) or 646.730 (Monopolies prohibited) may prosecute a suit for equitable relief.")); *see In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* , 383 F. Supp. 3d 187, 261 (S.D.N.Y. 2019) (concluding there is no authority from Oregon state courts regarding the application of the *AGC* factors and therefore refusing to conclude that the Oregon Supreme Court would apply *AGC* to damages claims, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See* Or. Rev. Stat. § 646.780(1)(a) ("An action authorized by this paragraph may be brought regardless of whether the plaintiff dealt directly or indirectly with the adverse party."). | CAC ¶¶ 553, 562, 570, 751, 762, 772, 905, 913, 1017, 1026 (citing Or. Rev. Stat. § 646.780 ("A person, the state or a public body may bring an action for an injury to the person's, the state's or the public body's business or property from a violation of ORS 646.705 . . . to 646.805 . . . and, upon prevailing in the action, shall recover three times the damages the person, the state or the public body sustained. An action authorized by this paragraph may be brought regardless of whether the plaintiff dealt directly or indirectly with the adverse party.")); *see In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* , 383 F. Supp. 3d 187, 261 (S.D.N.Y. 2019) (concluding there is no authority from Oregon state courts regarding the application of the *AGC* factors and therefore refusing to conclude that the Oregon Supreme Court would apply *AGC* , and noting that in the one instance where an Oregon court applied the *AGC* factors, *Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris, Inc.* , 17 F. Supp. 2d 1170 (D. Or. 1998), *aff'd* , 185 F.3d 957 (9th Cir. 1999), the question of whether to apply *AGC* was "not raised by the parties or analyzed by the court"). |
| 12 | Utah Antitrust Act | CAC ¶¶ 502, 511, 519, 688, 699, 709, 872, 880, 998 (citing Utah Code Ann. § 76-16-511 ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in the person's business or property by a violation of this part may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant.")); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to damages claims brought by purchaser plaintiffs, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See* Utah Code Ann. § 76-16-511 ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in the person's business or property by a violation of this part may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant."). | CAC ¶¶ 503, 512, 520, 689, 700, 710, 873, 881, 999 (citing Utah Code Ann. § 76-16-511 ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in the person's business or property by a violation of this part may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant.")); *see In re Broiler Chicken Antitrust Litig.* , 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (holding that "any state with an *Illinois Brick* repealer would reject application of *AGC* " to claims brought by purchaser plaintiffs). |

## APPENDIX D

| Col. | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Row** | **Law** | **Plaintiffs** | **Mergers & Acquisi-tions** | **Restraint of Trade/ Trust** | **Monopoliza-tion, Attempt, Conspiracy** | **Exclu-sive Dealing** | **Unfair Competi-tion/ Unfair Practices** | **Harmonization Statute?** |
| 13 | Wiscon-sin Antitrust Law | CAC Wisconsin Plaintiff, City of Allentown, City of Portsmouth, City of Green Bay, City of Tacoma, City of Tuscaloosa, City of Tampa | - | Wis. Stat. Ann. § 133.03(1) | Wis. Stat. Ann. § 133.03(2) | - | - | *Carlson & Erickson Builders v. Lampert Yards* , 190 Wis. 2d 650, 665 (1995) ("[T]he Wisconsin legislature intended to follow interpretations of the federal act for those sections of ch. 133 that were patterned after the federal Sherman Act."). |

# APPENDIX D

| Col. | A | I | J | K |
|---|---|---|---|---|
| **Row** | **Law** | **Standing-Injunctive Relief** | **Standing-Damages-*Illinois Brick* Applies?** | **Standing-Damages** |
| 13 | Wiscon-sin Antitrust Law | CAC ¶¶ 578, 588, 597, 782, 794, 805, 930, 1045 [Wisconsin Law Pls.: Allentown, Portsmouth, Green Bay]; Tacoma Compl. ¶¶ 362, 372, 381, 423, 435, 446, 471, 480, 504, 514; Tuscaloosa Compl. ¶¶ 357, 367, 376, 418, 430, 441, 466, 499, 509; Tampa Compl. ¶¶ 360, 370, 379, 421, 433, 444, 469, 478, 502, 512 (citing Wis. Stat. Ann. § 133.16 ("Any circuit court may prevent or restrain, by injunction or otherwise, any violation of this chapter. The department of justice, any district attorney or any person by complaint may institute actions or proceedings to prevent or restrain a violation of this chapter, setting forth the cause and grounds for the intervention of the court and praying that such violation, whether intended or continuing be enjoined or prohibited.")); *see In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* , 383 F. Supp. 3d 187, 263 (S.D.N.Y. 2019) (finding that Wisconsin courts would not use *AGC* to damages claims, let alone claims for injunctive relief which have less stringent standing requirements (*see Cargill* , 479 U.S. 104, 111 n.6 ("[S]ome of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.")). | No. *See* Wis. Stat. Ann. § 133.18(1)(a) ("any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person"). | CAC ¶¶ 576, 579, 586, 589, 595, 598, 780, 783, 792, 795, 803, 806, 919, 922, 928, 931, 1033, 1036, 1043, 1046 [Wisconsin Law Pls.: Allentown, Portsmouth, Green Bay]; Tacoma Compl. ¶¶ 363, 370, 373, 379, 382, 421, 424, 433, 436, 444, 447, 469, 472, 478, 481, 502, 505, 512, 515; Tuscaloosa Compl. ¶¶ 355, 358, 365, 368, 374, 377, 416, 419, 428, 431, 439, 442, 464, 467, 473, 476, 497, 500, 507, 510; Tampa Compl. ¶¶ 358, 361, 368, 371, 377, 380, 419, 422, 431, 434, 442, 445, 467, 470, 476, 479, 500, 503, 510, 513 (citing Wis. Stat. Ann. § 133.18 ("[A]ny person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees.")); *see Obstetrical & Gynecological Assocs. of Neenah, S.C. v. Landig* , 129 Wis. 2d 362 (Ct. App. 1986) (assessing antitrust standing under the Wisconsin Antitrust Law without considering the *AGC* factors); *see also In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* , 383 F. Supp. 3d 187, 263 (S.D.N.Y. 2019) (finding that Wisconsin courts would not use *AGC* factors and that Wisconsin trial court that did so failed to consider *Landig* )). |