**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| IN RE: FIRE APPARATUS ANTITRUST LITIGATION | Case No. 26-MD-3179 |
| THIS DOCUMENT RELATES TO:<br>*City of Providence v. Oshkosh Corp., et al.*,<br>Case No. 2:26-cv-01198-WCG | |

**PLAINTIFF CITY OF PROVIDENCE'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

LEGAL STANDARD ........ 2

ARGUMENT ........ 2

I. Oshkosh and REV Group Appropriately Bear Liability ........ 2

A. Oshkosh Defendants ........ 3

1. Oshkosh Is Liable for Pierce's Anticompetitive Information Exchange ........ 3

2. Oshkosh Is a Proper Defendant to Providence's Section 3 Claims 5

3. Both Oshkosh Defendants Are Liable for Both the BME and Maxi-Métal Acquisitions ........ 6

B. REV Group ........ 8

1. REV Acquired Market Power by Acquiring Companies ........ 9

2. REV Exploited its Market Power to Increase Its Profit Margins.... 9

3. REV Sought to Soften Competition With Its Remaining Competitors ........ 10

4. REV Subsidiaries Participate in the FAMA Information Exchange That Suppresses Competition ........ 11

II. Rosenbauer ........ 11

CONCLUSION ........ 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnett v. Webster*,
658 F.3d 742 (7th Cir. 2011) ....................2

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................2

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................2

*Cmty Publishers, Inc. v. Donrey Corp.*,
882 F. Supp. 138 (W.D. Ark. 1995)....................7, 8

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)....................2, 11

*Hrubec v. Nat'l R.R. Passenger Corp.*,
981 F.3d 962 (7th Cir. 1992) ....................2

*Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004)....................3

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
630 F. Supp. 3d 968 (N.D. Ill. 2022) ....................3, 5

*Smith v. Dart*,
803 F.3d 304 (7th Cir. 2015) ....................2

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................2

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................4

**Statutes**

15 U.S.C. § 1.................... *passim*

15 U.S.C. § 14....................5, 6, 7

15 U.S.C. § 18....................1, 6, 7

## INTRODUCTION[1]

Plaintiff City of Providence responds to the motions to dismiss filed by the individual defendant groups, REV Group Defendants (Dkt. Nos. 150-151)), Oshkosh Defendants (Dkt. Nos. 167, 169), and Rosenbauer Defendants (Dkt. Nos. 166, 168)) (collectively "Defendants"). Because of common issues of law and related factual arguments, and for the conservation of judicial resources, Providence provides this consolidated brief in response to the three Defendant groups' individual motions to dismiss. These motions arise following the City of Providence—and numerous other municipalities—alleging violations of the antitrust laws relating to both anticompetitive acquisitions and conduct on the part of the manufacturer defendants. *See generally* Providence Compl. Oshkosh Corporation and its wholly owned subsidiary Pierce Manufacturing, Inc. (collectively "Oshkosh Defendants") and REV Group, LLC both seek to dismiss claims whole cloth based solely on the formalities of their respective corporate structures. This argument is belied by the plain language of Section 7 of the Clayton Act and the factual conduct alleged in the complaint. Rosenbauer America LLC rehashes arguments raised in Defendants' Joint Motion to Dismiss City of Leominster and City of Providence Complaints. Dkt. Nos. 158-159. These arguments fail for the same reasons argued in Providence's Response to that brief. As to Providence, the individual defendant groups' motions fail to warrant dismissal and should therefore be denied.

[1] Plaintiff City of Providence incorporates by reference the legal arguments advanced in its Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss City of Leominster and City of Providence, as well as the arguments raised by the Non-Class Action Plaintiffs in their Opp'n Defs.' Jt. Mot. Dismiss (Dkt. No. 238).

## LEGAL STANDARD

To defeat a motion to dismiss, a complaint need only include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "[I]n antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff opportunity for discovery should be granted very sparingly." *Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001) (quotations omitted). "No heightened pleading requirements apply in antitrust cases." *Id*. "The complaint must . . . call for 'enough fact to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Arnett v. Webster,* 658 F.3d 742, 752 (7th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556. It is not required that Plaintiffs plead all essential facts in the complaint. *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.3d 962, 963 (7th Cir. 1992). A plaintiff may supplement the allegations in a complaint by affidavit or brief, and, so long as the additional facts are consistent with the complaint, the Court may consider them when evaluating its sufficiency. *Id.*; *see also Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015).

## ARGUMENT

### I. Oshkosh and REV Group Appropriately Bear Liability

"[S]ubstance rather than form" determines antitrust liability. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 760 (1984). Both REV and the Oshkosh Defendants seek to use the formality of corporate structure to evade liability for their anticompetitive conduct and, for Oshkosh, its anticompetitive acquisitions. This argument ignores that Oshkosh and REV each have a "complete unity of [economic] interest" within their respective internal structures and the conduct of their subsidiaries is intertwined with that of the respective parent entities. *Id.* at 771. For this reason, REV's and Oshkosh's motions must be denied.

A parent entity cannot "escape antitrust liability by hiding behind its separate incorporation[…]." *Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1069 (D. Colo. 2004) [hereinafter *NIPP*]. A parent is responsible for its subsidiary's anticompetitive conduct where the parent "operates as an operating company, controlling and managing the conduct of its subsidiaries, rather than as a holding company" and is therefore potentially subject to direct liability for that subsidiary's anticompetitive conduct. *Id.* at 1072. Similarly, a parent entity has direct liability when it has "directed, controlled, or encouraged its subsidiary's participation in" anticompetitive conduct. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022). The complaint alleges that Oshkosh and REV have and exercise significant control over their respective subsidiaries. Perhaps more importantly, their subsidiaries acted to implement each parent's goal of creating and exploiting market power.

## A. Oshkosh Defendants

### 1. Oshkosh Is Liable for Pierce's Anticompetitive Information Exchange

The Court should deny Oshkosh's motion to dismiss Providence's Sherman Act Section 1 claim against it because Oshkosh operates, directs, controls, and encourages Pierce's anticompetitive conduct. As in *NIPP*, where the parent-entity acted as an operating company and was therefore subject to antitrust liability, Oshkosh is an operating company with active management, control, and supervision over the activities of its subsidiary and therefore bears direct liability under Section 1 of the Sherman Act.

Oshkosh argues that it is not a proper defendant to Providence's anticompetitive information exchange claim because it is not a member of the Fire Apparatus Manufacturers' Association ("FAMA") and because "FAMA statistical reports and meetings are for members." Oshkosh Defs.' Mem. Supp. Mot. Dismiss 6, Dkt. No. 169. However, Oshkosh's subsidiaries

receive data and information through the FAMA Data & Research Committee. Oshkosh conspicuously fails to offer any substantive argument that it abstains from using that data and information. Moreover, it fails to overcome the facts that Providence has pleaded evidencing Oshkosh's control, direction, and encouragement of its subsidiaries.

Oshkosh's ownership of Pierce is beyond the mere "acts incident to the legal status of stockholders." *United States v. Bestfoods*, 524 U.S. 51, 62 (1998) (internal citation omitted). Oshkosh directs—and benefits from—the conduct that suppresses competition in the market. Oshkosh, as a global enterprise, "specialize[s] in the design, development, and manufacturing" of specialty vehicles. Compl. ¶ 31. Oshkosh sells its products through numerous subsidiary brands which are organized into three primary business segments over which Oshkosh exercises its control. *Id.* ¶¶ 32-33. Oshkosh treats and publicly reports on these segments—and their constituent subsidiary brands—not as semi-autonomous entities turning a profit to their single shareholder, but as corporate subdivisions operating under a cohesive business enterprise strategy. *See, e.g.*, *id.* ¶¶ 35, 108, 129. Oshkosh, along with the rest of the industry, strategically employ purchase backlogs among their fire truck manufacturer subsidiaries, enabling them to benefit from floating price clauses and imposed surcharges while delaying delivery of critical municipal infrastructure. *Id.* ¶¶ 20-21, 128. Oshkosh boasts of its fire truck backlog through Securities and Exchange Commission filings and to reporters, *id.* ¶¶ 20, 108, publicly signaling to its competitors that the concentrated industry should forego vigorous competition and share oligopolistic profits. Further, Oshkosh's participation in FAMA is not limited to Pierce; its other fire truck brand, Maxi-Métal, is also a member. *Id.* ¶ 87.

Moreover, Pierce's participation in and utilization of anticompetitive information from the alleged information exchange is known and tacitly accepted, if not outright endorsed, by Oshkosh.

The president of Pierce Manufacturing is Marty Bass. *See* Ryan Baker, *Pierce Manufacturing Appoints New President*, Firehouse (Feb. 6, 2026), https://tinyurl.com/4dfk9tjf. In addition to managing Pierce, Mr. Bass also oversees the following nominally separate Oshkosh subsidiaries: Maxi-Métal, Frontline Communications, and Oshkosh Airport Products. *Id.* A previous Pierce president also served as an executive vice president for Oshkosh. *Darley Welcomes Jim Johnson to Board of Directors*, Fire Apparatus & Emergency Equip. Mag. (June 26, 2026), https://tinyurl.com/ycyfeehp. These overlapping leadership roles demonstrate the close relationship and interconnectedness among Pierce, Oshkosh, and other Oshkosh subsidiaries, further undermining Oshkosh Defendants' attempt to treat these entities as wholly separate. For all intents and purposes, there is no substantive distinction between Oshkosh and Pierce. Oshkosh recognizes this in its SEC filings: "[Oshkosh] produces and sells custom and commercial firefighting vehicles in North America and abroad under the Pierce and Maxi-Metal brands. Competitors for firefighting vehicles include Rosenbauer International AG, REV Group, Inc. and numerous smaller, regional manufacturers." *Annual Report* (Form 10-K), Oshkosh Corp. 8 (Feb. 20, 2025). Oshkosh views itself as a participant in the fire truck manufacturing industry. As such, Providence has properly pleaded that Oshkosh is liable under Sherman Act Section 1.

**2. Oshkosh Is a Proper Defendant to Providence's Section 3 Claims**

The same factual allegations that support liability for Oshkosh under Section 1 of the Sherman Act similarly establish that Providence has properly pleaded Oshkosh's liability under Section 3 of the Clayton Act. Section 3 similarly targets inter-enterprise anticompetitive conduct. *See* 15 U.S.C. § 14. As such, the same standard of parent entity direction, control, or encouragement of the subsidiary should govern parent-entity liability. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 991.

Oshkosh, similar to the other defendants, has pursued a strategy of acquisitions and anticompetitive information exchange that resulted in substantially increased prices, reduced output, and increased delivery times, yielding dramatically higher profit margins. Compl. ¶¶ 62-64, 88, 136-138. Pierce is but one instrumentality through which Oshkosh has pursued this line of conduct. Unlike the other defendant groups, however, Oshkosh has additionally pursued an anticompetitive strategy in the After-Market and Replacement Parts Market for its trucks. *Id.* ¶¶ 181-187. As before, Providence plausibly pleads that Pierce's exclusive dealing arrangements are made and performed under the control, direction, and encouragement of Oshkosh. In addition to the active control and supervision that Oshkosh has over Pierce generally, this is also true with respect to arrangements under Pierce's dealer network. While it is nominally Pierce's dealer network, Oshkosh is in control. Oshkosh purchased Maxi-Métal, not Pierce. *Id.* at ¶ 63. According to Oshkosh's own press release, this was largely for the purpose of "expand[ing] sales and distribution capabilities within Pierce's North American dealer network." *Id.* Pierce's dealer network is a resource of which Oshkosh may avail itself for its own benefit and that of its non-Pierce subsidiaries. The Complaint adequately pleads that Oshkosh controls, directs, and encourages Pierce's anticompetitive exclusive dealing conduct. The Oshkosh Defendants' motion to dismiss Providence's Section 3 claims against Oshkosh should be denied.

### 3. Both Oshkosh Defendants Are Liable for Both the BME and Maxi-Métal Acquisitions

The Oshkosh Defendants seek to dismiss Providence's claims 1) against Oshkosh for liability resulting from Pierce's acquisition of a 25% stake in Boise Mobile Equipment, and 2) against Pierce for liability resulting from Oshkosh's acquisition of Maxi-Métal. Either dismissal would depart from the plain language of Section 7 of the Clayton Act, which prohibits direct or

indirect mergers and acquisitions that substantially lessen competition, and would artificially cabin its scope. 15 U.S.C. § 18. Defendants' arguments must be rejected.

With respect to anticompetitive acquisitions, the statutory text of the Clayton Act explicitly prescribes liability across interrelated defendants. Section 7 prohibits mergers and acquisitions "directly or *indirectly*" where "the effect of such acquisition may be substantially to lessen competition . . . ." 15 U.S.C. § 18 (emphasis added). In considering the legislative history of Section 7, the Western District of Arkansas held "that the term 'indirectly' must be broadly interpreted, lest persons and firms manipulate corporate structures in order to avoid the appearance of direct acquisition. . . . [T]he term 'directly or indirectly' should be interpreted as broadly as necessary to accomplish the purposes of the antitrust laws." *Cmty Publishers, Inc. v. Donrey Corp.*, 882 F. Supp. 138, 140 (W.D. Ark. 1995).

**Boise Mobile Equipment**

As discussed above, the interrelationship between Oshkosh and Pierce is sufficient to establish liability as to Oshkosh under Sherman Act Section 1 and Clayton Act Section 3. With respect to Section 7 liability, this is all the more true given the statute's express textual basis for establishing liability against entities where the acquisitions are indirect but nevertheless may substantially lessen competition. Here, Oshkosh controlled, directed, and encouraged Pierce. The same facts that establish liability under Sections 1 and 3 similarly establish liability for Oshkosh as the indirect acquirer of the 25% ownership interest in BME.

**Maxi-Métal**

Pierce is additionally liable for Oshkosh's acquisition of Maxi-Métal. Prior to the acquisition, Maxi-Métal and Pierce engaged in a strategic partnership, but were still price competitors among U.S. fire truck purchasers. Compl. ¶¶ 63-64. Following the acquisition, Pierce

was not only a subsidiary of Oshkosh alongside Maxi-Métal, it was in direct management of Maxi-Métal through Pierce leadership. *See* Baker, *supra*. Through this acquisition and management structure, it is plausibly pleaded—and now a question of fact appropriate for later resolution—that Pierce controlled, directed, and encouraged Oshkosh's acquisition of Maxi-Métal. It therefore bears liability for the acquisition as an indirect acquirer. *See Cmty Publishers, Inc.*, 882 F. Supp. at 140-42.

**B. REV Group**

REV Group advances the same theory of limited parent-entity liability for the anticompetitive conduct of its subsidiaries as Oshkosh. The sole argument advanced in REV Group's motion is that because its subsidiaries manufacture the actual fire trucks and belong to FAMA, under traditional notions of corporate separateness it may not be found liable under Section 1. As it does for Oshkosh, this argument similarly fails for REV.

REV Group paints a picture of itself as a passive investor who has no role in the day-to-day operations of its wholly owned subsidiaries. The Complaint allegations paint a different picture: REV adopted a years-long strategy to eliminate competition and increase profits. Compl. ¶¶ 54-60. It literally acquired market power by rolling up the industry through a series acquisition. *Id.* Either REV or its subsidiaries exploited REV's market power by closing plants and reducing capacity, thereby increasing its prices, delivery times, and profit margins. REV executives then publicly signaled to its competitors to limit competition and increase prices. *Id.* ¶¶ 60, 84. Meanwhile, its subsidiaries are all participating in FAMA's anticompetitive information exchange that has the effect of increasing prices and lowering output. REV would have this court believe that the only reasonable inference from those facts is REV neither directed their subsidiaries to participate in the information exchange, nor were the subsidiaries implementing REV's strategic

goal to eliminate competition. That is incorrect. REV's direction and control make it liable for its subsidiaries' participation in the FAMA information exchange. The Court should deny their motion.

**1. REV Acquired Market Power by Acquiring Companies**

The complaint alleges that "[a]s recently as 2015, approximately two dozen independent companies manufactured fire trucks . . . Today, only three companies dominate the industry" noting that Oshkosh, Rosenbauer, and REV Group combine to "control between 70% and 80% of the market." *Id.* ¶ 7.

REV Group played a major role in that consolidation. The complaint details how, beginning in 2016, REV began a "serial roll-up" of the fire-truck industry. *Id*. at ¶ 56. REV sought to buy family-owned firms facing falling sales and aging leadership at discounted prices. *Id.* ¶54. REV acquired a number of former independent manufacturers to achieve its dominant position beside Oshkosh and Rosenbauer. Over the course of the next five years, REV acquired Kovatch Mobile Equipment Corp., Ferrara Fire Apparatus, Inc., Spartan Emergency Response and its underlying brands, Smeal Fire Apparatus, and US Tanker Fire Tanker Apparatus, Inc. *Id*. at ¶¶ 56-58. As a result of these acquisitions, the City that "REV was the dominant manufacturer of fire trucks within the United States." *Id*. ¶ 58; *see also id.* ¶ 54, Fig 2 ("A History of Consolidation").

**2. REV Exploited its Market Power to Increase Its Profit Margins**

REV's goal was to increase margins of its subsidiaries from 4-5 percent to over "above that 10 percent level." *Id.* ¶ 60. To accomplish this, REV's CEO explained, "You bring them into the fold, you got to give them the religion, and they've got it now."

Although REV's CEO publicly stated the goal was increased efficiency, the true religion was eliminating competition and reaping the benefits of supracompetitive profits. Margins

increased because REV and its subsidiaries reduced capacity and increased prices. REV announced to its investors a new truck chassis/cab "platform" strategy that calls for REV subsidiaries to "[c]onverge on common designs that can be shared across brands." *Id.* ¶ 59. It further told investors that "channel management" entailed eliminating existing manufacturing and dealership overlap between subsidiary brands. *Id.* Although facing record demand, REV subsidiaries closed plants reducing REV's manufacturing footprint by roughly a third. *Id.* ¶¶ 119-120. As a legal matter, it does not matter whether REV directly ordered those decisions or the subsidiaries were implementing REV's strategic goal of eliminating competition. Rather, having acquired former independent economic actors, the subsidiaries were now effectively a single economic decision maker under REV's control and direction.

**3. REV Sought to Soften Competition With Its Remaining Competitors**

Consolidation changes the competitors' incentives. In an atomized market, each competitor has a strong incentive to lower price and increase output to increase profits. In a consolidated market, the players are more likely to avoid competition or tacitly collude.

Having consolidated the industry, REV moved to soften competition with its competitors. REV told analysts that it would substantially raise margins and expected others to do the same. *Id.* ¶¶ 16, 85. It celebrated its backlogs as a strategic asset. *Id.* ¶ 123. Its primary competitors, like Oshkosh, adopted a similar strategic posture. *Id.* ¶¶ 20, 108, 138. Also similar to Oshkosh's business segments, REV has a "Fire Group" that oversees and actively controls its fire apparatus subsidiaries. *Id.* ¶ 84. REV's Vice President of sales for the Fire Group actively controlled and directed how its subsidiaries compete, including explicit statements about softening competition: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't

tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say 'Stop it.'" *Id.*

**4. REV Subsidiaries Participate in the FAMA Information Exchange That Suppresses Competition**

REV's subsidiaries all belong to FAMA and participate in its information exchange. That exchange shares price, output, backlog, and sales and marketing forecasts which reduces competition and increases prices.[2] The exchange is one more tool to achieve REV's goals of less competition, higher prices, and greater margins. REV's involvement goes beyond ordinary oversight—instead, it sets policies aided and furthered by its subsidiaries' participation in the illegal information exchange. *Copperweld* confirms this result. The Court held for the purposes of Section 1, a parent and a wholly owned subsidiary could not form an agreement for the purposes of Section because they are a single actor. Similarly, where the parent relies on its subsidiaries to achieve its anticompetitive goals, the parent and the subsidiaries are one economic decision maker, and the parent is liable for its subsidiaries' actions implementing that strategy. REV's motion should therefore be denied.

## II. Rosenbauer

Rosenbauer fares even worse than the other two Defendant groups. It advances no argument concerning parent-entity liability. Instead, it rehashes the same failing arguments that Defendants advance in their Joint Motion to Dismiss City of Leominster and City of Providence brief. *See* Dkt. No. 159 at 6. The only novel argument from Rosenbauer's individual motion is that Providence fails to state a claim because, it argues, Providence does not allege that Rosenbauer

[2] For a more detailed description of the information sharing and its effect, *see* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss.

agreed to exchange competitively sensitive information. Rosenbauer characterizes its participation in FAMA as mere membership in a trade association.

Rosenbauer is not simply a member of FAMA, however. Drew Kirvida, a Rosenbauer executive, served as one of four committee members on the Data & Research Committee that runs the information exchange. Compl. ¶ 88 n.119. Further, its representatives attended the Spring 2024 FAMA meeting. *Id.* ¶ 103. Helping to run and oversee the exchange alone makes Rosenbauer a member of the exchange, satisfying the requirement for Section 1, despite Rosenbauer's argument to the contrary.[3] However, if the Court must draw any inference, it is a reasonable inference that Rosenbauer, in fact, participated in the Data & Research Committee information exchange. Providence alleges that the Committee enforced the expectation of sharing information freely by requiring that Committee members provide their data in order to obtain competitors' data. *Id.* ¶ 95. Because of the mandated reciprocal nature of the Committee's reports, it stands to reason that Mr. Kirvida could not serve on the Committee's board—thereby having access to the shared data—without Rosenbauer being a participating member.

Rosenbauer's motion should therefore be denied.

## **CONCLUSION**

For all the reasons set forth above, because Defendants individual motions to dismiss respectfully must be denied. Providence's complaint alleges far more than is necessary to surpass the motion to dismiss and proceed to discovery. Purely for the sake of argument, if the Court were

[3] Because the remainder of Rosenbauer's argument restates the same arguments in the Memorandum in Support of Defendants' Joint Motion to Dismiss City of Leominster and City of Providence Complaints, arguing no anticompetitive effect and no sharing of competitively sensitive data, Providence adopts the same arguments it offers in its Response brief. *See* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss, Sec. 1.

to be persuaded to the contrary, then Providence respectfully requests leave to amend its complaint to substitute parties.

Dated: October 16, 2026

Respectfully submitted,

*/s/Jeff Dan Herrera*
Michael Kades
mkades@ntrial.com
Jeff Dan Herrera
jherrera@ntrial.com
Nachawati Law Group
5489 Blair Rd.
Dallas, TX 75231
Tel: (214) 890-0711

*Counsel for the City of Providence*