**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| IN RE: FIRE APPARATUS ANTITRUST LITIGATION | Case No. 26-MD-3179 |
| THIS DOCUMENT RELATES TO:<br>*City of Providence v. Oshkosh Corp., et al.*,<br>Case No. 2:26-cv-01198-WCG | |

**PLAINTIFF CITY OF PROVIDENCE'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**
**CITY OF LEOMINSTER AND CITY OF PROVIDENCE**

## TABLE OF CONTENTS

INTRODUCTION .... 1

ARGUMENT .... 1

I. Providence Plausibly Alleges that Defendants' Information Exchange Unreasonably Restrains Competition .... 1

A. Section 1 Reaches Information Exchanges That Unreasonably Restrain Competition. .... 2

B. Defendants Ignore that Information Sharing is Concerted Action for the Purposes of the Sherman Act .... 3

C. Defendants' Information Exchange Harms Competition. .... 5

1. The Market Structure is Conducive to Information Sharing Suppressing Competition .... 5

2. The Nature of the Information Exchange Plausibly Suppresses Competition. .... 8

D. Providence Alleges Anticompetitive Effects .... 10

II. Providence Properly Alleges That the Acquisitions of BME and Maxi-Métal Violate Section 7 of the Clayton Act .... 11

A. Providence's Claims Are Timely .... 11

B. Providence's Markets Are Plausible .... 12

C. Providence Plausibly Alleges That Both Acquisitions May Substantially Lessen Competition .... 14

III. Pierce's Agreements With Its Dealers Are Illegal Exclusive Dealing. .... 15

A. Pierce Replacement Parts Market Is an Antitrust Market .... 16

B. Exclusive Dealing is Different than Lock-In .... 16

C. The Complaint Suffices Even Under Defendants' Aftermarket Framework .... 17

D. Foreclosing the Dealer Channel is Substantial Foreclosure .... 18

IV. Defendants Were Unjustly Enriched Under Rhode Island Common Law .... 20

CONCLUSION .... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ....................13

*Audo Car Stereo, Inc. v. Little Guys, Inc.*,
No. 04 C 3562, 2004 WL 3019298 (N.D. Ill. Dec. 28, 2004) ....................13

*In re Broiler Chicken Antitrust Litig.*,
No. 16 C 8637, 2023 WL 4303476 (N.D. Ill. June 30, 2023) ....................3, 9

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)....................3, 4

*Casino Queen Marquette, Inc. v. Sci. Games Corp.*,
No. 21-CV-01798, 2022 WL 1591578 (N.D. Ill. May 19, 2022)....................11

*Choh v. Brown Univ.*,
753 F. Supp. 3d 117 (D. Conn. 2024), *aff'd*, No. 24-2826, 2026 WL 905018
(2d Cir. Apr. 2, 2026)....................13

*Cleary v. Philip Morris, Inc.*,
656 F.3d 511 (7th Cir. 2011) ....................20

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
715 F.2d 1115 (6th Cir. 1983) ....................4

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) ....................13

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) ....................19

*Dellagrotta v. Dellagrotta*,
873 A.2d 101 (R.I. 2005)....................20

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
8 F.3d 1217 (7th Cir. 1993) ....................2

*In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*,
2013 U.S. Dist. LEXIS 29865 (D.N.J. Mar. 5, 2013)....................19

*E.I. DuPont de Nemours & Co. v. Kolon Indus.*,
637 F.3d 435 (4th Cir. 2011) ....................19

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992)....................16, 17, 18

*Fourqurean v. Nat'l Collegiate Athletic Ass'n*,
143 F.4th 859 (7th Cir. 2025) ....................12

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
151 F.4th 922 (7th Cir. 2025) ....................16, 17

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)....................19

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)....................19

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ....................5

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)....................4

*In re Musical Instruments and Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ....................5

*In re Novartis & Par Antitrust Litig.*,
No. 18 Civ. 4361 (AKH), 2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019)....................20

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....................10, 11

*Olean Wholesale Grocery Coop., Inc. v. Agri Stat., Inc.*,
No. 19 C 8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ....................3, 4, 9

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) ....................13

*In re Pork Antitrust Litig.*,
781 F. Supp. 3d 758 (D. Minn. 2025)....................4, 8, 9, 10

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....................17

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
899 F.2d 951 (10th Cir. 1990) ....................6

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ....................14

*Rozema v. Marshfield Clinic*,
977 F. Supp. 1362 (W.D. Wis. 1997) ....................14

*Sidney Hillman Ctr. of Rochester v. Abbott Lab'ys, Inc.*,
782 F.3d 922 (7th Cir. 2015) ....................11

*Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*,
2026 U.S. App. LEXIS 24440 (9th Cir. Aug. 13, 2026) ....................17

*Tex. Spec. Physicians v. F.T.C.*,
528 F.3d 346 (5th Cir. 2008) ....................9

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001).................... *passim*

*U.S. v. Container Corp. of Am.*,
393 U.S. 333 (1969)....................2, 4, 6, 9

*U.S. v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)....................3

*United States v. Am. Linseed Oil Co.*,
262 U.S. 371 (1923)....................9

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005)....................18

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ....................11, 12

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
669 F. Supp. 2d 895 (N.D. Ill. 2009) ....................12

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
372 F.3d 899 (7th Cir. 2004) ....................12

*Xerox v. Media Scis. Int'l Inc.*,
511 F. Supp. 2d 372 (S.D.N.Y. 2007)....................19

**Statutes**

15 U.S.C. § 14....................15

15 U.S.C. § 18....................11, 15

R.I. Gen. Laws § 6-36-2(b)....................20

R.I. Gen. Laws § 6-36-25....................20

Rhode Island Antitrust Act ....................................................................................................20

15 U.S.C. § 1 ............................................................................................................2, 3, 4

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................................11, 14

## INTRODUCTION[1]

"We have trucks that are literally older than the firefighters driving them," said Derek Silva, then-Providence Firefighters Union president, now-Providence Fire Chief. Danielle Kennedy, *Providence Finance Committee meets to discuss city's aging fire trucks*, NBC 10 News (Feb. 25, 2020, 11:16 PM), https://tinyurl.com/3x8fef4u. There is no mystery why Providence is paying more for trucks and waiting longer to receive them. It is a series of anticompetitive events. Before Providence's most recent fire truck purchases in 2024, Oshkosh acquired two competitors in an already-concentrated industry. REV and Oshkosh, via their subsidiaries, and Rosenbauer participate in an illegal information-sharing exchange that further suppresses competition. And Oshkosh's exclusive dealing agreements protect Oshkosh from having to compete on replacement parts. Combined these acts increase the price to replace fire trucks, delivery times to receive them, and the cost of maintaining their increasingly aging fleet.

## ARGUMENT[2]

### I. Providence Plausibly Alleges that Defendants' Information Exchange Unreasonably Restrains Competition

The three Manufacturer Defendants, directly or through wholly owned subsidiaries, account for 70 to 80 percent of fire truck sales in the United States, whether the market is measured as all fire trucks or as the narrower markets for custom fire trucks, custom aerials, and custom pumpers. Compl. ¶¶ 7, 168–169.[3] They belong to the industry's trade association, the Fire

---

[1] Providence incorporates by reference the legal arguments raised by the Non-Class Action Plaintiffs in their Opposition to Defendants' Joint Motion to Dismiss Non-Class Action Plaintiffs' Complaints ("NCAP Opp.")

[2] Providence incorporates its description of the relevant legal standard in its Memorandum of Law in Opposition to Defendants' Individual Motions to Dismiss.

[3] Dkt. # 1 in Case No. 2:26-cv-01198. To avoid confusion, subsequent citations to Providence's complaint are to this docket entry. Because of the need to distinguish between Defendants' motions to dismiss, Providence's complaint, and the Class Plaintiffs' complaint, those docket citations are to Case No. 2:26-md-03179.

Apparatus Manufacturers' Association ("FAMA"). *Id.* ¶¶ 45–46, 87. A committee within FAMA that "collects confidential information from manufacturer competitors and provides quarterly statistical reports to the manufacturers on what their supposed competitors are doing." *Id.* ¶ 10. Manufacturers enter "order and delivery statistics" into FAMA's data portal, *id.* ¶ 89, and FAMA presents members with "original equipment manufacturer market share, market trends, industry backlogs, and sales forecasting." *Id.* ¶ 98. Defendants exchanged "competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies." *Id*. ¶ 230.

FAMA's "member entities agree to share their competitively sensitive, nonpublic information with the knowledge and expectation that their direct competitors will do the same for the collective benefit of all member entities." *Id.* ¶ 93-94. "The FAMA committee guarantees access to the reports only if manufacturers contribute their own competitively sensitive information." *Id*. ¶ 11. FAMA members, however, do not share the data with fire-truck buyers or the public. *Id*. ¶ 92. Members discuss these reports at their semiannual meetings, which, according to a former FAMA president and former REV executive, "give[] you unprecedented access to your peers." *Id*. ¶¶ 100-102. The Complaint alleges that this exchange suppresses competition, raises prices, delays delivery, and reduces output. *Id*. ¶¶ 229, 231.

### A. Section 1 Reaches Information Exchanges That Unreasonably Restrain Competition

An information exchange among competitors, whether direct or through a third party, can violate Section 1 of the Sherman Act. *U.S. v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) (Inferring that "the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition."); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).

Section 1 requires a contract, combination, or conspiracy that unreasonably restrains trade and causes injury. *Denny's Marina, Inc. v. Renfro Prods., Inc.,* 8 F.3d 1217, 1220 (7th Cir. 1993).

An information exchange can be a facilitating practice that supports an inference of price-fixing, but "[t]here is a closely related but analytically distinct type of claim [from a per se violation], also based on § 1 of the Sherman Act, where the violation lies in the information exchange itself." *Todd*, 275 F.3d at 198. Courts in this Circuit recognize such claims. *See Olean Wholesale Grocery Coop., Inc. v. Agri Stat., Inc.*, No. 19 C 8318, 2020 WL 6134982, at *5-6 (N.D. Ill. Oct. 19, 2020); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 4303476, at *2 (N.D. Ill. June 30, 2023) (analyzing claim under rule of reason before granting summary judgment). For such a claim, sharing the information itself is the question. *See Todd*, 275 F.3d at 198.

The question is whether the agreement to share information unreasonably restrains trade. *See Todd*, 275 F.3d at 198. "[E]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act." *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). Courts weigh several factors, "including most prominently the structure of the industry involved and the nature of the information exchanged." *Id*.

Providence alleges each element: an agreement to exchange information, an industry structure and type of information that make the exchange likely to suppress competition, and actual effects on price and output.

### B. Defendants Ignore that Information Sharing is Concerted Action for the Purposes of the Sherman Act

Defendants imply that information sharing is not an agreement under Section 1: "Pleading an agreement is essential whenever a plaintiff alleges that competitors violated Section 1, including when the violation involves exchanging information." Dkt. No. 153 at 23-24. Their cited authority undermines their argument. *Burtch* explained that "the dissemination of price information is not itself a *per se* violation of the Sherman Act." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223

(3d Cir. 2011). It distinguished *Container Corp.* because there "the exchange of price information had the effect of stabilizing prices at a downward level . . . and, contrary to Appellant's position here, the defendants had an 'agreement.'" *Id.* at 224. Defendants' parenthetical for *Cont'l Cablevision* reads: "'the exchange of price data' does 'not offend § 1' in 'the absence of . . . an actual agreement to restrain competition.'" Dkt. No. 153 at 24. But the ellipsis omits the critical language: "Accordingly, in the absence of **a purpose or effect to restrain competition**, or some other evidence of an actual agreement to restrain competition, we hold that the exchange of price data does not offend § 1 of the Sherman Act." *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) (emphasis added).

Providence alleges exactly that agreement, and it is explicit. FAMA conditions access to its reports on each manufacturer's contributing its own data, Compl. ¶¶ 11, 93–95, and members share their data expecting their rivals to do the same. *Id.* ¶ 94. Each manufacturer gives its data because its rivals give theirs. That reciprocal commitment is "a conscious commitment to a common scheme." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). It is also the horizontal "rim" that Defendants say is missing. *See* Dkt. No. 153 at 24.

The manufacturers also knew who else was participating. Each Manufacturer Defendant or its subsidiaries are FAMA members, their executives serve on the Data & Research Committee that runs the exchange, and their representatives attend the members-only meetings where the data are presented and discussed. Compl. ¶¶ 46–47, 88, 96–99, 103. Courts have found an agreement on similar facts. *See In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 857 (D. Minn. 2025) (finding an agreement where defendants "subscribed to and shared confidential information with Agri Stats . . . , that Agri Stats took that information and formulated reports that were shared with competitors, and that Defendants knew which competitors were participating in each of the reports"); *Olean*,

2020 WL 6134982, at *6 (sustaining hub-and-spoke information-exchange claim where defendants agreed to "regularly exchange detailed, timely, competitively sensitive and non-public information about their operations" and "knew of each other's participation in the information exchange").

Defendants' remaining cases do not address information exchange; they address whether a court can infer an implicit agreement. In *In re Musical Instruments and Equip. Antitrust Litig.*, plaintiffs tried to allege an agreement among manufacturers to adopt minimum-advertised-price policies. 798 F.3d 1186, 1186 (9th Cir. 2015). The plaintiffs, however, alleged no direct evidence of such an agreement. Similarly, in *Marion Healthcare*, the plaintiffs alleged that distributors of medical devices were part of a conspiracy to inflate prices. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). Again, plaintiffs alleged no direct evidence of an agreement; nothing showed that the distributors "played any role in setting anticompetitive pricing or that there was any *quid pro quo* . . . conspiracy." *Id.* at 843.

**C. Defendants' Information Exchange Harms Competition.**

Under Todd, whether an information exchange harms competition depends on the structure of the market and the nature of the information exchanged. 275 F.3d at 207–08, 211. Defendants misapply each factor and ignore what the information is and how it can be used.

**1.** The Market Structure is Conducive to Information Sharing Suppressing Competition

The structural factors (concentration, fungibility, and elasticity) show whether the market is susceptible to coordination. *Id.* at 208. Defendants' primary market-structure argument is market definition, which Providence addresses in Sec. II.B. On concentration, they argue only that fifty smaller manufacturers share the remaining 60 percent of the market. Dkt. No. 159 at 5; Dkt. No. 153 at 21, 32. Market shares, not the number of competitors, determines concentration. *See Todd*, 275 F.3d at 208-09. "The Supreme Court has found that data exchange can be unlawful despite a

relatively large number of sellers." *Id.* at 208. In *Container Corp.*, the six largest defendants controlled 60 percent of the market, and all 18 defendants together accounted for about 90 percent of shipments. 393 U.S. at 336, 342 (Marshall, J., dissenting). Here, just three manufacturers account for 70 to 80 percent of the market. Compl. ¶¶ 7, 169**.** These are not bare conclusions: the Complaint pleads each manufacturer's annual U.S. sales in dollars, with sources. *Id.* ¶¶ 35, 41, 44, 169. Under the DOJ's and FTC's measure of concentration, the Herfindahl–Hirschman Index, the market is highly concentrated. U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.1 (2023).[4] Entry barriers are high. Compl. ¶¶ 173-174 (engineering expertise, supply chains, facilities, capacity, labor force, developing a customer base taking years, and capital requirements). Despite more than doubling prices and increased margins, defendants did not lose market share. *Id.* ¶ 162; *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) ("[S]ubstantial market power can persist only if there are significant and continuing barriers to entry.") (*quoting* Areeda & Turner, *Antitrust Law,* ¶ 505)).

Fungibility matters because it makes it "easier to determine and monitor a consensus on some competitive variable. *Todd*, 275 F.3d at 209. A product made to a buyer's specifications can be fungible. In *Container Corp.*, the Supreme Court explained that although containers "vary as to dimensions, weight, color, and so on, they are substantially identical, no matter who produces them, when made to particular specifications." 393 U.S. at 336. The Court therefore held that "[t]he product is fungible, and the competition for sales is price." *Id.* at 337. The same is true of fire trucks. Although fire trucks are customized, buyers rely on NFPA and NWCG standards to set

---

[4] HHI equals the sum of the squared market shares of the firms. Providence alleges that REV controls 33% of the market, Oshkosh has 25%, and Rosenbauer has 10%. The HHI for just the three firms is $(33)^2 + (25)^2 + (10)^2 = 1814$, which exceeds the 2023 Merger Guidelines' threshold of 1,800 for a highly concentrated market. That estimate is a floor because the complaint alleges the market shares are at least that high. Compl. at ¶¶ 35, 41, 44.

common core specifications. Compl. ¶¶ 148-156. Once a fire department writes its specification, every compliant bid offers the same truck, and bidders compete on price. *See id*. ¶¶ 126, 201-202. Defendants' contrary argument compares different types of trucks, such as pumpers and wildland trucks. That is a market-definition objection, not a fungibility one.

Nor must the trucks themselves be fungible for competitors to coordinate. Firms can coordinate on output, backlogs, and contract terms that are common to every configuration. Members provide FAMA with "order and delivery statistics," Compl. ¶ 89, and FAMA presents members with "industry backlogs," "market share," and "sales forecasting." *Id.* ¶ 98. Defendants impose the same "floating" price clauses, a contract term identical whatever the truck. *Id.* ¶¶ 128–29. That standardization allows manufacturers to monitor a common competitive variable.

Elasticity of demand asks "whether it is economically feasible for buyers to abstain from purchasing the product for some period of time." *Todd*, 275 F.3d at 211. Defendants confuse elasticity with anticompetitive effect. Deferring purchases in response to inflated prices is the reduced output the antitrust laws forbid, not evidence that the market is elastic. Compl. ¶¶ 197. The question is whether, at competitive prices, buyers could hold off long enough to defeat coordination. Providence alleges they could not. *Id.* ¶ 145. Fire trucks must be replaced: the NFPA recommends moving trucks to reserve after 15 years and retiring them after 20 to 25, and aging trucks break down more often and cost more to maintain. *Id.* ¶ 196. Deferral only postpones the purchase, and the buyer pays the inflated price when it returns. Providence now keeps trucks from the early 1990s in reserve, and bought the same Pierce pumper in 2021 and 2024 at prices that rose more than 60 percent. *Id.* ¶¶ 196, 201–202. Defendants know this. REV's CEO told investors he did not expect cancellations because once a city sets aside the money, it is earmarked. *Id.* ¶ 122.

**2.** The Nature of the Information Exchange Plausibly Suppresses Competition

Defendants ignore Providence's allegations that the information sharing here suppressed competition, increased prices, lengthened delivery times, and reduced output. *See* Compl. ¶¶ 87, 105–123 (orders outpaced deliveries; backlogs grew and lead times stretched to four years or more while Defendants held capacity flat and closed plants), *Id.* ¶¶ 124–129 (prices roughly doubled; floating price clauses), *Id.* ¶¶ 131–138, 162 (margins more than doubled with no loss of market share). They do not argue that, as a matter of law, information of this kind cannot suppress competition, and they cite no case so holding. The question is what information is shared and how it can be used. *See In re Pork*, 781 F. Supp. 3d at 870–71.

Defendants call FAMA's data backward looking. Dkt. No. 153 at 29-30. It is not. Even past order and delivery data reveal the industry backlog, and in an industry with multi-year lead times, the backlog is future output. Compl. ¶¶ 110. Defendants say as much. REV tells investors that its backlog "enables strong visibility into future net sales" and lets it "plan and predict . . . sales and production activity." *Id.* ¶ 123.

Defendants argue that the information is not competitively sensitive. Dkt. No. 153 at 29-30. But members contribute data on their own "past transactions or activities," Compl. ¶ 89, and FAMA may deny reports to anyone who will not agree in advance to keep the results confidential. *Id.* ¶ 93. That FAMA keeps the reports from the public and from buyers, *id.* ¶¶ 91–92, supports the inference that the information is competitively sensitive. *See In re Pork*, 781 F. Supp. 3d at 869-70. And FAMA itself calls the reports "[a]mong the most powerful benefits of FAMA membership" and says members find them "invaluable for their internal business purposes." Compl. ¶ 90. Defendants' contrary description comes from FAMA's own website, which they offer for the truth of its claims that the data are anonymized and limited to past transactions. Dkt. No. 153 at 29-30.

At this stage, a defendant's description of its own conduct cannot override the reasonable inferences the Complaint supports. *See* Compl. ¶¶ 87-104, 176, 229.

Defendants imply that aggregated, anonymized data cannot trigger antitrust liability, reading *Container Corp.* to hold that statistical reports of averages that do not identify the parties to specific transactions are lawful. Dkt. No. 153 at 29-30; Dkt. No. 159 at 6. The passage they quote simply describes the information-exchange cases the Court had decided. The Court made no judgment, let alone a categorical one, about aggregated and anonymous reports. *See* 393 U.S. at 334–35.

What matters is what the data is and how it is used, not its form. *Todd* sustained an allegation of illegal wage-sharing where the data was anonymous and aggregated. 275 F.3d at 212-13; *see also Olean*, 2020 WL 6134982, at *[6]. In *In re Pork*, the court rejected at summary judgment the argument that anonymized and aggregated data are benign:

> Regardless of whether the data was aggregated or disaggregated, information exchanges that provide only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors. There is no requirement that the reports contain individual competitor price or production information to generate anticompetitive effects. Rather, the legality of information exchanges that report only aggregated data depends on whether the information exchange tends to suppress competition, not on the format of the reported data.

*In re Pork*, 781 F. Supp. 3d at 870–71 (citing *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 390 (1923); *Container Corp.*, 393 U.S. at 337; *Todd*, 275 F.3d at 212, and *N. Tex. Spec. Physicians v. F.T.C.*, 528 F.3d 346, 363 (5th Cir. 2008)).[5] In a highly concentrated market, competitors may be able to deanonymize the data. *Todd*, 275 F.3d at 211-214. Because three firms control 70 to 80

[5] *But see In re Broiler Chicken*, 2023 WL 4303476, at *26-27 (granting summary judgment on rule-of-reason information-exchange claim involving the same data intermediary, Agri Stats). *In re Broiler Chicken* was decided on a full evidentiary record, not on the pleadings, and the Pork court declined to follow it. *In re Pork*, 781 F. Supp. 3d at 782 n.3.

percent of sales, Compl. ¶ 7, each may be able to subtract its own figures from an industry total and estimate the results for each of its main rivals. Whether they can, or did, is a question of fact.

Even without deanonymizing the data, FAMA members can use the reports to suppress competition in several familiar ways. First, by Defendants' own account, the reports include average sale prices, Dkt. No. 153 at 29-30; *see* Compl. ¶ 11, which can serve as a focal point for pricing and a benchmark for the floating-price surcharges Defendants imposed. Compl. ¶¶ 128–129. Second, market-share data, *id.* ¶ 98, let each firm detect whether a rival is gaining business by cutting price or adding capacity, which removes the incentive to do either. Third, backlog and order data reveal the industry's production commitments, *id.* ¶¶ 98, 123, so no firm need fear that a rival will expand into the surge in demand. Fourth, sales forecasts and member outlook surveys, *id.* ¶ 98, let firms signal their expectations to one another. Which of these mechanisms operated, and how Defendants used the data, are questions of fact for discovery. At this stage, Providence need only plausibly allege that the exchange tends to suppress competition, and it has. *See In re Pork*, 781 F. Supp. 3d at 870–71; *Todd*, 275 F.3d at 211–13. The data are also recent. The latest quarter in each report is less than three months old, Compl. ¶¶ 10, and the Department of Justice "has suggested that data less than three months old is current." *In re Pork*, 781 F. Supp. 3d at 869.

**D. Providence Alleges Anticompetitive Effects**

Anticompetitive effects can be shown through direct or indirect evidence. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("*Amex*"). Direct evidence includes "reduced output, increased prices, or decreased quality in the relevant market." *Id.* Providence alleges higher prices, restricted output, and multi-year delivery delays. Compl. ¶¶ 110–129. And the Complaint ties those effects to the exchange: the data FAMA circulates let the manufacturers coordinate on price and output in the ways described in Sec. I.C.2. Defendants may attribute the higher prices and longer waits to

consolidation or demand, but competing explanations raise questions of fact, not grounds for dismissal.

Providence also alleges indirect evidence. "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542. Defendants' market power is set forth in Sec. I.C.1, which, combined with the evidence just discussed, also provides indirect evidence of the exchange's anticompetitive effects.

The Court should deny the motion to dismiss the information-exchange claim.

## II. Providence Properly Alleges That the Acquisitions of BME and Maxi-Métal Violate Section 7 of the Clayton Act

Providence adopts the NCAPs' Section 7 arguments. After REV's serial roll-up, Oshkosh "staked out its own acquisitions." Compl. ¶ 61. Through Pierce, Oshkosh acquired an ownership interest in Boise Mobile Equipment ("BME") in September 2021. *Id.* ¶ 62. Less than a year later, in June 2022, it acquired Maxi-Métal, a Quebec manufacturer. *Id.* ¶¶ 63, 224.

### A. Providence's Claims Are Timely[6]

Defendants do not contest that the Maxi-Métal claim is timely. They contend, however, that the BME claim is untimely because that acquisition closed more than four years before Providence sued. Dkt. No. 153 at 32. Timeliness is "an affirmative defense and thus normally (and here) is not properly resolved at the Rule 12(b)(6) stage." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022). "[I]t is well-established that a plaintiff generally does not need to 'anticipate and overcome' affirmative defenses at the pleading stage." *Casino Queen Marquette, Inc. v. Sci. Games Corp.*, No. 21-CV-01798, 2022 WL 1591578, at *4 (N.D. Ill. May 19, 2022) (citing *Sidney Hillman Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015)).

[6] Providence incorporates NCAPs' argument regarding the inapplicability of Defendants' laches defense. *See* NCAP Opp. 10-11.

The Seventh Circuit "applie[s] a demanding standard to dismissals on timeliness grounds at the pleading stage of antitrust cases, asking whether 'the plaintiff pleads itself out of court.'" *Vasquez*, 40 F.4th at 588 (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004)).

Providence challenges the acquisitions "individually or as a series." Compl. ¶ 225. A claim that the two acquisitions together lessened competition could not accrue before the second closed in June 2022, within four years of this suit, even under Defendants' accrual rule. *Id.* ¶ 224; *see* NCAP Opp. Sec. III.A. Defendants' accrual rule is also wrong. A purchaser's claim accrues each time it pays an overcharge, not when the acquisition closes. NCAP Opp. at 3-8. Providence's 2024 order falls well within four years of this suit. Compl. ¶ 202. And under the discovery rule, the limitations period does not run until the plaintiff discovers its injury and its cause. NCAP Opp. at 8-11. Providence alleges that, before press coverage in 2025, a reasonable buyer would have had no reason to question whether fire truck prices were legitimate. Compl. ¶ 177. Finally, Providence adopts the NCAPs' argument that class-action tolling independently preserves the claim. NCAP Opp. at 9. n.9.

**B. Providence's Markets Are Plausible**

Providence's markets apply to both its Section 7 and Section 1 claims. Market definition is "a deeply fact-intensive inquiry," so "courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market." *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 870 (7th Cir. 2025) (quoting *Todd*, 275 F.3d at 199–200). As the Seventh Circuit explains, "questions of whether the defendant possessed the requisite market power frequently are best addressed on a motion for summary judgment or at trial." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.,* 669 F. Supp. 2d 895, 901–02 (N.D. Ill. 2009). "Courts should dismiss antitrust claims based

on a market argument only when it is certain that 'the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way.'" *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070-71 (N.D. Ill. 2016) (quoting *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)).

First, Providence alleges direct evidence of anticompetitive effects: prices that roughly doubled, multi-year delays, and restricted output. That evidence makes elaborate market analysis unnecessary. Compl. ¶¶ 110–129, 162–166; see NCAP Opp. Sec. II. Second, the practical indicia support a fire truck market. "Fire trucks serve the specific need of carrying personnel, water, firefighting and safety equipment, and, in some instances, ladders and other aerial access equipment to the location of any emergency call." Compl. ¶ 147. NFPA and NWCG standards classify every fire truck into seven types. *Id.* ¶¶ 148–155. Manufacturers, such as REV, build multiple types of fire trucks on shared platforms and sell them through the same dealers and purchasing contracts to the same fire departments. *Id.* ¶¶ 34, 39–40, 43, 205. Fire departments need to have different types of fire trucks. In Providence, a complicated call involving a structure fire requires at least three engines and two ladder companies. *Id.* ¶ 29. Those shared conditions justify analyzing the types together even though one type does not substitute for another. *See* NCAP Opp. Sec. II.

Defendants' cases do not support their argument. Several cases involved plaintiffs who never identified the contours of *any* market. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 345-46 (7th Cir. 2012); *Choh v. Brown Univ*., 753 F. Supp. 3d 117, 133 (D. Conn. 2024), *aff'd*, No. 24-2826, 2026 WL 905018 (2d Cir. Apr. 2, 2026); *Audo Car Stereo, Inc. v. Little Guys, Inc.*, No. 04 C 3562, 2004 WL 3019298, at *7 (N.D. Ill. Dec. 28, 2004). Providence pleads two defined,

nested markets. *Rozema*, the source of Defendants' "purchased as a group" test, was decided on summary judgment. *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1379 (W.D. Wis. 1997). And *Reilly v. Apple Inc*. requires facts showing why products are, or are not, substitutes. 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022). Providence pleads those facts . Compl. ¶¶ 142-145.

Third, the market may be as narrow as custom fire trucks, a submarket of the kind Brown Shoe recognized. Contrary to defendants' argument, Providence pleads more than buyer preferences. Dkt. No. 159 at 7. Defendants recognize custom trucks as a distinct product, and Pierce's vice president of sales told the Senate that most customers "continue to request customized, build-to-order fire trucks" even though stock trucks cost less and are available immediately. Compl. ¶¶ 141–143. Buyers did not switch to stock trucks even as custom prices and delivery times rose dramatically, which satisfies the hypothetical monopolist test. *Id.* ¶¶ 124–125, 145.

Defendants raise factual disputes: whether, for instance, fire trucks designed to fight wildfires and fire trucks designed to fight urban fires belong in one market for vehicles designed to fight fires, as defined by industry standards. That factual dispute cannot be resolved on a Rule 12(b)(6) motion. *See Todd*, 275 F.3d at 199–200. Defendants' market-definition arguments therefore fail as to both the Section 1 and Section 7 claims.

### C. Providence Plausibly Alleges That Both Acquisitions May Substantially Lessen Competition

Providence alleges that Oshkosh acquired two actual competitors in a highly concentrated market, that the acquisitions eliminated or reduced both existing and future competition, and that prices and delivery times then rose. At this stage, those allegations are sufficient. Three firms control 70 to 80 percent of the broader market and likely similar shares in the custom market. Compl. ¶¶ 7, 169. BME was a competitor. *See id.* at ¶ 62. So was Maxi-Métal. *Id.* ¶ 9, 64. It built

pumpers and tankers for the U.S. market. *Id.* ¶ 64. Although it sold them through Pierce's dealers, the two companies "were still free to engage in price competition to obtain contracts with municipalities." *Id.* Maxi-Métal trucks were available to Providence through the HGAC contract. *Id.* ¶ 205. It was also "poised to expand its presence in the United States market." *Id.* ¶ 9. The acquisition "deprived the market of an additional competitor." *Id.* ¶ 64. And prices rose and deliveries slowed. Providence paid $449,159 apiece for pumpers in 2021 and agreed to pay $734,320 apiece for almost identical pumpers in 2024, which are not scheduled for delivery until August 2027. *Id.* ¶¶ 162, 201–202.

Defendants do not dispute that these allegations, if true, describe an actual substantial lessening of competition, which is more than Section 7 requires. Defendants dispute the facts. Dkt. No. 159 at 7. None of their authorities requires a complaint to plead the change in concentration from each acquisition, the impact of the partial acquisition on BME, or the probability that Maxi-Métal would have expanded. See NCAP Opp. Sec. III.C. These are evidentiary questions, not legal ones. Because each acquisition removed a competitor, each states a claim on its own, so defendants' transaction-specific argument changes nothing. In any event, Maxi-Métal had already entered the U.S. market. Compl. ¶ 64. And defendants call the BME deal procompetitive because it let Pierce expand on the West Coast, Dkt. No. 159 at 9, but that was "a market already served by BME." Compl. ¶ 62. Pierce bought into a rival's territory instead of entering a new one.

## III. Pierce's Agreements With Its Dealers Are Illegal Exclusive Dealing.

Providence alleges that Oshkosh, through Pierce, established exclusive dealing arrangements with its dealer network that violate Section 3 of the Clayton Act. This is a textbook exclusive dealing claim. Pierce dealers may not sell parts from independent manufacturers even when those parts would work. Compl. ¶ 185. Pierce has market power in the sale of replacement parts for its trucks. Id. ¶¶ 191–194, 237. Its dealers are the primary and most efficient channel to

reach municipal customers like Providence. *Id.* ¶ 192. By foreclosing competition at the dealer level, Pierce can charge higher prices to Providence. *Id.* ¶¶ 193, 237–238.

Providence adopts the NCAPs' arguments, which show that parts that fit Pierce trucks are a relevant market, that *Kodak*'s lock-in requirements do not govern an exclusive dealing claim and are satisfied in any event, and that Pierce's agreements substantially foreclose competition. NCAP Opp. Secs. V–VI. Four points bear emphasis for Providence.

### A. Pierce Replacement Parts Market Is an Antitrust Market

The relevant market is replacement parts that fit Pierce trucks, regardless of manufacturer. A department that needs a part for a Pierce truck must buy one that fits that truck. Compl. ¶¶ 182, 192; *see In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 933 (7th Cir. 2025); NCAP Opp. Sec. V. The complaint's allegations satisfy the *Brown Shoe* practical indicia. *See* NCAP Opp. Sec. V. Pierce's dealer agreements treat replacement parts for Pierce trucks as a separate line of business. Compl. ¶¶ 185, 236. Pierce sells those parts under its own brand and serial numbers, *id.* ¶ 183, and third-party manufacturers make parts designed for Pierce trucks, *id.* ¶ 184. The parts are made to replace original parts on Pierce trucks. *Id.* ¶¶ 182–183. Owners of Pierce trucks buy them through Pierce-authorized dealers and parts suppliers. *Id.* ¶ 192. When Pierce raises their prices, municipalities have "little to no recourse but to pay the higher prices." *Id.* ¶ 193. Those allegations establish industry recognition, peculiar characteristics and uses, distinct customers, specialized vendors, and insensitivity to price.

### B. Exclusive Dealing is Different than Lock-In

Defendants try to turn a straightforward exclusive dealing case into an aftermarket lock-in case. Dkt. No. 159 at 10; Non-Class Br. §§ VII.A–B. A lock-in claim alleges that the customer has no alternative to the manufacturer's parts: having bought the equipment, the customer is trapped

and exploited in the aftermarket. *See e.g. Kodak*, 504 U.S. at 462–63 (service companies needed Kodak parts because there were no alternatives). In *Harley-Davidson*, the plaintiff claimed that his warranty locked him into Harley-Davidson parts. 151 F.4th at 925–26. That is why the lock-in cases ask what the customer knew when it bought, and whether it agreed to the restraint. *See Queen City Pizza*, 124 F.3d at 440 (franchisees agreed by contract to buy approved supplies).

Exclusive dealing alleges the reverse: competing products exist, and the defendant keeps them out of the channel customers use. For example, the manufacturers that make Pierce's white-label parts also make their own branded parts that fit Pierce trucks. Compl. ¶¶ 183–184. Pierce's dealers, however, may not sell them. *Id.* ¶ 185. The restraint binds Pierce's dealers, not the Providence; the the City's knowledge is irrelevant. In contrast, the complaint *Harley-Davidson* identified a "vast" and "robust" aftermarket. 151 F.4th at 935. Here, compatible parts cannot reach Pierce owners because the dealers will not sell them. Compl. ¶¶ 185, 192.

**C. The Complaint Suffices Even Under Defendants' Aftermarket Framework**

Even under the lock-in framework, the City's allegations would satisfy it. The *Kodak* lock-in framework exists for one situation: a "competitive foremarket" that might discipline a single-brand aftermarket. *Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, 2026 U.S. App. LEXIS 24440, at *35 (9th Cir. Aug. 13, 2026); *see* NCAP Opp. Sec. V.A & n.62. The fire truck market is not competitive. Three firms control 70 to 80 percent of the fire truck market, acquisitions have consolidated it, and its members exchange competitively sensitive data. Compl. ¶¶ 7, 54–82, 88–96. Prices have soared and deliveries have slowed without correction. *Id.* ¶¶ 105–114, 131–139. If competition in the foremarket has not disciplined the foremarket, it will not discipline the market for repair parts.

The exclusive dealing agreement, not the warranty, is the issue. Fire trucks stay on the front line for 15 years and in service for 20 to 25, and Providence keeps trucks from the early 1990s in reserve. *Id.* ¶ 196. A warranty cannot explain how Pierce controls the parts market for a truck in its second decade.

Defendants' lock-in argument also assumes that when Providence bought its Pierce trucks, it could have foreseen the market in which it now buys parts. Nothing in the complaint supports that assumption – an assumption that is improper on a motion to dismiss. Over a fire truck's 20- to 25-year service life, *id.*, acquisitions consolidated the fire truck market into three firms, *id.* ¶¶ 7, 54–82; Pierce's dealers consolidated their territories, *id.* ¶¶ 66–72; and prices rose sharply, *id.* ¶¶ 124–129. A buyer pricing a truck's lifetime costs at purchase could not have accounted for those changes. *See Kodak*, 504 U.S. at 473–75; NCAP Opp. Sec. V.B. Defendants also assume that a municipality engages in lifecycle pricing, when budgeting rules may prevent it. *See Kodak*, 504 U.S. at 475.

**D. Foreclosing the Dealer Channel is Substantial Foreclosure**

Foreclosing a rival from the most efficient channel of distribution substantially forecloses competition, even when other channels exist. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191–96 (3d Cir. 2005) (reversing judgment for defendant after trial). Pierce dealers are the dominant distribution channel for Pierce Replacement Parts. Compl. ¶ 192. Because Pierce assigns territory exclusivity to its dealerships, which also act as service centers, Pierce truck purchasers develop an ongoing relationship with a single dealer for both purchasing and repairs. *Id.* ¶ 66. The exclusive agreements foreclose the Dealer distribution channel from anyone seeking to compete with Pierce's branded or white-label authorized parts. *Id.* ¶ ¶ 185, 92.

Defendants reaming arguments are factual disputes. Courts do not require plaintiffs to plead a specific percentage of foreclosure. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 237 (S.D.N.Y. 2019); *see, e.g.*, *Xerox v. Media Scis. Int'l Inc.*, 511 F. Supp. 2d 372, 390 (S.D.N.Y. 2007) (plaintiff's allegations that it was "exclud[ed] from much of the market" sufficient); *E.I. DuPont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("While [Plaintiff] did not allege a specific percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim, with its extensive factual allegations, solely on the basis at the pre-discovery, motion-to-dismiss stage, when [Plaintiff] likely has insufficient information to calculate a precise number."); *LePage's Inc. v. 3M*, 324 F.3d 141, 158-59 (3d Cir. 2003).

At this stage, the question is whether "allegations raise a reasonable inference that . . . Defendants' exclusive-dealing provisions . . . could foreclose a substantial portion of the . . . market and reduce output." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 958 (N.D. Ill. 2018); *see In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, 2013 U.S. Dist. LEXIS 29865, at *40 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.").

Defendants' reliance on White-label parts is a question of fact. White-label parts are made for Pierce and sold by Pierce. Compl. ¶ 183. Whether their manufacturers compete with Pierce as an independent manufacturer would cannot be resolved on the pleadings. Neither can the duration of the agreements, the share foreclosed, or the availability of other channels. *See* NCAP Opp. Sec. VI. Providence pleads that the agreements foreclose competition and increase prices, which is more than sufficient at this stage of litigation.

Providence's complaint adequately pleads its federal antitrust claims and therefore pleads its state claims. *See* R.I. Gen. Laws § 6-36-2(b).

## IV. Defendants Were Unjustly Enriched Under Rhode Island Common Law

Defendants make no argument specific to Providence's unjust enrichment claim. They rely on their briefing against the indirect purchaser class, which applies Illinois law, Dkt. No. 165 at 14-15 (citing *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011)), and on a decision dismissing an unjust enrichment claim that "simply duplicates, or replaces, a conventional contract or tort claim," Dkt. No. 165-4 at 9 (citing *In re Novartis & Par Antitrust Litig.*, No. 18 Civ. 4361 (AKH), 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019)). Neither states Rhode Island law.

Under Rhode Island law, unjust enrichment "is not simply a remedy in contract and tort but can stand alone as a cause of action in its own right." *Dellagrotta v. Dellagrotta*, 873 A.2d 101, 113 (R.I. 2005). Its elements are "(1) That [plaintiff] conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances that it would be inequitable for the recipient to retain the benefit without paying the value thereof." *Id.* (internal quotation omitted). The Rhode Island Antitrust Act makes its remedies cumulative of other remedies at law and in equity. *See* R.I. Gen. Laws § 6-36-25.

Providence pleads each element. It bought trucks from Defendants, conferring profits on them. Compl. ¶¶ 199–203. Defendants appreciated that benefit through higher revenues and margins. *Id.* ¶¶ 16, 35, 44, 85. And retaining it would be inequitable, because Defendants obtained it through the anticompetitive acquisitions and conduct the Complaint describes, at Providence's expense. *Id.* ¶¶ 50–207. That conduct makes retention inequitable even if the Court were to dismiss the antitrust claims.

## CONCLUSION

For the foregoing reasons, City of Providence respectfully requests that Defendants' Motion be denied.

Dated: October 16, 2026

Respectfully submitted,

*/s/ Michael Kades*
Michael Kades
mkades@ntrial.com
Jeff Dan Herrera
jherrera@ntrial.com
Nachawati Law Group
5489 Blair Rd.
Dallas, TX 75231
Tel: (214) 890-0711

*Counsel for the City of Providence*